Page 1

VOLUME: I

EXHIBITS: 1-5

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

SMITH & NEPHEW, INC.,

        Plaintiff,

  v.                        C.A. No.

INTERLACE MEDICAL, INC., a wholly    11-CV-12064-RWZ

Owned business of Hologic, Inc.,

and HOLOGIC, INC.,

        Defendants.

- - - - - - - - - - - - - - - - - - x

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION of KEITH B. ISAACSON, M.D.

May 2, 2012

9:03 a.m.

Sunstein Kann Murphy & Timbers, LLP

125 Summer Street

Boston, Massachusetts


Reporter: Michael D. O'Connor, RPR

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
KEITH B. ISAACSON, M.D. - 5/2/2012

Page 22

1  done to date?
2     A. I'd say approximately ten.
3     Q. Of those ten, how many of those were
4  myomectomies and how many of those were
5  polypectomies?
6     A. 100 percent were myomectomies.
7     Q. Do you recall how big the biggest myoma was
8  of those ten?
9     A. No.
10    Q. Was there a ceiling where you can say I'm
11 fairly certain all of those myomas were less than
12 this amount in terms of their diameter?
13       MS. FLORES: Object to the form of the
14 question.
15    A. I'm fairly certain that they were all less
16 than four to five centimeters.
17    Q. Do you recall resecting any myomas with the
18 TRUCLEAR that were about three centimeters in
19 diameter?
20    A. Not specifically.
21    Q. That was a specific question, so let me see
22 if I can phrase it a little differently.
23    A. Okay.
24    Q. Do you recall whether any of the myomas

Page 23

1  were between two and four centimeters?
2     A. I don't have specific recollection on the
3  size of the myomas for these cases. The majority of
4  the cases I do, the myomas are between one and four
5  centimeters.
6     Q. Do you recall whether any of the myomas you
7  removed with the TRUCLEAR would be considered large
8  to you?
9        MS. FLORES: Object to the form of the
10 question.
11    A. I don't recall.
12    Q. So I'm going to preamble this and ask you a
13 question. I just want an understanding of the
14 distribution of these, whether you did nine of them
15 last week and the one two years ago or what.
16       So as to these -- let me start over with a
17 proper question. As to these ten TRUCLEAR
18 procedures, is their occurrence roughly equal over
19 time from the time you started performing TRUCLEAR
20 to today; were they done mostly recently or done
21 mostly a while ago? Do you understand my question?
22    A. I do. They were mostly done a while ago.
23    Q. When was the last time you performed a
24 TRUCLEAR procedure?

Page 24

1     A. I would estimate 18 months.
2     Q. What's the name of the hospital at which
3  you perform myomectomies?
4     A. Newton-Wellesley Hospital.
5     Q. Is TRUCLEAR available at Newton-Wellesley
6  for its doctor or did you have to get it through
7  some other means to perform these procedures?
8        MS. FLORES: Object to the form of the
9  question.
10    Q. Do you understand my question?
11    A. I do. Just tell me if I'm answering it
12 correctly. It was brought in by the Smith & Nephew
13 representative each time we used it. It was not
14 purchased by Newton-Wellesley Hospital.
15    Q. Were you performing the TRUCLEAR procedures
16 to see if it was a device that you wanted to bring
17 into the hospital?
18    A. Correct.
19    Q. Did you make a recommendation to the
20 hospital to bring the device in?
21       MS. FLORES: Object to the form of the
22 question.
23    A. To purchase the device or bring it in for
24 trial?

Page 25

1     Q. Well, let's back up. Did you make a
2  recommendation to the hospital to bring it in for a
3  trial?
4     A. I did.
5     Q. Did the hospital do that?
6     A. Yes.
7     Q. When did you make that recommendation?
8     A. When I was initially approached by the
9  representative from Smith & Nephew that it was
10 available.
11    Q. Were the ten TRUCLEAR procedures that we
12 discussed before performed pursuant to that trial?
13    A. That's correct.
14    Q. And after the trial, did you recommend that
15 Newton-Wellesley Hospital make the TRUCLEAR
16 available to its gynecological surgeons?
17    A. I did not.
18    Q. Did you recommend that it not do that or
19 were you simply silent on the matter?
20       MS. FLORES: Object to the form of the
21 question.
22    A. No. The way it works is it's available to
23 the other gynecologic surgeons at the hospital. I
24 can't tell you how many of them tried it, and of the

Page 26

1  ones that tried it, we would vote as a group, as a
2  department, as to whether or not we'd recommend the
3  hospital purchase it.
4      Q.  Was such a vote taken?
5      A.  It was taken.
6      Q.  When was the vote taken?
7      A.  18 to 24 months ago at the conclusion of
8  the trial period.
9      Q.  I apologize. What was your vote?
10     A.  Not to purchase it.
11     Q.  Why did you vote that way?
12     A.  For two reasons. One, I prefer to remove
13 myomas with a resectoscope. And two, I thought it
14 was too expensive to use on a routine basis.
15     Q.  Why do you refer to remove myomas with a
16 resectoscope?
17     A.  Because myomas can be of three types. They
18 are categorized as Type 0, Type 1 and Type 2. The
19 Type 0, 100 percent of the myoma is in the cavity.
20 Type 1, over 50 percent is in the cavity, but the
21 remainder is in the muscle, embedded in the muscle
22 of the uterus. And Type 2, over 50 percent is in
23 the muscle of the uterus.
24     I did not find that the Smith & Nephew

Page 27

1  device that I tried was adequate for removing the
2  portion of the myoma that was within the muscle of
3  the uterus, and therefore, there'd be an incomplete
4  resection and a higher recurrence rate. So I prefer
5  to resect the entire myoma with a loop electrode as
6  opposed to a morcellator.
7      Q.  Do you recall whether anyone voted to
8  purchase the TRUCLEAR?
9      A.  No, I don't recall.
10     Q.  You don't recall one way or the other or do
11 you recall that nobody voted to purchase the
12 TRUCLEAR?
13     A.  I don't recall one way or the other. I
14 don't know the vote.
15     Q.  Do you remember if it was unanimous?
16     A.  I don't.
17     Q.  You say it was too expensive to use on a
18 routine basis. What did you mean by that?
19     A.  We're very careful about the cost of
20 disposable items for surgeries, and if we recommend
21 the use of a disposable, it should be because
22 there's no equally effective, equally safe, less
23 expensive alternative.
24     So the disposable costs per use for the

Page 28

1  TRUCLEAR was higher than the loop electrode, and I
2  did not feel that the advantages were worth the
3  costs.
4      Q.  Is the loop electrode an equally effective,
5  equally safe alternative to removal of Type 0
6  fibroids to the TRUCLEAR?
7         MS. FLORES:  Object to the form of the
8  question.
9      A.  There are no comparative safety trials to
10 tell you that one is more safe than the other.
11     Q.  Do you have a view one way or the other?
12     A.  My view is that they should be equal.
13     Q.  Now, when you used the TRUCLEAR, you used
14 the reciprocating blade; is that right?
15     A.  That's correct.
16     Q.  Are you aware that there's a
17 non-reciprocating blade that only rotates?
18     A.  Yes.
19     Q.  Did you use that blade at all?
20     A.  I did not.
21     Q.  Do you know if any of your colleagues
22 during the trial at Newton-Wellesley used the
23 rotating blade for the TRUCLEAR?
24     A.  I'm not aware if they used it.

Page 29

1      Q.  Have you ever used a MyoSure product?
2      A.  In the laboratory.
3      Q.  Whose laboratory?
4      A.  Multiple laboratories. So I'm involved in
5  quite a few education courses, and we have hands-on
6  labs in which we demonstrate the products. So we've
7  done -- I've used the MyoSure device in the lab six
8  or seven times in the past year, year and a half.
9      Q.  What were you cutting with the MyoSure in
10 the lab, if anything?
11     A.  Typically they use chicken.
12     Q.  Boneless, skinless chicken breasts?
13     A.  Hmm-hmm.
14     Q.  Do you cut the chicken in a distended
15 chamber that has fluid in it?
16     A.  It's not distended. It's typically in a --
17 it's almost like a pan that has fluid in it.
18     Q.  The cutting is done in a fluid environment?
19     A.  Yes.
20     Q.  But it's not pressurized; is that right?
21     A.  It's not pressurized.
22     Q.  Is there suction to draw the tissue and the
23 fluid through the cutter?
24     A.  Yeah. They have a setup -- Hologic has a

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
KEITH B. ISAACSON, M.D. - 5/2/2012

Page 94

1  A. Then looking at the last one, "A cutting
2  window at the distal region of the outer tube."
3  Smith & Nephew's proposed construction, "An opening
4  to provide access to a cutting component at a distal
5  region of the outer tube." Hologic's proposed
6  construction is that "An open distal end at the
7  outer tube."
8      This is not an open distal end of the outer
9  tube. The Smith & Nephew proposed construction in
10 the devices described in the patent '359 still has a
11 cutting window at the distal end of the tube, but
12 it's not an open end of the outer tube.
13     The open end of an outer tube that I would
14 interpret is similar to what we talked about with
15 the laparoscopic Morcellex morcellator. That's an
16 open end. This is a window at the distal end of the
17 outer tube.
18     So I would disagree with, I think, all four
19 proposed constructions.
20  Q. Are you familiar with the arrangement of
21 the cutting window in the MyoSure?
22  A. Yes.
23  Q. It's on the side of the tube?
24  A. Right.

Page 95

1  Q. Would that be an open distal end of the
2  tube?
3  A. No.
4  Q. I think you said that the further outlet
5  channel was not necessary to perform the method
6  described in the '359 patent; is that what you said?
7      MS. FLORES: Object to the form.
8  Q. Do you agree or disagree that the further
9  outlet channel makes it possible to cut tissue in
10 the uterus using the method in the '359 patent?
11     MS. FLORES: Object to the form of the
12 question.
13  A. It is not essential. It is a variation of
14 the device. It's an extra feature, but it's not
15 essential to use the device.
16  Q. So you disagree that the further outlet
17 channel is what makes it possible to remove uterine
18 tissue using the method described in the '359
19 patent?
20     MS. FLORES: Object to the form of the
21 question.
22  A. That's right.
23  Q. So let's look at Page 9. Element 1(a),
24 "Inserting a distal region of an endoscope into said

Page 96

1  uterus." Do you see that?
2  A. Yes.
3  Q. How did you identify the distal region of
4  the MyoSure? Let me ask a threshold question. Did
5  you identify a distal region of the MyoSure?
6  A. Well, when you say the MyoSure, are you
7  referring to the endoscope of the MyoSure or are you
8  referring to the MyoSure cutting device?
9  Q. Well, let me --
10 A. There are two components, correct?
11 Q. Yes. But let me ask, in Paragraph 56 of
12 your report, what did you consider the distal region
13 of the MyoSure hysteroscope to be?
14 A. The distal region in the endoscope is the
15 flat edge where the lens is flush with the outer
16 tube.
17 Q. That's the full extent of the distal
18 region?
19     MS. FLORES: Object to the form.
20 A. That's the full extent of the distal region
21 of the endoscope.
22     MS. FLORES: Object to the form of the
23 question.
24 Q. Now if you look on the next page at ten,

Page 97

1  Element 1(b), "The endoscope including a valve and
2  an elongated member." Do you see that?
3  A. Hmm-hmm.
4  Q. What did you consider the elongated member
5  of the MyoSure hysteroscope to be?
6  A. The elongated member is from the distal end
7  where the lens is all the way to the proximal end,
8  and there's essentially two portions of the proximal
9  end of the elongated member.
10     One is where the eyepiece is of the
11 endoscope. And two is where the valve is -- not is
12 valve, but it's like a seal for the working channel
13 of the endoscope. They're close to being flush.
14 It's a relatively similar distance.
15 Q. Okay. Do you see in Element 1(b) it talks
16 about a "proximal region of the elongated member"?
17 A. Yes.
18 Q. Did you identify a proximal region of the
19 MyoSure hysteroscope?
20 A. Yeah. The proximal region is the region
21 closest to the surgeon.
22 Q. Is it simply the proximal half of the
23 endoscope?
24 A. You can define it however you want.

Page 102

1  67 you render an opinion that the MyoSure
2  hysteroscope would be equivalent to an endoscope
3  having the Hologic's proposed construction of being
4  at least 30 centimeters in length; is that right?
5      A.  That's correct.
6      Q.  As part of your analysis, did you undertake
7  to determine how long the MyoSure endoscope was?
8      A.  I did measure it.  I just can't tell you
9  exactly what it was.
10     Q.  You didn't relate that measurement in your
11 report; is that right?
12     A.  No, I don't see it in the report.
13     Q.  Did you look at any -- do you recall
14 looking at any technical drawings of the MyoSure
15 that had the measurement on it?
16     A.  No.  I had one MyoSure device itself and
17 just measured it.
18     Q.  And you measured it from tip to tail?
19         MS. FLORES:  Object to the form of the
20 question.
21     Q.  Is that right?
22     A.  Yes.  I measured it from the proximal end
23 to the distal end.
24     Q.  Did you measure any other parts of the

Page 103

1  endoscope?
2      MS. FLORES:  Object to the form of the
3  question.
4      A.  Be specific.  Such as what; the eyepiece?
5      Q.  Well, let's look at Figure 2 of the '359
6  patent, which I've just put in front of you as KI 2.
7  Do you see the piece of the endoscope in Figure 2 of
8  the '359 patent denoted by the letter "A"?
9      A.  Yes.
10     Q.  Is there a term in the art for that portion
11 of an endoscope?
12         MS. FLORES:  Object to the form of the
13 question.
14     A.  In this art?  I'd have to go through it and
15 look.
16     Q.  I don't mean in the patent.  I mean in the
17 field among doctors?
18         MS. FLORES:  Object to the form of the
19 question.
20     A.  Not specifically, no.
21     Q.  Would you refer to that as a working
22 length?
23         MS. FLORES:  Object to the form of the
24 question.

Page 104

1      A.  Not necessarily.  And if I could expand on
2  that.
3      Q.  Sure.
4      A.  We have scopes that are made for obese
5  women, and there are various parts of the scopes
6  that are elongated for that.  One is the, I would
7  call it, the shaft, but we sometimes need it longer
8  for the other portion of the elements for the longer
9  instruments.
10     Q.  When you said "other portion of elements,"
11 you were referring with your hand to the parts of
12 the endoscope to the left of "A"; is that right?
13     A.  That's correct.
14     Q.  So for purposes of today, can we call "A"
15 the Shaft A; will that work?
16     A.  We can call it a shaft, sure.
17     Q.  Do you know if the MyoSure has a portion
18 that can be identified as the shaft, as shown as "A"
19 in Figure 2?
20         MS. FLORES:  Object to the form of the
21 question.
22     A.  Yes, it should.
23     Q.  Did you measure the length of that on the
24 MyoSure?

Page 105

1      A.  No.  I measured the proximal end to the
2  distal end.
3      Q.  And you didn't measure the length of "A" on
4  the MyoSure product in preparing your report, did
5  you?
6      A.  No.
7      Q.  Did you look at any engineering drawings to
8  try to determine how long "A" was?
9      A.  No.
10     Q.  Are you aware that the shaft of the MyoSure
11 product is about 18.4 centimeters long?
12         MS. FLORES:  Object to the form of the
13 question.
14     A.  I am now.
15     Q.  And that's the first time you've been made
16 aware of that, is me telling you today, as far as
17 you can recall?
18         MS. FLORES:  Object to the form of the
19 question.
20     A.  I don't remember discussing that before.
21     Q.  Okay.  So is it your opinion that if the
22 Court interprets the elongated member to include a
23 length requirement of at least 30 centimeters, that
24 a 18.4 centimeter shaft would be equivalent to a

Page 106

1  greater than 30 centimeter shaft?
2       MS. FLORES: Object to the form of the
3  question.
4       A. No. If you're asking me the obvious
5  question is 18 equal to 30, no, it's not equivalent.
6  From a clinical standpoint, I'd say up to five
7  centimeters for a hysteroscope is probably
8  clinically equivalent. But between 18 and 30, I
9  would say it's different.
10      Q. Clinically different?
11      A. Clinically different.
12      Q. Significantly clinically different?
13      MS. FLORES: Object to the form of the
14 question.
15      A. Clinically different. I mean
16 significantly, no, because both of them could be
17 utilized. But you could definitely say those two
18 instruments look different.
19      Q. And they'd be clinically different?
20      MS. FLORES: Object to the form of the
21 question.
22      A. Not clinically different.
23      MS. FLORES: You've got to give me a chance
24 to object and you've got to get a chance to answer.

Page 107

1       Q. What did you mean earlier when you said
2  "clinically different," that the five centimeter
3  would be about the boundary of clinical difference?
4       MS. FLORES: Object to the form of the
5  question.
6       A. You know, you can -- there can be
7  variations of scopes that you look at them and use
8  them differently in which the technique and the
9  methodology and everything essentially is going to
10 be the same.
11      For a hysteroscope, if two scopes are
12 probably within, say, three to five centimeters of
13 each other, they're not going to be used differently
14 just based upon the length.
15      However, if one scope is 30 centimeters and
16 another is 18, then they're both clinically usable,
17 but your actual technique as far as your angle of
18 use may be different.
19      So they're both clinically usable and
20 likely effective, but your technique might change a
21 little bit due to the length of your scope itself.
22      Q. When you say "clinically usable," what do
23 you mean by that?
24      A. For a hysteroscope, you have to have a

Page 108

1  minimum length, because you're going from the
2  outside of the vulva, through the vagina, through
3  the cervix into the uterus.
4       So on the thinnest, youngest patient,
5  there's still a minimal length that is necessary to
6  use it. If it's less than that, you just can't --
7  it's not practical. You can't use it.
8       But there are -- if it's longer than that,
9  than that minimal length, you can still use it, but
10 your technique may change. So "clinically usable,"
11 I mean if it's below a certain length, it's just --
12 it's unusable for this application.
13      Q. How would the technique be different if one
14 were to use a hysteroscope that was 12 centimeters
15 longer? Well, let's make this more concrete.
16      If you were to remove a myoma from an
17 average woman using a 31-centimeter -- strike that.
18 Let's back up.
19      If you were to use a hysteroscope to remove
20 a myoma in an average woman where the shaft was 31
21 centimeters long, compared to using a hysteroscope
22 where the shaft was 18 and a half centimeters long,
23 how would your procedure differ?
24      MS. FLORES: Object to the form of the

Page 109

1  question.
2       A. The scope goes through the cervix which
3  acts as a fulcrum for a rigid device. So the only
4  thing that changes is your angle of being able to
5  place your cutting window up against the myoma.
6       So for a shorter shaft, as you can imagine,
7  you might need a more acute angle. For a longer
8  shaft, it would just be less of an acute angle.
9       So it's just a matter of positioning the
10 scope to get the cutting blade on the tissue that
11 would change if it were 30 versus 18.
12      Q. Any other differences that you can think
13 of?
14      MS. FLORES: Object to the form of the
15 question.
16      A. Just your position in how far away you're
17 holding the endoscope itself from the patient.
18      Q. Are there instances where the location of
19 the myoma might be such that the long endoscope
20 might be appropriate and the short one not; is that
21 possible?
22      MS. FLORES: Object to the form of the
23 question.
24      Q. Because of that angle or other reasons?

Page 110

1  A.  Only because of obesity, as we've talked
2  about.  So in a very obese patient, it's a greater
3  distance you need to reach that scope.  So that's
4  why we need a longer scope itself.
5  Q.  In the section starting at Paragraph 61 of
6  your report where it says under "Hologic's Proposed
7  Claim Construction," what did you consider the
8  elongated member of the MyoSure hysteroscope to be
9  in that analysis?
10  A.  The elongated member being from the end of
11  this rubber gasket, which is the most proximal end,
12  to the, again, flattened of the endoscope, which is
13  where the lens is located.
14  Q.  So the whole length of the endoscope?
15  A.  Correct.
16  Q.  Let's look at Element 1(c) that's on Page
17  11 of your report.  Well, let's back up a little
18  bit.  I'm sorry.
19      Let's go to the patent, which is KI 2.  We
20  talked about the -- and you can look at Claim 1 if
21  you want.  If you look at Claim 1, you see it talks
22  about "The endoscope, including a valve and an
23  elongated member defining discrete first and second
24  channels."  Do you see that?

Page 111

1  A.  No.  Tell me what --
2  Q.  Claim 1 is the last page in Column 5.
3  A.  Okay.  So say that again.
4  Q.  At about Line 23, it says, "The endoscope,
5  including a valve and an elongated member defining
6  discrete first and second channels."  Do you see
7  that?
8  A.  Yes.
9  Q.  So you would agree that the elongated
10  member is a part of the endoscope that defines the
11  first and second channels?
12  A.  Yes.
13  Q.  If you go to Column 3, do you see where it
14  says "Detailed Description"?
15  A.  Yes.
16  Q.  And at the bottom at about Line 51 it
17  begins with a reference to Figure 2.  Do you see
18  that?
19  A.  Yes.
20  Q.  It says, "It can be seen that the viewing/
21  receiving Part 3, is composed of a outer tube four
22  in which a main Channel 5 and viewing Channel 6 are
23  defined."  Do you see that?
24  A.  Yes.

Page 112

1  Q.  And there that word "defined," that's the
2  same word "defining" that we saw in the claim; is
3  that right?
4      MS. FLORES:  Object to the form of the
5  question.
6  A.  It is the same word.
7  Q.  And the main Channel 5 and the viewing
8  Channel 6, those are the first and second channels
9  that we saw in the claim; is that right?
10  A.  Yes.
11      MS. FLORES:  Object to the form of the
12  question.
13  Q.  And so the outer tube in which the first
14  and second channels are defined, that corresponds to
15  the elongated member in the claim; is that right?
16      MS. FLORES:  Object to the form of the
17  question.  Again, this seems -- I mean, if you're
18  going to go through claim construction with him and
19  waste your time for all of the others, I guess it's
20  your choice, but it seems to be a little outside the
21  scope of it.  He said that he doesn't -- it's his
22  understanding that the Court has not construed --
23      MR. COHN:  Excuse me.
24      MS. FLORES:  I'm allowed to put my

Page 113

1  objection on the record.
2      MR. COHN:  You're not allowed to coach the
3  witness.
4      MS. FLORES:  I'm allowed to put my
5  objection on the record, counselor, and we've done
6  this before.  I'm objecting, because he's already
7  testified --
8      MR. COHN:  I'm going to warn you, if you
9  coach this witness, I'm going to cancel this
10  deposition, and I'm going to call the Court.
11      MS. FLORES:  Then go ahead and call the
12  Court.  I'm objecting because he's testified that
13  he's aware claimed construction is in dispute, and
14  we're waiting for those terms to be given to us by
15  the Court.  But if you want to go ahead and keep
16  asking about it, I just want you to know you only
17  have him for today.
18      MR. COHN:  Why can't you preserve your
19  objection by saying objection to form?  Why is that
20  not good enough?
21      MS. FLORES:  Because for the other 15
22  depositions that have been taken in this case, I was
23  following the style.  But if that's the case, then
24  you're going to hold -- I'm going to hold you to

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
KEITH B. ISAACSON, M.D. - 5/2/2012

Page 146

1  visualization, but that actual range of pressure can
2  vary from patient to patient.
3    Q. How does maintaining distention facilitate
4  visualization?
5    A. If the uterus is collapsed upon the lens,
6  then you can't see. So it's like putting your hands
7  in front of your eyes. You can't see.
8    Q. When removing a polyp or a fibroid with a
9  morcellator, is it important that the distention
10 remain relatively well controlled and constant so
11 that the wall isn't moving around?
12       MS. FLORES: Object to the form of the
13 question.
14   A. No. Meaning you need to maintain that
15 minimal pressure, that it remains distended. But if
16 it went from a pressure of 40 to -- let me see, 50
17 to 70, it's not going to move around. The uterus
18 won't move around. It just remains distended.
19       The only difference is that more fluid will
20 go into the venous sinuses, which is what you're
21 trying to minimize.
22   Q. The venous sinuses being the bloodstream?
23   A. Part of the bloodstream. So you have the
24 arteries and the veins. So it has to get above the

Page 147

1  mean arterial pressure to get into the arteries.
2  But the venous pressure is about eight millimeters
3  of mercury.
4       So it's always going to get into it,
5  because your distention pressure is greater than
6  your venous pressure, but you try to keep that to a
7  minimum by keeping your distention pressure the
8  lowest possible that will give you adequate
9  visualization.
10   Q. In the MyoSure device, the tissue is
11 aspirated through the cutter, right?
12   A. Correct.
13   Q. And that's the only way that the tissue is
14 removed from the uterus in the MyoSure procedure; is
15 that right?
16   A. Correct.
17   Q. And fluid is also aspirated through the
18 cutter in the MyoSure; is that right?
19   A. Correct.
20   Q. And during the procedure, that's the only
21 way that fluid is discharged from the uterus; is
22 that correct?
23   A. That's correct, with the exception if
24 there's some distention around the cervix.

Page 148

1   Q. If there's some leakage?
2   A. Leakage around the cervix.
3   Q. Leakage is not desired?
4   A. It's not horrible, meaning typically you
5  can compensate for it with your inflow if you have
6  it.
7   Q. The fluid that is discharged through the
8  cutter of the MyoSure has to pass through the uterus
9  before it will be -- well, strike that.
10      The fluid in the MyoSure, it comes out of
11 the endoscope, it has to pass through some portion
12 of the uterus, and then it's eventually sucked out
13 through the cutter; is that right?
14      MS. FLORES: Object to the form of the
15 question.
16   A. Right.
17   Q. So all the fluid that's being pulled out of
18 the cutter has to at some point travel through a
19 portion of the uterus?
20      MS. FLORES: Object to the form of the
21 question.
22   A. Correct.
23   Q. And if we can look at Element 1(h)?
24   A. Where are you?

Page 149

1   Q. I'm at Page 14 of your report. At the top
2  Element 1(h) says, "Aspirating cut tissue and fluid
3  from the uterus and the endoscope through the
4  cutter." Do you see that?
5   A. Hmm-hmm.
6   Q. Fluid from the uterus, you're referring to
7  the fluid, the irrigation fluid that's in the
8  uterus; is that right?
9   A. That's right.
10      MS. FLORES: Object to the form of the
11 question.
12   Q. Are you referring to blood and lymph or
13 anything else that's actually, I don't know,
14 secreted or excreted by the uterus?
15   A. It would be included.
16   Q. Okay.
17   A. So it's any -- it's all mixed together. So
18 when the fluid goes into the uterine cavity, the
19 distention fluid, it circulates. So if there's any
20 blood in there, it will also be mixed up. There's
21 not much in the way of lymph tissue.
22   Q. All of that fluid in the uterus, that's
23 what you meant by or that's what you believed this
24 term "fluid from the uterus" means?

Page 190

1  claimed invention?
2      MS. FLORES: Object to the form of the
3  question.
4     A. Let's go through that and you try to give
5  me a specific example of what you're talking about.
6     Q. Well, let me ask it a different way.
7     A. Okay.
8     Q. The last sentence of 97, "Therefore, in my
9  opinion, the '359 provides support for the claimed
10 invention." Do you see that?
11    A. Hmm-hmm.
12    Q. That's based on the fact that the devices
13 disclosed in the description of the '359 patent meet
14 all the elements of Claim 1; is that right?
15    A. Correct.
16    Q. And that's the sole basis for your opinion;
17 is that right?
18       MS. FLORES: Object to the form of the
19 question.
20    A. Yes.
21    Q. If you look at the bottom of Paragraph 99,
22 do you see "further a Dr. May," and then it ends?
23 Do you know what was meant to be there?
24    A. I think that was a typo. It should have

Page 191

1  been picked up.
2     Q. Should "further a Dr. May" have come out?
3     A. I think so. I caught that afterwards, and
4  I don't know what it was referring to.
5     Q. Do you know what it said?
6     A. No.
7     Q. Let's turn to Column 2 of the '359 patent.
8  Do you see starting around Line 4 of Column 2 says,
9  "Fluid is introduced by way of a space between the
10 stem and the rigid housing and discharged together
11 with the detached tissue through the hollow stem of
12 the cutter." Do you see that?
13    A. Yes.
14    Q. Do you understand that sentence?
15       MS. FLORES: Object to the form of the
16 question.
17    A. Yes.
18    Q. You agree that's how the MyoSure works,
19 right?
20       MS. FLORES: Object to the form of the
21 question.
22    A. Yes.
23    Q. Do you see later in the paragraph it says
24 that in the uterus it is "important that the amount

Page 192

1  of enlargement of the organ be accurately
2  controlled. The irregular discharge of fluid
3  through the hollow stem of the cutter, caused partly
4  by the irregular release of tissue, means that it
5  cannot be guaranteed that the pressure inside the
6  cavity is accurately controlled." Do you see that?
7     A. I do.
8     Q. In 1997, was that statement accurate?
9        MS. FLORES: Object to the form of the
10 question.
11    A. Yes.
12    Q. Is it still accurate today?
13       MS. FLORES: Object to the form of the
14 question.
15    A. Again, if we can go back to what it means
16 by being accurately controlled. Accurately
17 controlled, based upon giving adequate distention
18 for visualization, it's accurate today. Adequately
19 controlled based upon it has to be within a narrow
20 range of intrauterine pressure, I would not say is
21 as accurate today as it was in '97.
22       In '97 we were more concerned, because we
23 were used to using hypotonic solution. Now that
24 we're using physiologic solution, again, it's

Page 193

1  visualization which is key more so than the
2  intravasation.
3     Q. Is the fluid that's being referenced in
4  this passage of Column 2 non-conductive or is it
5  conductive? Is it saline?
6     A. Saline.
7     Q. And at the end of this section in Column 2,
8  it says, "Such a device is consequently not very
9  suitable for use in the treatment of such a cavity."
10 Do you see that?
11    A. Hmm-hmm.
12    Q. And that was true in 1997, correct?
13       MS. FLORES: Object to the form of the
14 question.
15    A. Such a device -- I didn't -- you know, I
16 didn't write this. So I'm not exactly sure what
17 they're trying to say on that last sentence, what
18 point they're trying to make.
19    Q. You can't tell me what a person of ordinary
20 skill in the art would understand that last sentence
21 to mean?
22       MS. FLORES: Object to the form of the
23 question.
24    A. So I think what they're saying is that if

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
KEITH B. ISAACSON, M.D. - 5/2/2012

Page 198

1   Q. What wasn't available?
2   A. The morcellator. We didn't have anything
3   to grind up the tissue and discharge it, other than
4   the Kresch device, the FEMRX device.
5   Q. If we looked down in Column 2, you get to
6   Line 31, do you see where it says, "This makes it
7   possible to remove undesired tissue from cavities
8   such as the uterus"?
9   A. Yes.
10  Q. What does the word "this" refer to to you?
11       MS. FLORES: Object to the form of the
12  question.
13  A. If you look at the beginning of that
14  paragraph, it says, "According to the invention, a
15  further outlet channel is provided, the function of
16  which is independent of whether or not detached
17  tissue has been released. In other words, a regular
18  discharge of fluid can occur through this further
19  outlet channel." In other words, a regular.
20       So this, "Since only a minor part of the
21  fluid is now discharged through the outlet in which
22  there are detached pieces of tissue, the pressure
23  inside the cavity can be regulated and controlled
24  accurately." This, which is the outer -- further

Page 199

1   outlet channel.
2   Q. So it's saying "The further outlet channel
3   makes it possible to remove undesired tissue from
4   the cavity such as the uterus"?
5        MS. FLORES: Object to the form of the
6   question.
7   A. That's how you -- this is referring to "The
8   further outlet channel makes it possible to remove
9   undesired tissue from the cavity such as the
10  uterus." That's how the sentence reads.
11  Q. Okay. Let's turn to Column 3. Do you see
12  at Line 8 it says, "The invention also relates to a
13  method for the removal of uterus tissue in which the
14  device described above is used." Do you see that?
15  A. Yes.
16  Q. What does "the device described above"
17  refer to in that sentence?
18       MS. FLORES: Object to the form of that
19  question.
20  A. Well, I think it's referring to the entire
21  endoscopic device. So if we go back to Column 2,
22  Line 59, "The observation part of the device
23  described above includes a light channel in the
24  housing providing near one end with a lens and near

Page 200

1   the other end with an observation mechanism. The
2   cutting elements described above can include any
3   cutting element known in the prior art."
4   Q. If you look at Column 2, Line 59, which I
5   think is where you started reading, "The observation
6   part of the device described above." Do you see
7   that?
8   A. Yes.
9   Q. Is "the device described above" in Column
10  2, Line 59, the same as "the device described above"
11  in Column 3, Line 9?
12       MS. FLORES: Object to the form of the
13  question.
14  A. That's what I'm trying to get to. That's
15  what I'm trying to get to to answer the question.
16  Q. Take you time if you need to review the
17  patent.
18  A. I think in Column 3, "The device described
19  above is an actual cutting mechanism, which the
20  protective tube is preferably provided with a
21  lateral opening through which a part of the cutting
22  element extends."
23       So I believe -- well, looking at nine.
24  It's talking about the cutting mechanism which is

Page 201

1   providing the machining operation is the device
2   described above. Does that answer?
3   Q. Have you been asked before I just asked you
4   that question what you think the phrase "device
5   described above" means in Column 3, Line 9?
6        MS. FLORES: Objection to the form of the
7   question.
8   A. No.
9   Q. Did you read Dr. Emanuel's deposition of a
10  couple weeks ago?
11  A. Not of a couple weeks ago, no.
12  Q. It was almost a month ago. It was April
13  12th of this year. Did you read that deposition?
14  A. No.
15  Q. If I represented to you that Dr. Emanuel
16  said that "the device described above" in Column 3,
17  Line 9 referred to the device with the further
18  outlet channel discussed at the top of the "Summary
19  of the Invention," how would you react to that?
20       MS. FLORES: Object to the form of the
21  question.
22  A. I'd say that's his opinion. But when I
23  read it, it looks to me like it's referring to the
24  actual cutting mechanism, the inner tube and outer

51 (Pages 198 to 201)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
KEITH B. ISAACSON, M.D. - 5/2/2012

Page 202

1  tube, which is the cutting mechanism here.
2      Q. So in the paragraph --
3      A. It's talking about each revolution -- go
4  ahead.
5      Q. No, no. I didn't mean to interrupt you.
6  You always win that if you're talking.
7      A. Go ahead.
8      Q. The paragraph that begins at Line 65 on
9  Column 2, "The cutting elements." Do you see that?
10     A. Yes.
11     Q. Does that paragraph contain the word
12 "device"?
13     MS. FLORES: Object to the form of the
14 question.
15     A. No.
16     Q. In Column 2, Line 59 where it says, "The
17 observation part of the device described above,"
18 what does "the device described above" refer to in
19 that sentence?
20     MS. FLORES: Object to the form of the
21 question.
22     A. That describes the endoscope.
23     Q. The endoscope described in the previous
24 paragraphs of the summary of the invention?

Page 203

1      MS. FLORES: Object to the form of the
2  question.
3      Q. Is that right?
4      A. Well, it says here that "The observation
5  part of the device described above includes a light
6  channel in the housing." So it's describing the
7  endoscope. It doesn't necessarily reflect all the
8  different components which can be described as
9  devices.
10     Q. If you look in the detailed description, it
11 starts in Column 3, is there any discussion there of
12 performing the claimed method without the further
13 outlet channel?
14     MS. FLORES: Object to the form of that
15 question.
16     A. Every -- again, these detailed -- oh, let
17 me back up. I'm looking at the brief description of
18 the drawing. So start again now. From the detailed
19 description in Column 3?
20     Q. Yes. To where the claims begin, in the
21 middle of Column 5.
22     A. Okay.
23     Q. My question is, where does it describe
24 performing the claimed method without the further

Page 204

1  outlet channel?
2      MS. FLORES: Object to the form of the
3  question.
4      A. So this detailed description that I can see
5  only describes how this device would be utilized as
6  comprised in Figure 1 with the outer sheath.
7      MR. COHN: Okay. Let's take another quick
8  break.
9      VIDEOGRAPHER: Going off the record, 3:42
10 p.m.
11     (Recess)
12     VIDEOGRAPHER: This marks the beginning of
13 tape number four in the videotape deposition of Dr.
14 Keith Isaacson. Back on the record at 3:54 p.m.
15     BY MR. COHN:
16     Q. Let's look at Column 5, Line 14. Do you
17 see that reference to housing four?
18     A. Yes.
19     Q. And four is depicted in Figure 2 as "A,"
20 right? That's the outer tube four that we talked
21 about, right?
22     MS. FLORES: Object to the form of the
23 question.
24     A. Figure 2?

Page 205

1      Q. Figure 2. I don't think the No. 4 is shown
2  in any other figure, and correct me if I'm wrong.
3  Let me ask a proper question. Is the No. 4 shown in
4  any figure other than Figure 2?
5      A. I don't know. Let's go through it. I
6  don't see it in any other figures. Okay, so the
7  question is?
8      Q. The "housing 4" referred to at Column 5,
9  Line 14, that's the four shown in Figure 2, right?
10     A. Correct.
11     Q. In that sentence on Column 5, where it
12 says, "For instance, it is possible to affect the
13 supply of working fluid and the discharge of
14 cleaning material in another way." Do you see that?
15     A. Yes.
16     Q. What is "working fluid"?
17     A. Working fluid is a fluid that was instilled
18 into the uterine cavity to allow for distention.
19     Q. What's "the discharge of cleaning
20 material"?
21     A. Well, you have to clean the scope. So...
22     Q. Is that the discharge of tissue, cleaning
23 material?
24     A. I don't think cleaning material -- I've

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
KEITH B.   ISAACSON, M.D. - 5/2/2012

Page 206

 1  never seen it referred to as tissue.
 2      Q.  It doesn't say cleaning fluid, right?
 3          MS. FLORES:  Object to the form of the
 4  question.
 5      Q.  Let me ask it this way.  Do you have any
 6  understanding of what "the discharge of cleaning
 7  material" refers to?
 8      A.  When I read it, my understanding was that
 9  it was cleaning fluid for processing, the way you
10  would process a reusable hysteroscope.
11      Q.  What do you mean by that; "process a
12  reusable hysteroscope"?
13      A.  For it to be used from patient to patient,
14  it has to be cleaned with some type of typically
15  enzymatic soap.  You have to rinse out the cleaning
16  material and fluid, and then you sterilize it.
17      Q.  If we go back to Column 2, Line 31, the
18  sentence we talked about many times, "This makes it
19  possible to remove undesired tissue from cavities
20  such as the uterus."  Do you see that?
21      A.  I do.
22      Q.  Doesn't that mean it's impossible to remove
23  -- strike that.  Doesn't that mean that at least the
24  patentee, whoever wrote that sentence, believed it

Page 207

 1  was not possible to remove undesired tissue from
 2  cavities such as the uterus without the "this"
 3  that's at the top of that sentence; do you agree
 4  with that?
 5          MS. FLORES:  Object to the form of that
 6  question.
 7      A.  I didn't interpret it that way.  Again, I
 8  interpreted that you have two ways to discharge
 9  fluid.  One is through the inner channel of the
10  cutter, and the second, if you choose to use it with
11  the further embodiment, you could use the outside
12  sheath.
13          If you want higher flow rates, if you need
14  it, if you're doing something like very vascular
15  tissue and you need higher flow rates, then it may
16  make sense to use the outer sheath.  However, if I'm
17  taking out a small polyp that's relatively
18  avascular, then I wouldn't need the outer sheath,
19  because I don't need the high flow rate.
20          So I looked at it that you have two
21  embodiments that work, one is with the sheath and
22  one is without the sheath, and you have a choice
23  which one is preferable based upon the tissue being
24  removed and the flow rates of your fluid that you're

Page 208

 1  looking for.
 2      Q.  The patent claims don't require a specific
 3  type of cutter so long as it's motor driven; is that
 4  right?
 5          MS. FLORES:  Object to the form of the
 6  question.
 7      A.  The patent Claim 6, which says that "The
 8  method of the Claim 5 wherein inserting a
 9  motor-driven cutter comprises inserting an outer
10  tube defining a cutting window at a distal region of
11  the outer tube and an inner tube received within the
12  outer tube."  So it looks like the claim does
13  describe the cutting mechanism.
14      Q.  That's Claim 2 you were reading?
15      A.  Claim 6.
16      Q.  But that cutting element was also found in
17  Claim 2; is that right?
18      A.  Yes.
19      Q.  Does the '359 patent teach that if you have
20  a device that has irregular discharge of fluid,
21  because of the irregular release of tissue, as you
22  read in Column 2, that a solution to that resulting
23  pressure problem is to use a further outlet channel?
24          MS. FLORES:  Object to the form of the

Page 209

 1  question.
 2      A.  No.
 3      Q.  What's the purpose of the further outlet
 4  channel as described in the '359 patent?
 5          MS. FLORES:  Object to the form of the
 6  question.
 7      A.  The further outlet channel is just another
 8  method or another pathway for which fluid can be
 9  discharged from the device.  So it can be discharged
10  within the inner tube of the cutter or it can be
11  discharged within the outer tube.
12          So again, depending upon the type of tissue
13  you're trying to remove, as well as the vascularity
14  and the amount of flow rate that you need, you can
15  use that outer tube or you don't have to use the
16  outer tube.  It clearly says fluid can come through
17  the inner tube of the cutting device.
18      Q.  Where does it say that?
19      A.  It says it in Claim 5, Column 6, Line 26.
20  "Aspirating fluid with detached tissue from the
21  uterus through the lumen of the cutter."
22      Q.  Go back to Column 2.  What is "makes it
23  possible" mean?
24          MS. FLORES:  Object to the question.

53 (Pages 206 to 209)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
KEITH B.   ISAACSON, M.D. - 5/2/2012

Page 210

1      A.  What line?
2      Q.  31.
3      A.  Enables.  To remove undesired tissue within
4  the cavity such as the uterus.
5      Q.  If you were asked in 1997 to use a
6  motor-driven cutter down the working channel of a
7  hysteroscope, a then available hysteroscope, what
8  would your response be to that?  I want you to do
9  this; what would you have said?
10         MS. FLORES:  Object to the form of the
11  question.
12      A.  Show me how.
13      Q.  You wouldn't know how to do that?
14      A.  I wouldn't use any device without going to
15  a lab, learning how to do it, getting familiar with
16  it, looking at the data.  So, no, I certainly
17  wouldn't just try it because someone asked me to do
18  that.
19      Q.  Going back to this issue of the pressure
20  problem.  The '359 patent does identify a problem
21  involving the control of pressure inside the uterus
22  when devices in which the tissue and fluid is
23  discharged together through the cutter are used; is
24  that fair?

Page 211

1         MS. FLORES:  Object to the form of that
2  question.
3      A.  Well, you know it's interesting.  When you
4  look at Column 1 at the bottom, it's talking about a
5  laparoscopic device or laparoscopic method that is
6  essential to inflate the related cavity using gas.
7  The gas feed is discontinuous and has no effect on
8  the operation of the site.
9         So again, they're talking about the history
10  or the background, that it is important, at least,
11  in the uterine cavity, not necessarily in the
12  laparoscopic cavity or the peritoneal cavity, to
13  have adequate distention.
14      Q.  But the '359 patent does identify a
15  pressure-control problem at the top of Column 2;
16  isn't that right?
17         MS. FLORES:  Object to the form of the
18  question.
19      A.  Not a problem with their device.  They're
20  just talking about you need to have adequate
21  distention in order for a hysteroscopic device, such
22  as this one, to be adequate.
23      Q.  Did persons of ordinary skill in the art
24  already know how to control the pressure inside the

Page 212

1  uterus using a device in which the fluid and tissue
2  were discharged together through the central lumen
3  of the cutter?
4         MS. FLORES:  Object to the form of the
5  question.
6      A.  No.
7      Q.  Where does the '359 patent teach someone of
8  ordinary skill in the art how to control the
9  pressure in the uterus using a device in which the
10  fluid and tissue are discharged together through the
11  hollow stem of the cutter?
12         MS. FLORES:  Object to the form of the
13  question.
14      A.  The control of uterine pressure is
15  controlled by multiple devices, not necessarily the
16  device, the hysteroscopic device itself.  So it's
17  controlled by your distention pressure, which is
18  either by a pump or by gravity or by a pressure bag,
19  it is controlled by your inflow tubing, it's
20  controlled by the uterine distention.
21         So you make sure you don't have a uterine
22  perforation.  It's controlled by your inflow valve,
23  your outflow valve from your outflow tubing.
24         So there are just multiple ways in which

Page 213

1  you need to -- in which you can control or lose
2  control over intrauterine pressure.  So a device
3  like this, I wouldn't expect to -- in and of itself
4  cannot teach me how to maintain pressure.
5         It can describe components, such as the
6  valves, which allow me to control inflow and
7  outflow, but it doesn't teach you how to use a pump,
8  it doesn't teach what pressures to use on the pump
9  or how to use gravity or anything else.  All of
10  those are important components of maintaining
11  distention pressure.
12      Q.  Would a person of ordinary skill in the art
13  in 1997 already know how to use the other components
14  of the system that you described to control the
15  distention in the uterus using a device in which the
16  fluid and the tissue were discharged together
17  through the cutter without a further outlet channel?
18         MS. FLORES:  Object to the form of the
19  question.
20      A.  Not necessarily, no.
21         MR. COHN:  Mark this as the next.
22         (Document marked as Exhibit 5
23         for identification)
24      Q.  Have you seen KI 5 before?

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
KEITH B. ISAACSON, M.D. - 5/2/2012

                                                                    Page 226
 1      MR. COHN: I pass the witness.
 2      MS. FLORES: I have no questions.
 3      VIDEOGRAPHER: Going off the record, 4:44
 4  p.m.
 5      (Whereupon the deposition
 6      concluded at 4:44 p.m.)

                                                                    Page 227
 1      C E R T I F I C A T E
 2    I, KEITH B. ISAACSON, M.D., do hereby certify
 3  that I have read the foregoing transcript of my
 4  testimony, and further certify that it is a true and
 5  accurate record of my testimony (with the exception
 6  of the corrections listed below):
 7  Page   Line           Correction
 8
 ...
17    _
18
19    Signed under the pains and penalties of perjury
20  this    day of        , 2012.
21
22              KEITH B. ISAACSON, M.D.
23
24

                                                                    Page 228
 1                CERTIFICATE
 2  Commonwealth of Massachusetts
 3  Suffolk, ss.
 4
 5      I, Michael D. O'Connor, Registered Professional
 6  Reporter and Notary Public in and for the
 7  Commonwealth of Massachusetts, do hereby certify
 8  that KEITH B. ISAACSON, M.D., the witness whose
 9  deposition is hereinbefore set forth, was duly sworn
10  by me and that such deposition is a true record of
11  the testimony given by the witness.
12      I further certify that I am neither related to
13  or employed by any of the parties in or counsel to
14  this action, nor am I financially interested in the
15  outcome of this action.
16      In witness whereof, I have hereunto set my hand
17  and seal this 2nd day of May, 2012.
18
19
20                Notary Public
21
22
23  My commission expires
24  December 3, 2015