### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SMITH & NEPHEW, INC., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | NO. 10-cv-10951-RWZ |
| vs. | ) | |
| | ) | |
| HOLOGIC MEDICAL, INC., and | ) | |
| HOLOGIC, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### EXPERT REPORT OF DR. HENRY A. DOMINICIS
### REGARDING NON-INFRINGEMENT OF U.S. PATENT NO. 8,061,359

## TABLE OF CONTENTS

I.     EDUCATIONAL BACKGROUND AND QUALIFICATIONS ................................... 1

II.    THE '359 PATENT AND THE ASSERTED CLAIMS ............................................... 2

    A.    The '359 Patent ................................................................................................. 2

    B.    The Asserted Claims ........................................................................................ 3

III.   THE PERSON OF ORDINARY SKILL IN THE ART ............................................... 5

IV.    MEANING OF CERTAIN CLAIM TERMS ................................................................ 5

    A.    "elongated member" ........................................................................................ 6

    B.    "aspirating cut tissue and fluid from the uterus and the endoscope
        through the cutter" ............................................................................................ 6

    C.    "aspirating fluid with detached tissue from the uterus through a
        lumen of the cutter" ......................................................................................... 6

    D.    "a cutting window at a distal region of the outer tube" ................................... 7

V.     BACKGROUND OF THE RELEVANT TECHNOLOGY ......................................... 7

VI.    APPLICABLE STANDARDS ................................................................................... 13

VII.   NON-INFRINGEMENT ............................................................................................ 17

    A.    No "Elongated Member" (All Claims) ........................................................... 17

    B.    No "Aspiration" Through A "Further Outlet Channel" (All Claims) ........... 18

    C.    No "aspirating cut tissue and fluid from the uterus and the endoscope
        through the cutter" (Claims 1-4) ..................................................................... 19

    D.    No "cutting window at a distal region of the outer tube" (Claims 2 and
        6) ...................................................................................................................... 20

1.     I am Dr. Henry A. Dominicis, M.D., and I have been retained as an expert on the behalf of Hologic, Inc. ("Hologic") to provide opinions regarding the non-infringement of U.S. Patent No. 8,061,359 (the "'359 patent"), which is currently asserted by Plaintiff Smith & Nephew, Inc. ("S&N"), against Hologic's MyoSure product.

2.     The bases for my conclusions include the following: (1) my education as a physician; (2) my experience of 20 years in the relevant surgical methods, (3) my review of the medical and patent literature; and (4) my review of documents pertaining to this litigation.

## I.     EDUCATIONAL BACKGROUND AND QUALIFICATIONS

3.     I am a practicing gynecologist at WomanCare PC in Arlington Heights, Illinois, a suburb of Chicago.  I have been a practicing gynecological surgeon for over 20 years and have experience in various procedures for, among other things, hysteroscopic and laparoscopic sterilization.

4.     I attended the University of Illinois College of Medicine in Chicago and completed my residency at Lutheran General Hospital in 1991.  I am Board Certified in Obstetrics and Gynecology.  I have been in my current practice since graduation and have taken a special interest in non-invasive surgical techniques.  I have also developed numerous community health clinics to serve the uninsured community.  I was the Chairman of the Obstetrics and Gynecology Department of Northwest Community Hospital until 2010.

5.     I am familiar with the history of devices and methods for tissue modification in the areas of ophthalmology, gynecology, and general surgery.  Over my 20-year medical career, I have performed numerous surgeries involving tissue modification in and removal from the uterus, and I am very familiar with the various techniques used to perform such surgeries.

6.      I submit this report in accordance with Federal Rule of Civil Procedure 26(a)(2)(B). This report sets forth the substance of the facts and opinions on which I currently expect to testify, and a summary of the bases and reasons for my opinions. In addition, where appropriate within this report, I have identified the most pertinent source or sources for the information on which I have relied. These references are not intended to be exhaustive or exclusive of other resources.

7.      I may rely on figures, enlargements or animations of portions of any of the patents, articles, and documents cited in this report as demonstrative exhibits during my testimony at trial.

8.      I am being compensated for my time at the rate of $400 per hour.

9.      I attach my curriculum vitae as Appendix A. In addition to my personal experience, I have considered the materials listed in Appendix B in forming my opinion.

10.     I have been requested to review and analyze claims 1-8 (the "Asserted Claims") of the '359 patent and to consider whether use of Hologic's MyoSure product practices each element of the claims.

## II.    THE '359 PATENT AND THE ASSERTED CLAIMS

### A.     The '359 Patent

11.     The '359 patent is titled "Reciprocating Rotary Arthroscopic Surgical Instrument." It was filed on July 20, 2007 and issued on November 22, 2011. The '359 patent lists Mark Hans Emanuel and the inventor.

12.    The '359 patent relates to a method of cutting and removing tissue from a uterus. I may testify about the disclosures in the '359 patent, including the claims, the figures and the associated descriptions.

### B.    The Asserted Claims

13.    I understand that S&N has asserted that Hologic infringes the Asserted Claims of the '359 patent, *i.e.*, claims 1-8.

14.    Claim 1 provides:

1. A method for removal of tissue from a uterus, comprising:

inserting a distal region of an endoscope into said uterus,

the endoscope including a valve,

and an elongated member defining discrete first and second channels extending from a proximal region of the elongated member to the distal region,

the second channel having a proximal end in communication with the valve such that fluid from the valve is able to flow into and through the second channel to the uterus,

and the first channel having a light guide permanently affixed therein and being sealed from the second channel to prevent fluid from the valve from entering the uterus through the first channel, followed by:

inserting a motor driven cutter into the second channel such that a distal cutting region of the cutter extends distally beyond the endoscope in the uterus;

delivering fluid into the uterus through the valve and the second channel to distend the uterus;

energizing an electric motor to drive the cutter to cut tissue within the uterus; and

aspirating cut tissue and fluid from the uterus and the endoscope through the cutter.

15.    Claim 2 provides:

2.      The method of claim 1 wherein inserting the motor driven cutter comprises inserting an outer tube defining a cutting window at a distal region of the outer tube and an inner tube received within the outer tube that is configured to rotate relative to the outer tube to cut tissue,

the inner tube including a cutting element at a distal region of the inner tube configured to cut tissue at the cutting window when the inner tube rotates relative to the outer tube.

16.     Claim 3 provides:

3.      The method of claim 1, wherein inserting the distal region of the endoscope comprises inserting a distal region of an endoscope that includes a fiber optics bundle permanently affixed to the first channel of the elongated member.

17.     Claim 4 provides:

4.      The method of claim 1, wherein inserting the distal region of an endoscope comprises inserting a distal region of an endoscope that includes a lens permanently affixed to the first channel of the elongated member.

18.     Claim 5 provides:

5.      A method for removal of tissue from a uterus, comprising:

inserting a distal region of an endoscope into the uterus,

the endoscope including a port for receiving a motor driven cutter and including an elongated member defining discrete first and second channels extending from a proximal region of the elongated member to the distal region,

the first channel having a light guide permanently affixed therein and the second channel having a straight, central longitudinal axis extending from the port to an opening at a distal tip of the endoscope, followed by:

inserting the motor driven cutter for cutting and detaching tissue into the second channel through the port;

introducing fluid into the uterus; and

aspirating fluid with detached tissue from the uterus through a lumen of the cutter.

19.     Claim 6 provides:

6.   The method of claim 5 wherein inserting the motor driven cutter comprises inserting an outer tube defining a cutting window at a distal region of the outer tube and an inner tube received within the outer tube that is configured to rotate relative to the outer tube to cut tissue,

the inner tube including a cutting element at a distal region of the inner tube configured to cut tissue at the cutting window when the inner tube rotates relative to the outer tube.

20.   Claim 7 provides:

7.   The method of claim 5, wherein inserting the distal region of the endoscope comprises inserting a distal region of an endoscope that includes a fiber optics bundle permanently affixed to the first channel of the elongated member.

21.   Claim 8 provides:

8.   The method of claim 5, wherein inserting the distal region of the endoscope comprises inserting a distal region of an endoscope that includes a lens permanently affixed to the first channel of the elongated member.

## III.   THE PERSON OF ORDINARY SKILL IN THE ART

22.   I understand that a patent should be construed from the perspective of a person of ordinary skill in the art.  I believe that the '359 patent is directed to a medical doctor with 4 years of experience performing hysteroscopic procedures, or a degreed engineer having at least 5 years of experience designing and developing devices used in minimally invasive surgery (endoscopes, resectoscopes, shavers, tissue removal devices, etc.), or a person having at least 10 years of experience designing and developing devices used in minimally invasive surgery (endoscopes, resectoscopes, shavers, tissue removal devices, etc.).

## IV.   MEANING OF CERTAIN CLAIM TERMS

23.   I understand that the Court has not yet issued an opinion construing certain claim terms of the '359 patent for which the parties seek construction.

A.    "elongated member"

24.    This claim element is found in all of the Asserted Claims.

25.    I understand that S&N has proposed a construction of "member of the endoscope that is elongated defining the length of the discrete first and second channels" for this claim element. *See* Plaintiff's Opening Markman Brief at 9.

26.    I further understand that Hologic has proposed a construction of "the component of an endoscope as indicated by A in Fig. 2 that is at least 30 cm in length." *See* Hologic's Opening Claim Construction Brief at 11.

B.    "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter"

27.    The term "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter" is found in Asserted Claims 1-4.

28.    I understand that S&N has proposed a construction of "aspirating cut tissue and fluid from the uterus through the cutter" for this claim element. *See* Plaintiff's Opening Markman Brief at 14.

29.    I further understand that Hologic has proposed a construction of "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter and aspirating substantially only fluid through a further outlet channel." *See* Hologic's Opening Claim Construction Brief at 14.

C.    "aspirating fluid with detached tissue from the uterus through a lumen of the cutter"

30.    The term "aspirating fluid with detached tissue from the uterus through a lumen of the cutter" is found in Asserted Claims 5-8.

31.     I understand that S&N has proposed a construction of "aspirating fluid with detached tissue from the uterus through a lumen of a cutter" for this claim element. *See* Plaintiff's Opening Markman Brief at 14.

32.     I further understand that Hologic has proposed a construction of "aspirating fluid with detached tissue from the uterus through a lumen of the cutter and aspirating substantially only fluid through a further outlet channel" for this claim element. *See* Hologic's Opening Claim Construction Brief at 14-15.

D.      **"a cutting window at a distal region of the outer tube"**

33.     The term "cutting window" is found in Asserted Claims 2 and 6.

34.     I understand that S&N has proposed a construction of "an opening to provide access to a cutting component at a distal region of the outer tube" for this claim element. *See* Plaintiff's Opening Markman Brief at 17.

35.     I further understand that Hologic has proposed a construction of "an open distal end of the outer tube" for this claim element. *See* Hologic's Opening Claim Construction Brief at 19.

V.      **BACKGROUND OF THE RELEVANT TECHNOLOGY**

36.     Techniques for cutting human tissue in small body cavities using specialized mechanical devices have been known and used for decades, at least since the 1970s and 1980s. (*See, e.g.,* Iglesias, Banko, and Vukovic.) Persons of ordinary skill in the art have used various methods and devices for cutting tissue, particularly in small spaces in the body including the uterus, the prostate, the knee, and the eye. Doctors and engineers have been continuously developing new techniques and using new devices to that maximize their ability to perform surgeries in small body cavities while minimizing patient discomfort, risk, and recovery time.

37.     I incorporate by reference herein my report regarding the invalidity of the '359 patent dated March 23, 2012.

38.     I am prepared to testify at trial regarding procedures and devices for the removal of intrauterine pathology, including fibroids and polyps.  Such procedures include hysterectomy, electrical resection, endometrial ablation, D&C, morcellation, and other means of pathology removal (e.g. graspers and forceps).  I am prepared to testify about the steps undertaken by doctors and their support staff during such procedures and how devices are used in such procedures.  I am also prepared to testify about the S&N and Hologic morcellator systems and how to perform procedures using those systems.  With respect to the procedures mentioned above, I am also prepared to testify about how to use a hysteroscope, how to distend a uterus with fluid and maintain that distention, how to dilate the cervix, how fluid is managed, how to maintain visualization, and the risks posed to the patient from each such procedure, including the risks of intravasation and perforation.

39.     I am prepared to demonstrate the operation of Hologic's and S&N's morcellation products, as well as hysterscopes and other devices that use electrical resection, endometrial ablation, D&C, morcellation, and other means of pathology removal (e.g. graspers and forceps), and hysterectomy.

40.     The S&N and Hologic morcellator products are designed to remove polyps and fibroids from the uteri of women suffering from abnormal uterine bleeding.  I have performed well over 600 hysterectomies in my career.  I have performed more than 250 procedures in which I removed intrauterine polyps and fibroids in a patient.  I have performed at least four such procedures using the S&N morcellator product.  The S&N morcellator was too slow in terms of the rate of tissue removal and was limited in the types of tissues that it could effectively remove.

-8-

For at least those reasons, I found that the S&N morcellator did not provide a sufficient advantage over the gold standard of electrical loop resection to justify using it in my practice. This understanding is based not only on my own personal experiences with the S&N morcellator, but also on communications I have had with my colleagues in the field who reached the same conclusion.

41.     Because of the inadequacies of the S&N morcellator, I do not believe that the S&N morcellator adequately addressed any need in the medical community for a device that removed intrauterine pathology more efficiently and more safely than electrical loop resection.

42.     I am aware that, this year, S&N modified its control unit such that the speed of its cutter has been increased. I have heard about the performance of the modified S&N morcellator from other doctors in my field and I understand that it does not yield a substantial improvement over the performance of the unmodified S&N morcellator.

43.     I have performed over 90 procedures using the Hologic morcellator product and find that product to be far superior to S&N's morcellator product and to other means of removing intrauterine pathology, including electrical resection. In my experience, and based as well on what I have discussed with other doctors in my field, the Hologic morcellator (1) removes tissue faster than the S&N morcellator and (2) is capable of removing a greater variety of tissue types than the S&N morcellator.

44.     Polyps and fibroids are very different kinds of tissue. Polyps are formed of soft endometrium. Because of their softness and the nature of their connection to the body, polyps are, in the vast majority of cases, much more easily removed from a patient than are fibroids. Many polyps can be removed by using a grasper, forceps or similar device to "pluck" them from

the wall of the patient's uterus. Polyps can generally be removed in an office-based setting, rather than in a hospital operating room ("OR").

45.     In contrast to the soft, endometrial polyps, fibroids (or myomas) are fibrous tissues that are often calcified. Fibroids commonly have the hardness of tough grizzle on a steak. When a fibroid is calcified, which is common, it can be even harder. Although rare, fibroids can sometimes be so hardened from calcification that they cannot be removed using any mechanical device, and electrical resection, hysterectomy, or other methods must be used for treatment. Because of the hardness of fibroid tissue and the nature of its connection to the patient's body, removal of fibroids is a more advanced procedure than removal of polyps. Fibroids are generally removed in the hospital OR rather than the office. Fibroids cannot be removed with graspers, but must be cut away using a mechanical cutter, electrical resection, or in some instances hysterectomy.

46.     At least because of these differences between fibroids and polyps, the reimbursement rates for the removal of fibroids and the removal of polyps are different; they are much lower for the removal of polyps.

47.     I have removed intrauterine fibroids using a number of methods in addition to morcellation. Electrical resection has been and continues to be the medical gold standard for removal of intrauterine fibroids in the medical community (though I personally use the Hologic morcellator product for the vast majority of my fibroid removal procedures and I believe it is superior to electrical loop resection). Electrical resection involves the use of a heated wire that cuts the fibroid away from the uterus using cautery. I have also treated abnormal uterine bleeding caused by intrauterine fibroids and/or polyps using endometrial ablation, which burns

the lining of the uterus. I have performed hysterectomies to treat abnormal uterine bleeding caused by fibroids. I have also removed polyps using graspers, D&C, and electrical resection.

48.     S&N's morcellator system was introduced commercially over five years ago (to the best of my recollection). The system was not readily adopted. The S&N morcellator does not cut fibroid tissue at a high enough rate of speed to justify using it over electrical loop resection. Also, the S&N morcellator does not adequately cut a large enough variety of fibroids. Some fibroids are too tough for the S&N morcellator to cut and the blade bounces off or chews these fibroids instead of cutting them. Because of these shortcomings, I and other doctors in my field declined to switch from electrical resection to morcellation when S&N's morcellator was launched. Thus, in my opinion, if Hologic's product had never been on the market, most of the doctors who have used or now use Hologic's product would, like me, have continued to use electrical resection and would not have used S&N's morcellator product.

49.     It is important that a fibroid removal device like a morcellator be able to remove the largest variety of fibroids because the toughness of a fibroid is generally unknowable until the doctor actually begins to remove tissue. The limitations of the S&N morcellator to remove harder fibroids would thus not become apparent until the middle of a procedure. If the tissue was of the type that the S&N product could not adequately cut, then the physician would have to change to electrical resection mid-procedure. This is inefficient and poses unnecessary risks to the patient, due at least in part to increased procedure time.

50.     The Hologic morcellator, by contrast, is capable of adequately cutting a much larger variety of tissue than the S&N morcellator. Because of this, the risk of having to switch from morcellation to electrical resection during a procedure is significantly reduced, to the point where the Hologic morcellator is, in my view, the superior method for fibroid removal, even to

-11-

electrical resection. Hologic's morcellator has the potential to be the new gold standard for removal of intrauterine fibroids.

51.     Morcellation is generally a safer procedure than electrical resection. One reason for this is that morcellators pose less of a risk of perforation or collateral damage to the uterine wall because the morcellator blade is contained within the outer tube. Both S&N's and Hologic's products provide this benefit. Both also provide the benefit that they are not using electrical energy, which poses some risk of burning the patient. Hologic's product, however, by being faster than S&N's product, provides the additional benefit that it takes substantially less time than electrical resection to remove a fibroid. Because of this, the time in which the patient's uterus is distended is generally greatly reduced, which in turn reduces the risk of intravasation caused by the uptake of fluid into the patient's body during dilation of the uterus.

52.     It is my opinion that patient care would be significantly compromised if Hologic's morcellator were not available. S&N's morcellator is not an adequate substitute for Hologic's morcellator because of its slow rate of cutting and inability to adequately cut a sufficient variety of fibroids.

53.     Another benefit of Hologic's morcellator product is that it can be used with any of the many commercially-available fluid management systems, while S&N's morcellator can only be used with S&N's fluid management system. Indeed, Hologic's morcellator can be used with S&N's fluid management system, which is the setup utilized in my facility. Hologic's flexibility in this regard means greater flexibility for doctors in managing fluid during a morcellation procedure, which in turn allows doctors to minimize risk and maximize efficacy and efficiency of the procedure. In addition, the flexibility of the Hologic product in terms of fluid management systems is another benefit of the Hologic product over the S&N product. If an operating room

has a fluid management system already, they could use the Hologic morcellator with the fluid management system they already have. If they wanted to use the S&N morcellator, however, they would have to buy the S&N fluid management system in addition to the fluid management system they already have.

## VI.   APPLICABLE STANDARDS

54.     I have been requested to review and analyze the expert reports of Dr. Andrew Brill and Dr. Keith Isaacson regarding their opinions that the asserted claims of the '359 patent patents are infringed by the use of the MyoSure and that Hologic contributes to and induces such infringement. I disagree with the conclusions of Drs. Brill and Isaacson.

55.     I base the opinions provided herein on my review of the '359 patent, including the specification and the claims of the '359 patent, the file history of the '359 patent, my review of certain prior art references, other documents in this case, the expert reports of Drs. Brill and Isaacson and the documents cited therein, and my experience as set forth above. I have been informed that this report is being submitted in accordance with the Court's Scheduling Order.

56.     I will not offer opinions of law as I am not an attorney. However, I have been informed of several principles concerning patent infringement and non-infringement, which I used in arriving at my conclusions.

57.     It is my understanding that assessment of infringement is a two-step process. First, the language of the patent claims must be construed by the Court. Second, the claims as construed are compared to the Hologic product or process to determine whether the Hologic product or process meets each and every limitation of the claim as construed by the Court.

58.     In formulating my opinion, I have reviewed the parties' proposed claim constructions as discussed above. I expressly reserve the right to supplement or modify my opinions and this report if and when the Court issues its claim construction ruling.

59.     Moreover, I note that there are theories of infringement in the Hogan Report that are not included in S&N's Preliminary Infringement Contentions served on February 3, 2012. Because I understand that S&N should not be permitted to assert such theories, I have addressed them only in a limited manner. I reserve the right to supplement or modify my opinions and this report if S&N is permitted to amend or modify its infringement contentions or add new contentions.

60.     It is my understanding that the patentee has the burden of proving infringement by the preponderance of the evidence. I understand this standard to require that the patentee present evidence that as a whole shows that the fact sought to be proved is more probable than not.

61.     In this case, S&N has asserted that Hologic has induced and contributed to the infringement of claims 1-8 of the '359 patent. I further understand that the claims that have been asserted against Hologic are what are known as method claims. I understand that any person or business entity that, without the '359 patent owner's permission, performs all the steps of at least one method claim of a patent, before the patent expires, infringes the patent.

62.     I am aware that to determine direct infringement, a person must compare the use of the MyoSure product with each step of claims 1-8 of the '359 patent.

63.     A patent method claim is directly infringed only if the accused method includes each and every element in that patent claim. I am aware that if the use of the MyoSure product does not involve one or more of the steps recited in a claim, then that product does not directly

infringe that claim. I am further aware that if the use of the MyoSure product includes each step of the claim, then it infringes the claim even if it contains additional elements or steps that are not recited in the claim.

64.     It is my understanding that every claim limitation is essential in proving infringement, and the absence of even one limitation in an accused product avoids infringement.

65.     I understand that in determining direct infringement one must consider each of the asserted claims of the patents-in-suit individually, and decide whether the use of the MyoSure infringes each claim.

66.     It is my understanding that in order to prove direct infringement, a claim limitation may be met in one of two ways: either literally or under the doctrine of equivalents.

67.     I understand that a claim limitation is literally met if it exists in the accused structure exactly as it is described in the claim language, as the Court has construed that language, or as it would be understood by one of skill in the art where the Court has not construed the language.

68.     It is my understanding that even if all limitations of a claim are not literally met, the use of the MyoSure product may still infringe under the doctrine of equivalents ("DOE").

69.     It is my understanding that to establish infringement under the doctrine of equivalents, the accused product or process must, for each element of the claim not literally present, contain a structure or perform a step that is substantially equivalent to the element in the claim. I understand this analysis is performed on a limitation by limitation basis, and not as to the claim as a whole. I understand that a claim limitation is present in an accused product or

-15-

process under the doctrine of equivalents if the differences between the claim limitation and a comparable element of the accused· product are insubstantial.

70.     It is my understanding that one common way of determining substantial equivalence is to examine whether the accused structure or process performs substantially the same function, in substantially the same way, to achieve substantially the same result as the corresponding limitation of the claim.

71.     I also understand that there are several restrictions on the application of the doctrine of equivalents.   First, if an accused product or process wholly lacks even a single limitation of a claim, it cannot infringe the claim under the DOE.   Second, the range of equivalents cannot be so broad as to encompass that which was already known in the prior art. Third, the doctrine of prosecution history estoppel precludes a patentee from reclaiming through equivalents subject matter that was relinquished based on statements or amendments made during prosecution.   Finally, if a patentee narrowed a claim limitation by amendment during prosecution for reasons pertaining to patentability, that limitation is not entitled to any range of equivalents unless: (a) the equivalent was unforeseeable at the time of the application; (b) the rationale underlying the amendment bears no more than a tangential relation to the equivalent; or (c) the patentee could not reasonably have been expected to have described the equivalent in question.   In addition, I understand the doctrine of equivalents cannot be applied if applying the doctrine would vitiate a claim limitation.

72.     It is my understanding that, to infringe a dependent claim, the accused product must include each and every limitation of all claims from which the dependent claim depends. Therefore, a depending claim cannot be infringed by an accused product if the product does not infringe the independent claim from which the depends claim depends.

## VII.   NON-INFRINGEMENT

73.     It is my opinion that the use of the MyoSure does not infringe any of the claims of the '359 patent because that use lacks:

- insertion into the uterus of an endoscope having an "elongated member"; and
- "aspiration" of substantially only fluid through a "further outlet channel" as required in the '359 patent;

74.     It is also my opinion that use of the MyoSure does not infringe claims 1-4 of the '359 patent because that use lacks "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter."

75.     Further, it is my opinion that use of the MyoSure does not infringe claims 2 and 6 of the '359 patent because the MyoSure lacks "a cutting window at a distal region of the outer tube."

### A.     No "Elongated Member" (All Claims)

76.     All of the claims require insertion into the uterus of an endoscope having an "elongated member." The MyoSure lacks the claimed "elongated member." Under Hologic's proposed construction, the elongated member is the component of an endoscope as indicated by A in Figure 2 of the '359 patent that is at least 30 centimeters in length. This 30 centimeter length is described as an "essential" feature of the invention. (*See, e.g.,* col. 2:56-58; col. 3:62-63.) The component of the MyoSure as indicated by A in Figure 2 of the '359 patent is only 18.43 centimeters in length. Accordingly, MyoSure cannot literally infringe this claim element under Hologic's proposed construction.

77.     It does not appear that Drs. Brill and Isaacson dispute that the MyoSure does not literally infringe this claim element under Hologic's proposed construction.

-17-

78.     Instead, Drs. Brill and Isaacson assert that the MyoSure's 18.43 centimeter long member would be equivalent to an elongated member. As a threshold matter, based on my review of S&N's preliminary infringement contentions, it appears that S&N did not set forth a contention that the MyoSure satisfies this element under the doctrine of equivalents.

79.     In any event, the 18.43 cm member of the MyoSure is not equivalent to an elongated member that must be more than 30 cm long. Drs. Brill and Isaacson attempt to perform the function-way-result analysis (discussed above) to Hologic's proposed construction of "elongated member," but their analysis appears flawed to me. Rather than focus on the claim limitation at issue — the component of an endoscope as indicated by A in Figure 2 of the '359 patent that is at least 30 centimeters in length — they focus on the endoscope as a whole. I understand that this is improper.

80.     According to the '359 patent, the function of the requirement that the member be at least 30 cm long is "to have a length which is sufficient to reach all tissue parts." ('359 patent col. 2:57-58.) The '359 patent provides that this 30 cm length is "essential" to the invention. (*Id.*) If this length is "essential" according to the '359 patent, then it cannot be that a member only 18.43 cm long is equivalent to one that is more than 30 cm long — such a short member would lack the "essential" 30 cm feature. Thus, the *way* that the MyoSure reaches tissue — through a member that is roughly half as long as the required 30 cm length — is substantially different than what is required in the patent.

**B.      No "Aspiration" Through A "Further Outlet Channel" (All Claims)**

81.     The term "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter" is found in claims 1-4. I understand that Hologic has proposed a construction

of "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter and aspirating substantially only fluid through a further outlet channel." *See* Hologic's Opening Claim Construction Brief at 14.

82. The term "aspirating fluid with detached tissue from the uterus through a lumen of the cutter" is found in claims 5-8. I further understand that Hologic has proposed a construction of "aspirating fluid with detached tissue from the uterus through a lumen of the cutter and aspirating substantially only fluid through a further outlet channel" for this claim element. *See* Hologic's Opening Claim Construction Brief at 14-15.

83. Under Hologic's construction, there can be no infringement because the MyoSure does not contain a "further outlet channel" for aspirating substantially only fluid. It does not appear that Drs. Brill and Isaacson dispute this conclusion, as they offer no opinions of infringement of this element under Hologic's proposed construction.

84. Indeed, according to the '359 patent, the use of the "further outlet channel" to aspirate substantially only fluid was the invention itself. It was this outlet channel that "makes it possible" (col. 2:31.) to remove tissue from the uterus with the motor driven cutter as described in the '359 patent. The MyoSure lacks what the inventor of the '359 patent believed made it possible to perform the invention in the '359 patent (if there is an invention there). Thus, it cannot infringe any of the asserted claims.

### C. No "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter" (Claims 1-4)

85. Even under S&N's proposed construction of "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter," which is simply the language of the claim limitation itself, the use of Hologic's MyoSure would not infringe.

86.     All of the tissue and fluid aspired by the MyoSure is from the uterus. Specifically, the irrigation fluid enters the uterus from the endoscope, mixes with the tissue there, and then the tissue and fluid are discharged together through the hollow stem of the MyoSure cutter. There is no fluid that is aspirated from the MyoSure that is from the endoscope — it always has to flow through the uterus first before it can be aspirated out the MyoSure.

87.     This claim element, however, requires that tissue and fluid be aspirated from both the uterus *and* the endoscope.   This is performed by the device shown in the '359 patent. Irrigation fluid traveling down the endoscope can be aspirated out through the further outlet channel without ever having entered the uterus.  Thus, that device aspirates fluid from the endoscope in addition to fluid from the uterus.   The MyoSure, lacking such a further outlet channel, does not aspirate any fluid from the endoscope.  Thus, there would be no infringement of claims 1-4 even under S&N's construction.

88.     I note that Drs. Brill and Isaacson do not assert infringement of this claim element under the doctrine of equivalents.  I reserve the right to render opinions rebutting any such assertions if S&N is permitted to provide expert testimony in that regard.

### D.     No "cutting window at a distal region of the outer tube" (Claims 2 and 6)

89.     Claims 2 and 6 require "a cutting window at a distal region of the outer tube." Under Hologic's proposed construction, this claim element means "an open distal end of the outer tube." The distal end of the MyoSure is not open; it is closed.  Moreover, any cutting window on the MyoSure is not at the distal region (or distal end) of the outer tube because it is proximate the distal region (or distal end) of the outer tube.  Accordingly, Hologic's MyoSure cannot literally infringe this claim element.  Neither Drs. Brill nor Isaacson have set forth a

contention that Hologic's MyoSure satisfies this element under the doctrine of equivalents, and I reserve the right to provide opinions regarding the doctrine of equivalents if S&N is permitted to provide expert testimony on that topic.

90.    Drs. Brill and Isaacson assert that the cutting window of the MyoSure is an open distal end of the outer tube. Neither of them provides any explanation for this conclusion; they simply say it with no basis. It is thus difficult to understand how they came to their conclusion. The distal end of the MyoSure's outer tube is unambiguously and completely closed. The cutting window is in the side of the tube, not the end of it. Thus, the MyoSure lacks an "open distal end" as required under Hologic's proposed claim construction.

I declare under penalty of perjury under the Laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Henry Dominicis

Executed this 16th day of April, 2012.

# APPENDIX A



WOMANCARE

## <u>CURRICULUM VITAE</u>

| | |
|---|---|
| Name: | Henry A. Dominicis, M.D. |
| Primary Office: | 1051 West Rand Road<br>Arlington Heights, IL 60004<br>(847) 221-4900 |
| Second Office: | 455 South Roselle Road<br>Schaumburg, IL 60193<br>(847) 221-4300 |
| Work History: | 1991 to Present |

Educational Background:

| | | |
|---|---|---|
| (College) | St. John's University<br>Collegeville, MN | 1979-1983 |
| (Medical School) | University of Illinois<br>Chicago, IL | 1983-1987 |
| (Intern) | Lutheran General Hospital | 1987-1988 |
| (Residency) | Lutheran General Hospital<br>Park Ridge, IL | 1988-1991 |

Hospital Appointments:

| | |
|---|---|
| Lutheran General Hospital – Park Ridge, IL –<br>Attending Physician | 1991-2006 |
| Northwest Community Hospital –<br>Arlington Heights, IL | 1996 to Present |
| Northwest Community Hospital –<br>Arlington Heights, IL<br>Chairman – Department of<br>Obstetrics and Gynecology | 2006 to 2010 |

| | |
|---|---|
| Work Background: | High Risk Pregnancy, Laparoscopic Surgery, including<br>Advanced Gyne Surgery, Laser Surgery, Gynecology and<br>Obstetrics and Ultrasound and Genetic Amniocentesis |
| Board Status: | Board Certified – November of 1995 to Present<br>American Board of Obstetricians and Gynecologists |

_____          _____

**Henry A. Dominicis, M.D.**                                    **Date**

*HAD: January of 2011*

# APPENDIX B

## Dr. Henry A. Domincis Documents Considered In Forming Opinions

- Smith & Nephew's Expert Report of Dr. Andrew Brill Regarding Infringement

- Smith & Nephew's Expert Report of Dr. Andrew Brill Regarding Infringement

- U.S. Patent No. 8,061,359

- Prosecution History of U.S. Patent No. 8,061,359