```
   UNITED STATES DISTRICT COURT
     DISTRICT OF MASSACHUSETTS
-------------------------------------

SMITH & NEPHEW, INC.,

                 Plaintiff,

           v.

HOLOGIC, INC.,

                 Defendant.
-------------------------------------


  Civil Action No: 11-CV-12064

  -----------------------
         Deposition of:

    DR. MARK HANS EMANUEL

   taken at the offices of:

       Boekel de Neere
      Gustav Mahlerplein 2
       1082 MA Amsterdam
           Netherlands

  on Friday, December 16th, 2011

      commencing at 1:00 p.m.

       -----------------------
```

Page 30

1   A. Yes.
2   Q. What does that mean? What is a continuous flow system?
3   A. Well, it means that there is a constant flow to keep the
4      uterus distended. If you -- if you stop flow inside the
5      uterus, the distension will go down. So it's only safe
6      to do surgery in a uterus when it is constantly
7      distended.
8   Q. And as a matter of the mechanics of the device used in
9      the procedure how do you ensure continuous flow?
10  MS. FLORES: I'll object to the form. The procedure as
11     claimed?
12  MR. WOLF: Yes.
13  A. Because there is -- you attach it to a certain
14     pressurised system where fluid is running into that --
15     the endoscope and the uterus. So the uterine cavity is
16     constantly distended, because the fluid is pressurised
17     either by a pump or pressure or mechanical or whatever.
18     That doesn't matter, but there should be a constant
19     inflow of fluid to keep it distended.
20  Q. And the way you envisioned in the '359 patent achieving
21     that is with two channels, one for fluid and one for
22     tissue. Correct?
23  MS. FLORES: Object to the form of that question.
24  A. Well, the channel for the tissue is not to intend to

Page 31

1      keep distension. There is an inflow channel for fluid
2      and that is intended to keep enough distension, and the
3      tissue channel -- the other channel is for tissue and
4      fluid as well, but that's not for keeping it distended.
5   Q. When you say "that's not for keeping it", what's not for
6      keeping it distended?
7   A. What you said, the continuous flow, it's not -- you
8      know, it's the inflow which should be continuous. If
9      you -- if you stop the inflow, you will get a collapse,
10     and if you have a collapse, you can't operate.
11  Q. Is there anywhere in the '359 patent where you identify
12     a device that can achieve the desired continued flow
13     without two separate channels, one primarily for tissue
14     removal and one primarily for fluid circulation?
15  A. Sorry. Rephrase.
16  Q. Could you read the question back, please?
17         (Question read back)
18  A. I don't know.
19  Q. What was your role in the prosecution of the '359
20     patent, if any? Do you understand the term
21     "prosecution"?
22  A. No, not exactly.
23  Q. In the U.S. patent system, as in the Dutch patent
24     system, you start by filing your application. There

Page 32

1      then is frequently -- and that point is when you
2      submitted your oath.
3   A. Yes.
4   Q. At that point there are frequently communications
5      between patent attorneys and the patent office and in
6      some circumstances an inventor remains involved
7      discussing things with the attorney. In other
8      situations the inventor never hears about the patent
9      again, and so in this particular case what was your
10     role, if any, after the date the original application
11     was filed in prosecuting this patent?
12  A. I think no role.
13  Q. Can you recall at any point in the last decade any
14     communications with any of the attorneys that were
15     prosecuting the U.S. patent that resulted in the
16     '359 claims?
17  A. No, I can't recall.
18  Q. Do you recall when you learned that the '359 patent was
19     going to issue?
20  A. When I -- sorry.
21  Q. When you learned --
22  A. Learned. The moment it was issued.
23  Q. So prior to it issuing you have no recollection of any
24     substantive conversations in roughly the previous ten

Page 33

1      years, prior ten years?
2   A. Not on the patent. We had a lot of conversations on the
3      technology, but not on this specific -- how you call
4      this one?
5   Q. The '359.
6   A. The '359 one.
7   Q. And I'm sure you've answered this question, but it will
8      shorten the deposition if I understand you correctly.
9      So as the discussions were going on with the patent
10     office about whether the claim should be written one way
11     or the claim should be written another, whether they
12     were allowed or not allowed in a given form, you had
13     nothing to do with those discussions. Is that right?
14  A. That's right. I -- well, I had the feeling it all came
15     from the original patent, the PCT, the world patent.
16  Q. I'm just trying to get an understanding of your role.
17     Were you in communication with the lawyers as they were
18     interacting with the patent office?
19  A. No.
20  Q. Were you in communication with the lawyers as they were
21     deciding whether and how to change the claims as
22     a result of those communications with the patent office?
23  A. No.
24  Q. Did there come a time that you became aware that

Page 38

1  the -- well, it has this channel to introduce surgical
2  instruments and furthermore it has an optic.  It has
3  a light connector for transmitting light to the end, to
4  the distil end, and it has a channel to provide the
5  continuous distension of the organ where it is used for.
6  Q. And what -- is there a separate picture, counsel, of
7  just that component, do you recall?
8  MS. FLORES:  For the life of me I am sorry, Matt.  I don't
9  have the pictures in front of me.  I think we sent you
10  eight.  I don't know that it's individual like that or
11  if it's all three of them that are somewhat lined up.
12  It may be that it's just from a different angle.
13  MR. WOLF:  And that's -- I'm not worried -- actually let's
14  mark as exhibit 4 a photograph labelled 855.
15     (Exhibit number 4 marked for identification)
16  MS. FLORES:  Those looked much better when I took them as
17  opposed to when we printed them out.  I will see if we
18  can get you better pictures.
19  MR. WOLF:  That's quite all right.  Can you identify 855?
20  A. Yes.  Tell what I see here?
21  Q. Let me ask you: of the three prototypes on the table is
22  exhibit 4 a photograph of those three components?
23  A. Yes.
24  Q. Okay.  So you were just describing what is in the middle

Page 39

1  of the three devices on exhibit 4.  Correct?
2  A. Yes.
3  Q. All right.
4  A. That's the endoscope.
5  Q. Right.  What is -- can you tell me about the history of
6  this particular prototype you're holding in your hand?
7  A. Actually this is originally a percutaneous nephroscope.
8  This is an instrument originally comes from urology.
9  Why?  We had to modify or build a hysteroscope which
10  could contain rather firm cutter to be able to introduce
11  that and the new -- well, the difference between this
12  instrument and the current hysteroscopes was that the
13  working channel is straightforward instead of a bended
14  working channel.
15  Q. Did you -- who actually built the prototype you're
16  holding in your hand --
17  A. Olympus.
18  Q. -- to your specifications?  That device in your hand,
19  did that pre-date your efforts?
20  A. Pre-date my efforts?
21  MS. FLORES:  Objection.  Try it again.
22  A. I don't understand.
23  MR. WOLF:  What you're holding in your hand right now, which
24  is the middle device --

Page 40

1  A. Yes.
2  Q. -- of exhibit 4, was that something purpose built, built
3  at your behest, or did that -- was that built by someone
4  else that you then used for your purposes?
5  A. It was built by someone else and I used it for my
6  purposes.
7  Q. Okay.  When did you acquire exhibit 4, the middle device
8  in exhibit 4?
9  A. Yes.  I can't remember exactly, but it was I think at
10  the moment I realised that I needed a specific
11  instrument like this with a straightforward working
12  channel.
13  Q. All right.  So let's look now --
14  A. This is used -- these type of instruments are used in
15  urology.
16  Q. So the device that is the middle device on exhibit 4 was
17  commercially available from a third party?
18  A. Yes.
19  Q. Now let's look at what appears to be, and I'd ask you to
20  confirm, the bottom device photographed on picture -- on
21  figure 4.
22  A. Right.
23  Q. Is that -- was that similarly a commercially available
24  device?

Page 41

1  A. Yes, I think so.
2  Q. Can you explain what we're looking at with that?
3  A. This is an extra sheath.  You can put on this one where
4  you have an extra channel, which is a channel for fluid
5  to run through, and very small tissue fragments that are
6  allowed to pass these little openings.
7  Q. Can I take a look for a second?
8  A. It's on the side.
9  Q. I'm looking at it head on and I see a rather large
10  opening at the top.  Correct?
11  A. Correct.
12  Q. And then I see the light fixture at the bottom?
13  A. Correct.
14  Q. And you're saying around the perimeter there are
15  channels?
16  A. Yes.  Well, on the outside of the sheath there are
17  little openings --
18  Q. Oh, I see.
19  A. -- and that allows fluid to go through.
20  Q. So you're talking about what looks like a sieve or
21  a strainer on the outside is what you're referring to as
22  the channels?
23  A. Yes, yes.
24  Q. So now we have the final piece, which is at the top of

Page 54

1     about in column 2 --
2  A. It is hysteroscopes. I am talking about hysteroscopes.
3  Q. Okay. The device --
4  A. I am not talking about hysteroscope with morcellation.
5  Q. The devices you are talking about in column 2 --
6  A. Yes.
7  Q. -- that you just said aren't very good but can get the
8     job done --
9  MS. FLORES: Object to the form or object to that
10    characterisation.
11 A. No.
12 MR. WOLF: -- can you use those devices you are referring to
13    in column 2 to perform the --
14 A. You mean arthroscopes and things like that?
15 Q. Well, whatever you're referring to in column 2. You
16    talk about at column 2, line 7:
17       "This device could be satisfactory ..."
18    Do you see that?
19 A. Yes.
20 Q. Whatever device you're referring to there --
21 A. Yes.
22 Q. -- could that device be used for the method of claim 1
23    of the '359 patent?
24 A. I don't understand. It's too difficult.

Page 55

1  Q. What exactly did you invent?
2  MS. FLORES: Object to the form of that question.
3  A. I invented a technology to remove tissue from a uterine
4     cavity by a technology which is called hysteroscopic
5     morcellation.
6  MR. WOLF: But what was new? What hadn't already been done?
7  MS. FLORES: Object to the form of that question.
8  A. There was no such technology available.
9  MR. WOLF: But you just told me that, although it wouldn't
10    be great, the device you are referencing in column 2
11    could be used with a single channel. Right?
12 MS. FLORES: Object to the characterisation of his
13    testimony.
14 A. For hysteroscopy.
15 MR. WOLF: Well, and in the uterus as well. Right?
16 A. I don't know. All I knew at that time we had no system
17    like this which we could use in the uterus.
18 Q. How was the lens attached to the prototype we have been
19    talking about?
20 A. The lens?
21 Q. Yes.
22 A. The lens?
23 Q. Let me ask you: was a lens attached?
24 A. What do you mean with "a lens"?

Page 56

1  Q. Lens, the image, the camera lens.
2  A. The camera you mean?
3  Q. Let's look at --
4  A. The camera is attached here in the optic.
5  Q. So let's look at claim 1.
6  A. Of which patent?
7  Q. Of the '359 patent. You see towards the bottom of the
8     first limitation:
9        "... and the first channel having a light guide ..."
10 A. Sorry. Where are you?
11 Q. Column 5, line 28 or so.
12 A. Yes.
13 Q. 29:
14       "... and the first channel having a light guide
15    permanently affixed therein and being sealed from the
16    second channel."
17    Do you see that?
18 A. Yes.
19 Q. ==Does the prototype that's pictured in exhibit 4 have==
20    ==a light guide?==
21 A. ==Yes. It's here.==
22 Q. ==Is it permanently affixed --==
23 A. ==Yes.==
24 Q. ==-- therein and sealed from the second channel to prevent==

Page 57

1     ==fluid --==
2  A. ==It is. It's here at the end.==
3  Q. ==That -- if testimony -- if I understand your testimony,==
4     ==that feature was commercially available prior to your==
5     ==invention. Correct?==
6  A. ==Yes.==
7  Q. ==So you didn't invent having a light guide permanently==
8     ==affixed and sealed from the second channel to prevent==
9     ==fluid from the valve ..., etc?==
10 A. ==No.==
11 Q. Let me go back. What in claim 1 -- and I want to focus
12    on the device -- perspective of device, not method --
13    what in claim 1 didn't pre-exist your work in terms of
14    device? Do you understand my question?
15 MS. FLORES: Object to the form of the question.
16 A. Yes.
17 MR. WOLF: Let me try again.
18 A. I'm not a patent attorney or the examiner.
19 Q. Let me try again. If I --
20 A. The whole -- the whole technology did not exist. It
21    simply wasn't there.
22 Q. But we know --
23 A. There was nothing where you could perform
24    a hysteroscopic morcellation within the uterus. There

15 (Pages 54 to 57)

Page 70

1  outflow channel when necessary in case of bleeding or
2  disturbing whatever visualisation. So it was not -- in
3  my concept of ideas it didn't play a role at that time.
4  Q. Is there any mention about the lens at all, the sealing
5  of the lens or permanent affixation of the lens, the
6  light source?
7  A. No, I don't think so.
8  Q. Do you believe that you invented anything with regard to
9  the lens component or the light component of this?
10 A. No, no.
11 MS. FLORES: Object to the form of that.
12 A. I do not.
13 MR. WOLF: Why don't we take our second and presumably final
14 break? Thank you.
15         (Off the record)
16 MR. WOLF: If we can mark as exhibit 10 document labelled
17 873 to 887.
18    (Exhibit number 10 marked for identification)
19 Q. Can you identify exhibit 11, please?
20 A. I don't know exactly what it is, but it is coming from
21 the European Society of Human Reproduction and
22 Embryology, and at that meeting there was a press
23 conference. I think it has something to do with the
24 press conference, but I'm not sure.

Page 71

1  Q. If we look at the back starting at page 884 --
2  A. 884, yes.
3  Q. -- what is this document beginning here?
4  A. The intrauterine shaver you mean?
5  Q. Yes.
6  A. It's a new hysteroscopical technique to remove
7  intrauterine tissue.
8  Q. More generally is this an abstract?
9  A. I've no idea. I have to read it first. I don't know.
10 Q. So this is not something you wrote?
11 A. Yes, definitely I wrote this, but -- what I remember is
12 that I gave a lecture, but this is not an abstract where
13 you -- an abstract to -- how do you say -- to send in
14 prior to the meeting -- how do you say -- submit. So
15 this definitely is not an abstract I submitted for the
16 meeting.
17    I remember that I got -- on a certain moment I got
18 a phone call or an e-mail that they said, "We choose
19 your technology for this press conference" and I think
20 they asked me some more information and something like
21 that, but I don't know exactly.
22 Q. If we look at the section entitled "Materials and
23 Methods" on 885 --
24 A. Yes.

Page 72

1  Q. -- is there any distinction in the materials and methods
2  described here and the prototype work you described
3  doing in 2007?
4  A. I have to read it. I think that exactly describes what
5  we did at that time.
6  Q. At that time you --
7  A. It is the prototype description.
8  Q. Could you hand me exhibit 4 for a second? All right.
9  So I'm holding up what we are now calling 4B, the actual
10 physical prototype.
11 A. Yes.
12 Q. The middle picture on 885. I see the logo "OES". Does
13 that stand for Olympus?
14 A. Yes, that's an Olympus logo I think.
15 MS. FLORES: Can I just -- are we sure that's B? I thought
16 that was A, because that's the one you started with, the
17 hysteroscope. Then you went A, B, C.
18 MR. WOLF: I hadn't intended -- let's --
19 MS. FLORES: I am sorry. I really didn't mean to interrupt.
20 MR. WOLF: No. Clarity is important. I was trying -- once
21 --
22 MS. FLORES: Do you want to call that the endoscope, the
23 outer sheath and the cutting device?
24 MR. WOLF: Sure. That's fine. I think we all understand,

Page 73

1  but so we are clear on the picture the thing with the
2  yellow handle is the endoscope. The device closest to
3  the label is the outer sheath.
4  A. Right.
5  Q. The device closest to the Bates number is the cutter.
6  A. The cutter.
7  MS. FLORES: The device closer to the label?
8  MR. WOLF: No, I meant the exhibit label.
9  MS. FLORES: Yes. Absolutely correct.
10 MR. WOLF: So the endoscope -- when did you first become
11 aware of endoscopes like the one I'm holding up from
12 exhibit 4?
13 A. Just a short time before we made the prototype. Must
14 have been at the end of 1996 or something like that,
15 because the idea I had in mind already for a longer
16 time.
17 Q. And so you went looking elsewhere to see whether someone
18 already had an off-the-shelf thing you could use in your
19 idea?
20 MS. FLORES: Object to the form.
21 A. Yes. My problem was that you can't bend these
22 instruments. You can't bend firm cutters, and
23 I realised that I need firm cutters to have an opening
24 that was large enough to discharge fluid, tissue,

19 (Pages 70 to 73)

Page 90

```
 1      (Off the record)
 2  MR. WOLF: I will try to make the best use of my
 3     seven minutes.
 4        If you could go back to the '359 patent, claim 1,
 5     and you see that there are five limitations in claim 1.
 6     So each paragraph is a limitation.
 7  A. Yes.
 8  Q. And so the first limitation begins on line 22 and ends
 9     on line 33.
10  A. Yes.
11  Q. Do you see that? You would agree that as to that
12     limitation that is all in the prior art. That's all
13     features of the Olympus endoscope and outer sheath.
14     Correct?
15  MS. FLORES: Object to the form of that question.
16  A. Correct.
17  MR. WOLF: Counsel, I should know this off the top of my
18     head, but it is claims 1, 3 and 4 that are at issue in
19     the preliminary injunction. Is that right?
20  MS. FLORES: I am just confirming that. Yes.
21  MR. WOLF: Okay. So let's go to claim 3. You would agree
22     that claim 3 is a feature of the Olympus endoscope.
23     Correct?
24  MS. FLORES: Object to the form of that question.
```

Page 91

```
 1  A. Not exactly.
 2  MR. WOLF: What do you mean "not exactly"?
 3  A. Do you mean by only the first part of claim 1?
 4  Q. Let me be clear. I understand that it is your assertion
 5     and Smith & Nephew's assertion that the additional -- at
 6     least some of the additional limitations of claim 1 are
 7     novel, are new?
 8  A. Yes.
 9  Q. I'm not trying to trick you on that.
10  A. No, no. Yes.
11  Q. I am just trying to save time by not going one by one.
12     The first limitation of claim 1 we talked about. Now
13     I want to talk about the limitation added by claim 3. I
14     understand your argument there are new things we are not
15     talking about.
16  A. So only on the first limitation you mean?
17  Q. Right. Now I want to focus only on the language of the
18     limitation of claim 3. You would agree that is
19     a feature of the Olympus endoscope. Correct?
20  MS. FLORES: Object to the form of the question.
21  A. Yes, correct.
22  MR. WOLF: And then the same question as to 4.
23  MS. FLORES: Object to the form of that question as well.
24  A. Correct.
```

Page 92

```
 1  MR. WOLF: Okay. Finally, I think the record is clear, and
 2     I apologise, but I just want to make sure I understand
 3     and I've asked every question I can about the
 4     interaction -- and I think the answer is there is none
 5     -- between you and the patent lawyers from, say, 2001
 6     until the lawsuit was filed. Do you recall -- I am
 7     talking about in terms of the U.S. application process.
 8  A. Yes.
 9  Q. Do you recall any discussions of any kind between you
10     and anyone involved in the claims that are being
11     asserted in this case?
12  A. No. Well, you mean after -- I don't fully understand
13     what you are asking for. We -- sorry.
14  Q. No, I don't want to interrupt you. The early dates
15     don't matter as much. There came a date when you filed
16     the initial application?
17  A. Yes.
18  Q. And you signed off on that?
19  A. (Nods.)
20  Q. After that date in the 2000 time-frame --
21  A. Yes.
22  Q. -- going forward --
23  A. Yes.
24  Q. -- did you have any discussions with anyone involved in
```

Page 93

```
 1     deciding what the claims -- how the claims would read of
 2     the '359 patent?
 3  A. Right. No.
 4  Q. I believe I mean you can get back to work. Thank you
 5     very much for your time. I am sure we will see you
 6     again in this litigation, but thank you for doing this
 7     on short notice. Thank you, Miss Flores.
 8  MS. FLORES: We are off the record.
 9  MR. WOLF: We are off the record.
10     (Whereupon the deposition concluded at 4.00 pm)
11              --ooOoo--
```

Page 94

CERTIFICATE OF DEPONENT

I, Dr Mark Hans Emanuel, hereby certify that I have read the foregoing pages of my witness statement of testimony taken in these proceedings on Friday, December 16th, 2011, and, with the exception of the changes listed on the next page and/or corrections, if any, find them to be a true and accurate transcription thereof.

Signed: ...................................
Name:   Dr. Mark Hans Emanuel
Date:   ...................................

Page 95

CERTIFICATE OF COURT REPORTER

I, Melanie Ball, an accredited real-time reporter with Merrill Legal Solutions, London, hereby certify that the testimony of the witness Dr. Mark Hans Emanuel in the foregoing transcript taken on Friday, December 16th, 2011 was recorded by me in machine shorthand and was thereafter transcribed by me; and that the foregoing transcript is a true and accurate verbatim record of the said testimony.

I further certify that I am not a relative, employee, counsel or financially involved with any of the parties to the within cause, nor am I an employee or relative of any counsel for the parties, nor am I in any way interested in the outcome of the within cause.

Signed: ........................
Name:  Miss Melanie Ball
Dated: ........................

Page 96

E R R A T A
Deposition of Dr. Mark Hans Emanuel

Page/Line No.     Description     Reason for change

Signed: ...................................
Name:   Dr. Mark Hans Emanuel
Date:   ...................................