# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SMITH & NEPHEW, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 11-CV-12064-RWZ |
| v. | ) | |
| | ) | |
| HOLOGIC, INC., | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## SMITH & NEPHEW, INC.'S EXPERT REPORT OF RICHARD J. APLEY

## REGARDING VALIDITY

# TABLE OF CONTENTS

**Page**

I.    EXPERT QUALIFICATIONS ............................................................... 1

II.   COMPENSATION AND PRIOR TESTIMONY .................................... 1

III.  MATERIALS REVIEWED ................................................................. 2

IV.  USE OF DEMONSTRATIVES ............................................................ 3

V.   SUBJECT MATTER OF TESTIMONY ............................................... 3

VI.  LEGAL STANDARDS APPLIED IN THIS REPORT ........................... 3

     A.   Claim Construction ........................................................... 3

     B.   Validity ........................................................................... 3

         1.   Anticipation ......................................................... 4

         2.   Obviousness ......................................................... 4

         3.   Enablement .......................................................... 4

         4.   Written Description ............................................... 5

         5.   Priority ................................................................ 6

VII.  LEVEL OF SKILL IN THE ART ...................................................... 6

VIII.  UNDERSTANDING THE NATURE OF THE PATENTED METHOD ......... 7

     A.   The Surgical Method Claimed by the '359 Patent ................... 7

     B.   The Asserted Claims .......................................................... 8

IX.  Disputed Claim Terms of the '359 Patent ........................................... 9

X.   DEPENDENT AND INDEPENDENT CLAIMS ......................................... 10

XI.  OPINIONS AND BASES FOR OPINIONS ......................................... 10

     A.   Summary of Opinions ........................................................ 10

     B.   Priority to Earlier-Filed Applications ................................... 11

         1.   Permanently Affixed Light Guide ........................... 12

         2.   Permanently Affixed Lens ...................................... 14

         3.   Further Outlet Channel ........................................... 15

**TABLE OF CONTENTS (continued)**

**Page**

4.     Cutting Window at the Distal Region .......................................................... 18

XII.   Reservation ................................................................................................................ 21

## I.    EXPERT QUALIFICATIONS

1.    A summary of my educational and professional experience is set forth in my Curriculum Vitae, the most current version of which is attached to this report as Exhibit A.

2.    I am a Civil Engineer and a retired United States Patent & Trademark Office Patent Examiner.  I have more than forty years experience analyzing patent applications in the mechanical engineering field, including medical devices.  Specifically, during my tenure with the United States Patent & Trademark Office I analyzed and evaluated more than 300 patents applications directed to the design and/or use of endoscopic devices. Also during my tenure with the United States Patent & Trademark Office, I interviewed countless inventors and attended numerous endoscopic device demonstrations, which evinced the design, physical structure and use of such devices. Furthermore, during my tenure with the United States Patent & Trademark Office I also visited several medical device companies to better understand how endoscopic devices are designed, made, and used.

3.    I earned my Bachelors of Science in Civil Engineering from Rensselaer Polytechnic Institute in 1966.  I attended the University of Baltimore School of Law, receiving my Juris Doctorate in 1974.

4.    From 1966 to 2004, I was employed by United States Patent & Trademark Office.  From 1966 to 1974 I was a Patent Examiner, from 1974 to 1982 I was a Primary Patent Examiner, and from 1982 to 2000 I was a Supervisory Patent Examiner.  During my tenure with the United States Patent & Trademark Office I was responsible for the examination of numerous patent applications, including medical devices and methods.  In addition during my tenure, I was responsible for supervising, instructing and training patent examiners regarding patent examining practice, procedure, statutes, rules and regulations.

## II.    COMPENSATION AND PRIOR TESTIMONY

5.    For my work in connection with this case, I am being paid $300 per hour.  My fees are not contingent on the outcome of this case.

6.    Over the past four years, I have been retained as an expert in the following cases in deposition, hearing, and/or trial:

- Helix Information Services, Inc. v. Hawaiian Gardens Casino
  - U.S. District Court for the Central District of California, Western Division
  - On behalf of the Plaintiff
  - Patent Infringement Case
- John T. Minimyer v. R-Roc Representatives, et al.
  - U.S. District Court for the Northern District of Illinois, Eastern Division
  - On behalf of the Plaintiff
  - Patent Infringement Case

1

### III.    MATERIALS REVIEWED

7.      In connection with formulating my opinions in this matter, I have reviewed the following materials:

- U.S. Patent No. 8,061,359 ("the '359 Patent");

- Prosecution history of the '359 Patent;

- U.S. Patent No. 7,249,602 ("the '602 Patent")

- Prosecution history of the '602 Patent;

- NL 1006944 (the "Dutch Patent");

- PCT/NL98/00504 (the "PCT Application");

- The prototype system, including the endoscope and the modified cutting device, used by Dr. Mark Hans Emanuel, the inventor of the '359 Patent;

- Deposition of Dr. Mark Hans Emanuel, dated December 16, 2011;

- Smith & Nephew's Preliminary Validity Contentions;

- Hologic's Preliminary Invalidity Contentions;

- Discovery materials, responses to interrogatories, filings, and documents produced by the parties;

- Expert Report of Hal Walbrink Regarding Invalidity of U.S. Patent No. 8,061,359;

- Expert Report of Dr. Henry A. Dominicis Regarding Invalidity of U.S. Patent No. 8,061,359;

- Expert Report of Dr. K. B. Isaacson Regarding Validity of U.S. Patent No. 8.061,359;

- Asserted Prior Art.

8.      I understand that written discovery, document discovery and depositions are not complete in this litigation, and that at trial Smith & Nephew will present the jury with a wide range of factual evidence to support a showing of validity.  Therefore, I expressly reserve the right to supplement my opinions in view of any new information that arises prior to the discovery deadline in this litigation and/or after the date of this report.

## IV.     USE OF DEMONSTRATIVES

9.      I expect that I may refer to the above referenced materials and/or those specifically cited in this report, as well as representative photographs, charts, graphs, schematics, layouts, animations, and/or models at trial and deposition that I may create to support and explain my testimony set forth herein.  I may also use such materials to explain the inventions, the '359 Patent or any related Patent, prior art references, relevant technology areas, and/or other matters that may assist the Court and jury in understanding the technology and patents.

## V.      SUBJECT MATTER OF TESTIMONY

10.      I understand that, in this case, Smith & Nephew is asserting claims 1-8 of the '359 Patent against Hologic.  I further understand that Hologic has alleged that claims 1-8 of the '359 Patent are invalid, and that the '359 Patent is not entitled to priority of the Dutch Patent or '602 Patent. I have been asked by Smith & Nephew to give my opinion regarding the validity and priority of the '359 Patent in rebuttal to the reports of Mr. Walbrink and Dr. Dominicis.

## VI.     LEGAL STANDARDS APPLIED IN THIS REPORT

11.      I understand that the following legal standards apply to my analysis presented in this Expert Report.

### A.  Claim Construction

12.      I understand that analysis of patent validity involves two steps: (1) properly construing the patent claims to ascertain their scope and meaning; and (2) comparing the properly construed claims with the prior art.

13.      I understand that the first step in any validity analysis is to determine the scope of the claims at issue, and that such "claim construction" is a legal matter to be decided by the Court.

14.      I understand that the Court has not yet construed the disputed claim terms in this litigation.  Therefore, I expressly reserve the right to supplement my opinions and this report following the Court's claim construction.

### B.  Validity

15.      I understand that the claims delineate the bounds of a patentee's invention and that claim construction starts with the language of the claims.  I further understand that claims are interpreted from the standpoint of a person of ordinary skill in the art in light of the patent specification, its prosecution history, and any relevant extrinsic evidence.

16.      It is my understanding that the law (35 U.S.C. § 282) states that a patent granted by the United States Patent and Trademark Office ("USPTO") is presumed valid.  I further understand that each claim is presumed valid independently of the other claims, and that clear and convincing evidence of invalidity is required in order to overcome the presumption.  My understanding of clear and convincing evidence is that it is a standard of proof requiring the fact

3

finder to have a clear conviction that a fact is highly probable.  Thus, each claim of the '359 Patent is presumed valid.

17.    I further understand that if a particular prior art reference was before the USPTO Examiner during prosecution of a relevant patent application, or is cumulative art that was before the USPTO Examiner, then an accused infringer bears an even heavier burden of proof than the clear and convincing evidence standard when seeking to prove invalidity on the basis of such a prior art reference.

18.    I further understand that a patent claim can only be proved invalid if it is anticipated (under 35 U.S.C. § 102) or rendered obvious (under 35 U.S.C. § 103) by one or more prior art references.  I also understand that a patent claim can be proved invalid if it does not meet one of the formal requirements including providing a sufficient written description of the invention or providing an enabling disclosure of the invention (under 35 U.S.C. § 112).

### 1.  Anticipation

19.    I understand that in order for a patent claim to be anticipated a party must show by clear and convincing evidence that each and every element of the claim must be disclosed in a single prior art reference and that reference must enable a person having ordinary skill in the art to make and use the claimed invention.

### 2.  Obviousness

20.    I understand that where a patent claim is not anticipated by a single prior art reference, the claim may be invalidated by a combination of references, provided there is some suggestion or rationale based in the prior art that would lead a person having ordinary skill in the art to modify the device disclosed in one reference according to a second reference.  In this context, the claimed invention as a whole must be considered in light of the individual reference.

21.    I further understand that it is improper to simply use the disclosure of the patentee as a road map to pick and choose elements out of the prior art to arrive at the claimed invention.  To demonstrate obviousness of the claimed invention, Hologic must provide some motivation or rationale for making the combination based on the prior art and consistent with the knowledge and experience of the person having the ordinary level of skill in the art.

22.    I further understand that additional or secondary considerations, such as (1) the invention's commercial success, (2) long felt but unresolved needs, (3) the failure of others, (4) skepticism by experts, (5) praise by others, (6) teaching away by others, (7) recognition of a problem, (8) copying of the invention by competitors, and (9) other relevant factors including the technical advantages or characteristics over the prior art, can also be used to rebut invalidity.

23.    I understand that the combined teachings of the references must also enable a person having ordinary skill in the art to make and use the invention.

### 3.  Enablement

24.    I understand that a valid patent must also adequately describe the invention, such that a

4

person of ordinary skill in the art can use the invention without undue experimentation.

25.     I understand that the USPTO evaluates whether a patent has met the requirements of patentability, including enablement, before the USPTO allows the patent to issue, so there is a presumption that the enablement requirement is met here.

26.     I understand that enablement based on the patent specification is judged as of the filing date of the first-filed patent application, which is September 4, 1997.  I further understand that enablement is to be determined from the viewpoint of a person of ordinary skill in the art who has read the specification.

27.     I understand that a patent specification may be enabling even though it does not expressly state some information, if a person of ordinary skill in the art could make or use the invention without having to perform excessive experimentation.

28.     In determining whether excessive experimentation is required, a number of factors can be considered: the scope of the claimed invention; the level of ordinary skill in the art; the amount of guidance presented in the patent; the amount of experimentation necessary; the time and cost of any necessary experimentation; how routine any necessary experimentation is; and whether the patent discloses specific working examples of the claimed invention.

### 4.  Written Description

29.     I understand that the written description of the invention must describe the invention in sufficient detail that one skilled in the art can reasonably conclude that the inventor had possession of the claimed invention.

30.     I understand that the USPTO evaluates whether a patent has met the requirements of patentability, including written description, before the USPTO allows the patent to issue, so there is a presumption that the written description requirement is met here.

31.     I understand that in order to satisfy the written description requirement, the specification must describe an invention understandable to a person of ordinary skill in the art and show that the inventor actually invented the invention claimed.  I further understand that the test for sufficiency is whether the disclosure relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.  I also understand that the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology.

32.     I understand that a determination that the written description requirement is satisfied requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art.  I further understand that given this perspective, in some instances, a patentee can rely on information that is well-known in the art to satisfy the written description requirement.  I also understand that drawings in a patent can constitute an adequate description if they describe what is claimed and convey to one of skill in the art that the patentee actually invented what is claimed.

5

### 5.  Priority

33.     I understand that in order to gain the benefit of the filing date of an earlier application under 35 U.S.C. §120, each application in the chain leading back to the earlier application must comply with the written description requirement of 35 U.S.C. §112, which requires that the earlier application describe the later claimed invention and do so in sufficient detail that one skilled in the art can clearly conclude that the inventor was in possession of the claimed invention as of the filing date sought.

34.     I am aware that the USPTO will examine an application with respect to any claims of priority to earlier-filed US and foreign patent applications and will notify the applicant if the application has not met the requirements for such claims to priority.

35.     I understand that a determination that the written description requirement is satisfied requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art.  I further understand that given this perspective, in some instances, a patentee can rely on information that is well-known in the art to satisfy the written description requirement.

36.     I understand that drawings in a patent can constitute an adequate description if they describe what is claimed and convey to one of skill in the art that the patentee actually invented what is claimed.  I further understand that the prior application need not describe the claimed subject matter in exactly the same terms as used in the claims.

## VII.   LEVEL OF SKILL IN THE ART

37.     I understand that claims are construed from the perspective of one of ordinary skill in the art to which the patented subject matter pertains at the time of the invention.  Furthermore, I understand that a determination of the level of ordinary skill in the art includes as relevant factors (1) the educational level of the inventor; (2) the type of problems encountered in the art; (3) the prior solutions to those problems; (4) the rapidity with which innovations are made in the art; (5) the sophistication of the technology in the art; and (6) the educational level of active workers in the field.

38.     The invention of the '359 Patent generally relates to a method for the removal of tissue from the uterus using an endoscope and a mechanical cutter that simultaneously cuts and removes tissue.  Thus, the relevant field of art is gynecologic surgery.  I understand that Dr. Keith B. Isaacson has been retained by Smith & Nephew as an expert in this matter.  I further understand that according to Dr. Isaacson, a person of ordinary skill in the art with respect to the methods claimed in the '359 Patent at the time of the invention, is a medical doctor who has completed an accredited residency program in gynecology, which would include one or more years of experience performing gynecological surgery that includes but is not limited to removing tissue, such as fibroids or polyps, from the uterus.  I agree with Dr. Isaacson's opinion and furthermore, I consider Dr. Isaacson to be a person of ordinary skill in the art with respect to the methods claimed in the '359 Patent.

39.     I understand that Hologic has asserted invalidity and priority arguments based upon the

design of the endoscope and mechanical cutter used in the method claimed by the '359 Patent. With respect to the design of the endoscope and mechanical cutter, it is my opinion that a person of ordinary skill in the art at the time of the invention is a degreed engineer having at least 5 years of experience analyzing the designs, components and/or structures of medical devices, including but not limited to endoscopes, resectoscopes, shavers, tissue removal devices, or a person having at least 10 years experience analyzing the designs, components and/or structures of medical devices, including but not limited to endoscopes, resectoscopes, shavers, tissue removal devices.

40.    As discussed above and in my Curriculum Vitae, I have the requisite education and extensive experience, and therefore qualify as one of skill in the art with respect to the design of the endoscope and mechanical cutter used in the method claimed by the '359 Patent.

## VIII.   UNDERSTANDING THE NATURE OF THE PATENTED METHOD

### A.  The Surgical Method Claimed by the '359 Patent

41.    Based upon my experience and review of the materials associated with this matter, including but not limited to the '359 Patent, Dr. Isaacson's Expert Reports, discovery materials, and depositions, I understand the following paragraphs to be an accurate description of the surgical method claimed by the '359 Patent.

42.    For many decades, the primary treatment for abnormal uterine bleeding, caused by the presence of uterine fibroids (i.e. myomas) or polyps, was minimally invasive "blind" surgery such as a dilation and curettage or major invasive surgery, such as an open abdominal myomectomy or hysterectomy.  The "blind" D&C procedures are mostly ineffective.

43.    In the late 1990's, around the time of the invention of the '359 Patent, gynecologists were using a less invasive transcervical method for removing intrauterine fibroids and polyps - monopolar loop resection – which involves the use of an electrified loop-shaped wire.  During this hysteroscopic procedure, the loop resector is fitted to an endoscope and inserted tranvaginally through the cervix and into the uterine cavity with no incisions.  With each pass of the loop resector against the polyp or fibroid attached to the lining of the uterus, a tissue chip is created.  During the course of the procedure, the tissue chips can obscure the operative field of vision, and thus must be removed separately.

44.    Monopolar loop resection provides good clinical results, however, its use is associated with the following disadvantages and risks: excessive intravasation of distention fluid and associated electrolyte disturbances; misdirected RF energy; uncontrolled monopolar leakage of electrical current, which may cause tissue burns; obscured visual field due to debris tissue; and uterine perforation or cervical laceration caused by repeated removal and reinsertion of surgical instruments.

45.    The '359 Patent is generally directed to a novel method for the removal of tissue from a uterus using an endoscope and a mechanical cutter that simultaneously cuts and removes tissue. More specifically, the '359 Patent recites a method for removing tissue by inserting an

endoscope with specific features into a uterus, followed by inserting a motor-driven cutter into the endoscope such that it extends beyond the endoscope into the uterus.  The method further involves delivering fluid through the endoscope into the uterus, energizing a motor that makes the cutter cut tissue within the uterus, and removing cut tissue and fluid through the cutter.

46.     I understand that the methods claimed by the '359 Patent avoid some of the disadvantages and risks associated with monopolar loop resection.

### B.  The Asserted Claims

47.     I am informed that the Asserted Claims are claims 1 – 8 of the '359 Patent.  Claims 1 – 8 of the '359 patent are reproduced below.

48.     Claim 1:

A method for removal of tissue from a uterus, comprising:
inserting a distal region of an endoscope into said uterus, the endoscope including a valve
    and an elongated member defining discrete first and second channels extending from
    a proximal region of the elongated member to the distal region, the second channel
    having a proximal end in communication with the valve such that fluid from the valve
    is able to flow into and through the second channel to the uterus, and the first channel
    having a light guide permanently affixed therein and being sealed from the second
    channel to prevent fluid from the valve from entering the uterus through the first
    channel; followed by:
inserting a motor driven cutter into the second channel such that a distal cutting region of
    the cutter extends distally beyond the endoscope in the uterus;
delivering fluid into the uterus through the valve and the second channel to distend the
    uterus;
energizing an electric motor to drive the cutter to cut tissue within the uterus; and
aspirating cut tissue and fluid from the uterus and the endoscope through the cutter.

49.     Claim 2:

        The method of claim 1 wherein inserting the motor driven cutter comprises
inserting an outer tube defining a cutting window at a distal region of the outer tube and
an inner tube received within the outer tube that is configured to rotate relative to the
outer tube to cut tissue, the inner tube including a cutting element at a distal region of the
inner tube configured to cut tissue at the cutting window when the inner tube rotates
relative to the outer tube.

50.     Claim 3:

        The method of claim 1, wherein inserting the distal region of the endoscope
comprises inserting a distal region of an endoscope that includes a fiber optics bundle
permanently affixed to the first channel of the elongated member.

8

51.    Claim 4:

     The method of claim 1, wherein inserting the distal region of the endoscope comprises inserting a distal region of an endoscope that includes a lens permanently affixed to the first channel of the elongated member.

52.    Claim 5:

A method for removal of tissue from a uterus, comprising:
inserting a distal region of an endoscope into the uterus, the endoscope including a port
    for receiving a motor driven cutter and including an elongated member defining
    discrete first and second channels extending from a proximal region of the elongated
    member to the distal region, the first channel having a light guide permanently affixed
    therein and the second channel having a straight, central longitudinal axis extending
    from the port to an opening at a distal tip of the endoscope; followed by:
inserting the motor driven cutter for cutting and detaching tissue into the second channel
    through the port;
introducing fluid into the uterus; and
aspirating fluid with detached tissue from the uterus through a lumen of the cutter.

53.    Claim 6:

     The method of claim 5 wherein inserting the motor driven cutter comprises inserting an outer tube defining a cutting window at a distal region of the outer tube and an inner tube received within the outer tube that is configured to rotate relative to the outer tube to cut tissue, the inner tube including a cutting element at a distal region of the inner tube configured to cut tissue at the cutting window when the inner tube rotates relative to the outer tube.

54.    Claim 7:

     The method of claim 5, wherein inserting the distal region of the endoscope comprises inserting a distal region of an endoscope that includes a fiber optics bundle permanently affixed to the first channel of the elongated member.

55.    Claim 8:

     The method of claim 5, wherein inserting the distal region of the endoscope comprises inserting a distal region of an endoscope that includes a lens permanently affixed to the first channel of the elongated member.

## IX.    DISPUTED CLAIM TERMS OF THE '359 PATENT

56.    Counsel for Smith & Nephew has informed me that a dispute exists between the parties regarding the proper construction of the following claim terms:

| Claim | Claim Term | Smith & Nephew's Proposed Construction | Hologic's Proposed Construction |
|---|---|---|---|
| 1-8 | "elongated member" | "member of the endoscope that is elongated defining the length of the discrete first and second channels" | "the component of an endoscope as indicated by A in Fig. 2 that is at least 30 cm in length" |
| 1-4 | "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter" | "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter" | "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter and aspirating substantially only fluid through a further outlet channel" |
| 5-8 | "aspirating fluid with detached tissue from the uterus through a lumen of the cutter" | "aspirating fluid with detached tissue from the uterus through a lumen of the cutter" | "aspirating fluid and detached tissue from the uterus through a lumen of the cutter and aspirating substantially only fluid through a further outlet channel" |
| 2, 6 | "a cutting window at a distal region of the outer tube" | "an opening to provide access to a cutting component at a distal region of the outer tube" | "an open distal end of the outer tube" |

57.     As stated previously, I understand that the Court has not yet construed the disputed claims.  Therefore, where applicable, I may address each element of the claims under both Smith & Nephew and Hologic's proposed claim constructions.  I expressly reserve the right to supplement, modify, or otherwise amend my opinions and this report following receipt of the Court's claim construction order.

## X.     DEPENDENT AND INDEPENDENT CLAIMS

58.     I understand that a claim in dependent form shall be construed to incorporate by reference all the limitations of the independent claim to which it refers.  Accordingly, I understand that in order to invalidate a dependent claim, the prior art must meet all of the claim limitations of the dependent claim, in addition to the claim limitations of the independent claim to which it refers.  And even though an independent claim may be held invalid, a dependent claim which depends from an invalid independent claim can be separately valid.

## XI.     OPINIONS AND BASES FOR OPINIONS

### A.  Summary of Opinions

59.     I understand that Smith & Nephew has asserted claims 1-8 of the '359 Patent against Hologic.  I further understand that Hologic has alleged that Claims 1-8 of the '359 Patent are invalid, and that the '359 Patent is not entitled to priority of the Dutch Patent or '602 Patent.

60.     More specifically, Mr. Walbrink and Dr. Dominicis conclude that the '359 Patent does not benefit from the earlier-filed patents and applications because those documents do not

provide adequate written description and/or enablement of the following 5 claim elements: "permanently affixed light guide," "permanently affixed lens," "a cutting window at a distal region of the outer tube," an endoscope without "a further outlet channel," and "inserting a motor driven cutter into a second channel" after inserting an endoscope.

61.     Neither Mr. Walbrink nor Dr. Dominicis offer an opinion regarding the priority or validity of the '359 Patent based upon the written description and/or enablement of the remaining claim elements.  To the extent Mr. Walbrink or Dr. Dominicis is allowed to modify or supplement his opinions, I reserve the right to respond.

62.     For the reasons set forth below, I disagree with Mr. Walbrink and Dr. Dominicis.  It is my opinion that each element of the asserted claims is disclosed adequately in the Dutch Patent, the PCT Application, and the '602 Patent to meet the written description requirements. Accordingly, it is my opinion that the '359 Patent is entitled to a priority date of at least as early as September 4, 1997.

63.     I have read and reviewed Dr. Isaacson's expert reports.   I consider Dr. Isaacson to be a person of ordinary skill in the art with respect to the use of the method claimed in the '359 Patent.  I incorporate by reference here Smith & Nephew Inc.'s Expert Report of Dr. Keith B. Isaacson Regarding Validity in its entirety.

## B.  Priority to Earlier-Filed Applications

64.     Mr. Walbrink and Dr. Dominicis conclude that the '359 is not entitled to the benefit of priority of the earlier-filed patent applications to which the '359 Patent claims priority.  I disagree with their opinions.

65.     The '359 Patent is a continuation of US 09/486,977 filed March 6, 2000, which granted as U.S. Patent No. 7,249,602 ("the '602 Patent").  As such, it is my understanding that the '359 Patent is entitled to the benefit of at least the effective filing date of the '602 Patent (35 U.S.C. § 120), March 6, 2000.  This is supported by the file history in the July 20, 2007 and October 30, 2007 Application Data Sheets, the July 20, 2007 Cover Letter filed with application that became the '359 Patent, the USPTO Filing Receipt, the July 20, 2011 USPTO Priority Acknowledgment and the Cover of the '359 Patent.

66.     The '602 Patent is the national phase entry of PCT/NL98/00504 (the "PCT Application"), filed September 4, 1998.  (35 U.S.C. § 371).  As such, it is my understanding that the '359 Patent is entitled to the benefit of priority of at least the effective filing date of the PCT Application. (35 U.S.C. § 119).  This is supported by the file history in the October 30, 2007 Application Data Sheet, the Declaration signed by Dr. Emanuel, the July 20, 2007 Cover Letter filed with application that became the '359 Patent, the USPTO Filing Receipt, and the July 20, 2011 USPTO Priority Acknowledgment.

67.     The PCT Application claims the benefit of priority of NL 1006944 ("the Dutch Patent"), filed September 4, 1997.  As such, it is my understanding that the '359 Patent is also entitled to the benefit of priority of the filing date of the Dutch Patent, September 4, 1997.  This is reflected

in the July 20, 2007 and October 30, 2007 Application Data Sheets, the July 20, 2007 Cover Letter filed with application that became the '359 Patent, the USPTO Filing Receipt, the July 20, 2011 USPTO Priority Acknowledgment and the Cover of the '359 Patent.

### 1.   Permanently Affixed Light Guide

68.     Mr. Walbrink and Dr. Dominicis conclude that the Dutch Patent and the '602 Patent do not disclose either a "light guide" or a "permanently affixed light guide."  For at least the reasons set forth below, I disagree with their opinions.

69.     As an initial matter, a person of ordinary skill in the art[1] of the design of medical devices such as endoscopes as of at least 1997 would have understood that the term "light guide" means a structure for transmission of luminous energy.  Furthermore, a person of ordinary skill in the art as of at least 1997 would have understood that fiber optics and rod lenses are examples of a light guide.

70.     The specification of the '359 Patent originally as filed reads:

> With reference to FIG. 2, it can be seen that the viewing/receiving part 3, is composed of an outer tube 4 in which a main channel 5 and a viewing channel 6 are defined.  Viewing channel 6 ends at one side in a lens 13 and at the other side in a viewing tube 7, on which an eyepiece or camera connection is placed.  A connection 8 for a light source is also present, for connection to a fibre optics bundle which provides for lighting at the end of the lens 13.

71.     During the prosecution of the '359 Patent, the Patent Examiner objected to the drawings, stating that "the limitation 'light guide' must be shown or the feature(s) or canceled from the claims(s).  No new matter should be entered."

72.     During an interview, the patentee explained to the Patent Examiner that a person of ordinary skill in the art reading the original specification language would have understood that a fiber optics bundle was an example of a light guide.

73.     It is my understanding that the disclosure of a single exemplary embodiment in a patent does not limit the patent to that embodiment.

74.     In an Interview Summary, the Patent Examiner concluded that "the drawings and the specification appear to have support for the limitation 'light guide,'" and that "a minor amendment of the specification may be acceptable."

75.     The patentee amended the specification by adding five (5) words to the specification, as set forth herein:

---

[1] As used herein, unless otherwise noted, the term "a person of ordinary skill in the art" is a person of ordinary skill in the art with respect to the design and structure of the endoscope and mechanical cutter.

12

With reference to FIG. 2, it can be seen that the viewing/receiving part 3, is composed of an outer tube 4 in which a main channel 5 and a viewing channel 6 are defined.  Viewing channel 6 ends at one side in a lens 13 and at the other side in a viewing tube 7, on which an eyepiece or camera connection is placed.  A connection 8 for a light source is also present, for connection to a <u>light guide, such as a</u> fibre optics bundle<u>,</u> which provides for lighting at the end of the lens 13.

76.     During the prosecution of a patent application, a Patent Examiner must evaluate any amendment to determine if the amendment constitutes an addition of new matter into the application.  The Patent Examiner allowed this slight clarification to the '359 Patent specification without objection.  Thus, it is my understanding that the Patent Examiner concluded that there was no addition of new matter.

77.     It is my opinion that a person of ordinary skill in the art of the design of medical devices such as endoscopes, having reviewed the specification, as originally filed, and figures 1-3 of the '359 Patent, would recognize that viewing tube 7, the fiber optics bundle, light connection 8, and lens 13 are permanently affixed parts of the device.  *See, e.g.*, '359 Patent Figs. 1-3, Col. 2:59-64; and Col. 3:51-58. Also, I understand based on my reading of Dr. Isaacson's Expert Report Regarding Validity, that a person of ordinary skill in the art of gynecological surgery also would have understood, based on a review of the specification and figures 1-3 of the '359 Patent, would have recognized the light guide features of the endoscope recited in the '359 Patent claims, and further would have understood how to use the recited endoscope as part of the method claimed in the '359 Patent.  *See* Isaacson Invalidity Rept. at ¶¶ 86-88.

78.     Given that the specification for the '602 patent is identical to the specification as originally filed in the '359 Patent, it is my opinion that a person of ordinary skill in the art of the design of medical devices such as endoscopes, having reviewed the specification and figures 1-3 of the '602 Patent, would recognize that viewing tube 7, which includes a fiber optics bundle, light connection 8, and lens 13 are permanently affixed parts of the endoscope.  *See, e.g.*, '602 Patent Figs. 1-3, Col 2:54-57, Col 3:47-56.

79.     It is my opinion that a person of ordinary skill in the art of the design of medical devices such as endoscopes, having reviewed the specification and figures 1-3 of the PCT Application, would recognize that viewing tube 7, the fiber optics bundle, light connection 8, and lens 13 are permanently affixed parts of the endoscope.  *See, e.g.*, PCT Application Figs. 1-3, Page 3: Lines 24-26, Page 4: Lines 30-37.

80.     It is my opinion that a person of ordinary skill in the art of the design of medical devices such as endoscopes, having reviewed the specification and figures 1-3 of the Dutch Patent, would recognize that viewing tube 7, which includes a fiber optics bundle, light connection 8, and lens 13 are permanently affixed parts of the endoscope.  *See, e.g.*, Dutch Patent Figs. 1-2, Pages 4, 5.

81.     It is my understanding that Dr. Emanuel does not claim to have invented an endoscope having a permanently affixed light guide.  Indeed, at the time of his invention a person of ordinary skill in the art would have been familiar with numerous endoscopes that included this

13

feature.  Specifically, a person of ordinary skill in the art would have understood that endoscopes at the time of the invention included permanently affixed light guides, which allowed light to pass through the endoscope and illuminate the operative field.  *See, e.g.*, U.S. Patent No. 4,414,962 (the "Carson Patent") Figs 1&2, Col 1: 36-44, claim 1; U.S. Patent No. 4,606,330 (the "Bonnet Patent") Fig. 2, Col 2:11-14, claim 1; U.S. Patent No. 4,706,656 (the "Kuboto Patent") Figs. 5&6, Col 1:35-52; 2:60-68, Col 3:14-22; and U.S. Patent No. 4,737,142 (the "Heckele Patent") Figs 1-3, Col 2:39-44, claim 8.

82.     In addition, a person of ordinary skill in the art of the design of medical devices such as endoscopes would have known that such endoscopes as described in the specification and shown in Figs. 1-3 of the '359 patent, were commercially available in 1997.  *See, e.g.*, the Olympus nephroscope used by Dr. Emanuel in his prototype system; OLYMPUS 0001-0006.

83.     I also note that there are many factual errors, inconsistencies and omissions in Mr. Walbrink's report.  For example, at ¶ 48 Mr. Walbrink states that "the limitation requiring a 'permanently affixed' light guide was added by amendment to attempt to overcome an objection by the Examiner."  This statement is incorrect.  The claim element "permanently affixed" was introduced via a preliminary amendment on October 23, 2009, as part of new method claims. This preliminary amendment was made prior to any action taken by the Patent Examiner.

84.     As another example of errors in Mr. Walbrink's report, at ¶ 48 Mr. Walbrink states that "S&N asserted that the addition of the permanently affixed light guide to the prior art was not obvious to do.  Thus, S&N admitted in the file history that the bare mention of a light guide does not imply or suggest to one of ordinary skill in the art that the light guide is *permanently affixed*."  This statement is incorrect.  No such admission exists in the prosecution history.  The patentee merely stated that a prior art reference (U.S. Patent No. 5,320,091 (the "Grossi Patent")), does not disclose an endoscope with a permanently affixed light guide as claimed in the '359 Patent, but rather it discloses a removable telescope inserted into an endoscope.

85.     Accordingly, it is my opinion that the '359 Patent satisfies the written description regarding the claim element "permanently affixed light guide."  It is my further opinion that this claim element is supported adequately by the disclosures in the '602 Patent, the PCT Application, and the Dutch Patent, and therefore the '359 Patent is entitled to a priority date of at least September 4, 1997.

## 2.  Permanently Affixed Lens

86.     Mr. Walbrink and Dr. Dominicis conclude that the Dutch Patent and the '602 Patent do not disclose either a "permanently affixed lens."  For at least the reasons set forth below, I disagree with their opinions.

87.     It is my opinion that a person of ordinary skill in the art of the design of medical devices such as endoscopes, having reviewed the specification, as originally filed, and figures 1-3 of the '359 Patent, would recognize that viewing tube 7, the fiber optics bundle, light connection 8, and lens 13 are permanently affixed parts of the device.  *See, e.g.*, '359 Patent Figs. 1-3Col. 2:59-64; 3:51-58.  Also, I understand based on my reading of Dr. Isaacson's Expert Report Regarding Validity, that a person of ordinary skill in the art of gynecological surgery also would have

understood, based on a review of the specification and figures 1-3 of the '359 Patent, that the lens of the endoscope recited in the '359 Patent claims is permanently affixed, and further would have understood how to use the recited endoscope as part of the method claimed in the '359 Patent. *See* Isaacson Invalidity Rept. at ¶¶ 91-93.

88.     Given that the specification for the '602 patent is identical to the specification as originally filed in the '359 Patent, it is my opinion that a person of ordinary skill in the art of the design of medical devices such as endoscopes, having reviewed the specification and figures 1-3 of the '602 Patent, would recognize that viewing tube 7, which includes a fiber optics bundle, light connection 8, and lens 13 are permanently affixed parts of the endoscope. *See, e.g.*, '602 Patent Figs. 1-3, Col 2:54-57, Col 3:47-56.

89.     It is my opinion that a person of ordinary skill in the art of the design of medical devices such as endoscopes, having reviewed the specification and figures 1-3 of the PCT Application, would recognize that viewing tube 7, the fiber optics bundle, light connection 8, and lens 13 are permanently affixed parts of the endoscope. *See, e.g.*, PCT Application Figs. 1-3, Page 3: Lines 24-26, Page 4: Lines 30-37.

90.     It is my opinion that a person of ordinary skill in the art of the design of medical devices such as endoscopes, having reviewed the specification and figures 1-3 of the Dutch Patent, would recognize that viewing tube 7, which includes a fiber optics bundle, light connection 8, and lens 13 are permanently affixed parts of the endoscope. *See, e.g.*, Dutch Patent Figs. 1-2, Pages 4, 5.

91.     It is my understanding that Dr. Emanuel does not claim to have invented an endoscope having a permanently affixed lens.  Indeed, at the time of his invention a person of ordinary skill in the art would have been familiar with numerous endoscopes that included this feature. Specifically, a person of ordinary skill in the art would have understood that endoscopes at the time of the invention included permanently affixed lenses.  *See, e.g.*, U.S. Patent No. 4,414,962 (the "Carson Patent") Figs 1&2, Col 1: 36-44, claim 1; U.S. Patent No. 4,606,330 (the "Bonnet Patent") Fig. 2, Col 2:11-14, claim 1; U.S. Patent No. 4,706,656 (the "Kuboto Patent") Figs. 5&6, Col 1:35-52; 2:60-68, Col 3:14-22; and U.S. Patent No. 4,737,142 (the "Heckele Patent") Figs 1-3, Col 2:39-44, claim 8.

92.     In addition, a person of ordinary skill in the art would have known that such endoscopes as described in the specification and shown in Figs. 1-3 of the '359 patent, were commercially available in 1997.  *See, e.g.*, the Olympus nephroscope used by Dr. Emanuel in his prototype system; OLYMPUS 0001-0006.

93.     Accordingly, it is my opinion that the '359 Patent satisfies the written description regarding the claim element "permanently affixed lens."  It is my further opinion that this claim element is adequately supported by the disclosures in the '602 Patent, the PCT Application, and the Dutch Patent, and therefore the '359 Patent is entitled to a priority date of at least September 4, 1997.

### 3.  Further Outlet Channel

94.    Dr. Dominicis suggests that the '359 Patent and the earlier-filed patents and applications do not describe a device without a "further outlet channel." Thus, Dr. Dominicis concludes that the '359 Patent does not meet the written description requirement. For at least the following reasons, I disagree with this conclusion.

95.    Dr. Dominicis would agree that the '359 Patent and the earlier-filed patents and applications describe a device that includes, among other components, a mechanical cutter that aspirates fluid and tissue and a "further outlet channel." Dr. Dominicis would also agree that the '359 Patent and the earlier-filed patents and applications describe a method of using such a device.

96.    I note that the use of a device with a "further outlet channel" meets all the elements of each claim of the '359 Patent. Thus, the '359 Patent would cover the use of such a device. Therefore, it is my opinion that the '359 Patent discloses a device with and without a "further outlet channel."

97.    As an initial matter, I note that during the prosecution of the '359 Patent that the Patent Examiner did not object to the claims of the '359 Patent. More specifically, the Patent Examiner did not question whether the disclosure of the '359 Patent or the earlier-filed patents and applications provided support for the use of a device without a "further outlet channel." Thus, it is my understanding that the Patent Examiner concluded that the written description requirement was satisfied.

98.    It is my opinion that a person of ordinary skill in the art in the design of medical devices such as endoscopes, having reviewed the specification, as originally filed, and figures 1 and 2 of the '359 Patent would recognize that the patent describes a device without a "further outlet channel" and a method of using such a device. *See*, *e.g.*, '359 Patent Figs. 1&2, Col. 3:8-22, 5:8-15.

99.    For example, the device shown in figures 1 and 2 evince that the further outlet channel (i.e. insertion tube 28) is a separate removable component of the disclosed system. A person of ordinary skill in the art, with respect to the method of using this system, would understand that the disclosed endoscope could be inserted with or without insertion tube 28. *See* Isaacson Invalidity Rept. at ¶¶ 96-100. Indeed, a person of ordinary skill in the art of gynecological surgery would know that a device such as the endoscope disclosed in the specification of the '359 Patent is more easily inserted transcervically without insertion tube 28, because the smaller the diameter of the endoscope, the easier the insertion. *Id.* In addition, a person of ordinary skill in the art, with respect to the method of using this system, would understand that insertion tube 28 is not a necessary component of the endoscope and that its use is optional in hysteroscopic procedures, particularly in less complicated procedures. *Id.*

100.    In addition, the '359 Patent makes clear that there are at least two methods of using the disclosed system, a method with a further outlet channel that regulates the pressure inside the body cavity and a method without a further outlet channel. *See*, *e.g.*, '359 Patent Col. 3:8-22. As a further example, the '359 Patent explains that "it is possible to effect the supply of working fluid and the discharge of cleaning material in another way, i.e. to arrange the interior of housing

16

4 slightly differently." *See*, *e.g.*, '359 Patent Col. 5:8-15. Thus, the '359 Patent indicates to a person of ordinary skill art in the design of medical devices such as endoscopes, that there are several embodiments, including an endoscope with and without a "further outlet channel" (i.e. insertion tube 28).

101.    It is my opinion that a person of ordinary skill in the art in the design of medical devices such as endoscopes, having reviewed the specification and figures 1 and 2 of the '602 Patent would recognize that the patent describes a device without a "further outlet channel" and a method of using such a device. *See*, *e.g.*, '602 Patent Figs. 1&2, Col. 3:4-18, 5:6-13.

102.    For example, the device shown in figures 1 and 2 evince that the further outlet channel (i.e. insertion tube 28) is a separate removable component of the disclosed system.  A person of ordinary skill in the art, with respect to the method of using this system, would understand that the disclosed endoscope could be inserted with or without insertion tube 28.  *See* Isaacson Invalidity Rept. at ¶¶ 96-100.  Indeed, a person of ordinary skill in the art of gynecological surgery would know that a device such as the endoscope disclosed in the specification of the '602 Patent is more easily inserted transcervically without insertion tube 28, because the smaller the diameter of the endoscope, the easier the insertion. *Id*. In addition, a person of ordinary skill in the art, with respect to the method of using this system, would understand that insertion tube 28 is not a necessary component of the endoscope and that its use is optional in hysteroscopic procedures, particularly in less complicated procedures. *Id*.

103.    In addition, the '602 Patent makes clear that there are at least two methods of using the disclosed system, a method with a further outlet channel that regulates the pressure inside the body cavity and a method without a further outlet channel. *See*, *e.g.*, '602 Patent Col. 3:4-18.  As a further example, the '602 Patent explains that "it is possible to effect the supply of working fluid and the discharge of cleaning material in another way, i.e. to arrange the interior of housing 4 slightly differently." *See*, *e.g.*, '359 Patent Col. 5:6-13. Thus, the '602 Patent indicates to a person of ordinary skill art the design of medical devices such as endoscopes that there are several embodiments, including an endoscope with and without a "further outlet channel" (i.e. insertion tube 28).

104.    It is my opinion that a person of ordinary skill in the art of the design of medical devices such as endoscopes, having reviewed the specification and figures 1 and 2 of the PCT Application would recognize that the patent describes a device without a "further outlet channel" and a method of using such a device. *See*, *e.g.*, PCT Application Figs. 1&2, Page 3: Line 38 – Page 4: Line 10, Page 6: Lines 32-37.

105.    For example, the device shown in figures 1 and 2 evince that the further outlet channel (i.e. insertion tube 28) is a separate removable component of the disclosed system.  A person of ordinary skill in the art, with respect to the method of using this system, would understand that the disclosed endoscope could be inserted with or without insertion tube 28.  *See* Isaacson Invalidity Rept. at ¶¶ 96-100.  Indeed, a person of ordinary skill in the art of gynecological surgery would know that a device such as the endoscope disclosed in the PCT Application is more easily inserted transcervically without insertion tube 28, because the smaller the diameter of the endoscope, the easier the insertion. *Id*.  In addition, a person of ordinary skill in the art,

17

with respect to the method of using this system, would understand that insertion tube 28 is not a necessary component of the endoscope and that its use is optional in hysteroscopic procedures, particularly in less complicated procedures. *Id.*

106.    In addition, the PCT Application makes clear that there are at least two methods of using the disclosed system, a method with a further outlet channel that regulates the pressure inside the body cavity and a method without a further outlet channel. *See, e.g.*, PCT Application Page 3: Line 38 – Page 4: Line 10.  As a further example, the PCT Application explains "it is possible to effect the supply of working fluid and the discharge of cleaning material in another way, i.e. to arrange the interior of housing 4 slightly differently." *See, e.g.*, PCT Application Page 6: Lines 32-37.  Thus, the PCT Application indicates to a person of ordinary skill art in the design of medical devices such as endoscopes, that there are several embodiments, including and endoscope with and without a "further outlet channel" (i.e. insertion tube 28).

107.    It is my opinion that a person of ordinary skill in the art, having reviewed the specification and figures 1 and 2 of the Dutch Patent would recognize that the patent describes a device without a "further outlet channel" and a method of using such a device. *See, e.g.*, Dutch Patent Figs. 1&2, Pages 1, 3, 4, and 6.

108.    For example, the device shown in figures 1 and 2 evince that the further outlet channel (i.e. introduction tube 28) is a separate removable component of the disclosed system.  A person of ordinary skill in the art, with respect to the method of using this system, would understand that the disclosed endoscope could be inserted with or without introduction tube 28.  *See* Isaacson Invalidity Rept. at ¶¶ 96-100.  Indeed, a person of ordinary skill in the art of gynecological surgery would know that a device such as the endoscope disclosed in the Dutch Patent is more easily inserted transcervically without insertion tube 28, because the smaller the diameter of the endoscope, the easier the insertion.  *Id.*  In addition, a person of ordinary skill in the art, with respect to the method of using this system, would understand that introduction tube 28 is not a necessary component of the endoscope and that its use is optional in hysteroscopic procedures, particularly in less complicated procedures.  *Id.*

109.    In addition, the Dutch Patent makes clear that method of using the disclosed system does not require a "further outlet channel." *See, e.g.*, Dutch Patent Pages 3, 4.  As a further example, the Dutch Patent explains that "it is possible to supply a working fluid and discharge removed materials in other ways, i.e. to set up the interior of housing 4 differently." *See, e.g.*, Dutch Patent Page 6.  Thus, the Dutch Patent indicates to a person of ordinary skill art in the design of medical devices such as endoscopes, that there are several embodiments, including and endoscope with and without a "further outlet channel" (i.e. introduction tube 28).

110.    Accordingly, it is my opinion that the '359 Patent satisfies the written description requirement because it discloses a method of using an endoscope without a "further outlet channel."  It is my further opinion that the '359 method claims are adequately supported by the disclosures in the '602 Patent, the PCT Application and the Dutch Patent.

### 4.  Cutting Window at the Distal Region

111.     Mr. Walbrink and Dr. Dominicis conclude that the Dutch Patent and the '602 Patent fail to provide a written description of the full scope of claims 2 and 6 of the '359 Patent.  More specifically, Mr. Walbrink and Dr. Dominicis argue that the earlier-filed patents and applications do not disclose a side or lateral cutting window at the distal region of the outer tube of the cutter.  For at least the reasons set forth below, I disagree with their opinions.

112.     As an initial matter, I also note that there are many factual errors, inconsistencies and omissions in Mr. Walbrink and Dr. Dominicis's report.  For example, to support their opinions that claims 2 and 6 of the '359 Patent are invalid for lack of written description, Mr. Walbrink and Dr. Dominicis conclude that "[t]he Dutch Patent and the '602 Patent do not describe any cutting windows located proximate <u>to the distal tip of the endoscope</u>."  *See* Walbrink Invalidity Rept. at ¶ 59; Dominicis Invalidity Rept. at ¶ 106 (emphasis added).  Although this identical statement made by both Mr. Walbrink and Dr. Dominicis is technically correct, it is not material as it does not accurately reflect the claim language.  The '359 Patent does not disclose or claim any cutting windows in any part of the claimed endoscope.  Consequently, it is not at all surprising that the earlier-filed patents and applications likewise do not disclose or claim cutting windows in the endoscope.

113.     The method claims 2 and 6 of the '359 Patent, however, do claim a "cutting window at the distal region of the outer tube" of the cutter.  I understand that Smith & Nephew has proposed that this claim term means "*an opening to provide access to a cutting component at a distal region of the outer tube*."  I further understand that Hologic has proposed that this claim term means "*an open distal end of the outer tube*."

114.     Mr. Walbrink and Dr. Dominicis suggest the '602 Patent and Dutch Patent do not provide adequate written description of this claim element because neither document discloses a side cutting window.  Specifically, Mr. Walbrink states that "the only cutting windows disclosed in the figures extend all the way to the tip."  Moreover, Mr. Walbrink states that "[t]his lone species cutting window does not support all the broader group of cutting windows required by claims 2 and 6 as S&N construes those claims, namely, to include windows proximate to the distal end of the cutter."  Dr. Dominicis makes similar statements regarding the earlier-filed patents and applications.  I disagree.

115.     It is my understanding that the disclosure of exemplary embodiments in a patent does not limit the patent to those embodiments.

116.     Although I do not believe that claims 2 and 6 are limited to "side" or "lateral" cutting windows, it is my opinion that a person of ordinary skill in the art of the design of medical devices such as endoscopes, having reviewed the specification, as originally filed, and figures 1, 3, and 4 of the '359 Patent, would recognize that opening 26 is a lateral cutting window located at the distal region of the outer tube of the cutter.  *See*, *e.g.*, '359 Patent Figs. 1, 3, & 4; Col. 2:65-3:7; 3:64-4:1.  My opinion is not dependent on either Smith & Nephew's claim construction or Hologic's claim construction.  Also, I understand based on my reading of Dr. Isaacson's Expert Report Regarding Validity, that a person of ordinary skill in the art of gynecological surgery also would have understood, based on a review of the specification and figures 1, 3 and 4 of the '359 Patent, that the cutter recited in the '359 Patent claims has a cutting window such as

19

the lateral opening 26 located at the distal region of the outer tube of the cutter, and further would have understood how to use the recited cutter and cutting window as part of the method claimed in the '359 Patent.  *See* Isaacson Invalidity Rept. at ¶¶ 109.

117.    Given that the specification for the '602 patent is identical to the specification as originally filed in the '359 Patent, it is my opinion that a person of ordinary skill in the art of the design of medical devices such as endoscopes, having reviewed the specification and figures 1, 3, and 4 of the '602 Patent, would recognize that opening 26 is a lateral cutting window located at the distal region of the outer tube of the cutter.  *See, e.g.*, '602 Patent Figs. 1, 3, & 4; Col. 2:61-3:3; 3:60-65.

118.    It is my opinion that a person of ordinary skill in the art of the design of medical devices such as endoscopes, having reviewed the specification and figures 1, 3, and 4 of the PCT Application, would recognize that opening 26 is a lateral cutting window located at the distal region of the outer tube of the cutter.  *See, e.g.*, PCT Application Figs. 1, 3, & 4; Page 3: Lines 30-37; Page 5: Lines 4-8.

119.    It is my opinion that a person of ordinary skill in the art of the design of medical devices such as endoscopes, having reviewed the specification and figures 1 and 3 of the Dutch Patent, would recognize that opening 26 is a lateral cutting window located at the distal region of the outer tube of the cutter.  *See, e.g.*, Dutch Patent Figs. 1 & 3; Pages 4, 5, Claim 8.

120.    Mr. Walbrink and Dr. Dominicis suggest that the '602 Patent and the Dutch Patent "teach away from side windows when [they] say[] the cutting element extends through the window."  Mr. Walbrink goes on to state that "[t]his would not happen in a side window, where the cutting element simply crosses the window."  I disagree with their conclusions.  It is my opinion that Mr. Walbrink and Dr. Dominicis have mischaracterized and/or misinterpreted the disclosures of the '359 Patent.  It is my opinion that a person of ordinary skill in the art would understand that the '359 Patent and earlier-filed patents and applications describe a cutter having a lateral opening through which a part of the cutting elements extends so that on each revolution, part of the tissue is removed and can be discharged directly through the cutter.  *See, e.g.*, '359 Patent Figs. 1, 3, & 4; Col. 2:65-3:7; '602 Patent Figs. 1, 3, & 4; Col. 2:61-3:3; PCT Application Figs. 1, 3, & 4; Page 3: Lines 30-37; Dutch Patent Figs. 1 & 3; Pages 4,  Claim 8.  Further, a person of ordinary skill in the art would understand that the circular profile of the inner tube of such a cutter results in the cutting elements extending through the lateral window or opening of the outer tube on each revolution.  *Id.*; *see also* U.S. Pat. No. 4,203,444 (the "Bonnell Patent").

121.    Accordingly, it is my opinion that the '359 Patent satisfies the written description requirement regarding the claim element "cutting window at a distal region of the outer tube."  It is my further opinion that this claim element is adequately supported by the disclosures in the '602 Patent, the PCT Application, and the Dutch Patent, and therefore the '359 Patent is entitled to a priority date of at least September 4, 1997.

## XII.   RESERVATION

122.    I expressly reserve the right to modify or supplement this report based upon any additional information produced or presented to me in this litigation and/or based upon the Court's claim construction order.

Dated: April 16, 2012

Richard J. Apley