**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| SMITH & NEPHEW, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 11-CV-12064-RWZ |
| v. | ) | |
| | ) | |
| HOLOGIC, INC., | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## SMITH & NEPHEW, INC.'S EXPERT REPORT OF DR. KEITH B. ISAACSON

## REGARDING VALIDITY

# TABLE OF CONTENTS

**Page**

I.      EXPERT QUALIFICATIONS ................................................................................ 1

II.     COMPENSATION AND PRIOR TESTIMONY ................................................... 2

III.    MATERIALS REVIEWED .................................................................................... 2

IV.     USE OF DEMONSTRATIVES ............................................................................. 4

V.      SUBJECT MATTER OF TESTIMONY ............................................................... 4

VI.     LEGAL STANDARDS APPLIED IN THIS REPORT ......................................... 4

        A.      Claim Construction .................................................................................... 4

        B.      Validity ...................................................................................................... 4

                1.      Anticipation .................................................................................... 5

                2.      Obviousness ................................................................................... 5

                3.      Enablement ..................................................................................... 6

                4.      Written Description ......................................................................... 6

                5.      Priority ............................................................................................ 6

VII.    LEVEL OF SKILL IN THE ART ......................................................................... 7

VIII.   UNDERSTANDING THE NATURE OF THE PATENTED METHOD ............... 8

        A.      The Surgical Method Claimed by the '359 Patent ..................................... 8

        B.      The Asserted Claims .................................................................................. 9

        C.      The Asserted Prior Art ............................................................................. 10

                1.      The Endoscope References ........................................................... 10

                2.      The Cutter References ................................................................... 11

                3.      Motivation to Combine References .............................................. 11

IX.     Disputed Claim Terms of the '359 Patent ........................................................... 12

X.      DEPENDENT AND INDEPENDENT CLAIMS ................................................ 13

XI.     OPINIONS AND BASES FOR OPINIONS ........................................................ 13

        A.      Summary of Opinions ............................................................................... 13

**TABLE OF CONTENTS (CONTINUED)**

**Page**

B.    Priority to Earlier Filed Applications ..................................................... 14

    1.    Permanently Affixed Light Guide ............................................. 15

    2.    Permanently Affixed Lens ........................................................ 15

    3.    Further Outlet Channel ............................................................. 16

    4.    Inserting the Endoscope followed by the Cutter ...................... 17

    5.    Cutting Window at the Distal Region ....................................... 18

C.    Invalidity in Light of Prior Art ............................................................. 18

    1.    Invalidity Based on a July 20, 2007 Priority Date ................... 18

    2.    Invalidity Based on a September 4, 1997 Priority Date ............ 21

D.    Lack of Enablement and Written Description ....................................... 39

XII.    Reservation ...................................................................................................... 42

## I.      EXPERT QUALIFICATIONS

1.      A summary of my educational and professional experience is set forth in my Curriculum Vitae, the most current version of which is attached to my prior Infringement report as Exhibit A.

2.      I am a physician, board certified in obstetrics and gynecology and reproductive endocrinology.

3.      I am currently in private practice in the greater Boston metropolitan area.  I am an attending physician in the Department of Obstetrics and Gynecology at Brigham and Women's Hospital and the Massachusetts General Hospital in Boston, MA.  I am the Medical Director of Minimally Invasive Gynecologic Surgery Center at the Newton-Wellesley Hospital in Newton, MA.  I am also the Associate Chairman of the Department of Obstetrics and Gynecology at the Newton-Wellesley Hospital. My practice focuses on minimally invasive gynecologic surgery. I am the current director of the AAGL fellowship at Newton Wellesley Hospital.

4.      I earned my Bachelors of Science in Biology from Tulane University in 1979.  I attended the Medical College of Georgia, receiving my Medical Doctor degree in 1983.  In 1987, I completed a residency in Obstetrics and Gynecology at Ochsner Foundation Hospital, in New Orleans, LA.  In 1989, I completed a fellowship in Reproductive Endocrinology and Infertility with the Department of Obstetrics and Gynecology at the Hospital of the University of Pennsylvania, in Philadelphia, PA.

5.      For more than twenty five years, I have conducted laboratory and clinical research, including the pathophysiology of endometriosis and the development of minimally invasive surgical tools.  As part of a collaborative research group with experts in a variety of medical and surgical disciplines, I have explored improvements in minimally invasive therapies and have continued my commitment to new areas of research, such as the development of surgical simulation and the study of novel processes and technology in the minimally invasive operating room suite to enhance patient safety and reduce costs.  I also recently received funding to start a Center for Engineering New Directions in Endometriosis and Women's Health at the Massachusetts Institute of Technology (MIT).  The initial focus has been investigating the pathophysiology of endometriosis, the field in which I began my research over 20 years ago.

6.      Since 1987, I have been a member of the American Association of Gynecologic Laparoscopists, and I am currently serving as the President of this organization.  I am also a past President of the Society of Reproductive Surgeons, a division of the American Society of Reproductive Medicine.  I am also a Committee Member of the American College of Obstetricians and Gynecologists.

7.      In 1989, I was appointed to the faculty of Harvard Medical School in Boston, MA.  Since 1998, I have served as Associate Professor of Obstetrics, Gynecology and Reproductive Biology.

8.      In 1995, I was a founding member of the Center for Innovative Technology in Medicine (CIMIT) at Massachusetts General Hospital.  At its inception, this collaborative research group

1

began with experts in a variety of medical and surgical disciplines coming together to discuss improvements in minimally invasive therapies.  It has now grown into a multi-institutional consortium which includes BWH, MIT, Draper National Labs and all of the major academic medical centers in the the Boston area.

9.      I have authored or co-authored over 100 publications, including articles, reviews, chapters, editorials, books, monographs, and textbooks.  I am a named inventor of more than 5 patents and patent applications.

## II.      COMPENSATION AND PRIOR TESTIMONY

10.     For my work in connection with this case, I am being paid $550 per hour.  My fees are not contingent on the outcome of this case.

11.     Over the past four years, I have been retained as an expert in the following cases in deposition, hearing, and/or trial:

- Denise O'Brien and Joseph O'Brien v. Patrick Hogan, M.D.
  - Worcester County Superior Court Civil Action No. WOCV2003-02280B
  - On behalf of the Defendant
  - Allegation of negligent performance of bilateral salpingo oophorectomy for severe pelvic pain resulting in the removal of two good ovaries
- Laura L. Dziuban and Heath M. Rawlings v. Christie L. Miller, M.D.
  - Franklin County Superior Court Civil Action No. FRCV2009-00068
  - On behalf of the Defendant
  - Allegation of negligent performance of a tubal ligation with resulting bladder perforation
- Tracey L. Dillard v. Elliot B. Greenberg, M.D., Howard G. Trietsch, M.D., and Baystate OB/GYN Group, Inc.
  - Hampden County Superior Court Civil Action No. HDCV2010-000342A
  - On behalf of the Defendants
  - Allegation of perforated left external iliac vein and right ureter during laparoscopic hysterectomy

## III.      MATERIALS REVIEWED

12.     In connection with formulating my opinions in this matter, I have reviewed the following materials:

- U.S. Patent No. 8,061,359 ("the '359 Patent");

- Prosecution history of the '359 Patent and the prior art cited;

- U.S. Patent No. 7,249,602 ("the '602 Patent"

- Prosecution history of the '602 Patent and the prior art cited;

- NL 1006944 (the "Dutch Application");

- PCT/NL98/00504 (the "PCT Application");

- The accused MyoSure® System, including the MyoSure® Rod Lens Hysteroscope ("MyoSure® Hysteroscope") and the MyoSure® Tissue Removal Device ("MyoSure® TRD");

- The prototype system, including the endoscope and the modified cutting device, used by Dr. Mark Hans Emanuel, the inventor of the '359 Patent;

- Deposition of Dr. Mark Hans Emanuel, dated December 16, 2011;

- Deposition of Dr. Henry A. Dominicis, dated December 29, 2011;

- Smith & Nephew's Preliminary Infringement Contentions;

- Hologic's Preliminary Non-Infringement Contentions;

- Smith & Nephew's Preliminary Validity Contentions;

- Hologic's Preliminary Invalidity Contentions;

- Hologic's website and marketing materials; and

- Discovery materials, responses to interrogatories, filings, and documents produced by the parties.

- Expert Report of Hal Walbrink Regarding Invalidity of U.S. Patent No. 8,061,359.

- Expert Report of Dr. Henry A. Dominicis Regarding Invalidity of U.S. Patent No. 8,061,359.

- Expert Report of Richard J. Apley Regarding the Validity of U.S. Patent No. 8,061,359 ("Apley Report").

- The Asserted Prior Art

13.     I understand that written discovery, document discovery and depositions are not complete in this litigation, and that at trial Smith & Nephew will present the jury with a wide range of factual evidence to support a showing of infringement.  Therefore, I expressly reserve the right to supplement my opinions in view of any new information that arises prior to the discovery deadline in this litigation and/or after the date of this report.

## IV.   USE OF DEMONSTRATIVES

14.     I expect that I may refer to the above referenced materials and/or those specifically cited in this report, as well as representative photographs, charts, graphs, schematics, layouts, animations, and/or models at trial and deposition that I may create to support and explain my testimony set forth herein. I may also use such materials to explain the inventions, the '359 Patent, any related Patent, any prior art references, relevant technology areas, and/or other matters that may assist the Court and jury in understanding the technology and patents.

## V.   SUBJECT MATTER OF TESTIMONY

15.     I understand that, in this case, Smith & Nephew is asserting claims 1-8 of the '359 Patent against Hologic. I further understand that Hologic has alleged that claims 1-8 of the '359 Patent are invalid, and that the '359 Patent is not entitled to priority of the Dutch Application or '602 Patent. I have been asked by Smith & Nephew to give my opinion regarding the validity and priority of the '359 Patent in rebuttal to the reports of Mr. Walbrink and Dr. Dominicis.

## VI.   LEGAL STANDARDS APPLIED IN THIS REPORT

16.     I understand that the following legal standards apply to my analysis presented in this Expert Report.

### A.  Claim Construction

17.     I have been advised by counsel for Smith & Nephew that analysis of patent validity involves two steps: (1) properly construing the patent claims to ascertain their scope and meaning; and (2) comparing the properly construed claims with the prior art.

18.     I understand that the first step in any infringement analysis is to determine the scope of the claims at issue, and that such "claim construction" is a legal matter to be decided by the Court.

19.     I understand that the Court has not yet construed the disputed claim terms in this litigation. Therefore, I expressly reserve the right to supplement my opinions and this report following the Court's claim construction.

### B.  Validity

20.     I understand that the claims delineate the bounds of a patentee's invention and that claim construction starts with the language of the claims. I further understand that claims are interpreted from the standpoint of a person of ordinary skill in the art in light of the patent specification, its prosecution history, and any relevant extrinsic evidence.

21.     It is my understanding that the law (35 U.S.C. § 282) states that a patent granted by the United States Patent and Trademark Office ("USPTO") is presumed valid. I further understand that each claim is presumed valid independently of the other claims, and that clear and convincing evidence of invalidity is required in order to overcome the presumption. My

4

understanding of clear and convincing evidence is that it is a standard of proof requiring the fact finder to have a clear conviction that a fact is highly probable.  Thus, each claim of the '359 Patent is presumed valid.

22.     Further, counsel for Smith & Nephew have informed me that if a particular prior art reference was before the USPTO Examiner during prosecution of a relevant patent application, or is cumulative of art that was before the USPTO Examiner, then an accused infringer bears an even heavier burden of proof than the clear and convincing evidence standard when seeking to prove invalidity on the basis of such a prior art reference.

23.     I am not an expert in patent law.  I am informed by counsel that a patent claim can only be proved invalid if it is anticipated (under 35 U.S.C. § 102) or rendered obvious (under 35 U.S.C. § 103) by one or more prior art references.  I am also informed by counsel that a patent claim can be proved invalid if it does not meet one of the formal requirements including providing a sufficient written description of the invention or providing an enabling disclosure of the invention (under 35 U.S.C. § 112).

### 1.  Anticipation

24.     I am informed by counsel that in order for a patent claim to be anticipated, each and every element of the claim must be disclosed in a single prior art reference and that reference must enable a person having ordinary skill in the art to make and use the claimed invention.

### 2.  Obviousness

25.     I am further informed by counsel that where a patent claim is not anticipated by a single prior art reference, the claim may be invalidated by a combination of references, provided there is some suggestion or rationale based in the prior art that would lead a person having ordinary skill in the art to modify the device disclosed in one reference according to a second reference.  In this context, the claimed invention as a whole must be considered in light of the combination of references.

26.     I am informed that it is improper to simply use the disclosure of the patentee as a road map to pick and choose elements out of the prior art to arrive at the claimed invention.  To demonstrate obviousness of the claimed invention, Hologic must provide some motivation or rationale for making the combination based on the prior art and consistent with the knowledge and experience of the person having the ordinary level of skill in the art.

27.     I am informed that additional or secondary considerations, such as (1) the invention's commercial success, (2) long felt but unresolved needs, (3) the failure of others, (4) skepticism by experts, (5) praise by others, (6) teaching away by others, (7) recognition of a problem, (8) copying of the invention by competitors, and (9) other relevant factors including the technical advantages or characteristics over the prior art, can also be used to rebut invalidity.

28.     I understand that the combined teachings of the references must also enable a person having ordinary skill in the art to make and use the invention.

### 3.  Enablement

29.     I understand that the written description of the invention in the patent must be sufficient to enable any person skilled in the art to make and use the invention without undue experimentation.

30.     I am informed that the USPTO examiner evaluates whether a patent has met the requirements of patentability, including enablement, before the USPTO allows the patent to issue, so there is a presumption that the enablement requirement is met with regard to the '359 Patent.

31.     I am informed that enablement based on the patent specification is judged as of the effective filing date of the '359 Patent, which is September 4, 1997.  I am further informed that enablement is to be determined from the viewpoint of a person having ordinary skill in the art who has read the specification.

32.     I am informed that a patent specification can be enabling even though it does not expressly state some information, if a person of ordinary skill in the art could make or use the invention without have to perform excessive or undue experimentation.

33.     I am informed that to determine whether excessive experimentation is required, a number of factors can be considered: the scope of the claimed invention; the level of ordinary skill in the art; the amount of guidance presented in the patent; the amount of experimentation necessary; the time and cost of any necessary experimentation; how routine any necessary experimentation is; and whether the patent discloses specific working examples of the claimed invention.

### 4.  Written Description

34.     I am informed that the written description of the invention must describe the invention in sufficient detail that one skilled in the art can reasonably conclude that the inventor had possession of the claimed invention.

35.     I am informed that the USPTO examiner evaluates whether a patent has met the requirements of patentability, including written description, before the USPTO allows the patent to issue, so there is a presumption that the written description requirement is met  with regard to the '359 Patent.

36.     I am informed that in order to satisfy the written description requirement, the specification must describe an invention understandable to a person of ordinary skill in the art and show that the inventor actually invented the invention claimed.  I am further informed that the test for sufficiency is whether the disclosure relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.  I am also informed that the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology.

### 5.  Priority

37.     I am informed that in order to gain the benefit of the filing date of an earlier filed application under 35 U.S.C. § 120, each application in the chain leading back to the earlier application must comply with the written description requirement of 35 U.S.C. 112, which requires that the earlier application describe the later claimed invention and do so in sufficient detail that one skilled in the art can clearly conclude that the inventor was in possession of the claimed invention as of the filing date sought.

38.     I am informed that a determination that the written description requirement is satisfied requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art.  I am further informed that given this perspective, in some instances, a patentee can rely on information that is well-known in the art to satisfy the written description requirement.

39.     I am informed that drawings in a patent can constitute an adequate description if they describe what is claimed and convey to one of skill in the art that the patentee actually invented what is claimed.  I further am informed that the prior application need not describe the claimed subject matter in exactly the same terms as used in the claims.


VII.   LEVEL OF SKILL IN THE ART

40.     I understand that claims are construed from the perspective of one of ordinary skill in the art to which the patented subject matter pertains at the time of the invention.  Furthermore, I understand that a determination of the level of ordinary skill in the art includes as relevant factors (1) the educational level of the inventor; (2) the type of problems encountered in the art; (3) the prior solutions to those problems; (4) the rapidity with which innovations are made in the art; (5) the sophistication of the technology in the art; and (6) the educational level of active workers in the field.

41.     The invention of the '359 Patent generally relates to a method for the removal of tissue from the uterus using an endoscope and a mechanical cutter that simultaneously cuts and removes tissue.  Thus, the relevant field of art is gynecologic surgery.  In my opinion, and based on the above factors, with respect to the methods claimed in the '359 Patent, a person of ordinary skill in the art at the time of the invention is a medical doctor who has completed an accredited residency program in gynecology, which would include one or more years of experience performing gynecological surgery that includes but is not limited to removing tissue, such as fibroids or polyps, from the uterus.

42.     I note that Hologic has asserted invalidity arguments based on the design of the endoscope and mechanical cutter used in the method claimed by the '359 Patent.  With respect to the design of the endoscope and mechanical cutter, I agree with the opinions of Mr. Richard Apley, that a person of ordinary skill in the art at the time of the invention is a degreed engineer having at least 5 years of experience with the design and/or structure of medical devices, including but not limited to endoscopes, resectoscopes, shavers, tissue removal devices, or a person having at least 10 years of experience with the design and/or structure of medical devices,

7

including but not limited to endoscopes, resectoscopes, shavers, tissue removal devices.

43.    As discussed above and in my Curriculum Vitae, I have the requisite education and extensive experience in this field, and therefore qualify as one of skill in the art.

## VIII.   UNDERSTANDING THE NATURE OF THE PATENTED METHOD

### A.  The Surgical Method Claimed by the '359 Patent

44.    For many decades, the primary treatment for abnormal uterine bleeding, caused by the presence of uterine fibroids (i.e. myomas) or polyps, was minimally invasive "blind" surgery such as a dilation and curettage or major invasive surgery, such as an open abdominal myomectomy or hysterectomy.  The "blind" D&C procedures are mostly ineffective.

45.    In the late 1990's, around the time of the invention of the '359 Patent, gynecologists were using a less invasive transcervical method for removing intrauterine fibroids and polyps - monopolar loop resection – which involves the use of an electrified loop-shaped wire.  During this hysteroscopic procedure, the loop resector is fitted to an endoscope and inserted transvaginally through the cervix and into the uterine cavity with no incisions.  With each pass of the loop resectoscope against the polyp or fibroid attached to the lining of the uterus, a tissue chip is created.  During the course of the procedure, the tissue chips can obscure the operative field of vision, and thus must be removed separately.

46.    Monopolar loop resection provides good clinical results, however, its use is associated with the following disadvantages and risks: excessive intravasation of electrolyte free distention fluid and associated electrolyte disturbances; misdirected RF energy; uncontrolled monopolar leakage of electrical current, which may cause tissue burns; obscured visual field due to debris tissue; and uterine perforation or cervical laceration caused by repeated removal and reinsertion of surgical instruments.

47.    Current loop resection procedures may utilize a bipolar loop resection technology that helps avoid the intravasation risks associated with using electrolyte free distention fluid.  For example, the Savage reference referred to by Dr. Dominicis and US 6,113,594 ("Savage '594") also describe a loop resection procedure that can be performed using a conductive fluid, such as saline, that reduces the risks associated with intravasation of electrolyte free fluids.

48.    The '359 Patent is generally directed to a novel method for the removal of tissue from a uterus using an endoscope and a mechanical cutter that simultaneously cuts and removes tissue.  More specifically, the '359 Patent recites a method for removing tissue by inserting an endoscope with specific features into a uterus, followed by inserting a motor-driven cutter into the endoscope such that it extends beyond the endoscope into the uterus.  The method further involves delivering fluid through the endoscope into the uterus, energizing a motor that makes the cutter cut tissue within the uterus, and removing cut tissue and fluid through the cutter.

49.    I perform about 50 loop resection procedures every year and in my experience, the disadvantages and risks associated with loop resection are minimal.  However, the methods

claimed by the '359 Patent can be used to avoid some of the disadvantages and risks associated with monopolar loop resection.

### B. The Asserted Claims

50.     I am informed that the Asserted Claims are claims 1 – 8 of the '359 Patent.  Claims 1 – 8 of the '359 patent are reproduced below.

51.     Claim 1:

1. A method for removal of tissue from a uterus, comprising:
inserting a distal region of an endoscope into said uterus, the endoscope including a valve and an elongated member defining discrete first and second channels extending from a proximal region of the elongated member to the distal region, the second channel having a proximal end in communication with the valve such that fluid from the valve is able to flow into and through the second channel to the uterus, and the first channel having a light guide permanently affixed therein and being sealed from the second channel to prevent fluid from the valve from entering the uterus through the first channel; followed by:
inserting a motor driven cutter into the second channel such that a distal cutting region of the cutter extends distally beyond the endoscope in the uterus;
delivering fluid into the uterus through the valve and the second channel to distend the uterus;
energizing an electric motor to drive the cutter to cut tissue within the uterus; and
aspirating cut tissue and fluid from the uterus and the endoscope through the cutter.

52.     Claim 2:

2. The method of claim 1 wherein inserting the motor driven cutter comprises inserting an outer tube defining a cutting window at a distal region of the outer tube and an inner tube received within the outer tube that is configured to rotate relative to the outer tube to cut tissue, the inner tube including a cutting element at a distal region of the inner tube configured to cut tissue at the cutting window when the inner tube rotates relative to the outer tube.

53.     Claim 3:

3. The method of claim 1, wherein inserting the distal region of the endoscope comprises inserting a distal region of an endoscope that includes a fiber optics bundle permanently affixed to the first channel of the elongated member.

54.     Claim 4:

4. The method of claim 1, wherein inserting the distal region of the endoscope comprises inserting a distal region of an endoscope that includes a lens permanently

9

affixed to the first channel of the elongated member.


55.    Claim 5:

5. A method for removal of tissue from a uterus, comprising:
inserting a distal region of an endoscope into the uterus, the endoscope including a port
    for receiving a motor driven cutter and including an elongated member defining
    discrete first and second channels extending from a proximal region of the elongated
    member to the distal region, the first channel having a light guide permanently affixed
    therein and the second channel having a straight, central longitudinal axis extending
    from the port to an opening at a distal tip of the endoscope; followed by:
inserting the motor driven cutter for cutting and detaching tissue into the second channel
    through the port;
introducing fluid into the uterus; and
aspirating fluid with detached tissue from the uterus through a lumen of the cutter.

56.    Claim 6:

    6. The method of claim 5 wherein inserting the motor driven cutter comprises
inserting an outer tube defining a cutting window at a distal region of the outer tube and
an inner tube received within the outer tube that is configured to rotate relative to the
outer tube to cut tissue, the inner tube including a cutting element at a distal region of the
inner tube configured to cut tissue at the cutting window when the inner tube rotates
relative to the outer tube.

57.    Claim 7:

    7. The method of claim 5, wherein inserting the distal region of the endoscope
comprises inserting a distal region of an endoscope that includes a fiber optics bundle
permanently affixed to the first channel of the elongated member.

58.    Claim 8:

    8. The method of claim 5, wherein inserting the distal region of the endoscope
comprises inserting a distal region of an endoscope that includes a lens permanently
affixed to the first channel of the elongated member.


## C.  The Asserted Prior Art

### 1.  The Endoscope References

59.    Throughout his report Dr. Dominicis cites many patent and other references that he
alleges disclose an endoscope, including what he refers to as the "Uterus References," the "Valve

References," the "Elongated Member/Two Channel References," the "Permanently Affixed References," and the "Fluid Delivery References."  For purpose of this report, I shall refer to these references as the "Endoscope References."

60.     I have reviewed the Endoscope References and none of these references disclose or even suggest the claimed method for removal of tissue from the uterus according to the '359 patent.  I disagree with Dr. Dominicis that these references disclose the elements of the asserted claims of the '359 Patent.

61.     It is my understanding that Dr. Emanuel does not claim to have invented an endoscope having a valve and permanently affixed light guide.  However, it is my opinion that Dr. Emanuel did invent a novel and non-obvious medical procedure that involves the use of an endoscope as described and shown in his patents.


## 2.  The Cutter References

62.     Throughout his report Dr. Dominicis cites many patent and other references that he alleges disclose a cutter, including what he refers to as the "Cutter Insertion References," the "Motor Driven Cutter References," the "Aspiration References," and the "Rotating Tube Cutter References."  For purpose of this report, I shall refer to these references as the "Cutter References."

63.     I have reviewed the Cutter References and none of these references disclose or even suggest the claimed method for removal of tissue from the uterus according to the '359 patent.  I disagree with Dr. Dominicis that these references disclose the elements of the asserted claims of the '359 Patent.

64.     It is my understanding that Dr. Emanuel modified an existing motor driven cutter to meet the needs of his invention.  However, it is my opinion that Dr. Emanuel did invent a novel and non-obvious medical procedure that involves the use of a motor drive cutter as described and shown in his patents.

## 3.  Motivation to Combine References

65.     It is my understanding that it is not enough to merely show that all the elements of the claimed invention existed in the prior art.  I am informed that in order to demonstrate that the claimed invention was obvious, the prior art must also provide some motivation or some rationale to suggest the combination and/or modification of the prior art references to meet the claimed invention.

66.     I note that while Dr. Dominicis identifies pairs of references to be combined, he does not specifically identify what features of the claimed invention are lacking in any particular reference or combination of references, or how the references or combination of references are to be modified to incorporate the missing feature(s).  I many cases, Dr. Dominicis fails to even specify what portions of a reference he believes may correspond to a feature of the claimed invention.  Further, Dr. Dominicis does not provide any specific motivation or rationale for

combining the specific references and provides no specific explanation about incorporating a missing feature from one prior art reference to another. Accordingly, my opinions set forth herein are partially based on what I can discern from the scant information in Dr. Dominicis reports about his opinions on particular references and combinations of references, and I reserve the right to supplement my report should Dr. Dominicis or Hologic be permitted to provide additional information relating to the specific combinations, the features of those references that they claim disclose particular elements of the claimed invention, or any motivation, reason, or rationale to make the modifications to those references and/or combine any particular features of any particular references.

67.    By 1997, a person having ordinary skill in the art would be familiar with surgical procedures that involve the use of an electric loop resectoscope to remove tissue from the uterus. That technology is considered, as Dr. Dominicis acknowledges, the gold standard for removing myomas and polyps. It is my opinion that the electric loop resectoscope is better suited for removing many myomas including Type I and Type II fibroids, which cannot be completely removed with mechanical cutting. Further, using the bipolar loop resection technologies, as referenced above, the risks associated with intravasation are significantly reduced. And as such, a person having ordinary skill in the art would not have had any reason to explore other, untested methods and devices for removing tissue from within the uterus, such as mechanical cutting, particularly when that method is incapable of removing many types of myomas that can be safely removed using, for example, a bipolar electric loop resectoscope.

68.    In fact, many of the prior art references cited in the '359 patent and identified by Dr. Dominicis and cited in the prosecution history are devices that utilize an electric loop for removing tissue from the uterus. *See, e.g.*, Alden, Savage, and Savage '594.

69.    It is my understanding that in 1997, a person having ordinary skill in the art of gynecologic surgery would probably not have any specific knowledge of or experience with the instruments (endoscopes and cutters) used for arthroscopic, orthopedic, and nephroscopic surgery because these types of instruments are not used in gynecologic surgical procedures. Further, it is my opinion the person having ordinary skill in the art of gynecologic surgery in 1997 would not consider using those arthroscopic, orthopedic, and nephroscopic instruments for uterine surgical procedures such as those described in the '359 Patent for at least these reasons.


## IX.    DISPUTED CLAIM TERMS OF THE '359 PATENT

70.    Counsel for Smith & Nephew has informed me that a dispute exists between the parties regarding the proper construction of the following claim terms:

| Claim | Claim Term | Smith & Nephew's Proposed Construction | Hologic's Proposed Construction |
|-------|-----------|----------------------------------------|----------------------------------|
| 1-8 | "elongated member" | "member of the endoscope that is elongated defining the length of the discrete first and second | "the component of an endoscope as indicated by A in Fig. 2 that is at least 30 cm in length" |

| | | | |
|---|---|---|---|
| | | channels" | |
| 1-4 | "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter" | "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter" | "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter and aspirating substantially only fluid through a further outlet channel" |
| 5-8 | "aspirating fluid with detached tissue from the uterus through a lumen of the cutter" | "aspirating fluid with detached tissue from the uterus through a lumen of the cutter" | "aspirating fluid and detached tissue from the uterus through a lumen of the cutter and aspirating substantially only fluid through a further outlet channel" |
| 2, 6 | "a cutting window at a distal region of the outer tube" | "an opening to provide access to a cutting component at a distal region of the outer tube" | "an open distal end of the outer tube" |

71.     As stated previously, I understand that the Court has not yet construed the disputed claims.  Therefore, where applicable, I may address each element of the claims under both Smith & Nephew and Hologic's proposed claim constructions.  I expressly reserve the right to supplement, modify, or otherwise amend my opinions and this report following receipt of the Court's claim construction order.

## X.     DEPENDENT AND INDEPENDENT CLAIMS

72.     I understand that a claim in dependent form shall be construed to incorporate by reference all the limitations of the independent claim to which it refers.  Accordingly, I understand that in order to invalidate a dependent claim, the prior art must meet all of the claim limitations of the dependent claim, in addition to the claim limitations of the independent claim to which it refers.  And even though an independent claim may be held invalid, a dependent claim which depends from an invalid independent claim can be separately valid.

## XI.     OPINIONS AND BASES FOR OPINIONS

### A.  Summary of Opinions

73.     Given the legal standards explained to me by counsel for Smith & Nephew and set forth above, it is my opinion that all the claims of the '359 Patent are valid.  I set forth below the bases for my opinions in regard to the validity of each asserted claim.

74.     It is my opinion that the '359 Patent is not anticipated by any of the references identified by Hologic.

75.     It is my opinion that the '359 Patent is not obvious in view of any of the references identified by Hologic.

76.     It is my opinion that the '359 Patent provides a sufficient written description to enable a person having ordinary skill in the art to practice the claimed invention.

77.     It is my opinion that the '359 Patent provides a sufficient written description to enable a person having ordinary skill in the art to determine that Dr. Emanuel was fully in possession of the claimed invention.

78.     Accordingly, it is my further opinion that the '359 Patent is entitled to a priority date of at least as early as September 4, 1997.

79.     I agree with and adopt the opinions of Mr. Richard Apley and hereby incorporate by reference the Apley Report.


### B.  Priority to Earlier Filed Applications

80.     Dr. Dominicis and Mr. Walbrink assert that the '359 is not entitled to the benefit of priority of the earlier filed patent applications to which the '359 Patent claims priority.  It is my understanding that those applications include US 09/486,977 filed March 6, 2000 which was granted as the '602 Patent, the PCT Application filed September 4, 1998 and the Dutch Application, filed September 4, 1997.

81.     I am informed by counsel that '359 Patent claims to be a continuation of US 09/486,977 filed March 6, 2000 which was granted as the '602 Patent.  As such, it is my understanding that the '359 Patent is entitled to the benefit of the effective filing date of the '602 Patent (35 U.S.C. § 120), March 6, 2000.  This is reflected in the July 20, 2007 and October 30, 2007 Application Data Sheets, the July 20, 2007 Cover Letter filed with application that became the '359 Patent, the USPTO Filing Receipt, the July 20, 2011 USPTO Priority Acknowledgment and the Cover of the '359 Patent.

82.     I am informed that the '602 Patent claims the benefit of priority to the PCT Application, filed September 4, 1998 (35 U.S.C. § 371).  Accordingly, the '359 Patent is entitled to the benefit of priority to the filing date of the PCT Application, September 4, 1998 (35 U.S.C. § 119).  This is reflected in the October 30, 2007 Application Data Sheet, the Declaration signed by Dr. Emanuel, the July 20, 2007 Cover Letter filed with application that became the '359 Patent, the USPTO Filing Receipt, and the July 20, 2011 USPTO Priority Acknowledgment.

83.     I am informed that the PCT Application claims the benefit of priority of the Dutch Application.  Accordingly, it is my understanding that the '359 Patent is entitled to the benefit of priority to the filing date of the Dutch Application, September 4, 1997.  This is reflected in the July 20, 2007 and October 30, 2007 Application Data Sheets, the July 20, 2007 Cover Letter filed with application that became the '359 Patent, the USPTO Filing Receipt, the July 20, 2011 USPTO Priority Acknowledgment and the Cover of the '359 Patent.

84.     I note that during the prosecution of the '359 Patent, that the USPTO Examiner did not question whether the disclosure of the '359 Patent or any of the related applications provided

support for any of the claimed subject matter.

### 1.   Permanently Affixed Light Guide

85.     Dr. Dominicis and Mr. Walbrink assert that a permanently affixed light guide is not disclosed in the '359 Patent, the '602 Patent, the PCT Application or the Dutch Application ("the related applications").  I disagree with their assertion.

86.     It is my opinion that a person having ordinary skill in the art in 1997 through the present day would recognize that the types of endoscope shown in Figs. 1 – 3 of the '359 patent, the '602 Patent, the PCT Application and the Dutch Application have permanently affixed light guides.  It is my understanding, based on my many years of experience, that the light guides in these types of endoscopes were permanently affixed within the device.  Further, it seems clear to me from the figures that viewing tube 7 and light connection 8 are permanently affixed parts of the endoscope shown in Figs. 1 – 3.  I also note that the description in the '359 Patent does not state or show that the light guide is removable.

87.     I further note that during the prosecution history of the '359 Patent, the USPTO Examiner did not question whether the disclosure of the '359 Patent or the related applications disclosed and provided support for a permanently affixed light guide.  During the prosecution, the Examiner allowed the patentee to amend the specification to include the term "light guide."  *See, e.g.*, Apley Report at ¶¶ 66 – 83.  Thus, it is my understanding that the Examiner considered this issue and concluded that there was support for the permanently affixed light guide.

88.     Thus, I believe that a person having ordinary skill in the art would understand based on the disclosure that the method described in the '359 Patent includes the use of an endoscope having a permanently affixed light guide.

89.     Endoscopes having permanently affixed light guides were cited as prior art to the US Patent Office during the prosecution of the '359 Patent.  *See, e.g.*, US 4,606,330 (Bonnet), and US 4,706,656 (Kuboto).

### 2.   Permanently Affixed Lens

90.     Dr. Dominicis and Mr. Walbrink assert that a permanently affixed lens is not disclosed in the '359 Patent or the related applications.  I disagree with their assertion.

91.     It is my opinion that a person having ordinary skill in the art in 1997 through the present day would recognize the types of endoscopes shown in Figs. 1 – 3 of the '359 patent, the '602 Patent, the PCT Application and the Dutch Application have permanently affixed lenses.  It is my understanding, based on my many years of experience, that the lenses in these types of endoscopes were permanently affixed within the device.  Further, it seems clear to me from the figures that lens 13 is a permanently affixed part of the endoscope shown in Figs. 1 – 3.  I also note that the description in the '359 Patent does not state or show that the lens is removable.

92.     I further note that during the prosecution history of the '359 Patent, the USPTO Examiner did not question whether the disclosure of the '359 Patent or related applications disclosed and provided support for a permanently affixed lens.

93.     Thus, I believe that a person having ordinary skill in the art would understand based on the disclosure that the method described in the '359 Patent includes the use of an endoscope having a permanently affixed lens.

94.     Endoscopes having permanently affixed lenses were cited as prior art to the US Patent Office during the prosecution of the '359 Patent.  See, e.g., US 4,606,330 (Bonnet), and US 4,706,656 (Kuboto).


### 3. Further Outlet Channel

95.     Dr. Dominicis asserts that the '359 Patent and the related applications lack sufficient description of a device without a further outlet or aspiration channel.  I disagree with Dr. Dominicis assertion.  But I note that Dr. Dominicis would agree that the '359 Patent does describe a device and a method which includes aspirating through the cutter and a second outlet or aspiration channel.  See, *e.g.*, Dominicis Report at ¶¶ 84 – 96.

96.     I further note that claims of the '359 Patent would read on the device having a further outlet channel, that is described in the '359 Patent.

97.     For example, the devices disclosed in the description of the '359 Patent meet all the elements of claim 1.  Therefore, in my opinion, the '359 Patent provides support for the claimed invention.

98.     I note that during the prosecution history of the '359 Patent, the USPTO Examiner did not question whether the disclosure of the '359 Patent disclosed and provided support for a device without a further outlet channel.  The USPTO Examiner did not object to the claims that were allowed in the '359 Patent as not being supported by the description.  I agree with the USPTO Examiner that the '359 Patent discloses a method that involves the use of a device with and without a further outlet channel.

99.     The device shown in figures 1 and 2 of the 359 Patent and related applications show that the further outlet channel (i.e. insertion tube 28) is a separate removable component of the disclosed system.  With respect to the method of using this system, a person of ordinary skill in the art would understand that the disclosed endoscope can be inserted with or without insertion tube 28.  Indeed a person of ordinary skill in the art of gynecological surgery would know that a device such as the endoscope disclosed in the specification of the 359 Patent is more easily inserted transcervically without insertion tube 28, because the smaller diameter of the endoscope provides for easier insertion.  Further, a doctor may

100.    I further note that the description in the '359 patent makes reference to "a further embodiment of the method" which is directed to "regulating" the pressure inside the body cavity

through the use of further outlet.  *See, e.g.*, the '359 Patent at 3:8 – 21, and 5:8 – 15, the '602 Patent at 3:12 – 18, and 5:6 – 13, the PCT Application at 4:7 – 12 and 6:32 – 37, and Dutch Patent Figs. 1&2, Pages 1, 3, 4, and 6.. Thus, the '359 Patent indicates to a person having ordinary skill in the art that there are several embodiments, including one without the further outlet channel and one with a further outlet channel to better regulate the pressure within the uterus.  Therefore, it is my opinion that the '359 Patent provides support for a method and a device that does not use the further outlet channel.

### 4.  Inserting the Endoscope followed by the Cutter

101.    Dr. Dominicis asserts that the '359 Patent and the related applications lack sufficient description of the invention, wherein the motor driven cutter is inserted in a separate step after the endoscope is inserted.  I disagree with Dr. Dominicis' assertion.

102.    Dr. Dominicis cites to various sections of the Dutch Application which refer to "assembled state" or that the parts "can be slid together and device is ready for use."  However, none of these  citations support Dr. Dominicis position that the Dutch Application teaches insertion of device in the assembled state.  They merely show how the device appears in the assembled state.

103.    In my opinion, a person having ordinary skill in the art would understand that the endoscope could be inserted (by itself or with an obturator), followed by the insertion of the cutter into the working channel to arrive at the assembled state at which point the device is ready for use.  The '359 Patent and its priority applications show that the endoscope includes a valve labeled 39 in Figs. 1 and 3 and labeled 10 in Fig. 2.  The valve allows the working channel to be closed during insertion, to enable the doctor to use the endoscope to view the pathology and diagnose the patient before any cutting tool is inserted.  This enables the doctor to select the appropriate cutting tool for treatment based on the observed pathology at the time of the procedure.  A person having ordinary skill in the art would recognize that there is no need for the valve, if the endoscope and cutter are assembled prior to insertion.

104.    Dr. Dominicis further cites to the specification of the '602 Patent which states that the device is inserted into the uterus wherein "insertion mandrel 40 will first be inserted, with shut-off valve 39 open, into insertion tube 28 with bayonet 30.  This assembly is then placed in the uterus in a relatively simple 35 manner due to the shape of mandrel 42."  According to this passage, with the Mandrel 42 inserted there would be no room for the cutter.  The passage then states: "Mandrel 42 is then removed by manipulating stem 41, and the construction shown in FIG. 2 is placed in tube 28."  The construction shown in Fig. 2 is just the endoscope without the cutter indicating that the endoscope is inserted first and that the cutter is inserted at some later point.  If the intent was to insert the endoscope and cutter combined, the construction shown in Fig. 1 would have been indicated.  This clearly indicates to a person having ordinary skill in the art that cutter insertion follows the endoscope insertion.

17

105.    Further, a person having ordinary skill in the art would know to plan the procedure to minimize the risk to the patient and minimize the expense of the procedure.  A person having ordinary skill would know that inserting the endoscope transcervically, in the same way that a loop resectoscope is inserted, is going to require some manipulation with the possible application of some force and that to minimize risk of perforation of the uterus, the endoscope is more safely inserted without the cutter, which could perforate the uterus on insertion.  After the endoscope is inserted, the doctor could use the endoscope to view inside the uterus in order to assess the pathology and determine the best cutting tool for treatment.  Accordingly, it is my opinion that a person having ordinary skill in the art would recognize that the cutter would be inserted after the endoscope is inserted.

106.    For at least these reasons, it is my opinion that the '359 patent supports the claimed method.

### 5.  Cutting Window at the Distal Region

107.    Dr. Dominicis and Mr. Walbrink assert that a side cutting window at "a distal region of the outer tube" of the claimed cutter is not disclosed in the '359 Patent or the related applications.  I disagree with their assertion.

108.    As an initial matter, I note that both Dr. Dominicis and Mr. Walbrink argue that the '359 Patent and the related applications do not describe any "cutting windows located proximate to the distal tip of the endoscope."  However, the claims do not recite that the cutting window is on the tip of the endoscope, the claims recite that the "cutting window is at a distal region of the outer tube."

109.    Figures 1, 3 and 4 of the '359 Patent, the '602 Patent, the PCT application and Figures 1 and 3 of the Dutch Application all show a side cutting window 26 at the distal region of the outer tube 16.  The description in the '359 Patent states "[n]ear the working end, tube 17 is provided with teeth 19 which mesh with teeth 18 provided in an opening 26 in the end part of protective tube 16."  "Near the working end" suggests to a person having ordinary skill that the opening does not have to be at the distal tip as Dr. Dominicis and Mr. Walbrink suggest.  Any window that is not at the distal tip, but still "near the working end" would be a side opening window.  Further, it is clear from the figures that opening 26 is on the side of the protective tube 16 and when used in combination with inner tube 17, provides side cutting capability.  Accordingly, it is my opinion that the '359 patent and the related applications disclose a side cutting window at the distal region of the outer tube of the motor driven cutter.

### C.  Invalidity in Light of Prior Art

### 1.  Invalidity Based on a July 20, 2007 Priority Date

110.    Dr. Dominicis asserts that the '359 Patent is not entitled to any priority date before the July 20, 2007 application that became the '359 Patent.  It is my understanding, based on the prior

application information printed on the front of the patent and priority claim in the specification, that the '359 Patent is entitled to priority to at least March 6, 2000, the filing date of the '602 Patent.  Further, I am informed that '602 Patent and the '359 Patent are both entitled to claim an effective filing date of September 4, 1998 based on the PCT Application and an effective filing date of September 4, 1997 based on the Dutch Application.  I note that during the prosecution of the '359 patent, that the USPTO Examiner did not question whether the disclosure of the '359 Patent or any of the earlier filed applications provided support for any of the claimed subject matter.

111.    It is my opinion that the Dutch Application, the PCT Application and the '602 Patent provide support for and enable the description of the claimed invention such that a person having ordinary skill in the art would be able to practice the claimed method and would understand that Dr. Emanuel was in possession of the invention at the time each application was filed.  *See, e.g.*, ¶¶ 76 – 102 *infra* and ¶¶ §112 et seq below)

112.    Dr. Dominicis asserts that, based on a priority date of July 20, 2007, the combination of Banko and Baggish renders the claims of the '359 Patent obvious.  I disagree with Dr. Dominicis' assertion.

113.    The Banko reference is directed to a device for ophthalmic surgery and does not disclose or suggest surgical use in the uterus.  This is clear from Fig. 1 and the accompanying description in the Banko reference which shows the device inserted through an incision in the eye E.  Further, the assignee is Surgical Design Corporation of New York, a well known ophthalmic medical device company.  A person having ordinary skill in the art would not consider surgery in the eye to be similar to surgery in the uterus, such that they would consider looking to ophthalmic surgical devices for use in uterine surgery.

114.    Even if the Banko reference were relevant prior art, I further note that Banko does not disclose a method for removing tissue from a uterus as recited in the claims.  In my opinion, the Banko reference teaches away from Dr. Emanuel's invention.  Dr. Emanuel teaches the use of a separate cutting tool that is inserted through the working channel of an endoscope, after the endoscope is inserted transcervically, without any incision.  Dr. Emanuel's invention allows the doctor to separately manipulate both the endoscope and the cutter to perform surgery on the uterus.  This enables the doctor to rotate the cutter relative to the endoscope during the procedure.  The Banko reference teaches a one piece device that is inserted through an incision, equivalent to laparoscopic surgery on the uterus.  In my opinion, a person having ordinary skill in the art would consider these differences to be significant and incompatible.  A person having ordinary skill in the art would not consider transcervical hysteroscopic morcellation to be the same as laparoscopic surgery on the eye.  For these reasons, a person having ordinary skill in the art would not consider modifying the device and the method disclosed in the Banko reference to meet the elements claimed in the '359 Patent.

115.    The Baggish reference is apparently cited to show the use of endoscopes in hysteroscopic procedures.  However, the Baggish reference does not disclose a method for removing tissue from a uterus as recited in the claims.  Neither reference discloses the method invented by Dr. Emanuel.

116.    Dr. Dominicis fails to provide any motivation or rationale to explain how or why a person having ordinary skill in the art would consider combining Banko with Baggish.  Since Banko teaches a device that includes optics, Dr. Dominicis fails to explain why a person having ordinary skill in the art would consider combining a device that already includes optics with an endoscope.  In my opinion, the Banko reference teaches away from using a separate endoscope as is clearly shown in Figs. 1, 2, 7, and 9 – 12, depicting that the optics and the fluid passages are all built into the probe 10.  For at least this reason, it is my opinion that a person having ordinary skill in the art would not seek to combine Banko with Baggish.

117.    The '359 patent further recites that the endoscope includes a valve in fluid communication with the second channel and fluid is delivered through the valve and the second channel into the uterus.  The Banko reference does not disclose this element of the claims.

118.    The Banko reference teaches a procedure that involves making an incision in the eye E and inserting the probe into the incision, making the Banko device similar to a laparoscopic device.  *See, e.g.*, Banko at 4:13 – 32.  The probe includes a cutting tool, fluid channels and optical fibers embedded into a unitary device.  This teaches away from the invention of the '359 patent which is clearly directed to a method that uses two separate components, an endoscope having two channels and a cutter designed to be inserted through one of the channels.  It also teaches away from the claimed method which avoids making an incision by inserting the endoscope transcervically.

119.    It is my opinion that a person having ordinary skill in the art would not consider the device of Banko suitable for uterine surgery because the cutting elements are not designed to resect myomas and other pathologies present in the uterus.  The small openings shown in Figs. 2 - 8 do not appear useful for removing intrauterine fibroids and other myomas.  Further, the suggested use, cutting the soft tissue of the eye, would indicate to a person having ordinary skill that the Banko device would not be suitable for tougher uterine tissue, such as intrauterine fibroids.

120.    Further, while Banko discloses the use of irrigation fluid, the reference does not teach the use distention fluid for distending an organ.  Dr. Dominicis relies on a passage in Banko that teaches replacing the ocular fluid to prevent the eye from collapsing, however, I disagree that passage teaches a person having ordinary skill in the art that the Banko device can be used to distend an organ such as the uterus.  In my opinion, a person having ordinary skill would understand that preventing a delicate organ like the eye from collapsing is very different from distending and maintaining distention of a muscular organ such as the uterus.  Distention of the uterus requires the application of significant pressure with distention fluid.  The pressure is much greater than the blood pressure of the patient, such that the distention fluid flows into the open blood vessels of the uterine wall resulting from the surgery.  While I am not an ophthalmologist, I suspect that pumping fluid into the eye needs to be done at very low pressures to prevent damage to the eye, particularly because the incision made for the insertion of the Banko device probably weakens the structural integrity of the spherical organ.

### 2.  Invalidity Based on a September 4, 1997 Priority Date

#### a. The Kresch, Alden and Savage References

121.    Dr. Dominicis asserts that the Kresch, Alden and Savage references each anticipate or render obvious all the claims of the '359 Patent.  I disagree with Dr. Dominicis' assertion.

122.    I note that the Kresch, Alden and Savage references were considered by the USPTO Examiner during the prosecution of the '359 patent and all appear in the list of references cited on the face of the patent.  I further note that the Savage reference (has an asterisk next to it indicating that it) was cited and applied by the USPTO Examiner.

123.    I have reviewed the Kresch, Alden and Savage references and note that the Savage reference appears to include the disclosure of Kresch and Alden.  For example, Figures 1A – 8 of Kresch appear as Figures 1A – 8 in Savage and Figures 1, 2, and 3 of Alden appear as Figures 15, 16, 18, in Savage.  The corresponding description of those figures is substantially the same in each of the references.

124.    The Kresch, Alden and Savage references are directed to a fundamentally different procedure than the claimed invention and do not anticipate or render obvious the claimed invention.  The Kresch, Alden and Savage references teach the insertion of a probe P with the use of an obturator O to facilitate insertion, after which the obturator O is removed and the optical fiber F and the cutting head C are inserted through the probe P as shown in Figs. 3A and 3B.  *See, e.g.*, Kresch at 6:3 - 10.  Alden discloses an equivalent procedure wherein sheath 22 is inserted transcervically using an obturator and then the obturator is removed and the cutting member 18 and the scope 20 are inserted into the sheath 22.

125.    Throughout his report, Dr. Dominicis makes numerous misstatements (*e.g.*, ¶ 106, "... distal tip [sic, distal region] of the endoscope [sic, outer tube].") and mischaracterizations (*e.g.*, ¶ 221, mischaracterizing probe P as an endoscope).  These misstatements and mischaracterizations are too numerous for me to address individually.  As a general matter, I disagree with Dr. Dominicis characterizations of the prior art because they are contrary to what I know based on my experience and his report does not include any explanation as to why his characterizations are appropriate or why a person having ordinary skill in the art would accept it as being appropriate.  (*e.g.*, Why would a person having ordinary skill consider the probe P of Kresch to an endoscope?)  For purposes of this report, it is not necessary for me to respond to all the issues I found, however, my failure to identify or respond to any misstatement or mischaracterization should not be construed to mean that I agree with the statements made in Dr. Dominicis' report and I reserve the right to respond to any specific statements as to what the prior art does or does not show as needed going forward.

126.    Dr. Dominicis suggests that probe P of Kresch is an endoscope and this is clearly not correct.  In my experience, a person having ordinary skill in the art would not consider the probe P to be an endoscope or even equivalent to the endoscope of claimed invention.  The probe P is a sheath that does not include a first and second channel or an optical scope of any kind.  As Kresch states, the scope F and the cutting head C are inserted after the obturator O is removed.  Thus, Kresch does not disclose inserting a distal region of an endoscope into the uterus according

21

to the claimed invention.  Further, Kresch teaches away from the claimed method in that Kresch teaches inserting the cutting head C followed by the endoscope, optical fiber F.  *See, e.g.*, Kresch at 6:3 – 10.

127.    Dr. Dominicis suggests that sheath 322 of Savage (and the sheath 22 of Alden) is an endoscope and this is simply not correct.  In my experience, a person having ordinary skill in the art would not consider the sheath 322 to be an endoscope or even equivalent to the endoscope of claimed invention.  The sheath 322 that does not include a first and second channel or an optical scope of any kind.  As Savage states, the scope 320 and the cutting member 318 are inserted after the obturator is removed.  Thus, Savage does not disclose inserting a distal region of an endoscope into the uterus according to the claimed invention.

128.    I note that the Savage and Alden references, for example, disclose multiple embodiments within each patent.  For example, in the Savage reference, Figs. 1 – 8 show one embodiment, Figs. 9 – 14 show another embodiment, Figs. 15 – 41 show a further embodiment of the devices disclosed.  In attempting to show that all the elements of the claims are present in the Savage reference, Dr. Dominicis uses elements from different embodiments, without explaining why the feature would be combined with any other embodiment to arrive at the claimed invention.  With respect to the Savage reference, Dr. Dominicis states that Savage discloses inserting the distal region of an endoscope into the uterus and refers to the embodiment shown Fig. 18 for support, however with respect to the endoscope having a valve, Dr. Dominicis refers to inlet conduit 61, which is not found in Fig. 18 or disclosed as part of the embodiment of Fig. 18, as being connected to a valve.  The inlet conduit 61 is disclosed as part of a different embodiment shown Figs 1A and 1B and no valve is disclosed.  And no explanation is provided for why a person having ordinary skill in the art would provide the inlet conduit 61 from the embodiment shown in Figs. 1A and 1B in the different device shown in Fig. 18.  This is but one example of numerous instances where features from various devices or embodiment are combined without explanation.  For this reason, to the extent Dr. Dominicis combines elements from different devices or different embodiments of devices without providing any explanation or rationale for the combination, these combinations would not be obvious to a person having ordinary skill in the art.

129.    Further, I disagree that Savage discloses or suggests that inlet conduit 61 is connected to a valve, it is merely an inlet hose and no valve is disclosed in the Savage reference.  The claim states that the endoscope includes a valve and a person having ordinary skill in the art would not consider the inlet conduit 61 or an alleged valve connected to the inlet conduit to be part of the endoscope.  Savage is silent as to providing an endoscope and even if the probe P were considered an endoscope, Savage does not disclose the probe including a valve.

130.    With respect to the element of inserting the motor driven cutter such that the distal end region extends distally beyond the endoscope in the uterus, Dr. Dominicis identifies Figs. 3A-3C, 4, 5, 9 and 10 which are directed to 2 different embodiments of Savage.  With respect to the first embodiment, Figs. 1 – 8, Savage discloses that the cutting head C does not extend beyond the probe P, what Dr. Dominicis indicates corresponds to the endoscope in the claim.  Savage states that the exposure of the cutting head C only occurs within the elongated slot 18 which is part of the probe P.  *See, e.g.*, 11:12 – 21, 1:53 – 64 and 2:30 - 46.  Thus, the cutting head C of

Savage does not extend beyond the probe P.

131.     Therefore, it is my opinion that none of these references teach a method that includes inserting an endoscope having first and second channels followed by the insertion of the cutter through the second channel.  In addition, it is my opinion that none of the references teach a method that includes inserting a motor driven cutter into the second channel of the endoscope such that the distal cutting region extends distally beyond the endoscope in the uterus.

132.     The claims of the '359 Patent also include inserting an endoscope having a valve in communication with the second channel and first channel being sealed from the second, such that fluid introduced through the valve and the second channel does not flow through the first channel into the uterus.

133.     The Kresch, Alden and Savage references cannot meet this element of the claims.  The Kresch, Alden and Savage references do not disclose an endoscope, a valve or first and second channels as recited in the claims.  The probe P (Kresch) and the sheath 322 (Savage and Alden) are open lumens that do not provide a first and second channel.  As shown in Fig. 8 of Kresch and Figs. 8, 11A, 12A, 13A and 19A of Savage, the fluid entering the uterus from the probe or sheath does not flow from a second channel that is sealed from a first channel containing the scope optics.

134.     Therefore it is my opinion that none of these references disclose delivering fluid into the uterus through the valve and the second channel.

135.     The Alden and Savage references are directed electric loop resection devices that use an electric loop to cut tissue from the uterus and therefore do not disclose energizing an electric motor to drive a cutter to cut tissue within the uterus according to the claims of the '359 Patent.

136.     To the extent that Dr. Dominicis asserts that the chopping or severing mechanism 206 and/or shaving port 356 and chopping tube 358 of Savage or cutting edges 84 of Alden correspond to the claimed motor driven cutter, I disagree with that assertion.  The '359 Patent is directed to a method for removing tissue from the uterus that, among other elements, recites using a cutter that cuts tissue from the uterine wall and aspirates the cut tissue through cutter. These embodiments of Savage and Alden cited by Dr. Dominicis are directed to a loop resection device that cuts tissue using a wire loop and then chops up the already cut tissue into smaller pieces to facilitate aspiration.  The '359 Patent is directed to a method of removing tissue from the uterus that, among other elements, recites using a device that cuts tissue from the uterine wall using a motor driven cutter and aspirates the cut tissue through the cutter.  Accordingly, it is my opinion that Alden and Savage do not meet this element of the claims.

137.     Further, I note that the Kresch, Alden and Savage references are directed to fundamentally different devices than that of the '359 patent.  As shown in Figs. 1B, 15, 18 28, 29, 35, and 36 of Savage, Fig. 1B of Kresch and Figs. 1, and 3 of Alden, these devices combine the imaging components and the cutting component into an integrated device that use a finger actuated trigger to move the cutting component relative to the probe and fiber optics.  *See, e.g.*, Savage at 3:54 – 60, Kresch at 3:35 – 41, and Alden at 6:21 – 49.  The '359 Patent discloses a

system and a method that a person having ordinary skill in the art would recognize involve the use of two separate components.

138.    It is my opinion that the Kresch device is poorly designed and probably does not work for purposes of cutting and removing tissue from the uterus.  I say this because the imaging component disclosed in the Kresch reference, *i.e.,* the optical fiber F, is in a fixed relation to the cutting head C such that the optical fiber F is always between the cutting head C and the tissue to be cut.  From my experience, in practice this configuration – which is the only configuration disclosed - does not enable the doctor to safely view the field being treated.  The Alden and Savage devices have similar deficiencies, in that the optical fiber F is positioned between the cutting wire loop and the tissue.

139.    The '359 Patent discloses a different design.  The methods disclosed in the '359 Patent provide a cutter that, among other differences, can be inserted into and rotated relative to the endoscope.  In the device used according to the method of the '359 patent, the angle of the cutting window relative to the endoscope can be manipulated by the doctor to more effectively cut the tissue within the field of view and the angular orientation of the endoscope relative to the cutter and cutting window can be manipulated by the doctor to enable the doctor to obtain better visualization of the tissue being cut.  Thus, the viewing channel can be above the cutter (e.g., the cutter oriented between the viewing channel and the tissue to be cut) or rotated to either side of the cutter, enabling the doctor to view the tissue resection from various orientations.  Because the relationship between the optical fiber and cutting head is fixed in the Kresch, Alden and Savage devices, those devices do not provide this capability and the added safety of the device disclosed in the '359 Patent.

140.    Due to the visualization, and, hence, safety problems inherent in the only design for a motorized cutter (as opposed to electric loop or other resector) that is disclosed in Kresch, Alden, or Savage, it is my opinion that these references neither disclose all of the elements of the methods disclosed in the '359 Patent claims nor enable one with ordinary skill to use the device disclosed in Kresch, Savage, or Alden for purposes of cutting and removing tissue from the uterus with only a mechanical or motor driven cutting tool.  In fact, these same visualization and safety concerns teach away from using the kind of motorized cutter disclosed in these references, and in my opinion the references instead teach the use of loop resection over the use of a motor driven cutter.

141.    I also note that cutters shown in Kresch are different than the cutters shown in the '359 patent.  The cutting heads C shown in Kresch have radially extending cutting edges 20, 21, that make for a large cutting head C that will require a relatively large probe or insert tube to accommodate a large opening which could be difficult to insert in the uterus.  This would make it difficult to insert such a cutting head C through the lumen of an endoscope and given the difference in size between the lumen of the endoscope and rotating drive tube 30, it will likely be difficult to keep the cutting head C stable during use.  It would require a person having ordinary skill in the art to further modify the design to stabilize the structure and it is not clear to me that the device will be able cut and aspirate uterine tissue without difficulty.

142.    In addition, the cutting heads C taught by Kresch are not received with an outer tube.

24

Thus, Kresch does not teach or suggest a cutter having an outer tube defining a cutting window at a distal region of the outer tube and an inner tube received within the outer tube that is configured to rotate relative to the outer tube to cut tissue at the cutting window.

143.     For at least these reasons, it is my opinion that neither Kresch, nor Alden, nor Savage disclose each and every element of any of the claims of the '359 Patent, and neither Kresch nor Alden nor Savage enable a person of ordinary skill to make or use any device capable of cutting and removing tissue from the uterus with a motor-driven cutter according to the methods of the '359 Patent.  Further, for at least these reasons, it is my opinion that a person having ordinary skill in the art would not consider modifying the devices disclosed in Kresch, Alden and Savage as suggested by Dr. Dominicis.

### b. The Banko Reference

144.     Dr. Dominicis asserts that the Banko reference anticipates or renders obvious all the claims of the '359 Patent.  I disagree with Dr. Dominicis' assertion.

145.     For the reasons provided above, it is my opinion that Banko does not anticipate or render obvious any of the method claims of the '359 Patent.

146.     As previously stated, the Banko reference is directed to a device for ophthalmic surgery and does not disclose or suggest surgical use in the uterus.  This is clear from Fig. 1 and the accompanying description in the Banko reference which shows the device inserted through an incision in the eye E.  Further, the assignee is Surgical Design Corporation of New York, a well known ophthalmic medical device company.  A person having ordinary skill in the art would not consider surgery in the eye to be similar to surgery in the uterus, such that they would consider looking to ophthalmic surgical devices for use in uterine surgery.

147.     Even if the Banko reference were relevant prior art, I further note that Banko does not disclose a method for removing tissue from a uterus as recited in the claims.  In my opinion, the Banko reference teaches away from Dr. Emanuel's invention.  Dr. Emanuel teaches the use of a separate cutting tool that is inserted through the working channel of an endoscope, after the endoscope is inserted transcervically, without any incision.  Dr. Emanuel's invention allows the doctor to separately manipulate both the endoscope and the cutter to perform surgery on the uterus.  The Banko reference teaches a one piece device that is inserted through an incision, equivalent to laparoscopic surgery on the uterus.  In my opinion, a person having ordinary skill in the art would consider these differences to be significant and incompatible.  A person having ordinary skill in the art would not consider transcervical hysteroscopic morcellation to be the same as laparoscopic surgery.  For these reasons, a person having ordinary skill in the art would not consider modifying the device and the method disclosed in the Banko reference to meet the elements claimed in the '359 Patent.

148.     The '359 Patent is directed to a method for removing tissue from the wall of a uterus that includes inserting an endoscope having first and second channels into the uterus and then inserting a motor driven cutter through the second channel of the endoscope.  The Banko

reference does not disclose a method that includes inserting an endoscope followed by a motor driven cutter.  Thus, the Banko reference does not disclose all the elements of claims 1 and 5.

149.     The '359 Patent is directed to a method for removing tissue from a uterus that includes inserting a motor driven cutter into the second channel of the endoscope such that the distal cutting region extends distally beyond the endoscope in the uterus.  The Banko device is unitary device that does not enable the cutter to move axially.  Thus, Banko instructs away from proving a cutter that can move relative to the endoscope.  Accordingly, it is my opinion that Banko can not anticipate this element of the claims and it would not be obvious to a person having ordinary skill in the art to modify Banko to meet this element of the claimed invention.

150.     As set forth above, there is no reason or rationale in the prior art for modifying the Banko device to include a separate endoscope and to utilize the method recited in the claims.

151.     The '359 patent further recites that the endoscope includes a valve in fluid communication with the second channel and fluid is delivered through the valve and the second channel into the uterus.  The Banko reference does not disclose this element of the claims.

152.     The Banko reference teaches a procedure that involves making an incision in the eye E and inserting the probe into the incision, making the Banko device similar to a laparoscopic device.  *See, e.g.*, Banko at 4:13 – 32.  The probe includes a cutting tool, fluid channels and optical fibers embedded into a unitary device.  This teaches away from the invention of the '359 patent which is clearly directed to a method that uses two separate components, an endoscope having two channels and a cutter designed to be inserted through one of the channels.  It also teaches away from the claimed method which avoids making an incision by inserting the endoscope transcervically.

153.     It is my opinion that a person having ordinary skill in the art would not consider the device of Banko suitable for uterine surgery because the cutting elements are not designed to resect myomas and other pathologies present in the uterus.  The small openings shown in Figs. 2 - 8 do not appear useful for removing intrauterine fibroids and other myomas.  Further, the suggested use, cutting the soft tissue of the eye, suggests that the Banko device would not be suitable for tougher uterine tissue, such as intrauterine fibroids.  In addition, as indicated above, a person having ordinary skill in the art would not be motivated to use a mechanical cutting device like the Banko device in the uterus because it cannot be used to treat all the pathologies that the well known electric loop resectoscope can be used for.

### c. The Obenchain Reference

154.     Dr. Dominicis asserts that the Obenchain reference anticipates or renders obvious all the claims of the '359 Patent.  I disagree with Dr. Dominicis' assertion.

155.     The Obenchain reference was considered by the USPTO Examiner during the prosecution of the '359 Patent.  Further, the Obenchain reference is discussed in the Background of the Invention section of the '359 Patent.

156.     The Obenchain reference is directed to a device for laparoscopic lumbar discectomy and does not disclose or suggest surgical use in the uterus.  This is clear from Figs. 7 and 8 and the corresponding description throughout the Obenchain reference which shows the device inserted through an incision in the skin for back surgery.  A person having ordinary skill in the art would not consider orthopedic surgery of the spine to be similar to surgery in the uterus, such that they would consider looking to orthopedic surgical devices for use in uterine surgery.

157.     In addition, as indicated above, a person having ordinary skill in the art would not be motivated to use the Obenchain device in the uterus because it cannot be used to treat all the pathologies that the well known electric loop resectoscope can be used for.

158.     The '359 Patent is directed to a method for removing tissue from a uterus that includes inserting an endoscope having first and second channels into the uterus and then inserting a motor driven cutter through the second channel of the endoscope.  The Obenchain reference does not disclose any procedures for removing tissue from a uterus.  Thus, the Obenchain reference does not disclose all the elements of claims 1 and 5.

159.     It is my opinion that a person having ordinary skill in the art would not consider the device of Obenchain suitable for uterine surgery because there is no suggestion that the cutting elements are suitable for resecting myomas and other pathologies present in the uterus.

160.     Further, Obenchain does not disclose delivering fluid through a valve and a second channel to distend the uterus.  Obenchain discloses that the abdomen can be distended using a gas, air or carbon dioxide (*See, e.g.*, 4:52 – 65), and then further discloses the use of irrigation fluid to irrigate the surgical sight.  *See, e.g.*, 5:25 – 31.  Thus, the Obenchain reference teaches away from the invention of the '359 Patent that uses the same fluid for distention and irrigation.

161.     Further, there is no reason or rationale to explain how or why a person having ordinary skill would consider modifying the Obenchain device for use in uterine surgery as recited in the claims.

### d. The Alden, Kresch and Savage Reference Combinations

162.     As set forth above, the Alden, Kresch and Savage references are essentially directed to the same device and the differences between these references are not material to the validity of the '359 Patent.

### i.  Alden, Kresch, Savage and Banko

163.     Dr. Dominicis asserts that the combinations of the Alden, Kresch or Savage references and the Banko reference render obvious the claims of the '359 patent.  I disagree with Dr. Dominicis' assertion.

164.     As set forth above, it is my opinion that the Alden, Kresch, Savage and Banko references

27

do not anticipate any of the claims of the '359 Patent. Alden and Savage are directed to a hand held electric loop resection devices and Kresch and Banko are directed to mechanical tissue cutting devices. Dr. Dominicis fails to explain how or why a person having ordinary skill in the art would consider combining Alden, Kresch or Savage with any of the other prior art references. It is my opinion that there is no motivation or rationale why a person having ordinary skill in the art would consider combining the teachings from Alden, Kresch or Savage with Banko. Because Alden/Kresch/Savage and Banko are directed to two structurally different types of devices, a person having ordinary skill in the art would not consider combining them.

165.     Further, even if the teachings of Alden, Kresch, Savage and Banko were combined it is not clear how the combination meets all the elements of the claimed invention. Alden, Kresch and Savage teach a method that involves inserting a hollow probe P or an outer sheath 22 with the use of an obturator into the uterus, and then removing the obturator and inserting the fiber optic scope F, 20 and a cutting head C or electrosurgical cutting loop 18 at the same time. Alden, Kresch and Savage disclose a self-contained handheld device and teach away from the use of an endoscope having first and second channels and a separate, motor driven cutter in a method for removing tissue from a uterus according to the claims. Banko teaches making an incision and inserting an integrated probe that includes cutting tip combined with fiber optics and fluid channels. Neither Banko nor Alden/Kresch/Savage disclose the use or the need for an endoscope having first and second channels and a motor driven cutter in a method for removing tissue from a uterus according to the claims.

166.     Since neither device discloses a method for removing tissue from a uterus that includes inserting an endoscope having a first and second channels into the uterus followed by inserting a motor driven cutter into the second channel of the endoscope, it is not clear to me how any combination of Alden/Kresch/Savage and Banko can render obvious any of the claims of the '359 Patent.

167.     It is my opinion that a person having ordinary skill in the art would not consider the device of Banko suitable for uterine surgery because the cutting elements are not designed to resect myomas and other pathologies present in the uterus. The small openings shown in Figs. 2 - 8 do not appear useful for removing intrauterine fibroids and other myomas. Further, the suggested use, cutting the soft tissue of the eye, suggests that the Banko device would not be suitable for tougher uterine tissue, such as intrauterine fibroids. In addition, as indicated above, a person having ordinary skill in the art would not be motivated to use a mechanical cutting device like the Banko device in the uterus because it cannot be used to treat all the pathologies that the well known electric loop resectoscope can be used for.

168.     In addition, as set forth above, a person having ordinary skill in the art would know that the electric loop resection device disclosed in Alden and Savage is capable of treating more intrauterine pathologies than a mechanical cutting device, such as that disclosed in Banko or Kresch. Therefore, a person having ordinary skill in the art would not be motivated to modify Alden or Savage to include the mechanical cutting device of Banko or to modify the Banko device to include features of Alden or Savage to remove tissue from a uterus.

### ii.  Alden, Kresch, Savage and Olympus

169.    Dr. Dominicis asserts that the combinations of the Alden, Kresch or Savage references and the Olympus nephroscope reference render obvious the claims of the '359 patent.  I disagree with Dr. Dominicis' assertion.

170.    I note that the Alden, Kresch and Savage references were considered by the USPTO Examiner during the prosecution of the '359 patent and all appear in the list of references cited on the face of the patent.  I further note that references disclosing nephroscopes essentially the same as the Olympus nephroscope were also considered by the USPTO Examiner during the prosecution of the '359 patent and appear in the list of references cited on the face of the patent. See, e.g., US 4,606,330 (Bonnet), and US 4,706,656 (Kuboto).

171.    As set forth in more detail above, it is my opinion that the Alden, Kresch, and Savage references do not anticipate any of the claims of the '359 Patent.  Alden and Savage are directed to a hand held electric loop resection devices and Kresch is directed to mechanical tissue cutting device.  The Olympus nephroscope is an endoscope used during laparoscopic surgery on the kidney and not known to be used in the method according to the claimed invention.  It is my opinion that there is no motivation or rationale why a person having ordinary skill in the art would consider combining the teachings from Alden, Kresch or Savage with a nephroscope, or any endoscope, for that matter.  That is because the Alden, Kresch, and Savage references are directed to self-contained handheld devices that integrate the scope optics with the cutting element, obviating the need for a separate endoscope.  Thus, a person having ordinary skill in the art would not be motivated to modify or combine them with a separate endoscope, such as the Olympus device.

172.    As discussed above, Alden, Kresch, and Savage teach a method that involves inserting a probe P or an outer sheath 22 with the use of an obturator and then removing the obturator and inserting the fiber optic scope F, 20 and cutting head C or electrosurgical cutting loop 18 at the same time.  Alden, Kresch and Savage do not disclose the use of an endoscope having first and second channels and motor driven cutter in a method for removing tissue from a uterus according to the claims.  The Olympus nephroscope reference does not disclose a method for removing tissue from the uterus according to the claims.

173.    Since neither reference discloses a method for removing tissue from a uterus that includes inserting an endoscope having a first and second channels into the uterus followed by inserting a motor driven cutter into the second channel of the endoscope, it is not clear to me how any combination of Alden, Kresch or Savage and the Olympus nephroscope can render obvious any of the claims of the '359 Patent.

174.    Further, neither Alden, Kresch, Savage, nor the Olympus nephroscope reference, disclose a method to cut tissue from a portion of the uterus that involves the use of a motor driven mechanical cutter inserted in a second channel of an endoscope such that a distal cutting region extends distally beyond the endoscope into the uterus and aspirates the cut tissue through the cutter.  Accordingly, it is my opinion that the combination of Alden, Kresch or Savage and the Olympus nephroscope reference cannot meet all the elements of the claimed invention.

175.    In addition, as set forth above, a person having ordinary skill in the art would know that

29

the electric loop resection device disclosed in Alden and Savage is capable of treating more intrauterine pathologies than a mechanical cutting device.  Therefore, a person having ordinary skill in the art would not be motivated to modify Alden or Savage to include a mechanical cutting device to remove tissue from a uterus.

176.    For the same reasons identified above, a person having ordinary skill in the art would not be motivated to modify the Olympus device or combine it with the cutter disclosed in Kresch, Alden or Savage for purposes of cutting and removing tissue from a uterus.  As identified above, a further reason not to combine the Olympus device and the cutter disclosed in Kresch, Alden or Savage is that it is entirely impractical to insert a cutter having a radially extending cutting heads such as that disclosed in the Kresch, Alden or Savage references in the narrow, straight working channel in the Olympus device.

### iii.   Alden, Kresch, Savage and Vukovic

177.    Dr. Dominicis asserts that combinations of the Alden, Kresch or Savage references and the Vukovic reference render obvious the claims of the '359 patent.  I disagree with Dr. Dominicis' assertion.

178.    I note that the Alden, Kresch, Savage and Vukovic references were considered by the USPTO Examiner during the prosecution of the '359 patent and all appear in the list of references cited on the face of the patent.

179.    As set forth in more detail above, it is my opinion that the Alden, Kresch, and Savage references do not anticipate any of the claims of the '359 Patent.  Alden and Savage are directed to a hand held electric loop resection devices and Kresch is directed to mechanical tissue cutting device.  Vukovic is directed to an arthroscope, *i.e.*, an endoscope for use in laparoscopic intra-articular surgery.  *See, e.g.*, 1:5 – 29.  It is my opinion that there is no motivation or rationale why a person having ordinary skill in the art would consider combining the teachings from Alden, Kresch or Savage with an arthroscope, or any endoscope.  Because the Alden, Kresch, and Savage references are directed to self-contained handheld devices that integrate the scope optics with the cutting element, obviating the need for a separate endoscope, a person having ordinary skill in the art would not be motivated to modify or combine them with a separate endoscope, such as the Vukovic device.

180.    As discussed above, Alden, Kresch, and Savage teach a method that involves inserting a probe P or an outer sheath 22 with the use of an obturator and then removing the obturator and inserting the fiber optic scope F, 20 and cutting head C or electrosurgical cutting loop 18 at the same time.  Alden, Kresch and Savage do not disclose the use of an endoscope having first and second channels and motor driven cutter in a method for removing tissue from a uterus according to the claims.  The Vukovic reference is directed to an arthroscope for intra-articular laparoscopic surgery and does not disclose a method for removing tissue from the uterus.

181.    Since neither reference discloses a method for removing tissue from a uterus that includes inserting an endoscope having a first and second channels into the uterus and then inserts a motor

driven cutter into the second channel of the endoscope, it is not clear to me how any combination of Alden, Kresch or Savage and the Vukovic reference can render obvious any of the claims of the '359 Patent.

182.     Further, neither Alden, Kresch, Savage, nor Vukovic, disclose a method to cut tissue from a portion of the uterus that involves the use of a motor driven mechanical cutter inserted in a second channel of an endoscope such that a distal cutting region extends distally beyond the endoscope into the uterus and aspirates the cut tissue through the cutter.  Accordingly, it is my opinion that the combination of Alden, Kresch or Savage and Vukovic cannot meet all the elements of the claimed invention.

183.     In addition, as set forth above, a person having ordinary skill in the art would know that the electric loop resection device disclosed in Alden and Savage is capable of treating more intrauterine pathologies than a mechanical cutting device.  Therefore, a person having ordinary skill in the art would not be motivated to modify Alden or Savage to include a mechanical cutting device to remove tissue from a uterus.

184.     For the same reasons identified above, a person having ordinary skill in the art would not be motivated to modify the Vukovic device or combine it with the cutter disclosed in Kresch, Alden or Savage for purposes of cutting and removing tissue from a uterus.  As identified above, a further reason not to combine the Vukovic device and the cutter disclosed in Kresch, Alden or Savage is that it is entirely impractical to insert a cutter having a radially extending cutting heads such as that disclosed in the Kresch, Alden or Savage references in the narrow, straight working channel in the Vukovic device.

### iv.   Alden, Kresch, Savage and Grossi

185.     Dr. Dominicis asserts that combinations of the Alden, Kresch and Savage references and the Grossi reference render obvious the claims of the '359 patent.  I disagree with Dr. Dominicis' assertion.

186.     I note that the Alden, Kresch, Savage and Grossi references were considered by the USPTO Examiner during the prosecution of the '359 patent and all appear in the list of references cited on the face of the patent.

187.     As set forth in more detail above, it is my opinion that the Alden, Kresch, and Savage references do not anticipate any of the claims of the '359 Patent.  Alden and Savage are directed to a hand held electric loop resection devices and Kresch is directed to mechanical tissue cutting device.  Grossi is directed to a continuous flow hysteroscope.  It is my opinion that there is no motivation or rationale why a person having ordinary skill in the art would consider combining the teachings from Alden, Kresch or Savage with a hysteroscope or any endoscope.  Because the Alden, Kresch, and Savage references are directed to self-contained handheld devices that integrate the scope optics with the cutting element, obviating the need for a separate endoscope, a person having ordinary skill in the art would not be motivated to modify or combine them with an endoscope, such as the Grossi device.

188.     As discussed above, Alden, Kresch, and Savage teach a method that involves inserting a

31

probe P or an outer sheath 22 with the use of an obturator and then removing the obturator and inserting the fiber optic scope F, 20 and cutting head C or electrosurgical cutting loop 18 at the same time. Alden, Kresch and Savage do not disclose the use of an endoscope having first and second channels and motor driven cutter in a method for removing tissue from a uterus according to the claims. The Grossi reference is directed to a continuous flow hysteroscope and does not disclose a method for removing tissue from the uterus according to the claimed invention. Grossi does not disclose the use of permanently affixed light guide or a sealed first channel and Grossi does not disclosure the use of a motor driven cutter inserted through the second channel and aspirating tissue through the cutter.

189.    As discussed during the prosecution of the '359 patent, the Grossi reference does not disclose an endoscope having a first channel sealed from the second channel to prevent fluid from entering the uterus through the first channel. Contrary to the statements made in Dr. Dominicis' report, Grossi states that the first and second channels are operatively connected to the inlet and fluid flows through both channels. *See, e.g.*, Grossi at 2:35 – 41, 3:52 – 55, 4:29 – 38. Further, Grossi teaches that the device shown in Figs. 9 – 17 uses similar components and that the fluid flow is the same as that described for Fig. 2. *See, e.g.*, Grossi at 7:55 – 56 and 8:11 – 20. Thus, in my opinion, Grossi teaches away from a sealed first channel.

190.    Since neither device discloses a method for removing tissue from a uterus that includes inserting an endoscope having a first and second channels into the uterus followed by inserting a motor driven cutter into the second channel of the endoscope, it is not clear to me how any combination of Alden, Kresch or Savage and the Grossi reference can render obvious any of the claims of the '359 Patent.

191.    Further, neither Alden, Kresch, Savage, nor Grossi disclose a method to cut tissue from a portion of the uterus that involves the use of a motor driven mechanical cutter inserted in a second channel of an endoscope such that a distal cutting region extends distally beyond the endoscope into the uterus and aspirates the cut tissue through the cutter. Accordingly, it is my opinion that the combination of Alden, Kresch or Savage and Grossi cannot meet all the elements of the claimed invention.

192.    In addition, as set forth above, a person having ordinary skill in the art would know that the electric loop resection device disclosed in Alden and Savage is capable of treating more intrauterine pathologies than a mechanical cutting device. Therefore, a person having ordinary skill in the art would not be motivated to modify Alden or Savage to include a mechanical cutting device to remove tissue from a uterus.

193.    For the same reasons identified above, a person having ordinary skill in the art would not be motivated to modify the Grossi device or combine it with the cutter disclosed in Kresch, Alden or Savage for purposes of cutting and removing tissue from a uterus. As identified above, a further reason not to combine the Grossi device and the cutter disclosed in Kresch, Alden or Savage is that it is entirely impractical to insert a cutter having a radially extending cutting heads such as that disclosed in the Kresch, Alden or Savage references in the narrow working channel in the Grossi device. Further, Grossi discloses a curved or bent working channel and in my experience one of ordinary skill in the art would recognize that a straight cutting device could not

32

be used in a hysteroscope having a curved or bent working channel.


### v.  Alden, Kresch, Savage and Grinberg

194.    Dr. Dominicis asserts that combinations of the Kresch and Savage references and the Grinberg reference render obvious the claims of the '359 patent.  I disagree with Dr. Dominicis' assertion.

195.    I note that the Kresch, Savage and Grinberg references were both considered by the USPTO Examiner during the prosecution of the '359 patent and both appear in the list of references cited on the face of the patent.

196.    As set forth in more detail above, it is my opinion that the Kresch, and Savage references do not anticipate any of the claims of the '359 Patent.  Savage is directed to a hand held electric loop resection device and Kresch is directed to mechanical tissue cutting device.  Grinberg is directed to an arthroscopic cutting device for use in laparoscopic intra-articular surgery.  It is my opinion that there is no motivation or rationale why a person having ordinary skill in the art would consider combining the teachings from Kresch or Savage with an arthroscopic bone cutting instrument such as Grinberg.  Because the Kresch, and Savage references are directed to self-contained handheld devices that include tissue cutting elements there is no reason or rationale why a person having ordinary skill in the art would be motivated to modify or combine them with an arthroscopic bone cutting instrument, such as the Gringberg device.

197.    As discussed above, Kresch, and Savage teach a method that involves inserting a probe P or an outer sheath 22 with the use of an obturator and then removing the obturator and inserting the fiber optic scope F, 20 and cutting head C or electrosurgical cutting loop 18 at the same time. Kresch and Savage do not disclose the use of an endoscope having first and second channels and motor driven cutter in a method for removing tissue from a uterus according to the claims.  The Grinberg reference is directed to an arthroscopic bone cutting instrument and does not disclose a method for removing tissue from the uterus according to the claimed invention.  Grinberg does not disclose the use of permanently affixed light guide or a sealed first channel and Grinberg does not disclosure the use of a motor driven cutter inserted through the second channel and aspirating tissue through the cutter.

198.    Since neither device discloses a method for removing tissue from a uterus that includes inserting an endoscope having a first and second channels into the uterus followed by inserting a motor driven cutter into the second channel of the endoscope, it is not clear to me how any combination of Kresch or Savage and Grinberg can render obvious any of the claims of the '359 Patent.

199.    Further, neither Kresch and Savage, nor Grinberg disclose a method to cut tissue from a portion of the uterus that involves the use of a motor driven mechanical cutter inserted in a second channel of an endoscope such that a distal cutting region extends distally beyond the endoscope into the uterus and aspirates the cut tissue through the cutter.  Accordingly, it is my opinion that the combination of Kresch or Savage and Grinberg cannot meet all the elements of

33

the claimed invention.

200.     In addition, as set forth above, a person having ordinary skill in the art would know that the electric loop resection device disclosed in Savage is capable of treating more intrauterine pathologies than a mechanical cutting device, such as Grinberg.  Therefore, a person having ordinary skill in the art would not be motivated to modify Savage to include the mechanical cutting device, such as Grinberg, to remove tissue from a uterus.

201.     Both the Kresch and Grinberg devices disclose a cutter that does not include an outer tube that includes a cutting window.  Therefore, the combination of Kresch and Grinberg does not teach or suggest using a cutter having an outer tube defining a cutting window at a distal region of the outer tube and an inner tube received within the outer tube that is configured to rotate relative to the outer tube to cut tissue at the cutting window.

### vi.  Alden, Kresch, Savage and Bonnell

202.     Dr. Dominicis asserts that the combination of the Kresch reference and the Bonnell reference render obvious the claims of the '359 patent.  I disagree with Dr. Dominicis' assertion.

203.     I note that the Kresch and Bonnell references were both considered by the USPTO Examiner during the prosecution of the '359 patent and both appear in the list of references cited on the face of the patent.

204.     As set forth in more detail above, it is my opinion that the Kresch reference does not anticipate any of the claims of the '359 Patent.  Kresch is directed to mechanical tissue cutting device.  Bonnell is directed to a surgical instrument for use in laparoscopic intra-articular surgery.  *See, e.g.*, 1:5 – 11.  It is my opinion that there is no motivation or rationale why a person having ordinary skill in the art would consider combining the teachings from Kresch with an arthroscopic bone cutting instrument such as Bonnell.  Because the Kresch reference is directed to a self-contained handheld device that include tissue cutting elements there is no reason or rationale why a person having ordinary skill in the art would be motivated to modify or combine them with an arthroscopic bone cutting instrument, such as the Bonnell device.

205.     As discussed above, Kresch teaches a method that involves inserting a probe P with the use of an obturator and then removing the obturator and inserting the fiber optic scope F and cutting head C at the same time.  Kresch does not disclose the use of an endoscope having first and second channels and motor driven cutter in a method for removing tissue from a uterus according to the claims.  The Bonnell reference is directed to an arthroscopic bone cutting instrument and does not disclose a method for removing tissue from the uterus according to the claimed invention.  Bonnell does not disclose the use of an endoscope having a permanently affixed light guide or a sealed first channel and Bonnell does not disclosure the use of a motor driven cutter inserted through the second channel of the endoscope and aspirating tissue through the cutter.

206.     Since neither reference discloses a method for removing tissue from a uterus that includes inserting an endoscope having a first and second channels into the uterus followed by inserting a motor driven cutter into the second channel of the endoscope, it is not clear to me how any

combination of Kresch and Bonnell can render obvious any of the claims of the '359 Patent.

207.    Further, neither Kresch nor Bonnell disclose a method to cut tissue from a portion of the uterus that involves the use of a motor driven mechanical cutter inserted in a second channel of an endoscope such that a distal cutting region extends distally beyond the endoscope into the uterus and aspirates the cut tissue through the cutter.  Accordingly, it is my opinion that the combination of Kresch and Bonnell cannot meet all the elements of the claimed invention.

### vii.   Alden, Kresch, Savage and Iglesias

208.    Dr. Dominicis asserts that the combination of the Alden reference and the Iglesias reference render obvious the claims of the '359 patent.  I disagree with Dr. Dominicis' assertion.

209.    I note that the Alden reference was both considered by the USPTO Examiner during the prosecution of the '359 patent and appears in the list of references cited on the face of the patent.  I further note that references disclosing electric loop resectoscopes essentially the same as the Iglesias were considered by the USPTO Examiner during the prosecution of the '359 patent and appear in the list of references cited on the face of the patent.  See, e.g., the background of the '359 Patent, US 2002/0058859 (Brommersma) and Savage.

210.    As set forth in more detail above, it is my opinion that the Alden reference does not anticipate any of the claims of the '359 Patent.  Alden is directed to a hand held electric loop resection device.  Iglesias is directed to loop resectoscope for transurethral resection of tissue from the prostate or bladder.  *See, e.g.*, 1:15 – 23.  It is my opinion that there is no motivation or rationale why a person having ordinary skill in the art would consider combining the teachings from Alden with another electric loop resectoscope.  Because the Alden reference is directed to self-contained handheld device that integrates the scope optics with the cutting element, obviating the need for a separate endoscope, a person having ordinary skill in the art would not be motivated to modify or combine them with a resectoscope, such as the Iglesias device.

211.    As discussed above, Alden teaches a method that involves inserting an outer sheath 22 with the use of an obturator and then removing the obturator and inserting the fiber optic scope 20 and an electrosurgical cutting loop 18 at the same time.  Alden does not disclose the use of an endoscope having first and second channels and motor driven cutter in a method for removing tissue from a uterus according to the claims.  The Iglesias reference does not disclose a method for removing tissue from the uterus according to the claims.

212.    Since neither reference discloses a method for removing tissue from a uterus that includes inserting an endoscope having a first and second channels into the uterus followed by inserting a motor driven cutter into the second channel of the endoscope, it is not clear to me how any combination of Alden and Iglesias can render obvious any of the claims of the '359 Patent.

213.    Further, neither Alden nor Iglesias disclose a method to cut tissue from a portion of the uterus that involves the use of a motor driven mechanical cutter inserted in a second channel of an endoscope such that a distal cutting region extends distally beyond the endoscope into the uterus and aspirates the cut tissue through the cutter.  Accordingly, it is my opinion that the combination of Alden and Iglesias cannot meet all the elements of the claimed invention.

35

214.    In addition, as set forth above, a person having ordinary skill in the art would know that the electric loop resection device disclosed in Alden and Iglesias is capable of treating more intrauterine pathologies than a mechanical cutting device.  Therefore, a person having ordinary skill in the art would not be motivated to modify Alden or Iglesias, two electric loop resecting devices, to include a mechanical cutting device to remove tissue from a uterus according to the invention.  Further, Iglesias discloses a device having a straight endoscope which a person having ordinary skill would understand would require a curved or bent working channel for the insertion of mechanical cutting tools.  As such, a person having ordinary skill in the art would know that a device like that of Iglesias would not be compatible with a straight mechanical cutting device, such as that disclosed in Alden.

### e. The Combination of Banko and Grossi

215.    Dr. Dominicis asserts that the combination of the Banko reference and the Grossi reference render obvious the claims of the '359 patent.  I disagree with Dr. Dominicis' assertion.

216.    As set forth in more detail above, it is my opinion that the Banko reference does not anticipate any of the claims of the '359 Patent.  Banko is directed to a unitary mechanical tissue cutting device and Grossi is directed to a continuous flow hysteroscope.  It is my opinion that there is no motivation or rationale why a person having ordinary skill in the art would consider combining the teachings from Banko and Grossi.  Because Banko and Grossi are directed to two structurally different types of devices, a person having ordinary skill in the art would not consider combining them.

217.    Further, even if the teachings of Banko and Grossi were combined it is not clear how the combination meets all the elements of the claimed invention.  Grossi teaches a method that involves inserting a hollow outer sheath 22 followed by inserting a Hysteroscope but does not disclose the use of a motor driven cutter or a permanently affixed light guide.  Banko teaches a method that includes making an incision and inserting an integrated probe that includes cutting tip combined with fiber optics and fluid channels into the incision.  Banko does not disclose the use or the need for an endoscope having first and second channels according to the '359 Patent and Grossi does not disclose the use or need for a motor driven cutter in a method for removing tissue from a uterus according to the '359 Patent.

218.    As discussed during the prosecution of the '359 patent, the Grossi reference does not disclose an endoscope having a first channel sealed from the second channel to prevent fluid from entering the uterus through the first channel.  Contrary to the statements made in Dr. Dominicis' report, Grossi states that the first and second channels are operatively connected to the inlet and fluid flows through both channels.  *See, e.g.*, Grossi at 2:35 – 41, 3:52 – 55, 4:29 – 38.  Further, Grossi teaches that the device shown in Figs. 9 – 17 uses similar components and that the fluid flow is the same as that described for Fig. 2.  *See, e.g.*, Grossi at 7:55 – 56 and 8:11 – 20.  Thus, in my opinion, Grossi teaches away from a sealed first channel.

219.    Since neither device discloses a method for removing tissue from a uterus that includes inserting an endoscope having a first and second channels into the uterus followed by inserting a

36

motor driven cutter into the second channel of the endoscope, it is not clear to me how any combination of Banko and Grossi can render obvious any of the claims of the '359 Patent.

220.    Further, neither Banko nor Grossi disclose a method to cut tissue from a portion of the uterus that involves the use of a motor driven mechanical cutter inserted in a second channel of an endoscope such that a distal cutting region extends distally beyond the endoscope into the uterus and aspirates the cut tissue through the cutter. Accordingly, it is my opinion that the combination of Banko and Grossi cannot meet all the elements of the claimed invention.

221.    As set forth above, it is my opinion that Banko does not disclose delivering fluid to distending a uterus for intrauterine surgery.

222.    As set forth above, it is my opinion that a person having ordinary skill in the art would not consider the device of Banko suitable for uterine surgery because the cutting elements are not designed to resect myomas and other pathologies present in the uterus.

223.    In addition, as set forth above, a person having ordinary skill in the art would know that the electric loop resection device disclosed in the prior art (*e.g.*, Alden or Savage) is capable of treating more intrauterine pathologies than a mechanical cutting device. Therefore, a person having ordinary skill in the art would not be motivated to combine Banko and Grossi to include a mechanical cutting device to remove tissue from a uterus.

224.    For the same reasons identified above, a person having ordinary skill in the art would not be motivated to modify the Grossi device or combine it with the cutter disclosed in Banko for purposes of cutting and removing tissue from a uterus. As identified above, Grossi discloses a curved or bent working channel and in my experience one of ordinary skill in the art would recognize that a straight cutting device, such as Banko, could not be used in a hysteroscope having a curved or bent working channel.


### f. The Combination of Grossi and Grinberg

225.    Dr. Dominicis asserts that the combination of the Grossi reference and the Grinberg reference render obvious the claims of the '359 patent. I disagree with Dr. Dominicis' assertion.

226.    I note that the Grossi and Grinberg references were considered by the USPTO Examiner during the prosecution of the '359 patent and appear in the list of references cited on the face of the patent. I further note that Grossi and Grinberg were considered in detail by the USPTO Examiner and all the claims of the '359 Patent were allowed over initial rejections based on Grossi and Grinberg.

227.    As set forth above, at the time the invention was made, a person having ordinary skill in the art was well aware of the electric loop resectoscope that was commonly used for the removal of tissue from the uterus. It is my opinion that a person having ordinary skill in the art would not consider using the mechanical cutting tool disclosed in Grinberg to remove tissue from the uterus because it is untested and not shown to provide acceptable results for cutting tissue within the

uterus.  Further, even if it were shown to provide acceptable cutting capability, because the mechanical cutter has limited application and cannot be used for a range of procedures that would require an electric loop resectoscope, a person having ordinary skill in the art would not be motivated to use the mechanical cutting device of Grinberg in a procedure for removing tissue from the uterus.

228.    For the same reasons identified above, a person having ordinary skill in the art would not be motivated to modify the Grossi device or combine it with the cutter disclosed in Grinberg for purposes of cutting and removing tissue from a uterus.  As identified above, Grossi discloses a curved or bent working channel and in my experience one of ordinary skill in the art would recognize that a straight cutting device, such as Grinberg, could not be used in a hysteroscope having a curved or bent working channel.

229.    The Grinberg device discloses a cutter that does not include an outer tube that includes a cutting window.  Therefore, the combination of Grossi and Grinberg does not teach or suggest using a cutter having an outer tube defining a cutting window at a distal region of the outer tube and an inner tube received within the outer tube that is configured to rotate relative to the outer tube to cut tissue at the cutting window.

### g. The Combination of Grinberg or Bonnell and Olympus

230.    Dr. Dominicis asserts that the combinations of the Grinberg or Bonnell references and the Olympus nephroscope reference render obvious the claims of the '359 patent.  I disagree with Dr. Dominicis' assertion.

231.    This combination is essentially no different than the Grossi and Grinberg combination discussed above and dismissed by the USPTO.  The Olympus nephroscope was not known to be used in a method according to the claimed invention.  Grinberg and Bonnell are mechanical cutting devices designed for use in arthroscopic/laparoscopic procedures of the joints.  Neither Grinberg nor Bonnell disclose or even suggest using mechanical cutting within the uterus.  There is no suggestion or teaching in the prior art that the mechanical cutting devices disclosed in Grinberg or Bonnell can or should be used in the working channel of an endoscope or nephroscope, such as the Olympus nephroscope.  Therefore, it is my opinion that it would not be obvious to a person having ordinary skill in the art to combine Grinberg or Bonnell with the Olympus nephroscope.

232.    As set forth above, at the time the invention was made, a person having ordinary skill in the art was well aware of the electric loop resectoscope that was commonly used for the removal of tissue from the uterus.  It is my opinion that a person having ordinary skill in the art would not consider using the mechanical cutting tool disclosed in Grinberg or Bonnell to remove tissue from the uterus because it is untested and not shown to provide acceptable results for cutting tissue within the uterus.  Further, even if it were shown to provide acceptable cutting capability, because the mechanical cutter has limited application and cannot be used for a range of procedures that would require an electric loop resectoscope, a person having ordinary skill in the art would not be motivated to use the mechanical cutting device of Grinberg or Bonnell in a

38

procedure for removing tissue from the uterus.

233.    The Grinberg device discloses a cutter that does not include an outer tube that includes a cutting window.  Therefore, the combination of Grinberg and the Olympus nephroscope does not teach or suggest using a cutter having an outer tube defining a cutting window at a distal region of the outer tube and an inner tube received within the outer tube that is configured to rotate relative to the outer tube to cut tissue at the cutting window.


### h. Other Combinations

234.    I note that Dr. Dominicis hints at other potential combinations or that additional features from the prior art can be added to the combination of references he identifies in his report. However, Dr. Dominicis does not provide enough details as to what features would be added to which specific combination or any motivation or rationale for this further modification so I am unable to render an opinion as to these undisclosed combinations.  I reserve the right to supplement my report, should Dr. Dominicis, Mr. Walbrink or any other expert for Hologic be allowed to supplement their reports and provide further details about these undisclosed combinations.


### D.  Lack of Enablement and Written Description

235.    Dr. Dominicis asserts that the written description in the '359 patent does not suggest to a person having ordinary skill in the art that Dr. Emanuel was in possession of the claimed invention.  Specifically, Dr. Dominicis suggests that the '359 Patent lacks a sufficient description of a device without a further outlet or aspiration channel.  I disagree with Dr. Dominicis' assertion

236.    However, as noted above, Dr. Dominicis would agree that the '359 Patent does describe a device and a method which includes aspirating through the cutter and a second output or aspiration channel.  See, *e.g.*, Dominicis Report at ¶¶ 84 – 96.

237.    I further note that claims of the '359 Patent would read on the device having a further outlet channel, that is described in the '359 Patent.

238.    For example, the device disclosed in the description of the '359 Patent meets all the elements of claim 1.  Therefore, in my opinion, the '359 Patent provides support for the claimed invention.

239.    As set forth above, I note that during the prosecution history of the '359 Patent, the USPTO Examiner did not question whether the disclosure of the '359 Patent disclosed and provided support for a device without a further outlet channel.  The USPTO Examiner did not object to the claims that were allowed in the '359 Patent as not being supported by the description.  I agree with the USPTO Examiner that the '359 Patent discloses a method that

39

involves the use of a device with and without a further outlet channel.

240.    Further, the device shown in Fig. 2 is a device that does not include a further outlet channel and the description of the method at 3:8 – 15 of the '359 Patent, does not mention the use of a further outlet channel.  In addition, the specification does not state that the method cannot be practiced without the further outlet channel.

241.    It is my opinion that a person of ordinary skill in the art, having reviewed the specification, as originally filed, and figures 1 and 2 of the '359 Patent and related applications would recognize that the patent describes a device without a "further outlet channel" and a method of using such a device.  *See, e.g.*, '359 Patent Figs. 1&2, Col. 3:8-22, 5:8-15 and corresponding sections of the related applications.

242.    In addition, the description in the '359 patent and related applications make reference to "a further embodiment of the method" which is directed to "regulating" the pressure inside the body cavity through the use of further outlet.  *See, e.g.*, the '359 Patent at 3:8 – 21, the '602 Patent 3:12 – 18 and the PCT Application at p.4, lines 7 – 12.  Thus, the '359 Patent indicates to a person having ordinary skill in the art that there are several embodiments, including one without the further outlet channel and one with a further outlet channel to better regulate the pressure within the uterus.  Therefore, it is my opinion that the '359 Patent provides support for a method and a device that does not use the further outlet channel and a person having ordinary skill in the art would recognize that Dr. Emanuel invented the method that does not include a further outlet channel.  It is my opinion that a person having ordinary skill in the art of gynecologic surgery, having reviewed the specification of the '359 Patent and those of the related applications would recognize that the '359 Patent and the related applications describes a method for using a device that does not include a further outlet channel and appreciate that Dr. Emanuel was in possession of the claimed invention.

243.    The description and drawings in the priority documents describe the prior art procedure for resecting fibroids and polyps using a loop resectoscope.  A person having ordinary skill in the art is a doctor experienced in performing these and similar procedures.  The priority documents show an endoscope having at least 2 channels, the first channel including a light guide fixed therein and the second channel being connected to a valve for the inlet of fluid to distend the uterus.  Further the description and the drawings show that the cutter is inserted into the second channel in the ready to use position.  Thus, a person having ordinary skill in the art would understand that as part of the procedure, after the endoscope is inserted, the cutter is inserted such that it extends beyond the end of the endoscope, so that the cutter can be used to cut tissue from the wall of the uterus and aspirate tissue through the lumen of the cutter.  *See, e.g.*, Figs. 1, 3 and 4, 3:29 – 42, 3:64 – 4:8, and 5:49 – 60.

244.    In my opinion, the description and drawings suggests to a person having ordinary skill that a procedure without the use of the further outlet channel was intended.  In addition to what is set forth above, this is further supported by the disclosure that insertion tube 28 is a separate and removable component of the disclosed system.  A person having ordinary skill in the art would also be aware that the endoscope could be inserted without the insertion tube 28, because the smaller diameter endoscope is more easily inserted transcervically than with the insertion tube

40

28.  Further, a person having ordinary skill may have performed or observed procedures that involved inserting hysteroscopes (without insertion tubes) and then inserted forceps or scissors through the working channel to remove, for example, polyps.

245.  Dr. Dominicis asserts that written description in the '359 patent does not enable a person having ordinary skill in the art to practice the claimed invention.  I disagree with Dr. Dominicis' assertion.

246.  As set forth above, it is my opinion that the '359 Patent and related application provide sufficient description to convey to a person having ordinary skill in the art that Dr. Emanuel was in possession of the method that includes the use of an endoscope without a further outlet channel.  This description also provides sufficient information, when combined with the knowledge of a doctor having ordinary skill in the art to practice the claimed method without undue experimentation.

247.  The description and drawings in the priority documents describe the prior art procedure for resecting fibroids and polyps using a loop resectoscope.  A person having ordinary skill in the art is a doctor experienced in performing this procedure.  The priority documents show an endoscope having at least 2 channels, the first channel including a light guide fixed therein and the second channel being connected to a valve for the inlet of fluid to distend the uterus.  Further the description and the drawings show that the cutter is inserted into the second channel in the ready to use position.  Thus, a person having ordinary skill in the art would understand that as part of the procedure, after the endoscope is inserted, the cutter is inserted such that it extends beyond the end of the endoscope, so that the cutter can be used to cut tissue from the wall of the uterus and aspirate tissue through the lumen of the cutter.  *See, e.g.*, Figs. 1, 3 and 4, 3:29 – 42, 3:64 – 4:8, and 5:49 – 60.

248.  In my opinion, the description and drawings provide sufficient information about the use of the device, both with and without the further outlet channel that a person having ordinary skill could perform the procedure without the use of the further outlet channel without much practice or experimentation.  As stated above, a person having ordinary skill in the art would also be aware that the endoscope could be inserted without the insertion tube 28, and may have performed or observed such procedures that involved inserting a hysteroscope without an insertion tube and then inserted forceps or scissors through the working channel to remove, for example, polyps.  From this experience, a person having ordinary skill would be able to perform the claimed method using an endoscope that does not provide a further outlet channel.

249.  Accordingly, it is my opinion that the '359 Patent satisfies the written description requirement because it discloses a method of using an endoscope without a "further outlet channel."  It is my further opinion that the '359 method claims are adequately supported by the disclosures in the '359 Patent and the related applications.

## XII.   RESERVATION

250.   I expressly reserve the right to modify or supplement this report based upon any additional information produced or presented to me in this litigation and/or based upon the Court's claim construction order.


Dated: April 16, 2012                                   Dr. Keith B. Isaacson

42