# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SMITH & NEPHEW, INC., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | NO. 10-cv-10951-RWZ |
| vs. | ) | |
| | ) | |
| HOLOGIC MEDICAL, INC., and HOLOGIC, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# EXPERT REPORT OF DR. HENRY A. DOMINICIS
## REGARDING INVALIDITY OF U.S. PATENT NO. 8,061,359

## TABLE OF CONTENTS

I.     EDUCATIONAL BACKGROUND AND QUALIFICATIONS...................................1

II.    THE '359 PATENT AND THE ASSERTED CLAIMS ........................................2

    A.   The '359 Patent .....................................................................2

    B.   The Asserted Claims .............................................................3

III.   THE PERSON OF ORDINARY SKILL IN THE ART.............................................5

IV.    MEANING OF CERTAIN CLAIM TERMS ............................................................5

    A.   "elongated member" ............................................................6

    B.   "aspirating cut tissue and fluid from the uterus and the endoscope
through the cutter" ...............................................................6

    C.   "aspirating fluid with detached tissue from the uterus through a
lumen of the cutter" ............................................................7

    D.   "a cutting window at a distal region of the outer tube"...............7

V.     BACKGROUND OF THE RELEVANT TECHNOLOGY .........................................8

VI.    APPLICABLE STANDARDS....................................................................13

VII.   PRIORITY............................................................................................21

    A.   Lacking Description For A "Permanently Affixed" Light Guide .................22

    B.   Lacking Description For A "Permanently Affixed" Lens .............................26

    C.   Lacking Description Of A Device Without A "Further Outlet
Channel".............................................................................26

    D.   Lacking Description Of Inserting A Distal Region Of An Endoscope
Into Uterus Followed By Inserting A Motor Driven Cutter Into The
Second Channel...................................................................31

    E.   Lacking Description Of A Cutting Window At A Distal Region Of The
Outer Tube .........................................................................34

VIII.  OPINIONS REGARDING INVALIDITY IN LIGHT OF THE PRIOR ART .........36

    A.   Overview Of Prior Art.........................................................38

1.    "A method for removal of tissue from a uterus, comprising: inserting a distal region of an endoscope into said uterus"................40

2.    "the endoscope including a valve" ......................................................41

3.    "and an elongated member defining discrete first and second channels extending from a proximal region of the elongated member to the distal region, the second channel having a proximal end in communication with the valve such that fluid from the valve is able to flow into and through the second channel to the uterus," .......................................................42

4.    "the first channel having a light guide permanently affixed therein and being sealed from the second channel to prevent fluid from the valve from entering the uterus through the first channel" .............................................................................................45

5.    "inserting a motor driven cutter into the second channel such that a distal cutting region of the cutter extends distally beyond the endoscope in the uterus" ................................................................48

6.    "delivering fluid into the uterus through the valve and the second channel to distend the uterus" ...................................................50

7.    energizing an electric motor to drive the cutter to cut the tissue within the uterus ...................................................................................52

8.    aspirating cut tissue and fluid from the uterus and the endoscope through the cutter. .............................................................54

9.    The method of claim 1 wherein inserting the motor driven cutter comprises inserting an outer tube defining a cutting window at a distal region of the outer tube and an inner tube received within the outer tube that is configured to rotate relative to the outer tube to cut tissue, the inner tube including a cutting element at a distal region of the inner tube configured to cut tissue at the cutting window when the inner tube rotates relative to the outer tube. .....................................................................57

10.   Motivation To Combine Various Elements .........................................59

B.   Invalidity Under The Correct Priority Date Of July 20, 2007 .......................61

1.    S&N's Own Morcellator System Invalidates All The Elements Of All Asserted Claims ..........................................................................61

2.    The Combination of Banko and Baggish Renders Claims 1-8 of the '359 Patent Obvious ........................................................................62

C.     **Invalidity Under S&N's Incorrect Priority Date Of September 4, 1997**........63

    1.     **The Kresch Patent Discloses And/Or Renders Obvious All The Elements Of All Asserted Claims**........64

        a.   **The Kresch Patent Discloses All The Elements Of Claim 1**..........64

        b.   **The Kresch Patent Discloses All The Elements Of Claim 2**.........71

        c.   **The Kresch Patent Discloses All The Elements Of Claim 3**..........73

        d.   **The Kresch Patent Discloses All The Elements Of Claim 4**.........74

        e.   **The Kresch Patent Discloses All The Elements Of Claim 5**..........75

        f.   **The Kresch Patent Discloses All The Elements Of Claim 6**..........79

        g.   **The Kresch Patent Discloses All The Elements Of Claim 7**..........80

        h.   **The Kresch Patent Discloses All The Elements Of Claim 8**.........80

    2.     **The Savage '673 Patent Discloses And/Or Renders Obvious All The Elements of All Asserted Claims**........81

        a.   **The Savage '673 Patent Discloses All of the Elements of Claim 1**........81

        b.   **The Savage '673 Patent Discloses All The Elements Of Claim 2**........90

        c.   **The Savage '673 Patent Discloses All The Elements Of Claim 3**........92

        d.   **The Savage '673 Patent Discloses All The Elements Of Claim 4**........94

        e.   **The Savage '673 Patent Discloses All The Elements Of Claim 5**........95

        f.   **The Savage '673 Patent Discloses All The Elements Of Claim 6**........100

        g.   **The Savage '673 Patent Discloses All The Elements Of Claim 7**........100

        h.   **The Savage '673 Patent Discloses All The Elements Of Claim 8**........101

3.	The Banko Patent Discloses And/Or Renders Obvious All The Elements of All Asserted Claims ........................................................102

	a.	The Banko Patent Discloses All of the Elements of Claim 1 .......102

	b.	The Banko Patent Discloses All The Elements Of Claim 2 ........110

	c.	The Banko Patent Discloses All The Elements Of Claim 3 .........112

	d.	The Banko Patent Discloses All The Elements Of Claim 4 ........112

	e.	The Banko Patent Discloses All The Elements Of Claim 5 .........113

	f.	The Banko Patent Discloses All The Elements Of Claim 6 .........117

	g.	The Banko Patent Discloses All The Elements Of Claim 7 .........118

	h.	The Banko Patent Discloses All The Elements Of Claim 8 ........118

4.	The Obenchain Patent Discloses And/Or Renders Obvious All The Elements of Asserted Claims 1, 3, 4, 5, 7, and 8 ..........................119

	a.	The Obenchain Patent Discloses All of the Elements of Claim 1 ........................................................................................119

	b.	The Obenchain Patent Discloses All The Elements Of Claim 3 ........................................................................................129

	c.	The Obenchain Patent Discloses All The Elements Of Claim 4 ........................................................................................130

	d.	The Obenchain Patent Discloses All The Elements Of Claim 5 ........................................................................................131

	e.	The Obenchain Patent Discloses All The Elements Of Claim 7 ........................................................................................135

	f.	The Obenchain Patent Discloses All The Elements Of Claim 8 ........................................................................................136

5.	Banko in Light of Alden Renders Claims 1-8 of the '359 Patent Obvious ..........................................................................................137

6.	Alden in Light of the Olympus Scope Renders Claims 1-8 of the '359 Patent Obvious ..................................................................138

7.	Alden in Light of Vukovic Renders Claims 1-8 of the '359 Patent Obvious..........................................................................................139

8.      Alden in Light of Grossi Renders Claims 1-8 of the '359 Patent Obvious .................................................. 141

9.      The Combination of Banko and Kresch Renders Claims 1-8 of the '359 Patent Obvious ..................................... 142

10.     The Combination of Banko and Savage Renders Claims 1-8 of the '359 Patent Obvious ..................................... 144

11.     The Combination of Banko and Grossi Renders Claims 1-8 of the '359 Patent Obvious ..................................... 146

12.     The Combination of Kresch and Vukovic Renders Claims 1-8 of the '359 Patent Obvious ..................................... 148

13.     The Combination of Savage and Vukovic Renders Claims 1-8 of the '359 Patent Obvious ..................................... 149

14.     The Combination of Kresch and the Olympus Scope Renders Claims 1-8 of the '359 Patent Obvious.................................... 151

15.     The Combination of Savage and the Olympus Scope Renders Claims 1-8 of the '359 Patent Obvious.................................... 153

16.     The Combination of Grossi and Grinberg Renders Claims 1-8 of the '359 Patent Obvious ..................................... 155

17.     The Combination of Grinberg and the Olympus Scope Renders Claims 1-8 of the '359 Patent Obvious ............................. 156

18.     The Combination of Kresch and Grinberg Scope Renders Claims 1-8 of the '359 Patent Obvious.................................... 157

19.     The Combination of Savage and Grinberg Scope Renders Claims 1-8 of the '359 Patent Obvious.................................... 159

20.     The Combination of Alden and Iglesias Renders Claims 1-8 of the '359 Patent Obvious ..................................... 161

21.     The Combination of Kresch '689 and Bonnell Renders Claims 1-8 of the '359 Patent Obvious ......................................... 162

22.     The Combination of Bonnell and the Olympus Scope Renders Claims 1-8 of the '359 Patent Obvious.................................... 164

D.      Additional Obviousness Combinations ........................................ 165

**IX.  OPINIONS REGARDING LACK OF WRITTEN DESCRIPTION AND/OR ENABLEMENT OF A METHOD OF REMOVING UTERINE TISSUE USING A DEVICE WITHOUT THE "FURTHER OUTLET CHANNEL" .......... 166**

**A.  Lack Of Written Description Of The Method Using A Device Without A "Further Outlet Channel" ....................................................................... 166**

**B.  Lack Of Enablement The Method Using A Device Without A "Further Outlet Channel" ........................................................................... 169**

1.      I am Dr. Henry A. Dominicis, M.D., and I have been retained as an expert on the behalf of Hologic, Inc. ("Hologic") to provide opinions regarding the invalidity of U.S. Patent No. 8,061,359 (the "'359 patent"), which is currently asserted by Plaintiff Smith & Nephew, Inc. ("S&N").

2.      The bases for my conclusions include the following: (1) my education as a physician; (2) my experience of 20 years in the relevant surgical methods, (3) my review of the medical and patent literature; and (4) my review of documents pertaining to this litigation.

## I.      EDUCATIONAL BACKGROUND AND QUALIFICATIONS

3.      I am a practicing gynecologist at WomanCare PC in Arlington Heights, Illinois, a suburb of Chicago.  I have been a practicing gynecological surgeon for over 20 years and have experience in various procedures for, among other things, hysteroscopic and laparoscopic sterilization.

4.      I attended the University of Illinois College of Medicine in Chicago and completed my residency at Lutheran General Hospital in 1991.  I am Board Certified in Obstetrics and Gynecology.  I have been in my current practice since graduation and have taken a special interest in non-invasive surgical techniques.  I have also developed numerous community health clinics to serve the uninsured community.  I was the Chairman of the Obstetrics and Gynecology Department of Northwest Community Hospital until 2010.

5.      I am familiar with the history of devices and methods for tissue modification in the areas of opthalmology, gynecology, and general surgery.  Over my 20-year medical career, I have performed numerous surgeries involving tissue modification in and removal from the uterus, and I am very familiar with the various techniques used to perform such surgeries.

6.      I submit this report in accordance with Federal Rule of Civil Procedure 26(a)(2)(B).  This report sets forth the substance of the facts and opinions on which I currently expect to testify, and a summary of the bases and reasons for my opinions.  In addition, where appropriate within this report, I have identified the most pertinent source or sources for the information on which I have relied.  These references are not intended to be exhaustive or exclusive of other resources.

7.      I may rely on figures, enlargements or animations of portions of any of the patents, articles, and documents cited in this report as demonstrative exhibits during my testimony at trial.

8.      I am being compensated for my time at the rate of $400 per hour.

9.      I attach my curriculum vitae as Appendix A.  In addition to my personal experience, I have considered the materials listed in Appendix B in forming my opinion.

10.      I have been requested to review and analyze claims 1-8 (the "Asserted Claims") of the '359 patent and the relevant prior art, from the perspective of a person of ordinary skill in the art, and to opine as to whether the Asserted Claims are invalid.

## II.      THE '359 PATENT AND THE ASSERTED CLAIMS

### A.      The '359 Patent

11.      The '359 patent is titled "Reciprocating Rotary Arthroscopic Surgical Instrument."  It was filed on July 20, 2007 and issued on November 22, 2011.  The '359 patent says it was invented by Mark Hans Emanuel.

12.      The '359 patent relates to a method of cutting and removing tissue from a uterus. I may testify about the disclosures in the '359 patent, including the claims, the figures and the

associated descriptions.  I am prepared to testify about the methods disclosed in the '359 patent

and in the prior art and the operation of devices used to perform these methods.

**B.    The Asserted Claims**

13.    I understand that S&N has asserted that Hologic infringes the Asserted Claims of

the '359 patent, *i.e.*, claims 1-8.

14.    Claim 1 provides:

1. A method for removal of tissue from a uterus, comprising:

inserting a distal region of an endoscope into said uterus,

the endoscope including a valve,

and an elongated member defining discrete first and second channels
extending from a proximal region of the elongated member to the distal
region,

the second channel having a proximal end in communication with the
valve such that fluid from the valve is able to flow into and through the
second channel to the uterus,

and the first channel having a light guide permanently affixed therein and
being sealed from the second channel to prevent fluid from the valve from
entering the uterus through the first channel, followed by:

inserting a motor driven cutter into the second channel such that a distal
cutting region of the cutter extends distally beyond the endoscope in the
uterus;

delivering fluid into the uterus through the valve and the second channel to
distend the uterus;

energizing an electric motor to drive the cutter to cut tissue within the uterus; and

aspirating cut tissue and fluid from the uterus and the endoscope through the
cutter.

15.    Claim 2 provides:

2.    The method of claim 1 wherein inserting the motor driven cutter
comprises inserting an outer tube defining a cutting window at a distal

region of the outer tube and an inner tube received within the outer tube that is configured to rotate relative to the outer tube to cut tissue,

the inner tube including a cutting element at a distal region of the inner tube configured to cut tissue at the cutting window when the inner tube rotates relative to the outer tube.

16.     Claim 3 provides:

3.     The method of claim 1, wherein inserting the distal region of the endoscope comprises inserting a distal region of an endoscope that includes a fiber optics bundle permanently affixed to the first channel of the elongated member.

17.     Claim 4 provides:

4.     The method of claim 1, wherein inserting the distal region of an endoscope comprises inserting a distal region of an endoscope that includes a lens permanently affixed to the first channel of the elongated member.

18.     Claim 5 provides:

5.     A method for removal of tissue from a uterus, comprising:

inserting a distal region of an endoscope into the uterus,

the endoscope including a port for receiving a motor driven cutter and including an elongated member defining discrete first and second channels extending from a proximal region of the elongated member to the distal region,

the first channel having a light guide permanently affixed therein and the second channel having a straight, central longitudinal axis extending from the port to an opening at a distal tip of the endoscope, followed by:

inserting the motor driven cutter for cutting and detaching tissue into the second channel through the port;

introducing fluid into the uterus; and

aspirating fluid with detached tissue from the uterus through a lumen of the cutter.

19.     Claim 6 provides:

6.     The method of claim 5 wherein inserting the motor driven cutter comprises inserting an outer tube defining a cutting window at a distal

region of the outer tube and an inner tube received within the outer tube that is configured to rotate relative to the outer tube to cut tissue,

the inner tube including a cutting element at a distal region of the inner tube configured to cut tissue at the cutting window when the inner tube rotates relative to the outer tube.

20.    Claim 7 provides:

7.    The method of claim 5, wherein inserting the distal region of the endoscope comprises inserting a distal region of an endoscope that includes a fiber optics bundle permanently affixed to the first channel of the elongated member.

21.    Claim 8 provides:

8.    The method of claim 5, wherein inserting the distal region of the endoscope comprises inserting a distal region of an endoscope that includes a lens permanently affixed to the first channel of the elongated member.

## III.    THE PERSON OF ORDINARY SKILL IN THE ART

22.    I understand that a patent and the prior art should be construed from the perspective of a person of ordinary skill in the art.  I believe that the '359 patent is directed to a medical doctor with 4 years of experience performing hysteroscopic procedures, or a degreed engineer having at least 5 years of experience designing and developing devices used in minimally invasive surgery (endoscopes, resectoscopes, shavers, tissue removal devices, etc.), or a person having at least 10 years of experience designing and developing devices used in minimally invasive surgery (endoscopes, resectoscopes, shavers, tissue removal devices, etc.).

## IV.    MEANING OF CERTAIN CLAIM TERMS

23.    I understand that the Court has not yet issued an opinion construing certain claim terms of the '359 patent for which the parties seek construction.

24.     For purposes of this Report, I will adopt the proposed constructions of S&N, which are broader than the proposed constructions of Hologic.  As to claim terms not discussed below, I will adopt a construction of the claims consistent with S&N's assertions of infringement of the MyoSure.  In other words, I will assume for purposes of this Report only that the claims have been construed broad enough to cover the MyoSure.

A.     **"elongated member"**

25.     This claim element is found in all of the Asserted Claims.

26.     I understand that S&N has proposed a construction of "member of the endoscope that is elongated defining the length of the discrete first and second channels" for this claim element.  *See* Plaintiff's Opening Markman Brief at 9.

27.     I further understand that Hologic has proposed a construction of "the component of an endoscope as indicated by A in Fig. 2 that is at least 30 cm in length."  *See* Hologic's Opening Claim Construction Brief at 11.

B.     **"aspirating cut tissue and fluid from the uterus and the endoscope through the cutter"**

28.     The term "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter" is found in Asserted Claims 1-4.

29.     I understand that S&N has proposed a construction of "aspirating cut tissue and fluid from the uterus through the cutter" for this claim element.  *See* Plaintiff's Opening Markman Brief at 14.

30.     I further understand that Hologic has proposed a construction of "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter and aspirating substantially

only fluid through a further outlet channel." *See* Hologic's Opening Claim Construction Brief at 14.

### C. "aspirating fluid with detached tissue from the uterus through a lumen of the cutter"

31.     The term "aspirating fluid with detached tissue from the uterus through a lumen of the cutter" is found in Asserted Claims 5-8.

32.     I understand that S&N has proposed a construction of "aspirating fluid with detached tissue from the uterus through a lumen of a cutter" for this claim element. *See* Plaintiff's Opening Markman Brief at 14.

33.     I further understand that Hologic has proposed a construction of "aspirating fluid with detached tissue from the uterus through a lumen of the cutter and aspirating substantially only fluid through a further outlet channel" for this claim element. *See* Hologic's Opening Claim Construction Brief at 14-15.

### D. "a cutting window at a distal region of the outer tube"

34.     The term "cutting window" is found in Asserted Claims 2 and 6.

35.      I understand that S&N has proposed a construction of "an opening to provide access to a cutting component at a distal region of the outer tube" for this claim element. *See* Plaintiff's Opening Markman Brief at 17.

36.     I further understand that Hologic has proposed a construction of "an open distal end of the outer tube" for this claim element. *See* Hologic's Opening Claim Construction Brief at 19.

## V.      BACKGROUND OF THE RELEVANT TECHNOLOGY

37.      Techniques for cutting human tissue in small body cavities using specialized mechanical devices have been known and used for decades, at least since the 1970s and 1980s. (*See, e.g.,* Iglesias, Banko, and Vukovic.)  Persons of ordinary skill in the art have used various methods and devices for cutting tissue, particularly in small spaces in the body including the uterus, the prostate, the knee, and the eye.  Doctors and engineers have been continuously developing new techniques using new devices to perform surgeries to maximize their ability to perform surgeries in small body cavities while minimizing patient discomfort, risk, and recovery time.

38.      I am prepared to testify at trial regarding procedures and devices for the removal of intrauterine pathology, including fibroids and polyps.  Such procedures include hysterectomy, electrical resection, endometrial ablation, D&C, morcellation, and other means of pathology removal (e.g. graspers and forceps).  I am prepared to testify about the steps undertaken by doctors and their support staff during such procedures and how devices are used in such procedures.  I am also prepared to testify about the S&N and Hologic morcellator systems and how to perform procedures using those systems.  With respect to the procedures mentioned above, I am also prepared to testify about how to use a hysteroscope, how to distend a uterus with fluid and maintain that distention, how to dilate the cervix, how fluid is managed, how to maintain visualization, and the risks posed to the patient from each such procedure, including the risks of intravasation and perforation.

39.      I am prepared to demonstrate the operation of Hologic's and S&N's morcellation products, as well as hysterscopes and other devices used electrical resection, endometrial

ablation, D&C, morcellation, other means of pathology removal (e.g. graspers and forceps), and hysterectomy.

40.     The S&N and Hologic morcellator products are designed to remove polyps and fibroids from the uteri of women suffering from abnormal uterine bleeding.  I have performed well over 600 hysterectomies in my career.  I have performed more than 250 procedures in which I removed intrauterine polyps and fibroids in a patient.  I have performed at least four such procedures using the S&N morcellator product.  The S&N morcellator was too slow in terms of the rate of tissue removal and was limited in the types of tissues that it could effectively remove.  For at least those reasons, I found that the S&N morcellator did not provide a sufficient advantage over the gold standard of electrical loop resection to justify using it in my practice.  This understanding is based not only on my own personal experiences with the S&N morcellator, but also on communications I have had with my colleagues in the field who reached the same conclusion.

41.     Because of the inadequacies of the S&N morcellator, I do not believe that the S&N morcellator adequately addressed any need in the medical community for a device that removed intrauterine pathology more efficiently and more safely than electrical loop resection.

42.     I am aware that, this year, S&N modified its control unit such that the speed of its cutter has been increased.  I have heard about the performance of the modified S&N morcellator from other doctors in my field and I understand that it does not yield a substantial improvement over the performance of the unmodified S&N morcellator.

43.     I have performed over 70 procedures using the Hologic morcellator product and find that product to be far superior to S&N's morcellator product and to other means of removing intrauterine pathology, including electrical resection.  In my experience, and based as well on

what I have discussed with other doctors in my field, the Hologic morcellator (1) removes tissue faster than the S&N morcellator and (2) is capable of removing a greater variety of tissue types than the S&N morcellator.

44.     Polyps and fibroids are very different kinds of tissue.  Polyps are formed of soft endometrium.  Because of their softness and the nature of their connection to the body, polyps are, in the vast majority of cases, much more easily removed from a patient than are fibroids. Many polyps can be removed by using a grasper, forceps or similar device to "pluck" them from the wall of the patient's uterus.  Polyps can generally be removed in an office-based setting, rather than in a hospital operating room ("OR").

45.     In contrast to the soft, endometrial polyps, fibroids (or myomas) are fibrous tissues that are often calcified.  Fibroids commonly have the hardness of tough grizzle on a steak. When a fibroid is calcified, which is common, it can be even harder.  Although rare, fibroids can sometimes be so hardened from calcification that they cannot be removed using any mechanical device, and electrical resection, hysterectomy, or other methods must be used for treatment. Because of the hardness of fibroid tissue and the nature of its connection to the patient's body, removal of fibroids is a more advanced procedure than removal of polyps.  Fibroids are generally removed in the hospital OR rather than the office.  Fibroids cannot be removed with graspers, but must be cut away using a mechanical cutter, electrical resection, or in some instances hysterectomy.

46.     At least because of these differences between fibroids and polyps, the reimbursement rates for the removal of fibroids and the removal of polyps are different; they are much lower for the removal of polyps.

47.     I have removed intrauterine fibroids using a number of methods in addition to morcellation.  Electrical resection has been and continues to be the medical gold standard for removal of intrauterine fibroids in the medical community (though I personally use the Hologic morcellator product for the vast majority of my fibroid removal procedures and I believe it is superior to electrical loop resection).  Electrical resection involves the use of a heated wire that cuts the fibroid away from the uterus using cautery.  I have also treated abnormal uterine bleeding caused by intrauterine fibroids and/or polyps using endometrial ablation, which burns the lining of the uterus.  I have performed hysterectomies to treat abnormal uterine bleeding caused by fibroids.  I have also removed polyps using graspers, D&C, and electrical resection.

48.     S&N's morcellator system was introduced commercially over five years ago (to the best of my recollection).  The system was not readily adopted.  The S&N morcellator does not cut fibroid tissue at a high enough rate of speed to justify using it over electrical loop resection.  Also, the S&N morcellator does not adequately cut a large enough variety of fibroids.  Some fibroids are too tough for the S&N morcellator to cut and the blade bounces off or chews these fibroids instead of cutting them.  Because of these shortcomings, I and other doctors in my field declined to switch from electrical resection to morcellation when S&N's morcellator was launched.  Thus, in my opinion, if Hologic's product had never been on the market, most of the doctors who have used or now use Hologic's product would, like me, have continued to use electrical resection and would not have used S&N's morcellator product.

49.     It is important that a fibroid removal device like a morcellator be able to remove the largest variety of fibroids because the toughness of a fibroid is generally unknowable until the doctor actually begins to remove tissue.  The limitations of the S&N morcellator to remove harder fibroids would thus not become apparent until the middle of a procedure.  If the tissue was

of the type that the S&N product could not adequately cut, then I would have to change to electrical resection mid-procedure.  This is inefficient and poses unnecessary risks to the patient, due at least in part to increased procedure time.

50.     The Hologic morcellator, by contrast, is capable of adequately cutting a much larger variety of tissue than the S&N morcellator.  Because of this, the risk of having to switch from morcellation to electrical resection during a procedure is significantly reduced, to the point where the Hologic morcellator is, in my view, the superior method for fibroid removal, even to electrical resection.  Hologic's morcellator has the potential to be the new gold standard for removal of intrauterine fibroids.

51.     Morcellation is generally a safer procedure than electrical resection.  One reason for this is that morcellators pose less of a risk of perforation or collateral damage to the uterine wall because the morcellator blade is contained within the outer tube.  Both S&N's and Hologic's products provide this benefit.  Both also provide the benefit that they are not using electrical energy, which poses some risk of burning the patient.  Hologic's product, however, by being faster than S&N's product, provides the additional benefit that it takes substantially less time than electrical resection to remove a fibroid.  Because of this, the time in which the patient's uterus is distended is generally greatly reduced, which in turn reduces the risk of intravasation caused by the uptake of fluid into the patient's body during dilation of the uterus.

52.     It is my opinion that patient care would be significantly compromised if Hologic's morcellator were not available.  S&N's morcellator is not an adequate substitute for Hologic's morcellator because of its slow rate of cutting and inability to adequately cut a sufficient variety of fibroids.

53.     Another benefit of Hologic's morcellator product is that it can be used with any of the many commercially-available fluid management systems, while S&N's morcellator can only be used with S&N's fluid management system.  Indeed, Hologic's morcellator can be used with S&N's fluid management system, which is the setup utilized in my facility.  Hologic's flexibility in this regard means greater flexibility for doctors in managing fluid during a morcellation procedure, which in turn allows doctors to minimize risk and maximize efficacy and efficiency of the procedure.  In addition, the flexibility of the Hologic product in terms of fluid management systems is another benefit of the Hologic product over the S&N product.  If an operating room has a fluid management system already, they could use the Hologic morcellator with the fluid management system they already have.  If they wanted to use the S&N morcellator, however, they would have to buy the S&N fluid management system in addition to the fluid management system they already have.

## VI.     APPLICABLE STANDARDS

54.     I have been requested to review and analyze whether the asserted claims of the '359 patent patents are invalid.

55.     *Invalidity in light of prior art.*  I understand that Hologic asserts that the '359 patent is invalid because, among other things, earlier patents, articles, and/or other public materials or devices disclose and/or describe the methods claimed in the '359 patent before the applicable priority date for the claims in the '359 patent.  I discuss priority below.

56.     *Invalidity for lack of written description and failure to meet the enablement requirement.*  I also understand that Hologic asserts that under S&N's proposed construction of the "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter" and "aspirating fluid with detached tissue from the uterus through a lumen of the cutter" the claims of

-13-

the '359 patent containing those terms are not adequately described in the specification of the '359 patent and their full scope is not enabled.

57.     I base the opinions provided herein on my review of the '359 patent, including the specification and the claims of the '359 patent, the file history of the '359 patent, my review of certain prior art references, and my experience as set forth above.  I have been informed that this report is being submitted in accordance with the Court's Scheduling Order.

58.     The prior art considered by me in this report are the key pieces of prior art of which I am currently aware.  The list is not exclusive and there may be other prior art that, alone or in various combinations, disclose all the elements of the '359 patent.  I reserve my right to supplement this report in light of other prior art references or combinations of references.

59.     I understand that S&N has not yet submitted an expert report regarding validity and/or infringement, and I reserve the right to provide further opinions in response to any opinions or arguments offered by S&N in the future.

60.     I am not an expert on patent law and have been instructed on certain aspects of patent law by counsel.  I have been informed that a patent may be invalid if invalidity is proven by clear and convincing evidence, which is more than a preponderance of the evidence.

61.     I understand that a patent may be invalid in a number of circumstances:

    a.    the invention was known or used by others in the U.S., or patented or described in a printed publication in the U.S. or a foreign country, before the invention date by the applicant for patent; or

b.   the invention was patented or described in a printed publication in the U.S. or a foreign country, or in public use or on sale in this the U.S., more than one year prior to the date of the application for patent in the United States; or

c.   the patentee has abandoned the invention, or

d.   the invention was first patented by the applicant in a foreign country prior to the date of the application for patent in this country on an application for patent filed more than twelve months before the filing of the application in the United States, or

e.   the invention was described in – (1) an application for patent, published by another filed in the United States before the date of invention or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent; or

f.   the patentee did not himself invent the subject matter sought to be patented, or

g.   before the invention of the patent at issue, the invention was made in the U.S. by another inventor who had not abandoned, suppressed, or concealed it.  I understand that in determining priority of invention under this basis for invalidity, I may consider not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

62.   I understand that a patent may be invalid for anticipation, which is considered on a claim-by-claim basis.  To be anticipated by a piece of prior art, I understand that a person of

ordinary skill in the art would understand that a single such prior art reference disclosed each and every limitation of the claim, either expressly or inherently.  To disclose a claim limitation inherently, the disclosure must necessarily include the unstated limitation.  I understand that prior art includes an invention that was known or used by others in the United States, or patented or described in a printed publication in the United States or a foreign country, before the priority date of the patent.  I also understand that a patent or publication disclosing an invention more than one year before the priority date of the patent is also prior art.

63.     I understand that even if not anticipated, a patent claim may be invalid if it is obvious.  I understand that an invention is considered obvious if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  I understand that a number of factors may be considered in this analysis and that none is controlling.  These factors include: (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) any relevant secondary considerations, including commercial success, unmet and unsolved patient needs, and failure of others.  When considering whether a combination of prior art references would render an invention obvious, I understand that I should also consider the following additional factors, none of which is conclusive: (5) whether there is any motivation, suggestion, or teaching in the prior art to combine those references, (6) whether such a teaching, suggestion, or motivation was generally within the knowledge of one of ordinary skill in the art, (7) whether such a combination would have yielded predictable results to one of ordinary skill in the art, (8) the nature of the problems to be solved

by the '359 patent and the prior art, and (9) whether it would be obvious to try to the combination.

64.     In addition to other materials that are identified in my Report, I have reviewed and intend to rely on the following references in support of my testimony.  I may discuss the entirety of any of the below references at trial:

- U.S. Patent No. 4,700,694 ("Shishido")

- U.S. Patent No. 5,133,713 ("Huang")

- U.S. Patent No. 5,275,609 ("Pingleton")

- U.S. Patent No. 5,709,698 ("Adams")

- U.S. Patent No. 4,756,309 ("Sachse")

- U.S. Patent No. 4,924,851 ("Ognier")

- U.S. Patent No. 5,195,541 ("Obenchain")

- U.S. Patent No. 5,569,284 ("Young")

- U.S. Patent No. 5,492,537 ("Vancaillie")

- U.S. Patent No. 5,498,258 ("Hakky")

- U.S. Patent No. 5,549,541 ("Muller")

- U.S. Patent No. 5,569,254 ("Carlson")

- U.S. Patent No. 5,730,752 ("Alden")

- U.S. Patent No. 5,456,689 "("Kresch")

- U.S. Patent No. 5,527,331 ("Kresch '331")

- U.S. Patent No. 5,759,185 ("Grinberg")

- U.S. Patent No. 5,320,091 ("Grossi")

- U.S. Patent No. 3,945,375 ("Banko")

- U.S. Patent No. 3,850,162 ("Iglesias")

- U.S. Patent No. 6,032,673 ("Savage")

- U.S. Patent No. 6,156,049 ("Lovato")

- U.S. Patent No. 6,113,594 ("Savage '594")

- U.S. Patent No. 6,086,542 ("Glowa")

- U.S. Patent No. 5,913,867 ("Dion")

- U.S. Patent No. 5,814,009 ("Wheatman")

- U.S. Patent No. 6,626,827 ("Felix")

- U.S. Patent No. 6,159,209 ("Hakky '209")

- U.S. Patent No. 4,369,768 ("Vukovic")

- U.S. Patent No. 4,950,278 ("Sachse '278")

- U.S. Patent No. 4,955,882 ("Hakky '882")

- U.S. Patent No. 5,392,765 ("Muller")

- U.S. Patent No. 5,449,356 ("Walbrink")

- WO 95/10982 ("Correa")

- WO 03/022164 ("Todd")

- DE 3615694 ("Korth")

- WO 00/28890 ("Hsei")

- Baggish *et al.*, "Instrumentation of Hysteroscopy," in "Diagnostic and Operative Hysterectomy," Mosby (1999).

- Baggish *et al.*, "Accessory Instruments for Operative Hysteroscopy," in "Diagnostic and Operative Hysterectomy," Mosby (1999).

- Baggish *et al.*, "Hysteroscopic Sterilization," in "Diagnostic and Operative Hysterectomy," Mosby (1999).

- Neis *et al.*, "Hysteroscopy: Textbook and Atlas" 91-103, Thieme Medical Publishers (1994).

- Sugimoto *et al.*, "A Color Atlas of Hysteroscopy" 6-7, Springer (1999).

- Gregory Bacsko, *Uterine Surgery by Operative Hysteroscopy*, 71 European Journal of Obstetrics & Gynecology and Reproductive Biology, 219-222 (1997).

- S. Gerber *et al.*, *The Endoscapel: A New Endoscopic Instrument for Supracervical Hysterectomy and Morcellation of Masses; Clinical Evaluation*, 86: Suppl. 1, European Journal of Obstetrics & Gynecology and Reproductive Biology, S9-S31 (1999).

- Ludovic Cravello *et al.*, *Hysteroscopic Resection of Fibroids: Results with a 6-Year Follow-up Period*, 15: 1, Journal of Gynecologic Surgery, 1-5 (1999).

- Michael R. Drews *et al.*, *Surgical Approach to Myomas: Laparoscopy and Hysteroscopy*, 10: 4, Seminars In Reproductive Endocrinology, 367-77 (1992).

- Daniel A. Dumesic *et al.*, *A New Approach to Hysteroscopic Cannulation of the Fallopian Tube*, 7 Journal of Gynecologic Surgery, 7-9 (1991).

- Mario Franchini *et al.*, *Endometrial Resection: A Diagnostic Tool in Postmenopausal Women*, 8 Gynecological Endoscopy, 111-14 (1999).

- Bao-Liang Lin *et al.*, *Clinical Applications of a New Fujinon Operating Fiberoptic Hysteroscope*, 6 Journal of Gynecologic Surgery, 81-87 (1990).

- L. Mettler *et al.*, *Pelviscopic Uterine Surgery* 6 Surgical Endoscopy, 23-31 (1992).

- M. Nisolle *et al.*, *Endometrial Ablation with the Nd-VAG Laser in Dysfunctional Bleeding* 1 Minimally Invasive therapy, 35-39 (1991).

- Ki Hyun Park *et al.*, *Endoscopic Management of Uterine Myoma* 40: 6 Yonsei Medical Journal, 583-88 (1999).

- Shirish S. Sheath *et al.*, *Fiberoptic Light for Oophorectomy at Vaginal Hysterectomy* 14 Journal of Gynecologic Surgery, 119-22 (1998).

- Rafael F. Valle, *Hysteroscopic Removal of Submucous Leiomyomas* 6:2 Journal of Gynecologic Surgery, 89-96 (1990).

- K. M. Williamson *et al.*, *Editorial 1: Complications of Hysteroscopic treatments of Menorrhagia*, 77:3 British Journal of Anesthesia, 305-08 (1996).

- Mark H. Emanuel *et al.*, *Long-term Results of Hysteroscopic Myomectomy for Abnormal Uterine Bleeding*, 93:5 Obstet Gynecology, 743-48 (1999).

- *Weck, a Squibb Company: Direct Path to Diagnostic and Operative Control*, Advertisement, Journal of Gynecologic Surgery, vol. 7 (1991).

- *Gynescope: Laser Fiber Director*, Advertisement, Journal of Gynecologic Surgery, vol. 6 (1990).

- *Karl Storz*, Advertisement, Journal of Gynecologic Surgery, vol. 5 (1989).

- *Karl Storz Uterine Resectoscopes for Endometrial Ablation and Resection*, Advertisement, Journal of Gynecologic Surgery, vol. 6 (1990).

- Commercially available Olympus scope used by Mark H. Emanuel ("Olympus Scope").

- Smith & Nephew morcellator system commercially offered for sale and sold since before July 20, 2006 ("S&N morcellator system").

- Cutter used by Mark H. Emanuel with the Olympus Scope (See Emanuel Tr. 41:24-42:9) ("Emanuel Cutter").

- Cutters by Dionics, DuPuy, and Storz identified by Mark H. Emanuel (See Emanuel Tr. 14:10-20) ("Dionics, DuPuy, and Storz Cutters").

- Textbook of Biliopancreatic Diseases (W. Hess and G. Berci, eds., PICCIN 1997), *e.g.*, Fig. 6.5.1, 1584-86.

- Any other prior art references of record shown on the face of the '359 patent.

## VII.   PRIORITY

65.     For purposes of this expert report, I address the invalidity of the Asserted Claims of the '359 patent from the perspective of a person of ordinary skill in the art as of the priority date of those claims.  It is my opinion, for the reasons set forth herein, that the earliest potential priority date of the claims of the '359 patent is July 20, 2007, *i.e.*, the filing date of the '359 patent.

66.     I understand that S&N contends that the priority date for the claims of the '359 patent is September 4, 1997, based on an Dutch patent filed prior to the '359 patent's filing date of July 20, 2007.  Moreover, I understand that S&N is entitled to but has not yet exchanged an expert report regarding the priority dates of each of the claims of the '359 patent.  I reserve the right to provide further opinions in response to any opinions or arguments offered by S&N as to priority, conception, and/or reduction to practice.

67.     The '359 patent was filed on July 20, 2007 and issued on November 22, 2011.

68.     The '359 patent is titled "Surgical Endoscopic Cutting Device and Method For Its Use," and is directed to a method for the cutting of tissue using a "surgical endoscopic cutting

device."  I understand S&N has asserted priority of the '359 patent back to September 4, 1997 through a chain comprising two applications: (1) NL 1006944 (submitted September 4, 1997) ("the Dutch patent") and (2) U.S. Patent Application No. 09/486,977 (filed March 6, 2000, which issued as U.S. Patent No. 7,249,602 ("the '602 patent")).

69.     It is my opinion that the disclosures in these two applications are not broad enough to entitle the '359 patent to the benefit of the priority date of either of these applications.

70.     I am aware that a patent claim may rely on an earlier-filed patent or application if that earlier document enables and provides sufficient written description of each and every element of the claim.

71.     It is my opinion that the '359 patent claims are not entitled to the benefit of the earlier-filed patents and applications listed on the front of the '359 patent.  Those earlier earlier-filed patents and applications fail to provide sufficient written description and/or enablement of every element of the claims as required by patent law.

**A.      Lacking Description For A "Permanently Affixed" Light Guide**

72.     Claims 1-8 of the '359 patent are only entitled to rely on the '359 filing date for priority, because neither the Dutch patent nor the '602 patent discloses a light guide that is "permanently affixed" within the endoscope.

73.     The light guide is described in the '359 patent

A connection 8 for a light source is also present, for connection to a ***light guide***, such as a fibre [sic] optics bundle which provides for lighting at the end of lens 13.

(359 patent at col. 3:56-60.)  The light guide discussed in this passage is not depicted in the figures of the '359 patent; only the lens is shown.

74.     Such a "light guide" is not depicted or described anywhere in the Dutch patent or the '602 patent.  Nor is there any discussion in the Dutch patent of a light guide that is "permanently affixed" within the endoscope.  The relevant passages of the Dutch patent relating to the viewing apparatus are set forth below:

- "The viewing part of the above-described device contains a light channel in the housing, provided close to its end with a lens, and near the other end thereof a viewing device is provided. This may consist of an eyepiece or a connection for a camera so that the surgeon can perform the operation in question with the aid of a monitor and other people can also view it at the same time." (Dutch patent at p. 3-4.)

- "The viewing channel 6 ends on one hand in a lens 13 and on the other hand in a viewing tube 7 on which an eyepiece or camera connection is placed. In addition a connection 8 for a light source is present." (*Id.* at 5.)

75.     None of these passages even mentions a "light guide" and there is no light guide depicted in any of the figures.  All that is mentioned or depicted is the lens.  The lens is for viewing the tissue, not for lighting the viewable area.  In fact, the lens is depicted in the figures as taking up the entire diameter of the first channel, leaving no room for a light guide.

76.     But even if one assumed the presence of a light guide, there is certainly no mention of a ***permanently affixed*** light guide anywhere in the Dutch patent.

77.     The '602 patent is similarly lacking.  The '602 patent does mention a light guide, but there is no mention of the light guide being permanently affixed in the endoscope:

Viewing channel 6 ends at one side in a lens 13 and at the other side in a viewing tube 7, on which an eyepiece or camera connection is placed.  A connection 8 for a light source is also present, for connection to a fibre [sic] optics bundle which provides for lighting at the end of lens 13.

('602 patent at col. 3:49-54.)  There is nothing to tell a person of ordinary skill in the art that the inventor possessed the concept of a ***permanently affixed*** light guide.

78.     There is no light guide depicted in any of the figures of the '602 patent — the "fibre optics bundle" mentioned in the specification is not drawn or labeled in the figures.  All that is mentioned or depicted is the lens.  The lens is for viewing the tissue, not for lighting the viewable area.  In fact, just as with the Dutch patent, the lens is depicted in the figures as taking up the entire diameter of the first channel, leaving no room for a light guide.

79.     One cannot assume that a light guide in the endoscope is permanently affixed, because many light guides in the prior art were not permanently affixed.  In fact, in the file history, the limitation requiring a "permanently affixed" light guide was added by amendment in an attempt to distinguish the invention from prior art cited by the Patent Office.  The passage from the patentee's remarks of October 25, 2010 is reproduced below:

The Examiner has objected to the drawings for not showing the "light guide" recited in the claims. As discussed during the interview, a fiber optics bundle provides lighting at the end of the lens 13 shown in Fig. 2 as described at page 4, line 30 to page 5, line 4 of the specification. The fiber optics bundle is an implementation example of the recited light guide. For clarity and as requested by the Examiner, applicants have amended the specification to reference the fiber optics bundle as an exemplary light guide. Therefore, applicant requests reconsideration and withdrawal of this objection.

Independent claims 31 and 33, and their dependent claims 32 and 34, have been rejected as being unpatentable over Grossi (U.S. Patent No. 5,320,091) in view of Grinberg (U.S. Patent No. 5,759,185). Each of claims 31 and 33, as amended, recites, among other features, inserting a distal region of an endoscope into a uterus. The endoscope includes an elongated member defining discrete first and second channels, and the <u>first channel has a light guide permanently affixed therein</u>. As acknowledged by the Examiner during the interview, Grossi does not describe or suggest inserting such an endoscope into a uterus. Specifically, the first channel 104 (which the Office Action alleges corresponds to the recited first channel) of Grossi's inner member 24 (which the Office Action alleges corresponds to the recited endoscope) does not include a light guide <u>permanently affixed therein</u>. Rather, as discussed during the interview, the first channel 104 of Grossi's inner member 24 <u>removably</u> receives a telescope 106. Grinberg, which is relied upon for disclosing a cutter for insertion into Grossi's scope, also does not describe or suggest the above-noted feature.

Thus, S&N has told the Patent Office that the presence of a light guide, standing alone, does not tell a person of ordinary skill in the art that the light guide is permanently affixed to the endoscope. It may or may not be.

80. Accordingly, because neither the '602 patent nor the Dutch patent provide any description of a "light guide," much less a ***permanently affixed*** light guide, none of the claims in the '359 patent benefits from the priority of these earlier documents and the applicable priority date is July 20, 2007, *i.e.*, the date on which the '359 patent was filed.

## B.   Lacking Description For A "Permanently Affixed" Lens

81.     Claims 4 and 8 of the '359 patent are only entitled to rely on the '359 filing date for priority, because neither the Dutch patent nor the '602 patent disclose a lens that is "permanently affixed" to the endoscope.

82.     As discussed above, the '602 patent and the Dutch patent only mention the presence of a lens.  There is no mention of how the lens is affixed to the device.  In the figures of the '602 and the Dutch patent, the lens is simply shown disposed at the tip of the first channel. There is no attachment means depicted in the figures (e.g., epoxy or glue or similar means).

83.     Thus, there is no support in these earlier documents for a ***permanently affixed*** lens, and claims 4 and 8 cannot rely on those documents for priority.

## C.   Lacking Description Of A Device Without A "Further Outlet Channel"

84.     I understand that S&N asserts that the claims of the '359 patent are broad enough to cover a device lacking a "further outlet channel" for the discharge of substantially only fluid. There is no written description in the Dutch patent or the '602 patent for a method that involves such a device.  As such, the '359 patent claims are broader than the disclosures in the Dutch patent and the '602 patent and do not benefit from their earlier filing dates.

85.     The Dutch patent describes the invention as including an "additional drainage channel":

> The invention pertains to a surgical endoscopic cutting device comprised of an elongated, rigid housing with a viewing channel extending over its length and incorporated therein, and also provided with a receptacle extending over its length for receiving cutting means comprised of an elongated shaft near one end provided with cutting elements extending, in the position of use, beyond the free extremity of the rigid housing, wherein the end of the receptacle for the cutting elements away from the introduction end is provided with inlet for fluid as well as

> an outlet for fluid, which outlet is provided for receiving material coming from the cutting means, ***wherein an additional drainage channel is provided***, extending from the introduction end of the rigid housing to a further drain at the end of the rigid housing away from that introduction end.

(Dutch patent at 1)

86.     The Dutch patent further provides that the continuous flow of material provided by this additional drainage channel is "essential" to the invention:

> Since the fluid supplied in the invention is a liquid, and blood and other particles are produced during cutting, it is essential for keeping the surgical site readily visualizable that a continuous flow of fluid takes place such that the surgical material will be kept away in so far as possible from the free end of the viewing channel, i.e., the lens.

(Dutch patent at 3)

87.     Thus, because of the importance of this continuous flow, there are two outlet channels, not just one:

> With the above-described design there is one inlet for fluid and two outlets, one opposite the inlet 12 and one, as described above, connected to the outlet hose 23.

(Dutch patent at 5)

88.     Even the claims of the Dutch patent state that "an additional removal channel is provided"  (Dutch patent claim 1.)

89.     There is no written description anywhere in the Dutch patent of a method for removal of uterine tissue using a device lacking the further  outlet channel.  Moreover, because the inventor stated that this channel was "essential," the Dutch patent does not convey to a person of ordinary skill in the art that the inventor possessed the concept of using a device without such an additional channel in the claimed method.

90.     The '602 patent is also lacking in description of such a device.  In the Abstract, the '602 patent provides that the invention include the further outlet channel:

(57)                        **ABSTRACT**

A surgical endoscopic cutting device includes cutting ele-
ments fitted in a protective tube. The device has an inlet for
fluid, a discharge outlet for tissue and fluid, and a further
outlet that discharges most of the fluid.

91.     The specification of the '602 patent describes prior art that lacked the further

outlet channel.  In this prior art, fluid was discharged "together with the detached tissue through

the hollow stem of the cutter":

> WO 96/11638 discloses a cutter including a hollow stem
> and a cutting head accommodated inside a rigid housing.
> This rigid housing likewise contains a viewing channel with
> the necessary optics. U.S. Pat. No. 5,195,541 describes a
> laproscopic discectomy apparatus. For a laproscopic method
> it is essential to inflate the related cavity using gas. The gas
> feed is discontinuous and has no effect on viewing of the
> operation site.
>
> Fluid is introduced by way of a space between the stem
> and the rigid housing and discharged together with the
> detached tissue through the hollow stem of the cutter.

('602 patent at col. 1:57-67.)

92.     Such a device was "not very suitable" for removal of uterine tissues because of

the pressure fluctuations that would occur as tissue and fluid are removed through the cutter:

> This device could be satisfactory for the removal of tissues from certain body cavities, such as from the bladder. However, in the case of other body cavities, it is necessary to "blow up" the cavity before treatment can be carried out. An example of this is the uterus, in which it is important that the amount of enlargement of the organ be accurately controlled. The irregular discharge of fluid through the hollow stem of the cutter, caused partly by the irregular release of tissue, means that it cannot be guaranteed that the pressure inside the cavity is accurately controlled.
>
> Such a device is consequently not very suitable for use in the treatment of such a cavity.

('602 patent at col. 2:1-12.)

93.     The '602 patent describes the solution to this problem as the provision of a

"further outlet channel" for discharging substantially only fluid.  This is described in the

Summary of the Invention as being a necessary part of the invention:

SUMMARY OF THE INVENTION

The object of the present invention is to provide a device
which can perform such a treatment.
According to the invention, a further outlet channel is
provided, the function of which is independent of whether or
not detached tissue has been released. In other words, a
regular discharge of fluid can occur through this further
outlet channel. Since only a minor part of the fluid is now
discharged through the outlet, in which there are detached
pieces of tissue, the pressure inside the body cavity can be
regulated and controlled accurately. This makes it possible
to remove undesired tissue from cavities such as the uterus.
The applicability of the removal of tissues by cutting is
consequently considerably increased.
The further outlet channel described above is formed by
an insertion tube fitted around the endoscopic device. This
insertion tube serves to clear a space for the endoscopic
device. For this purpose, the front side of the insertion tube
can be provided with an insertion mandrel, which is
removed after the positioning of the insertion tube and
replaced by the endoscopic device described above. In this
case the further outlet channel can be defined between the
endoscopic device and the insertion tube.

('602 patent at col. 2:15-37; *see also* col. 4:24-30 ("Most of the fluid will be discharged through

the further outlet 31".)

94.     Notably, the '602 patent provides that the further outlet channel "makes it

possible" to remove tissue in the uterus using the device described.  (*Id.* col. 2:25.)

95.     Because the '602 patent describes the further outlet channel as an essential part of

the invention that "makes it possible," the '602 patent does not convey to one of ordinary skill in

the art that the inventor possessed the concept of his method using a device without the further

outlet channel. To the inventor, this was not possible because the further outlet channel made it

possible.

96. Accordingly, because there is no support in the '602 patent or the Dutch patent for

the method of the '359 patent using a device without the further outlet channel, these earlier

documents do not provide priority for the claims of the '359 patent.

### D. Lacking Description Of Inserting A Distal Region Of An Endoscope Into Uterus Followed By Inserting A Motor Driven Cutter Into The Second Channel

97. Claims 1-8 of the '359 patent are only entitled to at most the '359 filing date

because neither the Dutch patent nor the '602 patent disclose the insertion of a motor driven

cutter as a separate step in the claimed method, following insertion of the distal region of an

endoscope into the uterus.

98. Both independent claim 1 of the '359 patent from which claims 2-4 depend, and

claim 5 of the '359 patent from which claims 6-8 depend, claim a method comprising the steps of

(1) "*inserting* a distal region of an endoscope into said uterus…; *followed by*: [(2)] inserting a

motor driven cutter into the second channel…." ('359 patent at col. 5:22, 34; 6:15-24.)

99. The Dutch patent discloses neither of these steps. In fact, the Dutch patent

expressly teaches away from the use of the claimed device (Fig. 1) in the uterus before the

viewing portion (Fig. 2) has been coupled with the cutting means (Fig. 3) where the specification

describes Fig. 1 as "the endoscopic cutting device according to the invention *in its assembled*

*state*" (*see* Fig. 1 below, depicting cutting device coupled to endoscope) and states that "[i]t

should be clearly apparent from Fig. 1 that the parts shown in Figs. 2 and 3 can be slid together

*and then the device is ready for use*." (English Translation of Dutch patent at 4-5 (emphasis added).)



**(The Dutch patent at Fig. 1.)**

100.    In fact, in the claims of the Dutch patent describe the "surgical endoscopic cutting device" is the hysteroscope with the included cutter as a single unit. Both are inserted together into the uterus. It does not describe them being inserted into the uterus one after the other.

101.    Accordingly, contrary to the method set forth in claims 1-8 of the '359, the Dutch patent lacks any written description supporting the insertion of an endoscope not yet coupled with a cutting means into the uterus and then following such insertion with the subsequent insertion of "a motor driven cutter into the second channel." As such, claims 1-8 of the '359 patent are not entitled to the September 4, 1997 priority date of the Dutch patent.

102.    As with the Dutch patent, the '602 patent specification (upon which claims 1-8 of the '359 patent rely for priority as a continuation) also expressly teaches away from the use of the claimed device (Fig. 1) in the uterus before the viewing portion (Fig. 2) has been coupled with the cutting means (Fig. 4) where the specification describes Fig. 1 as "the endoscopic cutting device according to the invention *in the assembled state*" (*see* Fig. 1 below, depicting cutting device coupled to endoscope).



( '602 patent at Fig. 1.)

103.     Accordingly, contrary to the method set forth in claims 1-8 of the '359, the '602

patent lacks any written description supporting the insertion of an endoscope not yet coupled

with a cutting means into the uterus and then following such insertion with the subsequent

insertion of "a motor driven cutter into the second channel."  This is particularly so where the

'602 patent specification only discloses insertion into the uterus where "insertion mandrel 40 will

first be inserted, with shut off valve 39 open, into insertion tube 28 with bayonet 30.  This

assembly is then placed in the uterus…. Mandrel 42 is then removed by manipulating stem 41,

and the construction shown in Fig. 2 is placed in tube 28.  Connection is made here to bayonet

30.  ***The cutting action can then begin after the uterus has been dilated by the introduction of

fluid.***"  ('602 patent] at col. 4:31-42 (emphasis added).)  This language suggests that the cutter is

already inserted into the viewing/receiving part shown in Figure 2 below.  There is, therefore, no

written description in the specification for the insertion of a motor driven cutter ***following*** the

insertion of the distal region of an endoscope into the uterus.  As such, claims 1-8 of the '359

patent are not entitled to the priority date of the '602 patent.



('602 patent at Fig. 2.)

### E.    Lacking Description Of A Cutting Window At A Distal Region Of The Outer Tube

104.    I understand that S&N proposed a construction of "a cutting window at a distal region of the outer tube" that would cover the side cutting window of the MyoSure product. Claims 2 and 6 of the '359 patent are only entitled to at most the '359 filing date because neither the Dutch patent nor the '602 patent provide sufficient written description for a side cutting window like that in the MyoSure and thus do not provide written description for the full scope of the claims 2 and 6 as those claims are interpreted by S&N.

105.    I understand that a single embodiment would support a generic claim only if the specification would reasonably convey to a person skilled in the art that the inventor had possession of the claimed subject matter at the time of filing.

106.    The Dutch patent and the '602 patent do not describe any cutting windows located proximate the distal tip of the endoscope. The only cutting windows disclosed in those patents are located *at* the distal tip of the endoscope. As such, there is no support in these earlier applications for priority of the cutting window claim terms in claims 2 and 6 of the '359 patent.

107.    The Dutch patent, relied on for priority in the '359 patent file, fails to provide
sufficient written description for claims 2 and 6 of the '359 Patent where the only cutting
windows disclosed in the figures are distal tip cutting windows (*see* figures 1, 3, and 4 below--
cropped to show cutting window).



**(The Dutch Patent at Figs. 1, 3, 4 (cropped to show relevant portions).)**

108.    This species of cutting window is insufficient support for the broader genus of
cutting windows covered by S&N's construction to include any and all cutting windows, even
those not *at* the distal end of the cutter.  One of ordinary skill in the art would not have believed,
based on a  review of the NL1006944, that the inventor possessed the concept of a side cutting
window (proximate the distal end) as part of his invention.

109.    For the same reasons, the '602 patent fails to provide sufficient written
description for the limitation in claims 2 and 6 of "a cutting window at a distal region of the
outer tube," where the only cutting windows disclosed in the figures are distal tip cutting
windows, as shown below:  ('602 patent at Figs. 1, 3, 4, 5.)



**( '602 patent at Figs. 1, 3, 4, 5 (cropped to show relevant portions).)**

110.    In fact, the '602 patent and the Dutch patent teach away from side windows when it says the cutting element extends through the window.  ('602 patent at col. 2:65-67; Dutch patent at 3 ("In the latter case a protective tube is preferably equipped with a side opening through which a part of the cutting element projects outward").)

## VIII.   OPINIONS REGARDING INVALIDITY IN LIGHT OF THE PRIOR ART

111.    It is my opinion that the methods claimed in the '359 patent were known in the art for many years prior to September 4, 1997, the date S&N has alleged is the priority date of the '359 patent.  I may testify at trial regarding the entirety of any of the references discussed in this section.

112.    The opinions in this Report are based on S&N's assertion that Hologic's MyoSure Tissue Removal System falls within the scope of the asserted claims.  My opinions regarding

invalidity should not be construed as opinions that the MyoSure Tissue Removal System is covered by the asserted claims or that any aspect of the MyoSure Tissue Removal System satisfies any element of the asserted claims.

113.    As discussed in more detail below, each of the claim elements of the asserted claims of the '359 patent were well known in the art as reflected in numerous prior art references dating back to the 1970s.  These prior art references show devices for performing surgery in small body cavities, such as the uterus, that include inserting the distal region of an endoscope into the uterus; an elongated member defining two channels, one for delivering irrigation fluid to the surgical site and one for a light guide, where the channel for irrigation fluid is sealed from the channel for the light guide and the light guide is permanently affixed to its channel; inserting a motor-driven cutter into the channel delivering fluid to the surgical site in the uterus, that can take the form of an outer tube and inner tube, where the outer tube can have a window that exposes tissue to the inner tube, and the inner tube cuts the exposed tissue as it rotates; delivering the fluid to the surgical site in the uterus; energizing a motor to drive the cutter to cut tissue; and aspirating the cut tissue and fluid from the uterus and endoscope through the cutter.

114.    It is my opinion that all of the asserted claims are anticipated by at least one prior art reference described in this Report and that all of the Asserted Claims are rendered obvious by one or more of the prior art references described in this Report.  When I say in the paragraphs below that a claim of the '359 patent would be obvious in light of a prior art reference "alone," I mean that the prior art reference in combination with the knowledge of a person of ordinary skill in the art would render the claim obvious.

A.    **Overview Of Prior Art**

115.    As described below in the detailed discussion of the individual references, the features described in the Asserted Claims of the '359 patent were well known to those of ordinary skill in the art, and had been described in the prior art before what I understand S&N asserts is the relevant priority date, September 4, 1997.

116.    The reasons for combining any of the references that I cite herein would stem from (i) each of the prior art references being combined; (ii) the state of the prior art as a whole; (iii) the knowledge, common sense, and creativity of those of ordinary skill in the art; (iv) the nature of the problem to be solved; (v) the demands in the design community and/or the marketplace; (vi) the simple and predictable substitution of one known element with another in accordance with their known functions; (vii) the application of a known technique or method; (viii) the obviousness of trying the combination; and/or (ix) the general needs and problems in the field.  I have considered and can testify to all of these factors in each of the combinations I discuss herein.

117.    If I assume for the sake of argument that the Asserted Claims are not invalid because they are deemed to have sufficient written description of the claimed invention, then I would conclude that the prior art had at least as much, if not more, disclosure of the claimed inventions.  In other words, if one of ordinary skill in the art would believe that the inventor possessed the concept of all the features of the Asserted Claims, and could make and use those claims without undue experimentation, based only on the description in the '359 patent, then the same person would be so informed of those features based on the descriptions in the prior art.  In that case, the differences, if any, between the relevant prior art references discussed in this Report and the Asserted Claims of the '359 patent would have been obvious, as I discuss herein,

with the knowledge and common sense of one of ordinary skill in the art. Modification, if any, to achieve the claimed invention would have been a routine choice with a reasonable expectation of success and with predictable results. The state of the prior art was such that the features of the claims, alone or in combination, were well known at the time of the purported invention of the Asserted Claims and were known to be combinable to achieve various predictable outcomes, *e.g.*, cutting and aspirating tissue and fluid from a small body cavity using mechanical resection while distending the cavity.

118.    If the above were not true, then, as discussed below in this Report, the '359 patent would be lacking in disclosure of the features of the Asserted Claims and would be invalid for lack of written description and/or enablement. Thus, the disclosures found in the '359 patent and in the prior art rise and fall together: if the disclosures of the '359 patent sufficiently describe the features of the Asserted Claims, then those claims would be invalid as anticipated and/or obvious in view of prior art that is at least as descriptive as the disclosures of the '359 patent; conversely, if disclosures of the prior art do not sufficiently describe and enable the claimed features, then the Asserted Claims also would be invalid for lack of written description. I see no possibility that the prior art could be considered insufficient in terms of disclosure while, at the same time, the specification of the '359 patent could be deemed sufficient.

119.    As described below, the features embodied in the Asserted Claims are in no way novel. They exist both in single references and in combinations of references that would have been obvious to persons having ordinary skill in the art at the time of S&N's asserted priority date of September 1997.

1.      **"A method for removal of tissue from a uterus, comprising: inserting a distal region of an endoscope into said uterus"**

120.     Methods for removing tissue from the uterus involving insertion of the distal region of an endoscope into the uterus were well known in the art.

121.     For purposes of this report, the art that I discuss in this subsection as disclosing a "a method for removal of tissue from a uterus, comprising: inserting a distal region of an endoscope into said uterus" shall be referred to as the "Uterus References."

122.     The Alden patent, the Grossi patent, and the Savage '594 patent all disclose the use of an endoscope in the uterus for the purpose of removing uterine tissue.  (*See* Alden Fig. 3, 6:12-20; Grossi 2:10-13; Savage '594 Fig. 9, 2:55-60, 8:1-25.)

123.     Other patents, such as the Sachise patent, disclose the use of an endoscope in all surgical fields in which direct visual control is not possible and the viewing aid of an endoscope is required, for example, to generally to remove bodies from hollow organs of the human body. (*See* Sachise 1:28-40.)

124.     The prior art references discussed in greater detail in sections VII(C-F) of this report (Kresch, Savage '673, Banko, and Obenchain) either inherently or expressly describe a method for removal of tissue from a uterus, comprising inserting a distal region of an endoscope into said uterus.

125.     Indeed, this feature is well known and is described in number other references. *See also, e.g.*,  Hsei (WO 00/28890) (1:25-30); Baggish et al. (396); Neis et al. (91-101); S. Gerber et al. (S9-S31); Ludovic Cravello et al. (1-5); Drews (370); Mario Franchini et al. (113);

Bao-Liang Lin et al. (82); L. Mettler et al. (29); Olympus Scope; Hess et al. (Fig. 6.5.1, 1584-86); and the S&N morcellator system.

126.    For these reasons, any of the limitations of the Asserted Claims claiming "a method for removal of tissue from a uterus, comprising: inserting a distal region of an endoscope into said uterus" are not novel, and have no inventive aspect.

### 2.    "the endoscope including a valve"

127.    For purposes of this report, the art that I discuss in this subsection as disclosing a "the endoscope including a valve" shall be referred to as the "Valve References."

128.    The four prior art references discussed in greater detail in sections VIII(C-F) of this report (Kresch, Savage '673, Banko, and Obenchain) all describe an endoscope including a valve.

129.    In addition, a number of other prior art references disclose the use of a valve with an endoscope.  The use of a valve in an endoscope to deliver fluid to the site of the surgery was well-known in the art and, in any event, is simply common sense, as the user needs the valve to control the fluid flow into and out of the patient.

130.    Iglesias discloses using an endoscope with an inlet tube with a stopcock that controls the flow of irrigation fluid to the site of surgery.  (*See* Iglesias Figs. 1-3; 1:48-51, 1:61-66, 2:50-57.)

131.    Ognier discloses the use of an endoscope with push buttons that control, among other things, the injection of irrigation fluid into the surgery site.  (*See* Ognier 2:11-14, 3:29-34, 4:63-67.)

132.    Huang discloses a resectoscope that includes a stopcock that controls the flow of irrigating fluid into the surgical site located in the prostate.  (*See* Huang Figs. 1-2, 4:1-5, 5:22-24.)

133.    The Alden device discloses a surgical cutter for use in internal tissue resection, endoscopy, and other minimally-invasive surgical procedures that discloses the use of a valve to supply irrigation fluid to the site of surgery.  (*See* Alden 5:24-25.)

134.    Indeed, this feature is well known and is described in number other references. *See also, e.g.*, Muller (Figs. 1, 2a, 7:3-5, 7:63-65); Alden (5:24-25); Grossi (Figs. 2,11, 12, 6:29-33); Grinberg; Savage '594 (Figs. 2, 4, 7:1-13); Hakky '209 (Fig. 4, 3:6-15); Vukovic (3:8-19); Sachse '278 (1:41-60); Bonnell (Fig. 3, 4:51-52); Baggish et al. (Figs. 8-12, 101, 396); Neis et al. (Fig. 146); Drews et al. (373); Mario Franchini et al. (113); Bao-Liang Lin et al. (Fig. 1, 82); the Olympus Scope; Hess et al. (Fig. 6.5.1, 1584-86), and the S&N morcellator system.

135.    For these reasons, any of the limitations of the Asserted Claims claiming an "endoscope including a valve" are not novel, and have no inventive aspect.

> **3.    "and an elongated member defining discrete first and second channels extending from a proximal region of the elongated member to the distal region, the second channel having a proximal end in communication with the valve such that fluid from the valve is able to flow into and through the second channel to the uterus,"**

136.    For purposes of this report, the art that I discuss in this subsection as disclosing the use of a "an elongated member defining discrete first and second channels extending from a proximal region of the elongated member to the distal region, the second channel having a proximal end in communication with the valve such that fluid from the valve is able to flow into and through the second channel to the uterus" will be referred to as the "Elongated Member/Two Channel References."

137.     The use of endoscopes with two channels extending from a proximal region, closer to the surgeon, to a distal region, the region farther from the surgeon and the region where the cutting takes place, was well-known in the art.  A host of prior art references disclose this claim element as discussed herein.

138.     The four prior art references discussed in greater detail in sections VIII(C-F) of this report (Kresch, Savage '673, Banko, and Obenchain) either inherently or expressly disclose this claim element.  The description of these disclosures for each of these four prior art patents can be found in their respective sections.

139.     Iglesias discloses an endoscopic instrument with an elongated sheath 8 that houses channels for (1) a telescope tube permanently affixed to the device and (2) a conduit to deliver irrigating fluid to the surgery site that is sealed from the channel holding the telescope tube.  (*See* Iglesias Figs. 1-3; 1:45-51, 2:50-57, 3:1-7.)

140.     Hakky discloses the use of a resectoscope for removing bladder tissue that uses an elongated member with an inlet channel for delivering irrigation fluid to the surgery site, connected to an inlet valve and a separate channel for fiber optics to illuminate and visualize the surgery.  The separate channel for the fiber optics is sealed from the inlet channel for irrigation fluid.  (*See* Hakky Figs. 1, 4; 2:61-64, 4:22-30.)

141.     Carlson discloses the use of a surgical tool for orthopedic operations that includes a long tube, whose distal region is where cutting takes place, that includes a channel 59 for delivery of irrigation fluid to the site of the surgery, channels for optical fibers (61, 63, 65, 67, and 69) used to illuminate and view the surgery site, which channels are sealed from the irrigation fluid channel.  (*See* Carlson Figs. 1, 2, 4; 2:58-3:20, 4:56-5:3.)  The channel through which the fluid is delivered to the surgical site also houses the shaft that at its distal end has a

cutting element, and that when rotated cuts bone during the surgery.  (*See* Carlson Figs. 1, 2, 4; 4:56-5:3.)

142.    Grossi discloses the use of a hysteroscope with an elongated member, outer sheath 22, and an inner member 24 that contains separate channels for a telescope to view the surgery site and for irrigation fluid delivery to the site and inserting the surgical device for performing the cutting of the surgery.  (*See* Grossi Figs. 2, 4, 6, 8, 15, 16; 5:53-62, 6:44-52, 7:19-29, 7:55-66, 8:50--61.)  The irrigation fluid can be delivered through the working channel containing the surgical device that performs the cutting of the surgery, and not through the channel containing the telescope.  (*See* Grossi 3:52-64.)

143.    Vukovic discloses the use of an arthroscope including a sheath 30 at its operative end which includes a channel for permanently affixed fiber optics 40 that illuminate the surgical site, a channel 28 and fixed lens system for viewing the surgery, a channel 38 for delivering irrigation fluid that is sealed from the viewing channel 28 and the fiber optics channel 40, and a channel 44 for introducing a surgical instrument into the surgery area.  (*See* Vukovic Figs. 2, 3; 1:30-35, 2:55-3:42.)

144.    Many other prior art references disclose this feature.  *See also, e.g.*, Shishido (*e.g.* Figs. 1-3, 3:62-4:27); Adams (*e.g.* Fig. 2, 3:22-27, 4:65-5:19, 6:24-7:4); Ognier (*e.g.* Figs. 1-7, 2:47-57, 5:16-26); Hakky (*e.g.* Fig. 1, 4, 2:61-64, 4:22-30); Muller (*e.g.* Figs. 1, 2a, 2b, 3, 7:3-40, 7:63-8:15); Alden (*e.g.* Figs. 1-3, 4:41-55, 6:12-20); Grinberg; Lovato  (*e.g.* Figs. 2A, 2B, 2C; 8:8-17), Savage '594 (*e.g.* Figs. 1, 2, 6:7-67); Glowa (*e.g.* Figs. 2-3, 5-7, 3:34-54, 4:42-65); Correa (WO 95/10982) (*e.g.* Fig. 1, Abstract, 4:1-9); Hakky '209 (*e.g.*, 4:25-47); Sachse '278 (*e.g.*, 1:41-60); Baggish et al. (*e.g.*, Figs 9-9, 9-10, 104, 396); Neis et al. (*e.g.*, Fig. 146); Drews et al. (*e.g.*, 373); Mario Franchini et al. (*e.g.*, 113); Bao-

Liang Lin et al. (*e.g.*, Fig 1, 82); Olympus Scope; Hess et al. (*e.g.*, Fig. 6.5.1, 1584-86), S&N morcellator system.

145.    For these reasons, any of the limitations of the Asserted Claims claiming the use of "an elongated member defining discrete first and second channels extending from a proximal region of the elongated member to the distal region, the second channel having a proximal end in communication with the valve such that fluid from the valve is able to flow into and through the second channel to the uterus" are not novel, and there is no inventive aspect to this feature.

> **4.      "the first channel having a light guide permanently affixed therein and being sealed from the second channel to prevent fluid from the valve from entering the uterus through the first channel"**

146.    For purposes of this report, the art that I discuss in this subsection as disclosing the use of a "the first channel having a light guide permanently affixed therein and being sealed from the second channel to prevent fluid from the valve from entering the uterus through the first channel" will be referred to as the "Permanently Affixed References." These references describe this claim element in combination with the claim element discussed in the immediately preceding section ("an elongated member defining discrete first and second channels extending from a proximal region of the elongated member to the distal region, the second channel having a proximal end in communication with the valve such that fluid from the valve is able to flow into and through the second channel to the uterus").

147.    The use of surgical instruments such as hysteroscopes and endoscopes having a permanently fixed light guide, illumination source, and/or device for viewing the surgery was well known in the art as of the alleged priority date of the '359 patent. The references discussed in more detail below (Kresch, Savage '673, Banko, and Obenchain) disclose this element. Moreover, it was well known to those of ordinary skill in the art to seal the channel containing

the light guide in such surgical instruments from channels delivering fluid to the site of the surgery.

148.     Iglesias discloses an endoscopic instrument with an elongated sheath 8 that houses channels for (1) a telescope tube permanently affixed to the device and (2) a conduit to deliver irrigating fluid to the surgery site that is sealed from the channel holding the telescope tube.  (*See* Iglesias Figs. 1-3; 1:45-51, 2:50-57, 3:1-7.)

149.     Hakky discloses the use of a resectoscope for removing bladder tissue that uses an elongated member with an inlet channel for delivering irrigation fluid to the surgery site, connected to an inlet valve and a separate channel for fiber optics to illuminate and visualize the surgery.  The separate channel for the fiber optics is sealed from the inlet channel for irrigation fluid.  (*See* Hakky Figs. 1, 4; 2:61-64, 4:22-30.)

150.     Carlson discloses the use of a surgical tool for orthopedic operations that includes a long tube, whose distal region is where cutting takes place, that includes a channel 59 for delivery of irrigation fluid to the site of the surgery, channels for optical fibers (61, 63, 65, 67, and 69) used to illuminate and view the surgery site, which channels are sealed from the irrigation fluid channel.  (*See* Carlson Figs. 1, 2, 4; 2:58-3:20, 4:56-5:3.)  The channel through which the fluid is delivered to the surgical site also houses the shaft that at its distal end has a cutting element, and that when rotated cuts bone during the surgery.  (*See* Carlson Figs. 1, 2, 4; 4:56-5:3.)

151.     Grossi discloses the use of an hysteroscope with an elongated member, outer sheath 22, and an inner member 24 that contains separate channels for a telescope to view the surgery site and for irrigation fluid delivery to the site and inserting the surgical device for performing the cutting of the surgery.  (*See* Grossi Figs. 2, 4, 6, 8, 15, 16; 5:53-62, 6:44-52, 7:19-

29, 7:55-66, 8:50--61.)  The irrigation fluid can be delivered through the working channel containing the surgical device that performs the cutting of the surgery, and not through the channel containing the telescope.  (*See* Grossi 3:52-64.)

152.    Vukovic discloses the use of an arthroscope including a sheath 30 at its operative end which includes a channel for permanently affixed fiber optics 40 that illuminate the surgical site, a channel 28 and fixed lens system for viewing the surgery, a channel 38 for delivering irrigation fluid that is sealed from the viewing channel 28 and the fiber optics channel 40, and a channel 44 for introducing a surgical instrument into the surgery area.  (*See* Vukovic Figs. 2, 3; 1:30-35, 2:55-3:42.)

153.    Numerous other references disclose this claim element.  *See also* Shishido (Figs. 1, 2; 3:62-4:4); Sachse (1:53-56, 1:66-2:4); Muller (Figs. 1, 2b, 3, 3:7-10, 7:12-25); Alden (Figs. 1-3, 4:52-54); Grinberg; Lovato (Figs. 1D, 2A, 2B, 2C; 1:56-67, 8:8-17; 8:35-47); Savage '594 (Fig. 2, 42-44); Correa (WO 95/10982) (Fig. 1, Abstract, 4:1-9); Hakky '209 (Fig. 4, 2:50-58); Baggish et al. (Figs. 8-18, 9-9, 9-10, 104, 396); Neis et al. (91); Sugimoto et al. (3-7); Drews et al., (373); the Olympus Scope; Hess et al. (Fig. 6.5.1, 1584-86); and the S&N morcellator system.

154.    For these reasons, any of the limitations of the Asserted Claims claiming "the first channel having a light guide permanently affixed therein and being sealed from the second channel to prevent fluid from the valve from entering the uterus through the first channel" are not novel, and there is no inventive aspect to this feature.

5.      **"inserting a motor driven cutter into the second channel such that a distal cutting region of the cutter extends distally beyond the endoscope in the uterus"**

155.    For purposes of this report, the art that I discuss in this subsection as disclosing "inserting a motor driven cutter into the second channel such that a distal cutting region of the cutter extends distally beyond the endoscope in the uterus" will be referred to as the "Cutter Insertion References."

156.    The use of surgical instruments such as hysteroscopes and endoscopes requiring the user to insert a motor-driven cutter into a channel of the instrument extending into the body cavity where the surgery is to take place was well known in the art.

157.    The four prior art references discussed in greater detail below in sections VIII(C-F) of this report (Kresch, Savage '673, Banko, and Obenchain) either inherently or expressly describe the user inserting a motor-driven cutter into a channel of the instrument extending into the body cavity where the surgery is to take place.

158.    Additional prior art references also disclose a user inserting a motor-driven cutter into a channel of the instrument extending into the body cavity where the surgery is to take place.

159.    For example, Alden discloses a motor-driven chopping mechanism comprised of an outer tube and an inner tube, where the outer tube has a window that exposes tissue to the inner tube, and the inner tube rotates with respect to the outer tube to cut the tissue. The chopping mechanism, including the inner and outer tubes, can be removed and replaced. (*See* Alden Figs. 1-3, 5:26-49.)

160.    Vukovic discloses the use of an arthroscope including a sheath 30 at its operative end which includes a channel for permanently affixed fiber optics 40 that illuminate the surgical

site, a channel 28 and fixed lens system for viewing the surgery, a channel 38 for delivering
irrigation fluid that is sealed from the viewing channel 28 and the fiber optics channel 40, and a
channel 44 into which a surgical instrument is inserted and is used to perform the surgery.  (*See*
Vukovic Figs. 2, 3; 1:30-35, 2:55-3:42.)

161.    Grossi discloses the use of an hysteroscope with an elongated member, outer
sheath 22, and an inner member 24 that contains separate channels for a telescope to view the
surgery site and for irrigation fluid delivery to the site and inserting the surgical device for
performing the cutting of the surgery.  (*See* Grossi Figs. 2, 4, 6, 8, 15, 16; 5:53-62, 6:44-52, 7:19-
29, 7:55-66, 8:50--61.)  The surgical device can be inserted in one of the working channels.  (*See*
Grossi Figs. 1, 2; 2:33-41, 3:25-37, 7:19-29, 7:55-66, 8:50-61.)

162.    Lovato discloses the insertion of a motor-driven cutter into an outer sheath to
morcellate tissue.  There is a separate channel for the insertion of a telescope element.  (Lovato
Figs. 2A-C, 3A; 8:8-34.)

163.    Bonnell discloses the use of an intra-articular arthroscopic surgical device using a
motor-driven cutter that follows the following steps, in this order: (1) insertion of the device into
the surgical site with the motor deactivated; (2) activating the valve to begin irrigating fluid flow
to the surgery site; (3) move the cutter to the tissue to be shaved/cut; (4) activate the motor to
begin shaving/cutting; and (5) aspirating cut tissue away from the surgical site through the
internal tube.  (*See* Bonnell Fig. 9; 4:51-5:14.)

164.    Numerous other references also disclose this claim element.  *See also, e.g.*,
Shishido (Figs. 2-4; 4:18-21, 5:36-52); Huang (Figs. 1-4; 2:31-34, 4:37-68); Pingleton (Figs. 1-3,
4:32-57, 5:13-24, 5:48-60), Adams (Figs. 1, 2, 4:50-5:1); Sachise (Fig. 4, 2:28-35); Ognier (2:21-
29, 5:16-26); Hakky (Fig. 4, 3:10-15, 4:59-65); Muller (3:9-11, 7:18-20, 7:26-30); Carlson (Fig.

3, 3:62-4:4, 4:28-30); Grinberg (1:56-64, 2:31-32, 3:26-35); Savage '594 (5:56-6:6); Correa (WO 95/10982) (Fig. 1, Abstract, 4:1-9); Hakky '209 (2:58-65); Sachse '278 (Fig. 6, 4:20-42); Bonnell (1:36-62, 3:31-4:17); Baggish et al. (104, 396); Neis et al. (91); Drews et al. (370); the Olympus Scope; Hess et al. (Fig. 6.5.1, 1584-86); the S&N morcellator system; the Emanuel Cutter; and the Dionics, DuPuy, and Storz Cutters.

165.    For these reasons, any of the limitations of the Asserted Claims claiming "inserting a motor driven cutter into the second channel such that a distal cutting region of the cutter extends distally beyond the endoscope in the uterus" are not novel, and there is no inventive aspect to this feature.

### 6.    "delivering fluid into the uterus through the valve and the second channel to distend the uterus"

166.    For purposes of this report, the art that I discuss in this subsection as disclosing "delivering fluid into the uterus through the valve and the second channel to distend the uterus" will be referred to as the "Fluid Delivery References."

167.    The delivery of fluid to the site of endoscopic, hysteroscopic, or other surgeries in small body cavities was well known in the art as of the alleged priority date of the '359 patent. There are numerous prior art references that describe delivering fluid to surgical sites in small body cavities during surgery.

168.    The four prior art references discussed in greater detail in sections VIII(C-F) of this report either inherently or expressly describe outer tubular members with proximately located cutting windows for the exposure of tissue to inner cutting members.  The description of these disclosures in provided in detail in the respective sections for each patent.

169.     Adams discloses that "during certain surgical procedures . . . it is desirable to introduce irrigating fluid to the surgical site in order to simply irrigate the site to improve visualization or to facilitate the aspiration of debris. . . . Recently, powered endoscopic surgical cutting devices have been produced in order to simultaneously provide irrigation and aspiration without the necessity of using a separate instrument." (*See* Adams 2:24-34.) Adams discloses the use of an endoscopic shaver blade with a separate irrigation port to provide irrigating flow to the surgical site. (*See* Adams 4:65-5:67.)

170.     Sachse discloses an endoscope with a separate tube for introducing irrigating fluid to the surgical site. (*See* Sachse Fig. 3; 1:56-60.)

171.     Hakky discloses a resectoscope with a special lumen that provides the introduction of irrigating fluids into the surgery site. (*See* Hakky Fig. 1; 4:22-28, 5:20-25.)

172.     Muller discloses the use of a continuous flow hysteroscope for surgery within the uterus, which permits the continuous flow of irrigating fluid to and from the surgical site through fluid passageways. (*See* Muller Fig. 4; 9:17-29, 9:46-49, 10:26-37.)

173.     Iglesias discloses the use of an endoscope for transurethral surgery that includes separate channels for inflow of irrigating fluid to a surgical site and outflow of irrigating fluid from a surgical site. (*See* Iglesias 3:31-45.)

174.     Bonnell discloses the use of an intra-articular arthroscopic surgical device using a motor-driven cutter that follows the following steps, in this order: (1) insertion of the device into the surgical site with the motor deactivated; (2) activating the valve to begin irrigating fluid flow to the surgery site; (3) move the cutter to the tissue to be shaved/cut; (4) activate the motor to

begin shaving/cutting; and (5) aspirating cut tissue away from the surgical site through the internal tube.  (*See* Bonnell Fig. 9; 4:51-5:14.)

175.    *See also* Shishido (4:35-39); Huang (4:1-5, 5:22-24); Ognier (Figs. 6, 7, 2:11-14, 3:29-34, 5:16-26); Carlson (2:58-3:5, 4:56-5:3); Alden (*e.g.* 4:58-61); Grossi (Fig. 2, 6:25-57, 8:50-61); Lovato (8:12-17, 9:42); Grinberg; Savage '594 (Figs. 2, 4, 7:1-13); Glowa (Figs. 2-3, 5-7, 3:51-4:13, 4:42-4:65); Correa (WO 95/10982) (Fig. 1, Abstract, 4:1-9); Hakky '209 (Fig. 4, 3:6-15); Vukovic (5:3-8); Hsei (WO 00/28890) (1:25-30, 7:3-9; Baggish et al. (100-101, 396); Neis et al. (91);  Sugimoto et al. (3-7); Drews et al. (373); Mario Franchini et al. (113); Bao-Liang Lin et al. (82); the Olympus Scope; Hess et al. (Fig. 6.5.1, 1584-86); and the S&N morcellator system.

176.    For these reasons, any of the limitations of the Asserted Claims claiming "delivering fluid into the uterus through the valve and the second channel to distend the uterus" are not novel, and there is no inventive aspect to this feature.

## 7.    energizing an electric motor to drive the cutter to cut the tissue within the uterus

177.    For purposes of this report, the art that I discuss in this subsection as disclosing "energizing an electric motor to drive the cutter to cut the tissue within the uterus" will be referred to as the "Motor-Driven Cutter References."

178.    The delivery of fluid to the site of endoscopic, hysteroscopic, or other surgeries in small body cavities was well known in the art as of the alleged priority date of the '359 patent. There are numerous prior art references that describe delivering fluid to surgical sites in small body cavities during surgery.

179.     Lovato discloses the insertion of a motor-driven cutter into an outer sheath to morcellate tissue.  There is a separate channel for the insertion of a telescope element.  (Lovato Figs. 2A-C, 3A; 8:8-34.)  The motor-driven cutter has a window in the outer tube that admits tissue to be cut and exposes it to the inner tube.  The motor, when activates, reciprocates or rotates the inner tube.  This results in the cutting of the exposed tissue.  (*See* Lovato Figs. 2A, 3A, 3B, 4A, 4B, 7A/B-19A/B; 8:18-34, 8:48-60, 9:55-10:17, 11:66-12:22.)

180.     Pingleton discloses the use of a surgical cutting instrument comprised of an outer tube and inner tube, which are concentric, with a port at the distal end of the tubes that admits tissue into the central lumen of the tubes, a cutting edge on the inner tube, and a motor to drive the inner tube to rotate such that when it rotates, the admitted tissue is cut.  (*See* Pingleton Figs. 1-3; 1:55-2:13; 2:45-52, 4:32-57, 5:13-24, 5:48-60, 6:16-20.)

181.     Alden discloses a motor-driven chopping mechanism comprised of an outer tube and an inner tube, where the outer tube has a window that exposes tissue to the inner tube, and the inner tube rotates with respect to the outer tube to cut the tissue.  The chopping mechanism, including the inner and outer tubes, can be removed and replaced.  (*See* Alden Figs. 1-3, 5:26-49.)  The motor allows for rotation in either direction and tissue is sheared mechanically during rotation.  (*See* Alden 5:41-49.)

182.     Bonnell discloses the use of an intra-articular arthroscopic surgical device using a motor-driven cutter that follows the following steps, in this order: (1) insertion of the device into the surgical site with the motor deactivated; (2) activating the valve to begin irrigating fluid flow to the surgery site; (3) move the cutter to the tissue to be shaved/cut; (4) activate the motor to begin shaving/cutting; and (5) aspirating cut tissue away from the surgical site through the internal tube.  (*See* Bonnell Fig. 9; 4:51-5:14.)

183.    *See also* Iglesias (Figs. 1-3; 1:55-60); Huang (4:37-68, 5:15-20); Adams (2:60-67, 4:54-61, 6:11-18); Sachse (Fig. 4, 2:28-35); Hakky (Fig. 4, 2:65-3:1, 4:6-11, 4:47-49); Carlson (Fig. 3, 3:62-4:4, 4:28-30); Grossi; Grinberg (1:56-64, 3:26-35); Savage '594 (5:56-6:6); Dion (1:36-50, 3:48-53); Hakky '209 (4:32-33, 4:48-49); Sachse '278 (Fig. 6, 4:20-42); Bonnell (2:27-33); Baggish et al. (396); Drews et al. (370); the Olympus Scope; Hess et al. (Fig. 6.5.1, 1584-86); the S&N morcellator system; the Emanuel Cutter; and the Dionics, DuPuy, and Storz Cutters.

184.    For these reasons, any of the limitations of the Asserted Claims claiming "energizing an electric motor to drive the cutter to cut the tissue within the uterus" are not novel, and there is no inventive aspect to this feature.

### 8.    aspirating cut tissue and fluid from the uterus and the endoscope through the cutter.

185.    For purposes of this report, the art that I discuss in this subsection as disclosing "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter" will be referred to as the "Aspiration References."

186.    The aspiration of fluid and tissue from the site of endoscopic, hysteroscopic, or other surgeries in small body cavities was well known in the art as of the alleged priority date of the '359 patent.  There are numerous prior art references that describe removing cut tissue and fluid from surgical sites in small body cavities during surgery.

187.    Pingleton discloses the use of a surgical cutting instrument comprised of an outer tube and inner tube, which are concentric, with a port at the distal end of the tubes that admits tissue into the central lumen of the tubes, a cutting edge on the inner tube, and a motor to drive the inner tube to rotate such that when it rotates, the admitted tissue is cut.  (*See* Pingleton Figs. 1-3; 1:55-2:13; 2:45-52, 4:32-57, 5:13-24, 5:48-60, 6:16-20.)  The removed tissue and fluid is vacuumed away from the surgical site through the hollow lumen inside the inner tube and out of

the inner tube through a side evacuation port at the proximal end of the inner tube of the cutter.
(*See* Pingleton Figs. 1, 3, 4-6; 4:8-11, 4:47-62, 6:23-26.)

188.    Alden discloses a motor-driven chopping mechanism comprised of an outer tube
and an inner tube, where the outer tube has a window that exposes tissue to the inner tube, and
the inner tube rotates with respect to the outer tube to cut the tissue.  The chopping mechanism,
including the inner and outer tubes, can be removed and replaced.  (*See* Alden Figs. 1-3, 5:26-
49.)  The cut tissue and fluid are evacuated from the surgical site through the lumen of the inner
tube.  (*See* Alden 2:40-47; 3:12-17, 5:1-12, 6:5-11, 7:10-15.)

189.    Grinberg discloses a cylindrical, rotating, surgical cutting tool with a hollow
lumen through which fragments of cut bone and irrigation fluid are drawn into and evacuated
from the surgical site.  (*See* Grinberg Figs. 3, 4; 1:47-53, 1:59-64, 3:14-19, 5:58-65.)

190.    Lovato discloses the insertion of a motor-driven cutter into an outer sheath to
morcellate tissue.  (Lovato Figs. 2A-C, 3A; 8:8-34.)  The motor-driven cutter has a window in
the outer tube that admits tissue to be cut and exposes it to the inner tube.  The motor, when
activates, reciprocates or rotates the inner tube.  This results in the cutting of the exposed tissue.
(*See* Lovato Figs. 2A, 3A, 3B, 4A, 4B, 7A/B-19A/B; 8:18-34, 8:48-60, 9:55-10:17, 11:66-
12:22.)  The cut tissue is aspirated from the surgical site through an aspiration channel formed by
the hollow lumen of the cutting implement.  (*See* Lovato Figs. 2C, 4A/B, 5A-C, 6A-C, 7A/B-
19A/B; 3:64-65, 4:37-39, 8:31-34, 9:55-10:17.)

191.    Dion discloses the use of an endoscopic cutter with a rotating cutter comprised of
an outer tube and an inner tube, with a burr that is exposed to tissue though an opening in the
distal end of the outer tube.  When the burr is rotated, the burr cuts the exposed tissue.  The inner

tube includes a suction passage through which cut tissue and irrigating fluid is aspirated from the surgical site.  (*See* Dion Figs. 2, 3; 1:45-50, 3:31-40, 3:50-59.)

192.    Bonnell discloses use of a device for intra-articular arthroscopic surgery that includes an external tube with a window or shaving port; an internal tube within the external tube that has shearing or cutting edges at its distal tip, which is exposed to tissue through the outer tube's window or shaving port; and a motor for rotating the internal tube.  The cut tissue and irrigation fluid is aspirated through the inner tube of the device and can be studied by a pathologist.  (*See* Bonnell Figs. 3-9; 3:31-4:17, 4:51-5:14.)

193.    *See also* Shishido (5:36-52); Adams (5:7-10); Ognier (Figs. 6, 7, 5:16-26); Hakky (3:10-15, 4:25-28); Muller (Fig. 4, 9:17-29, 9:46-49, 10:26-37);  Carlson (Fig. 4, 4:56-5:3); Grossi (Fig. 2, 6:25-67);  Savage '594 (7:1-13); Glowa (Figs. 2-3, 5-7, 3:51-4:13, 4:42-4:65); Correa (WO 95/10982) (Fig. 1, Abstract, 4:1-9); Hakky '209 (Fig 4, 3:6-15); Vukovic (5:3-8); Sachse '278 (3:49-53); Hakky '882 (2:63-70); Bonnell (2:16-26); Baggish et al. (127-128, 396); Neis et al. (91); Drews et al. (373); the Olympus Scope; Hess et al. (Fig. 6.5.1, 1584-86); the S&N morcellator system; the Emanuel Cutter; and the Dionics, DuPuy, and Storz Cutters.

194.    For these reasons, any of the limitations of the Asserted Claims claiming "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter" are not novel, and there is no inventive aspect to this feature.

> **9.** **The method of claim 1 wherein inserting the motor driven cutter comprises inserting an outer tube defining a cutting window at a distal region of the outer tube and an inner tube received within the outer tube that is configured to rotate relative to the outer tube to cut tissue, the inner tube including a cutting element at a distal region of the inner tube configured to cut tissue at the cutting window when the inner tube rotates relative to the outer tube.**

195.     For purposes of this report, the art that I discuss in this subsection as disclosing "[t]he method of claim 1 wherein inserting the motor driven cutter comprises inserting an outer tube defining a cutting window at a distal region of the outer tube and an inner tube received within the outer tube that is configured to rotate relative to the outer tube to cut tissue, the inner tube including a cutting element at a distal region of the inner tube configured to cut tissue at the cutting window when the inner tube rotates relative to the outer tube" will be referred to as the "Rotating Tube Cutter References."

196.     Pingleton discloses the use of a surgical cutting instrument comprised of an outer tube and inner tube, which are concentric, with a port at the distal end of the tubes that admits tissue into the central lumen of the tubes, a cutting edge on the inner tube, and a motor to drive the inner tube to rotate such that when it rotates, the admitted tissue is cut.  (*See* Pingleton Figs. 1-3; 1:55-2:13; 2:45-52, 4:32-57, 5:13-24, 5:48-60, 6:16-20.)  The removed tissue and fluid is vacuumed away from the surgical site through the hollow lumen inside the inner tube and out of the inner tube through a side evacuation port at the proximal end of the inner tube of the cutter. (*See* Pingleton Figs. 1, 3, 4-6; 4:8-11, 4:47-62, 6:23-26.)

197.     Alden discloses a motor-driven chopping mechanism comprised of an outer tube and an inner tube, where the outer tube has a window that exposes tissue to the inner tube, and the inner tube rotates with respect to the outer tube to cut the tissue.  The chopping mechanism,

including the inner and outer tubes, can be removed and replaced. (*See* Alden Figs. 1-3, 5:26-49.) The cut tissue and fluid are evacuated from the surgical site through the lumen of the inner tube. (*See* Alden 2:40-47; 3:12-17, 5:1-12, 6:5-11, 7:10-15.)

198.    Grinberg discloses a cylindrical, rotating, surgical cutting tool with a hollow lumen through which fragments of cut bone and irrigation fluid are drawn into and evacuated from the surgical site. (*See* Grinberg Figs. 3, 4; 1:47-53, 1:59-64, 3:14-19, 5:58-65.)

199.    Lovato discloses the insertion of a motor-driven cutter into an outer sheath to morcellate tissue. (Lovato Figs. 2A-C, 3A; 8:8-34.) The motor-driven cutter has a window in the outer tube that admits tissue to be cut and exposes it to the inner tube. The motor, when activates, reciprocates or rotates the inner tube. This results in the cutting of the exposed tissue. (*See* Lovato Figs. 2A, 3A, 3B, 4A, 4B, 7A/B-19A/B; 8:18-34, 8:48-60, 9:55-10:17, 11:66-12:22.) The cut tissue is aspirated from the surgical site through an aspiration channel formed by the hollow lumen of the cutting implement. (*See* Lovato Figs. 2C, 4A/B, 5A-C, 6A-C, 7A/B-19A/B; 3:64-65, 4:37-39, 8:31-34, 9:55-10:17.)

200.    Dion discloses the use of an endoscopic cutter with a rotating cutter comprised of an outer tube and an inner tube, with a burr that is exposed to tissue though an opening in the distal end of the outer tube. When the burr is rotated, the burr cuts the exposed tissue. The inner tube includes a suction passage through which cut tissue and irrigating fluid is aspirated from the surgical site. (*See* Dion Figs. 2, 3; 1:45-50, 3:31-40, 3:50-59.)

201.    Bonnell discloses use of a device for intra-articular arthroscopic surgery that includes an external tube with a window or shaving port; an internal tube within the external tube that has shearing or cutting edges at its distal tip, which is exposed to tissue through the outer tube's window or shaving port; and a motor for rotating the internal tube. The cut tissue and

irrigation fluid is aspirated through the inner tube of the device and can be studied by a pathologist.  (*See* Bonnell Figs. 3-9; 3:31-4:17, 4:51-5:14.)

202.    Young discloses the use of an endoscopic morcellator apparatus that includes an elongated tubular member 210, and inside and concentric with that elongated tubular member is an auger for cutting tissue in its distal region, that is itself tubular.  The outer elongated member has a window that exposes tissue to the auger to be cut, and a cover flap that opens and closes the window.  When the window opens, the tissue to be cut is exposed to the auger.  When the auger rotates, the tissue is cut.  (*See* Young Figs. 1, 4-6, 9; 4:53-5:58.)  The auger can be rotated by a motor.  (*See* Young 7:1-5.)

203.    *See also* Shishido (Figs. 6, 7; 5:36-52); Adams (3:37-45, 5:57-67, 6:7-18); Grossi; Savage '594 (5:56-6:6) (use of a morcellator); Hakky '209 (*e.g.*, 2:40-3:15); Sachse '278 (*e.g.*, 4:20-42); Hakky '882 (Figs. 3-4, 3:23-30); Baggish et al. (396); the S&N morcellator system; the Emanuel Cutter; and the Dionics, DuPuy, and Storz Cutters.

204.    For these reasons, any of the limitations of the Asserted Claims claiming "the method of claim 1 wherein inserting the motor driven cutter comprises inserting an outer tube defining a cutting window at a distal region of the outer tube and an inner tube received within the outer tube that is configured to rotate relative to the outer tube to cut tissue, the inner tube including a cutting element at a distal region of the inner tube configured to cut tissue at the cutting window when the inner tube rotates relative to the outer tube" are not novel, and there is no inventive aspect to this feature.

### 10.    Motivation To Combine Various Elements

205.    The person of ordinary skill in the art would have been motivated to combine the features in the discussed prior art references because they all relate to instruments for the

conversion of motion and they are all directed to the problem(s) alleged to be solved by the Asserted Claims. For example, a person of ordinary skill in the art would have known to implement any of the features described above in a surgical device for the resection of semi-rigid tissue. As a specific example, it would be obvious to combine the Permanently Affixed References with a device such as Kresch or the Motor-Driven Cutter References or the Cutter Insertion References, such that the cutter may be inserted and removed, for example for cleaning, while the lenses and illuminating elements are permanently affixed, to minimize the number of parts and the possibility that the lenses and illuminating elements could be broken (as fiber optics, for example, can be very fragile). The person of ordinary skill in the art could have combined the teachings in any prior art reference with any of the references that I discuss in this Report.

206.    Nearly all of the references demonstrate a motivation to combine various elements. In the background of the invention, the references point to other known art (both patents and devices). (*See, e.g.*, Alden, which references Kresch and Banko; Adams, which references Iglesias; Savage, which references Banko and Iglesias) The person of ordinary skill in the art would have looked at the various teachings in designing a surgical instrument with the desired properties and features.

207.    As described below, the combinations of features embodied in the asserted claims are in no way novel. They exist both in single references and in combinations of references that would have been obvious to those of ordinary skill in the art.

208.    Throughout my analysis of the prior art, for those claim elements for which neither party has sought a construction from the Court, I have applied the plain meaning of this claim term from the perspective of a person of ordinary skill in the art.

**B.     Invalidity Under The Correct Priority Date Of July 20, 2007**

**1.     S&N's Own Morcellator System Invalidates All The Elements Of All Asserted Claims**

209.     I understand that S&N concedes that its morcellator system, now known as the TruClear system, has been commercially available since 2005.  (Sahney Depostiion (10/26/11) at p.55:17-18 ("Smith & Nephew first sold the reciprocating morcellator in 2005.").)  I further understand that S&N concedes that sales of its morcellator system before July 20, 2006 would satisfy all the elements of the claims of the '359 patent.  For example, in its "validity contentions" dated March 8, 2012, S&N did not appear to assert that the system it sold before July 20, 2006 lacked any of the limitations of the claims of the '359 patent.  I reserve the right to submit supplemental opinions in the event that S&N is permitted to assert that its morcellator system sold before July 20, 2006 lacks any elements of the claims of the '359 patent.

210.     Based on my experience with the S&N morcellator system, it is my opinion that the method of tissue removal performed with that system would satisfy all the elements of the claims of the '359 patent.  The endoscope and cutter of the S&N system contain all the structural features of the endoscope and cutter in the claims, and I understand that this is not disputed.  The method of cutting tissue with the S&N system involves all the steps recited in the asserted claims.

211.     Because the priority date of the '359 patent is July 20, 2007, and because the S&N morcellator system was on sale, and offered for sale, before July 20, 2006, it is my opinion that the claims of the '359 patent are invalid in light of that system.

### 2. The Combination of Banko and Baggish Renders Claims 1-8 of the '359 Patent Obvious

212.    As described in more detail below, it is my opinion that the Banko patent anticipates the '359 patent.  To the extent that Banko does not anticipate the '359 patent, the combination of Banko and the Baggish reference render the Asserted Claims of the '359 patent obvious under the correct priority date of July 20, 2007 (or even under the priority date of the '602 patent of March 6, 2000).

213.    The Banko patent discloses, among other things, (1) permanently affixed fiber optic illumination sources and mechanisms for illuminating and viewing the surgical site (Banko Figs. 11, 12; 5:38-56), (2) use of a motor-driven cutter (Banko 2:34-41), (3) a cutting window in an outer tube that admits tissue into the outer tube, which is then cut by the rotating cutter within the outer tube (Banko Figs. 2-7; 4:13-32), (4) conduit for directing irrigating fluid to the surgical site that is sealed from the channels with the cutter and the optical devices (Banko Fig. 2; 4:37-59), (5) use of a valve to introduce irrigating fluid into the system (Banko 4:53-59), and (6) aspiration of cut tissue and fluid away from the surgical site through the central passage of the device where the cutter is located (Banko Figs. 2, 9-12; 4:33-36).

214.    The Baggish references disclose (1) use of an endoscopic device such as the Banko device in the uterus (*see* Baggish *et al.*, "Instrumentation of Hysteroscopy," in "Diagnostic and Operative Hysterectomy," Mosby (1999); Baggish *et al.*, "Hysteroscopic Sterilization," in "Diagnostic and Operative Hysterectomy," Mosby (1999)); (2) permanently fixed illumination and observation elements in a hysteroscope (*see* Baggish *et al.*, "Instrumentation of Hysteroscopy," in "Diagnostic and Operative Hysterectomy," Mosby (1999) at 98, Fig. 8-2; Baggish *et al.*, "Hysteroscopic Sterilization," in "Diagnostic and Operative Hysterectomy," Mosby (1999), at 394, Fig. 30-10); (3) sealing of the optical elements from the

irrigation fluid channel (*see* Baggish *et al.*, "Instrumentation of Hysteroscopy," in "Diagnostic and Operative Hysterectomy," Mosby (1999), at 104); and (4) insertion of a cutting or other surgical device into the uterus through a sheath (*see* Baggish *et al.*, "Accessory Instruments for Operative Hysteroscopy," in "Diagnostic and Operative Hysterectomy," Mosby (1999)).

215.    It would be obvious to one of ordinary skill in the art to combine the teachings of Banko and Baggish to perform the method of the '359 patent for a number of reasons.  Both devices are used in the general field of performing surgery in small spaces by inserting an endoscopic device into the small space, and Baggish teaches the applicability of devices like Banko in the uterus.  One of ordinary skill in the art performing the method would want to permanently affix the optical elements to the device and seal them from the irrigation fluid as Banko and Baggish both teach, to minimize the number of separate parts to the device, to prevent corrosion of the optical elements, and to ensure a clear view of the optical elements.  In addition, one of ordinary skill in the art would want to be able to remove the cutter from the device as Baggish teaches, to clean it or replace it after each use for hygenic purposes.

216.    Accordingly, it is my opinion that to the extent Banko does not individually anticipate the '359 patent, Banko in combination with Baggish renders the Asserted Claims obvious.

### C.    Invalidity Under S&N's Incorrect Priority Date Of September 4, 1997

217.    Even assuming for the sake of argument that S&N is correct to assert a priority date of September 1997 (it is not), the claims of the '359 patent are still invalid in light of the prior art discussed herein.

### 1. The Kresch Patent Discloses And/Or Renders Obvious All The Elements Of All Asserted Claims

#### a. The Kresch Patent Discloses All The Elements Of Claim 1

218.     The Kresch patent discloses all the elements of Claim 1 of the '359 patent.

**A method for removal of tissue from a uterus, comprising:**

219.     Kresch discloses that "[t]his invention relates to a method and device for tissue resection, especially surgical treatment of the uterus or prostate." (*See, e.g.,* Kresch 1:4-6.)

**inserting a distal region of an endoscope into said uterus**

220.     The Kresch patent clearly discloses this claim element to a person of ordinary skill in the art.

221.     Kresch discloses the insertion of a distal region of an endoscope into the uterus through at least Figure 3A (below) depicting the insertion of an endoscope into the uterus using an obdurator. (*See e.g.*, Kresch 6:3-8 ("Insert of the instrument is easy to understand.  Referring to Fig. 3A, probe P with obturator O is inserted [into] uterus U.  Thereafter, obturator O is withdrawn, and housing H with cutting head C threaded.  Once this insertion is made, fiber F is thereafter inserted for visualization of the surgical site.")

222.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Kresch that it also describes this claim element.

**the endoscope including a valve**

223.     The Kresch patent clearly discloses this claim element to a person of ordinary skill in the art.

224.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Kresch that it also describes this claim element.

225.    The specification of the Kresch patent discloses that the aforementioned endoscope  includes a valve via its statement that the device uses "standard technology" to maintain required pressure for uterine cavity distension through inlet conduit 61, where such standard technology would be understood by one of ordinary skill in the art to include a valve. (*See, e.g.,* Kresch 5:41-43.)

226.    In addition, the use of a valve to control irrigation fluid flow to a surgical site has been well known in the art, as shown in the Valve References.  A person of ordinary skill in the art would be motivated to combine the valves disclosed in any of the Valve References with the device in the Kresch patent at least because the devices in these cited references and the device in the Kresch patent both include delivery of irrigating fluid to a surgical site and because the use of a valve is one of the simplest, most well known ways of controlling irrigating fluid through an endoscope.  Accordingly, the Kresch patent combined with any one of the Valve References would render this claim element obvious.

> **and an elongated member defining discrete first and second channels extending from a proximal region of the elongated member to the distal region,**

227.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Kresch that it also describes this claim element.

228.    As can be seen from Figure 8, Kresch discloses an elongated member defining discrete first and second channels where inside probe P the first channel (comprised of optical

fiber and viewing scope F) is discrete from the second channel (comprised of "the remaining interior volume of probe P" that "forms a channel which contains the perfusion fluid" (Kresch 7:14-15) and contains rotating tube 30 such that "evacuation of fluid occurs directly from the cutting edges of cutting head C to rotating tube 30 with its aspiration lumen 25" (Kresch 6:26-28).

229.    Moreover, the use of endoscopic surgical devices having discrete channels has been described in numerous prior art references, as described above in section VIII(A)(3). A person of ordinary skill in the art would be motivated to combine any of the Elongated Member/Two Channel References with the device in the Kresch patent because the devices in these cited references and the device in the Kresch patent both include optical and cutting devices housed inside an elongated sheath. Accordingly, the Kresch patent combined with any one of the Elongated Member/Two Channel References would render this claim element obvious.

> **the second channel having a proximal end in communication
> with the valve such that fluid from the valve is able to flow into
> and through the second channel to the uterus,**

230.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Kresch that it also describes this claim element.

231.    Kresch discloses a second channel having a proximal end in communication with a valve such that fluid from the valve is able to flow into and through the second channel to the uterus. *See e.g*., Figs. 1A, 7. As explained above, a valve is disclosed by the statement in the specification of Kresch that "standard technology will be used to maintain required pressure for uterine cavity distension through inlet conduit 61" (Kresch 5:40-42.) Through such valve, inlet

conduit 61 of Figures 1A and 7 is in communication with the second channel--probe P in the infusion lumen 62 of Figure 1A--such that fluid from the valve is able to flow into and through probe P and infusion lumen 62 to the uterus through slot 18 of Figure 1A at the end of probe P. (*See* Kresch 5:43:44 ("Inlet conduit 61 communicates to probe P in the infusion lumen 62."); 7:4-6, 14-17 ("perfusion fluid is introduced through conduit 61 into perfusion chamber 100.  It then enters probe P"; "The remaining interior volume of probe P forms a channel which contains the perfusion fluid.  Exit of the fluid occurs through slot 18 and the end of probe P.").

232.    Moreover, the use of endoscopic surgical devices having discrete channels has been described in numerous prior art references, as described above in section VIII(A)(3).  A person of ordinary skill in the art would be motivated to combine any of the Valve References with the device in the Kresch patent at least because the devices in these cited references and the device in the Kresch patent both introduce irrigating fluid to the surgical site and because the use of a valve is one of the simplest, most well known ways of controlling irrigating fluid through an endoscope.  Accordingly, the Kresch patent combined with any one of the Valve References would render this claim element obvious.

> **and the first channel having a light guide permanently affixed therein and being sealed from the second channel to prevent fluid from the valve from entering the uterus through the first channel, followed by:**

233.    As can be seen in Figures 1A, 1B and 2A, Kresch discloses that bearing member 102 defines channels for fiber F and rotating tube 30 and extends almost the full length of the lumen within probe P and has viewing strands for illuminating the surgery area.  If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe a permanently affixed light guide, then that person would also understand from reading Kresch that Kresch also describes a permanently affixed light

guide.  Indeed, the figures of Kresch actually depict the fiber F, which one of ordinary skill would know can be permanently affixed to the endoscope.  (*See* Kresch 7:7-17.)  In contrast, there is no depiction at all of a light guide in any of the figures of the '359 patent, the '602 patent, or the Dutch patent.

234.    In addition, the use of a permanently affixed light guide sealed from a fluid channel has been well known in the art, as shown in the Permanently Affixed References.  A person of ordinary skill in the art would be motivated to combine the light guides disclosed in any of the Permanently Affixed Light Guide References and Sealing References with the device in the Kresch patent because the devices in these cited references and the device in the Kresch patent both include a light guide, and one of ordinary skill would be motivated to permanently affix the light guide to the Kresch patent at least for ease of storage, durability, and to seal it from the irrigation fluid infusion channel.  Accordingly, to the extent it is believed that Kresch does not disclose this claim element, the Kresch patent combined with any one of the Permanently Affixed References would render this claim element obvious.

> **inserting a motor driven cutter into the second channel such that a distal cutting region of the cutter extends distally beyond the endoscope in the uterus;**

235.    Kresch discloses the insertion of a motor driven cutter into the second channel such that a distal region of the cutter extends distally beyond the endoscope into the uterus where the specification discloses that a DC motor rotates the drive tube 30 placed in the endoscope in the channel defined by bearing member 102 and the drive tube has at its end a cutting element C that cuts tissue.  (*See, e.g.,* Kresch 1B, 2A, 3B, 5, 6, 8; 2:32-35, 6:3-10, 6:32-37, 7:7-17.)  In fact, claim 2 of Kresch provides that the fiber optic can be "attached" to the shaft of the endoscope. (Kresch 8:27-30.)

236.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Kresch that it also describes this claim element.

237.    Moreover, the Kresch patent combined with any one of the Cutter Insertion References would render this claim element obvious, as one of ordinary skill in the art would be motivated to use any of the cutters in the Cutter Insertion References with the endoscope of Kresch.

**delivering fluid into the uterus through the valve and the second channel to distend the uterus;**

238.    Kresch discloses the delivery of fluid into the uterus through the valve and the second channel to distend the uterus where fluid for uterine cavity distension comes into the device through inlet conduit 61, into perfusion chamber 100, and then into probe P; fluid then exits through slot 18 into the uterus at the end of the probe P.  (*See* Kresch 5:43-44, 7:4-6, 7:14-17.)

239.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Kresch that it also describes this claim element.

240.    Moreover, a person of ordinary skill in the art reading Kresch would know that removal of tissue in a uterus using an endoscope requires distention of the uterus for purposes of visibility and control of the cutter.

**energizing an electric motor to drive the cutter to cut the tissue within the uterus; and**

241.    Kresch discloses the energizing of an electric motor to drive the cutter to cut tissue within the uterus where a motor in the housing is connected to rotate the drive tube and the cutting head.  (*See* Kresch Abstract, 5:11-14, 5:26-28, 6:32-38.)

242.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Kresch that it also describes this claim element.

**aspirating cut tissue and fluid from the uterus and the endoscope through the cutter.**

243.    Under S&N's view of this claim element as being satisfied by the MyoSure Tissue Removal System, Kresch discloses the aspiration of cut tissue and fluid from the uterus and the endoscope through the cutter where the specification states that "[f]luid exits the site of the surgery through lumen 25 in rotating tube 20 and passes to chamber 130 where chips or morsels from surgery are captured."  (Kresch 5:48-33.)  Accordingly, the "[e]vacuation of the fluid occurs directly from the cutting edges of cutting head C to rotating tube 30 with its aspiration lumen 25."  (*See* Kresch 6:26-28; 7:26-36.)

244.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Kresch that it also describes this claim element.

245.    Moreover, the Kresch patent combined with any one of the Aspiration References would render this claim element obvious, as both sets of devices are intended to remove cut tissue and fluid from the surgery site.

246.    Accordingly, the Kresch patent discloses and/or renders obvious all the elements of Claim 1 of the '359 patent.

**b.      The Kresch Patent Discloses All The Elements
Of Claim 2**

247.      The Kresch patent discloses all the elements of Claim 2 of the '359 Patent.

**The method of claim 1 wherein inserting the motor driven
cutter comprises inserting an outer tube defining a cutting
window at a distal region of the outer tube and an inner tube
received within the outer tube that is configured to rotate
relative to the outer tube to cut tissue,**

248.      As described previously, the Kresch patent discloses each element of claim 1 of
the '359 patent.

249.      As can be seen from Figures 2A and 2B, Kresch discloses an outer tube, probe P,
that has an expanded, open end to accommodate cutting head C at the distal end of rotating tube
30, the inner tube, and expose tissue to cutting head C, which rotates to cut tissue.  (*See e.g.*,
Kresch 4:58-64, 4:66-5:4, 5:11-14, 6:7-17.)

250.      If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent,
or the Dutch patent would understand those patents to describe this claim element, then that
person would also understand from reading Kresch that it also describes this claim element.

251.      Moreover, the use of a cutter with an inner tube rotating relative to an outer tube,
with a window in the outer tube exposing tissue to the inner tube that is cut when the inner tube
rotates, has been well known in the art, as shown in the Rotating Tube Cutter References.  A
person of ordinary skill in the art would be motivated to use a cutter with the cutting window
configuration shown in any of the Rotating Tube Cutter References with the device in the Kresch
patent because the devices in these cited references and the device in the Kresch patent are both
directed to cutting tissue in a body cavity with a mechanical cutter.  Accordingly, the Kresch

patent combined with any one of the Rotating Tube Cutter References would render this claim element obvious.

> **the inner tube including a cutting element at a distal region of the inner tube configured to cut tissue at the cutting window when the inner tube rotates relative to the outer tube.**

252.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Kresch that it also describes this claim element.

253.    Kresch discloses an outer tube, probe P, that has an expanded, open end to accommodate cutting head C, located at the distal end of rotating tube 30, and expose tissue to cutting head C, which rotates to cut tissue. (*See e.g*., Kresch Figs. 2A, 2B; 4:58-64, 4:66-5:4, 5:11-14, 6:7-17.)

254.    Moreover, the use of a cutter with an inner tube rotating relative to an outer tube, with a window in the outer tube exposing tissue to the inner tube that is cut when the inner tube rotates, has been well known in the art, as shown in the Rotating Tube Cutter References.  A person of ordinary skill in the art would be motivated to combine the light guides disclosed in any of the Rotating Tube Cutter References with the device in the Kresch patent because the use of a cutter with an inner tube rotating relative to an outer tube, with a window in the outer tube exposing tissue to the inner tube that is cut when the inner tube rotates, has been well known in the art, as shown in the Rotating Tube Cutter References.  A person of ordinary skill in the art would be motivated to use a cutter with the cutting window configuration shown in any of the Rotating Tube Cutter References with the device in the Kresch patent because the devices in these cited references and the device in the Kresch patent are both directed to cutting tissue in a

body cavity with a mechanical cutter.  Accordingly, the Kresch patent combined with any one of the Rotating Tube Cutter References would render this claim element obvious.

255.   Accordingly, the Kresch patent discloses and/or renders obvious all the element of Claim 2 of the '359 patent.

### c.   The Kresch Patent Discloses All The Elements Of Claim 3

256.   The Kresch patent discloses all the elements of Claim 3 of the '359 Patent.

**The method of claim 1, wherein inserting the distal region of the endoscope comprises inserting a distal region of an endoscope that includes a fiber optics bundle permanently affixed to the first channel of the elongated member.**

257.   As described previously, the Kresch patent discloses each element of claim 1 of the '359 patent.

258.   If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Kresch that it also describes this claim element.

259.   Kresch discloses an endoscope  including a fiber optics bundle permanently affixed to the first channel of an elongated member where, as described in the specification, the invention discloses a fiber F with strands that illuminate the area of surgery and a eyepiece or video camera coupler for viewing the surgery.  (*See* Kresch 5:35-37, 6:3-10, 7:7-17.)  Figures 1B, 2A, and 8 demonstrate that such fiber can be fixed to the channel or slot in the endoscope.

260.   If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe a permanently affixed fiber optics bundle, then that person would also understand from reading Kresch that Kresch also describes a

permanently affixed fiber optics bundle.  Indeed, the figures of Kresch actually depict the fiber F, which one of ordinary skill would know can be permanently affixed to the endoscope.  (*See* Kresch 7:7-17.)  In contrast, there is no depiction at all of a light guide in any of the figures of the '359 patent, the '602 patent, or the Dutch patent.

261.    In addition, the use of a permanently affixed fiber optics bundles was well known in the art, as shown in the Permanently Affixed References.  A person of ordinary skill in the art would be motivated to combine the light guides disclosed in any of the Permanently Affixed References with the device in the Kresch patent because the devices in these cited references and the device in the Kresch patent both include fiber optics, fiber optics were well known to one of ordinary skill in the art as being useful to illuminate and view surgery sites, and one could simply permanently affix the fiber optics to the Kresch patent for ease of storage, durability, and to seal it from the irrigation fluid infusion channel.  Accordingly, the Kresch patent combined with any one of the Permanently Affixed References would render this claim element obvious.

262.    Accordingly, the Kresch patent describes and/or renders obvious all the elements of claim 3 of the '359 patent.

### d.    The Kresch Patent Discloses All The Elements Of Claim 4

263.    The Kresch patent discloses all the elements of Claim 4 of the '359 Patent.

> **The method of claim 1, wherein inserting the distal region of an endoscope comprises inserting a distal region of an endoscope that includes a lens permanently affixed to the first channel of the elongated member.**

264.    As described previously, the Kresch patent discloses each element of claim 1 of the '359 patent.

265.     Kresch discloses a distal region of an endoscope including a lens permanently affixed to the first channel of the elongated member where its specification discloses a fiber F with strands that illuminate the area of surgery and an eyepiece or video camera coupler for viewing the surgery.  (*See* Kresch 5:35-37, 6:3-10, 7:7-17.)  Figures 1B, 2A, and 8 demonstrate that such lens can be fixed to the channel or slot in the endoscope.

266.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe a permanently affixed lens, then that person would also understand from reading Kresch that Kresch also describes a permanently affixed lens.

267.     In addition, the use of permanently affixed lenses was well known in the art, as shown in the Permanently Affixed References.  A person of ordinary skill in the art would be motivated to combine the lenses disclosed in the Permanently Affixed References with the device in the Kresch patent because the devices in these cited references and the device in the Kresch patent both include lenses, permanently affixed distal lenses were well known to one of ordinary skill in the art as being useful to view surgery sites, and one would be motivated to permanently affix the lens to the Kresch patent for ease of storage, durability, and to seal it from the irrigation fluid infusion channel.  Accordingly, the Kresch patent combined with any one of the Permanently Affixed References would render this claim element obvious.

268.     Accordingly, the Kresch patent describes and/or renders obvious all the elements of claim 4 of the '359 patent.

e.     **The Kresch Patent Discloses All The Elements Of Claim 5**

269.     The Kresch patent discloses all the elements of Claim 5 of the '359 Patent.

**A method for removal of tissue from a uterus, comprising:**

270.     As discussed above with respect to claim 1, As discussed above, Kresch discloses this.

**inserting a distal region of an endoscope into the uterus,**

271.     As discussed above, Kresch discloses this claim element.

**the endoscope including a port for receiving a motor driven cutter and including an elongated member defining discrete first and second channels extending from a proximal region of the elongated member to the distal region,**

272.     Kresch discloses an endoscope including a port for receiving a motor driven cutter and including an elongated member defining discrete first and second channels extending from a proximal region of the elongated member to the distal region where the specification sets forth that Kresch discloses an elongated member with bearing member 102 defining discrete first and second channels where inside probe P the first channel (comprised of optical fiber and viewing scope F) is discrete from the second channel (comprised of "the remaining interior volume of probe P" that "forms a channel which contains the perfusion fluid" (Kresch 7:14-15) and contains rotating tube 30 such that "evacuation of fluid occurs directly from the cutting edges of cutting head C to rotating tube 30 with its aspiration lumen 25" (Kresch 6:26-28). A DC motor rotates the drive tube 30 placed in the endoscope in one of the channels defined by bearing member 102 and the drive tube has at its end a cutting element C that cuts tissue. (*See* Kresch 1B, 2A, 5, 6, 8; 2:32-35, 6:3-10, 6:32-37, 7:7-17.)

273.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Kresch that it also describes this claim element.

274.    Moreover, the use of endoscopic surgical devices having discrete channels has been described in numerous prior art references, as described above in section VIII(A)(3).  A person of ordinary skill in the art would be motivated to combine any of the Elongated Member/Two Channel References with the device in the Kresch patent because the devices in these cited references and the device in the Kresch patent both include optical and cutting devices housed inside an elongated sheath.  Accordingly, the Kresch patent combined with any one of the Elongated Member/Two Channel References would render this claim element obvious.

> **the first channel having a light guide permanently affixed therein and the second channel having a straight, central longitudinal axis extending from the port to an opening at a distal tip of the endoscope, followed by:**

275.    As described previously, Kresch discloses that bearing member 102 with fiber F and rotating tube 30 receiving concavities is placed interior of probe P and extends almost the length of the lumen within probe P.  (*See* Kresch 7:7-17.)  The second channel in Kresch is depicted as having a straight, longitudinal axis extending from the port to an opening at the distal tip of the endoscope.

276.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Kresch that it also describes this claim element.

277.    In addition, the use of a permanently affixed light guide sealed from a fluid channel has been well known in the art, as shown in the Permanently Affixed References.  A person of ordinary skill in the art would be motivated to combine the light guides disclosed in any of the Permanently Affixed References with the device in the Kresch patent because the

devices in these cited references and the device in the Kresch patent both include a light guide, and one could simply permanently affix the light guide to the Kresch patent for ease of storage, durability, and to seal it from the irrigation fluid infusion channel.  Accordingly, the Kresch patent combined with any one of the Permanently Affixed References would render this claim element obvious.

> **inserting the motor driven cutter for cutting and detaching tissue into the second channel through the port;**

278.    As described previously, Kresch also discloses that a DC motor rotates the drive tube 30 placed in the endoscope in the channel defined by bearing member 102 where the distal end of the drive tube has a cutting element C that cuts tissue.  (*See* Kresch 1B, 2A, 3B, 5, 6, 8; 2:32-35, 6:32-37, 7:7-17.)

279.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Kresch that it also describes this claim element.

> **introducing fluid into the uterus; and**

280.    As described previously, Kresch discloses that fluid for uterine cavity distension comes into the device through inlet conduit 61 to perfusion chamber 100 and into probe P whereby fluid then exits through slot 18 into the uterus.  (*See* Kresch 5:43-44, 7:14-17.)

281.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Kresch that it also describes this claim element.

> **aspirating fluid with detached tissue from the uterus through a lumen of the cutter.**

282.    Under S&N's view of this claim element as being satisfied by the MyoSure Tissue Removal System, Kresch discloses the aspiration of cut tissue and fluid from the uterus and the endoscope through the cutter where the specification states that "[f]luid exits the site of the surgery through lumen 25 in rotating tube 20 and passes to chamber 130 where chips or morsels from surgery are captured."  (Kresch 5:48-33.)  Accordingly, the "[e]vacuation of the fluid occurs directly from the cutting edges of cutting head C to rotating tube 30 with its aspiration lumen 25."  (*See* Kresch 6:26-28; 7:26-36.)

283.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Kresch that it also describes this claim element.

284.    Moreover, the Kresch patent combined with any one of the Aspiration References would render this claim element obvious, as both sets of devices are intended to remove cut tissue and irrigation fluid from the surgery site.

285.    Accordingly, the Kresch patent describes all the elements of claim 5 of the '359 patent.

> **f.      The Kresch Patent Discloses All The Elements Of Claim 6**

286.    The Kresch patent discloses all the elements of Claim 6 of the '359 Patent.

> **The method of claim 5 wherein inserting the motor driven cutter comprises inserting an outer tube defining a cutting window at a distal region of the outer tube and an inner tube received within the outer tube that is configured to rotate relative to the outer tube to cut tissue, the inner tube including a cutting element at a distal region of the inner tube configured to cut tissue at the cutting window when the inner tube rotates relative to the outer tube.**

287.     As discussed previously with respect to claims 2 and 5, the Kresch patent discloses ad/or renders obvious all of the elements of claim 6.

288.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Kresch that it also describes this claim element.

### g.     The Kresch Patent Discloses All The Elements Of Claim 7

289.     The Kresch patent discloses all the elements of claim 7 of the '359 patent.

> **The method of claim 5, wherein inserting the distal region of the endoscope comprises inserting a distal region of an endoscope that includes a fiber optics bundle permanently affixed to the first channel of the elongated member.**

290.     For the reasons described previously with respect to claims 3 and 5, the Kresch patent discloses all of the elements of claim 7.

291.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Kresch that it also describes this claim element.

### h.     The Kresch Patent Discloses All The Elements Of Claim 8

292.     The Kresch patent discloses all the elements of claim 8 of the '359 Patent.

**The method of claim 5, wherein inserting the distal region of an endoscope comprises inserting a distal region of an endoscope that includes a lens permanently affixed to the first channel of the elongated member**

293.    For the reasons described previously with respect to claims 4 and 5, the Kresch patent discloses all of the elements of claim 8.

294.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Kresch that it also describes this claim element.

### 2.    The Savage '673 Patent Discloses And/Or Renders Obvious All The Elements of All Asserted Claims

295.    Even assuming for the sake of argument that S&N is correct to assert a priority date of September 1997 (it is not), the claims of the '359 patent are still invalid under Savage '673, as discussed herein.

### a.    The Savage '673 Patent Discloses All of the Elements of Claim 1

296.    The Savage '673 patent discloses all the elements of claim 1 of the '359 Patent.

**A method for removal of tissue from a uterus, comprising:**

297.    Savage '673 discloses "[a] method and device for tissue removal, especially for surgical treatment of the uterus or prostate." (*See e.g.*, 1:23-25; 29:30 (claiming  "[a] method for resecting tissue from the uterus"); 32:4, 25 (claiming "[a] method for extracting tissue from a uterus").)

**inserting a distal region of an endoscope into said uterus**

298.    Savage '673 discloses the insertion of a distal region of an endoscope into the uterus through at least Figure 18 (below) depicting "transcervically introducing sheath 322 into

uterus U….Once the sheath is properly positioned, the obturator is removed and the shaft 316,

cutting member 318, and the scope 320 are inserted through the shaft and proximal housing 324

is attached to sheath coupling 350." (21:31-41.)

299.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent,

or the Dutch patent would understand those patents to describe this claim element, then that

person would also understand from reading Savage '673 that it also describes this claim element.

### the endoscope including a valve

300.    The specification of the Savage '673 patent discloses that the aforementioned

endoscope  includes a valve via its statement that "standard technology will be used to maintain

required pressure for uterine cavity distension  through inlet conduit 61." (11:67-12:1-2.)  One

of ordinary skill in the art reading Savage '673 would understand that such standard technology

refers at least in part to a valve.  A valve is necessary to control the flow of irrigation fluid into

the device.

301.    Moreover, the Savage '673 patent specification states that a valve may be used to

supply irrigation fluid.  (20:45-46.)

302.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent,

or the Dutch patent would understand those patents to describe this claim element, then that

person would also understand from reading Savage '673 that it also describes this claim element.

303.    In addition, the use of a valve to control irrigation fluid flow to a surgical site has

been well known in the art, as shown in the Valve References.  A person of ordinary skill in the

art would be motivated to combine the valves disclosed in any of the Valve References with the

device in the Savage '673 patent because the devices in these cited references and the device in

the Savage '673 patent both include delivery of irrigating fluid to a surgical site and because the use of a valve is one of the simplest, most well known ways of controlling irrigating fluid through an endoscope.  Accordingly, the Savage '673 patent combined with any one of the Valve References would render this claim element obvious.

**and an elongated member defining discrete first and second channels extending from a proximal region of the elongated member to the distal region,**

304.     The claimed "elongated member" has not yet been construed by the Court.  I understand that the parties have proposed different constructions for the claimed "elongated member."

305.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Savage '673 that it also describes this claim element.

306.     Savage '673 discloses an elongated member defining discrete first and second channels where inside probe P the first channel (comprised of optical fiber and viewing scope F) is discrete from the second channel (comprised of  "the remaining interior volume of probe  P" that "forms a channel which contains the perfusion fluid"  (13:39-40; *see also* Figures 1A, 8.) and contains  rotating tube 30 such  that "evacuation of fluid occurs directly from the cutting edges of cutting head C to rotating tube 30 with its aspiration lumen 25" (12:53-55).

307.     Alternatively, Figures 10, 10A, 11, 12, and 13 of Savage '673 disclose an "elongate body 212 includ[ing] a central lumen 237 extending between the distal end 214 and proximal end 216," where "[h]eld within the lumen 237 is the chopping mechanism 206" including "a concentric rotating tube 240 disposed within the lumen 237."  (17:23-27; *see also* 16:13-67.)  In defining the first and second channels, "[t]he guide 230 is preferably permanently

fixed to the outside of the elongate member 212 and includes O-rings 232 and 234 for sealing the guide 230 to the sheath 226 and scope 222." (16:62-65.)

308. Moreover, the use of endoscopic surgical devices having discrete channels has been described in numerous prior art references, as described above in section VIII(A)(3). A person of ordinary skill in the art would be motivated to combine any of the Elongated Member/Two Channel References with the device in the Savage '673 patent at least because the devices in these cited references and the device in the Savage '673 patent both include optical and cutting devices housed inside an elongated sheath. Accordingly, the Savage '673 patent combined with any one of the Elongated Member/Two Channel References would render this claim element obvious.

**the second channel having a proximal end in communication
with the valve such that fluid from the valve is able to flow into
and through the second channel to the uterus,**

309.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent,
or the Dutch patent would understand those patents to describe this claim element, then that
person would also understand from reading Savage '673 that it also describes this claim element.

310.     Savage '673 discloses a second channel having a proximal end  in communication
with a valve such that fluid from the valve is able to flow into and through the second channel to
the uterus.  (*See e.g*., Figs. 1A, 7, 10, and 17.)  As explained previously, a valve is disclosed by
the  statement in the specification of Savage '673 that "standard technology will be used to
maintain required pressure for uterine cavity distension  through inlet conduit 61."  (11:67-12:1-
2.)  One of ordinary skill in the part reading that passage would understand it to include at least a
valve.  A valve is also expressly disclosed as a mechanism for supplying irrigation fluid.
(20:45-46.)

311.     Through such valve, inlet conduit 61 of Figures 1A and 7 is in communication
with the second channel -- probe P in the infusion lumen 62 of Figure 1A -- such that fluid from
the valve is able to flow into and through probe P and infusion lumen 62 to the uterus through
slot 18 of Figure 1A at the end of probe P.  (12:2-4 ("Inlet conduit 61 communicates to probe P
in the infusion lumen 62."); 13:20-31, 39-42 ("perfusion fluid is introduced through conduit 61
into perfusion chamber 100.  It then enters probe P";  "The remaining interior volume of probe P
forms a channel which contains the perfusion fluid.  Exit of the fluid occurs through slot 18 and
the end of probe P.").

312.     Likewise, as shown in Figure 17, the proximal end of the infusion lumen of sheath
322 -- sheath coupler 350 -- is in communication with the valve such that "perfusion fluid is

introduced through conduit 61 irrigation fluid supplied to irrigation port 328 enters the probe at a

sheath coupler 350, and then flows distally through an infusion lumen of sheath 322. The sheath

ends proximally of the distal end of shaft 316 so that the irrigation fluid flows outward into the

body cavity, generally washing distally over the scope 320 and cutting member 318." (21:3-9;

*see also* 20:18-21 ("An irrigation fluid port 328 and aspiration port 330 provide a continuous

flow path for a mannitol, glycine, or the like.").)

313.    In addition, the use of a valve to control irrigation fluid flow to a surgical site has

been well known in the art, as shown in the Valve References. A person of ordinary skill in the

art would be motivated to combine the valves disclosed in any of the Valve References with the

device in the Savage '673 patent because the devices in these cited references and the device in

the Savage '673 patent both include delivery of irrigating fluid to a surgical site and because the

use of a valve is one of the simplest, most well known ways of controlling irrigating fluid

through an endoscope. Accordingly, the Savage '673 patent combined with any one of the Valve

References would render this claim element obvious.

> **and the first channel having a light guide permanently affixed therein
> and being sealed from the second channel to prevent fluid from the
> valve from entering the uterus through the first channel, followed by:**

314.    As can be seen in Figures 1A, 1B, 10, 11, 28, 29, Savage '673 discloses that an

optical fiber is included in the device held in a translatable shaft adjacent the elongate member to

observe cutting; bearing member 102 defines channels for fiber F and rotating tube 30 and

extends almost the full length of the lumen within probe P and has viewing strands for

illuminating the surgery area. The figures further demonstrate that the fiber F can be

permanently affixed within fiber optic scope 222, which is used to visualize the surgery and is

sealed from the irrigation tube 228; fiber-optic scope 320 within sheath 322 is used to visualize

surgery.  *See e.g.*, 16:34-39 ("When the components of the device 200 are introduced into the

sheath 226, a seal is formed between the components of the device 200 and the sheath 226 (see

Fig 10)  In this way, irrigation fluid can be applied through an irrigation tube 228 to distend the

uterus . . .").

315.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent,

or the Dutch patent would understand those patents to describe a permanently affixed light guide,

then that person would also understand from reading Savage '673 that it also describes a

permanently affixed light guide.  Indeed, the figures of Savage actually depict the light guide,

which one of ordinary skill would know can be permanently affixed to the endoscope.  In

contrast, there is no depiction at all of a light guide in any of the figures of the '359 patent, the

'602 patent, or the Dutch patent.

316.    In addition, the use of a permanently affixed light guide sealed from a fluid

channel has been well known in the art, as shown in the Permanently Affixed References.  A

person of ordinary skill in the art would be motivated to combine the light guides disclosed in

any of the Permanently Affixed References with the device in the Savage '673 patent because

the devices in these cited references and the device in the Savage '673 patent both include a light

guide, and one could simply permanently affix the light guide to the Savage '673 patent for ease

of storage, durability, and to seal it from the irrigation fluid infusion channel.  Accordingly, the

Savage '673 patent combined with any one of the Permanently Affixed References would render

this claim element obvious.

> **inserting a motor driven cutter into the second channel such that a
> distal cutting region of the cutter extends distally beyond the
> endoscope in the uterus;**

317.    Savage '673 discloses the insertion of a motor driven cutter into the second

channel such that a distal region of the cutter extends distally beyond the endoscope into the

uterus where probe P with obdurator O is inserted [into] uterus U, and then obdurator O is

withdrawn and housing H with cutting head C threaded; with cutting head C being rotated by a

DC motor and extending beyond the housing to resect uterine tissue.  (*See, e.g.* Figs. 3A-C, 4, 5,

9, 10; 2:53-55, 3:44-45, 12:30-37, 16:27-39, 21:30-34, 37-41.)

318.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent,

or the Dutch patent would understand those patents to describe this claim element, then that

person would also understand from reading Savage '673 that it also describes this claim element.

319.    Moreover, the Savage '673 patent combined with any one of the Cutter Insertion

References would render this claim element obvious, as one of ordinary skill in the art would be

motivated to use any of the cutters in the Cutter Insertion References with the endoscope of

Savage '673.

> **delivering fluid into the uterus through the valve and the second
> channel to distend the uterus;**

320.    Savage '673 discloses the delivery of fluid into the uterus through the valve and

the second channel to distend the uterus where fluid for uterine cavity distension comes into the

device through inlet conduit 61 and enters probe P; the remaining interior volume of probe P

forms a channel which directs the perfusion fluid  to slot 18 at its distal end and into the uterus;

seal formed between tissue resection device 200 and the sheath 226, allowing irrigation fluid to

be applied through an irrigation tube 228 to distend the uterus before tissue removal, and to make

up for fluid used in the extraction process; in another embodiment, an irrigation fluid port 328

and aspiration port 330 provide a continuous path for a irrigation fluid to enter the uterus; irrigation fluid supplied to irrigation port 328 enters the probe at a sheath coupler 350, and then flows distally through an infusion lumen of sheath 322.  (*See, e.g.*, 11:65-12:6, 13:29-31, 13:39-42, 16:27-39, 21:3-9.)

321.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Savage '673 that it also describes this claim element.

**energizing an electric motor to drive the cutter to cut the tissue within the uterus; and**

322.    Savage '673 discloses the energizing of an electric motor to drive the cutter to cut tissue within the uterus where the specification states that a DC motor rotates the cutting member to cut tissue.  (*See, e.g.*, Savage 2:53-55, 3:44-45.)

323.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Savage '673 that it also describes this claim element.

**aspirating cut tissue and fluid from the uterus and the endoscope through the cutter.**

324.    Under S&N's view of this claim element as being satisfied by the MyoSure Tissue Removal System, Savage '673 discloses the aspiration of cut tissue and fluid from the uterus and the endoscope through the cutter where the specification states that morsels removed by the cutter or chopped by the chopping mechanism are extracted immediately through the aspiration lumen in the rotating shaft.  (*See, e.g.*, Savage 3:3-5, 12:53-55, 13:52-62, 14:66-15:7, 15:35-47, 17:44-48, 21:9-18.).

325.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Savage '673 that it also describes this claim element.

326.    Moreover, the Savage '673 patent combined with any one of the Aspiration References would render this claim element obvious, as both sets of devices are intended to remove cut tissue and irrigation fluid from the surgery site.

327.    Accordingly, the Savage '673 patent discloses and/or makes obvious all of the elements of claim 1.

**b.      The Savage '673 Patent Discloses All The
             Elements Of Claim 2**

328.    The Savage '673 patent discloses all the elements of claim 2 of the '359 Patent.

> **The method of claim 1 wherein inserting the motor driven
> cutter comprises inserting an outer tube defining a cutting
> window at a distal region of the outer tube and an inner tube
> received within the outer tube that is configured to rotate
> relative to the outer tube to cut tissue,**

329.    As described previously, the Savage '673 patent discloses all of the elements of claim 1.

330.    I understand the parties have proposed different constructions for the claim element "a cutting window at a distal region of the outer tube," as described previously.

331.    As can be seen from Figs. 5, 6A-C, 10A, 11, 12, 12A, 13 and 13A, Savage '673 discloses a cutting head that rotates past a window into which tissue to be cut is exposed, thereby cutting the tissue.  (11:13-40, 15:25-47.)

332.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Savage '673 that it also describes this claim element.

333.     Moreover, the use of a cutter with an inner tube rotating relative to an outer tube, with a window in the outer tube exposing tissue to the inner tube that is cut when the inner tube rotates, has been well known in the art, as shown in the Rotating Tube Cutter References.  A person of ordinary skill in the art would be motivated to combine the light guides disclosed in any of the Rotating Tube Cutter References with the device in the Savage '673 patent because the devices in these cited references and the device in the Savage '673 patent both include a light guide, and one could simply permanently affix the light guide to the Savage '673 patent for ease of storage, durability, and to seal it from the irrigation fluid infusion channel.  Accordingly, the Savage '673 patent combined with any one of the Rotating Tube Cutter References would render this claim element obvious.

334.     The Savage '673 patent discloses this claim element under at least S&N's proposed construction of this claim element.

**the inner tube including a cutting element at a distal region of the inner tube configured to cut tissue at the cutting window when the inner tube rotates relative to the outer tube.**

335.     As can be seen from Figs. 5, 6A-C, 10A, 11, 12, 12A, 13 and 13A, Savage '673 discloses a cutting head that rotates past a window into which tissue to be cut is exposed, thereby cutting the tissue.  (11:13-40, 15:25-47.)

336.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Savage '673 that it also describes this claim element.

337.     Moreover, the use of a cutter with an inner tube rotating relative to an outer tube, with a window in the outer tube exposing tissue to the inner tube that is cut when the inner tube rotates, has been well known in the art, as shown in the Rotating Tube Cutter References.  A person of ordinary skill in the art would be motivated to use a cutter with the cutting window configuration shown in any of the Rotating Tube Cutter References with the device in the Savage '673 patent because the devices in these cited references and the device in the Savage '673 patent are both directed to cutting tissue in a body cavity with a mechanical cutter. Accordingly, the Savage '673 patent combined with any one of the Rotating Tube Cutter References would render this claim element obvious.

338.     Accordingly, the Savage '673 patent discloses and/or makes obvious all of the elements of claim 2.

### c.      The Savage '673 Patent Discloses All The Elements Of Claim 3

339.     The Savage '673 patent discloses all the elements of claim 3 of the '359 Patent.

340.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Savage '673 that it also describes this claim element.

> **The method of claim 1, wherein inserting the distal region of the endoscope comprises inserting a distal region of an endoscope that includes a fiber optics bundle permanently affixed to the first channel of the elongated member**

341.     As described previously, the Savage '673 patent discloses all of the elements of claim 1.

342.    Savage '673 discloses the insertion of a distal region of an endoscope  including a permanently affixed fiber optic bundle permanently affixed to the first channel of the elongated member where, as described in the specification, an optical fiber is included in the device held in a translatable shaft adjacent the elongate member to observe cutting.  Bearing member 102 defines channels for fiber F and rotating tube 30 and extends almost the full length of the lumen within probe P and has viewing strands for illuminating the surgery area.  The figures demonstrate that the fiber F can be permanently affixed.  Fiber optic scope 222 near the electrosurgical member 202 is used to visualize the surgery and is sealed from the irrigation tube 228, and in another embodiment, fiber-optic scope 320 within sheath 322 to visualize surgery. (*See, e.g.* Savage Figs. 1A, 1B, 10, 11, 28, 29; 5:21-25, 11:62-64, 13:34-37, 16:13-19, 16:27-39, 16:50-59, 20:11-15.)

343.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe a permanently affixed fiber optics bundle, then that person would also understand from reading Savage '673 that it also describes a permanently affixed fiber optics bundle.  Indeed, the figures of Savage '673 actually depict the fiber F, which one of ordinary skill would know can be permanently affixed to the endoscope.  In contrast, there is no depiction at all of a light guide in any of the figures of the '359 patent, the '602 patent, or the Dutch patent.

344.    In addition, the use of permanently affixed fiber optics bundles was well known in the art, as shown in the Permanently Affixed References.  A person of ordinary skill in the art would be motivated to combine the light guides disclosed in any of the Permanently Affixed References with the device in the Savage '673 patent because the devices in these cited references and the device in the Savage '673 patent both include fiber optics, fiber optics were

well known to one of ordinary skill in the art as being useful to illuminate and view surgery sites, and one could simply permanently affix the fiber optics to the Savage '673 patent for ease of storage, durability, and to seal it from the irrigation fluid infusion channel.  Accordingly, the Savage '673 patent combined with any one of the Permanently Affixed References would render this claim element obvious.

345.    Accordingly, the Savage '673 patent discloses and/or makes obvious all of the elements of claim 3.

### d.    The Savage '673 Patent Discloses All The Elements Of Claim 4

346.    The Savage '673 patent discloses all the elements of claim 4 of the '359 Patent.

347.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Savage '673 that it also describes this claim element.

> **The method of claim 1, wherein inserting the distal region of an endoscope comprises inserting a distal region of an endoscope that includes a lens permanently affixed to the first channel of the elongated member.**

348.    As described previously, the Savage '673 patent discloses all of the elements of claim 1.

349.    Savage '673 discloses inserting a distal region of an endoscope, such distal region including a lens permanently affixed to the first channel of the elongated member where its specification describes how an optical fiber is included in the device held in a translatable shaft adjacent the elongate member to observe cutting; bearing member 102 defines channels for fiber F and rotating tube 30 and extends almost the full length of the lumen within probe P and has

viewing strands for illuminating the surgery area; the figures demonstrate that the fiber F can be permanently affixed; fiber optic scope 222 near the electrosurgical member 202 and eyepiece 224 used to visualize the surgery and is sealed from the irrigation tube 228; fiber-optic scope 320 within sheath 322 to visualize surgery.  (*See, e.g.*, Figs. 1A, 1B, 10, 11, 28, 29; 5:21-25, 13:34-37, 16:13-19, 16:27-39, 16:50-59, 20:11-15.)

350.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe a permanently affixed lens, then that person would also understand from reading Savage '673 that it also describes a permanently affixed lens.

351.     In addition, the use of permanently affixed lenses was well known in the art, as shown in the Permanently Affixed References.  A person of ordinary skill in the art would be motivated to combine the lenses disclosed in the Permanently Affixed References with the device in the Savage '673 patent because the devices in these cited references and the device in the Savage '673 patent both include lenses, distal lenses were well known to one of ordinary skill in the art as being useful to view surgery sites, and one could simply permanently affix the lenses to the Savage '673 patent for ease of storage, durability, and to seal it from the irrigation fluid infusion channel.  Accordingly, the Savage '673 patent combined with any one of the Permanently Affixed References would render this claim element obvious.

352.     Accordingly, the Savage '673 patent discloses and/or makes obvious all of the elements of claim 4.

          **e.**       **The Savage '673 Patent Discloses All The Elements Of Claim 5**

353.     The Savage '673 patent discloses all the elements of claim 5 of the '359 Patent.

**A method for removal of tissue from a uterus, comprising:**

354.    As described previously with respect to claim 1, Savage '673 discloses this

element.

**inserting a distal region of an endoscope into the uterus,**

355.    As described previously, Savage '673 discloses this element.

**the endoscope including a port for receiving a motor driven cutter
and including an elongated member defining discrete first and second
channels extending from a proximal region of the elongated member
to the distal region,**

356.    As discussed above, Savage '673 discloses the endoscope including a port for

receiving a motor driven cutter and including an elongated member defining discrete first and

second channels extending from a proximal region of the elongated member to the distal region

where the specification sets forth:  bearing member 102 that defines channels for optical fiber F

and rotating tube 30; separate channels for a fiber optic scope 222 and tissue resection device

200 and irrigation lumen 228; probe P with obdurator O that is inserted [into] uterus U, and then

obdurator O is withdrawn and housing H with cutting head C threaded; cutting head C that

extends beyond the housing and is exposed to tissue; and a DC motor that rotates the cutting

member.  (*See, e.g.*, Savage Figs. 3A-C, 4, 5, 8, 9-13, 15; 2:53-55, 3:44-45, 12:30-37, 13:34-43,

16:13-67 21:30-34, 21:37-41.)

357.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent,

or the Dutch patent would understand those patents to describe this claim element, then that

person would also understand from reading Savage '673 that it also describes this claim element.

358.    Moreover, the use of endoscopic surgical devices having discrete channels has

been described in numerous prior art references, as described above in section VIII(A)(3).  A

person of ordinary skill in the art would be motivated to combine any of the Elongated

Member/Two Channel References with the device in the Savage '673 patent because the devices

in these cited references and the device in the Savage '673 patent both include optical and cutting

devices housed inside an elongated sheath.  Accordingly, the Savage '673 patent combined with

any one of the Elongated Member/Two Channel References would render this claim element

obvious.

> **the first channel having a light guide permanently affixed therein and the second channel having a straight, central longitudinal axis extending from the port to an opening at a distal tip of the endoscope, followed by:**

359.    As discussed above, Savage '673 discloses that an optical fiber is included in the

device held in a translatable shaft adjacent the elongate member to observe cutting; bearing

member 102 defines channels for fiber F and rotating tube 30 and extends almost the full length

of the lumen within probe P and has viewing strands for illuminating the surgery area; the figures

demonstrate that the fiber F can be permanently affixed; fiber optic scope 222 near the

electrosurgical member 202 used to visualize the surgery and is sealed from the irrigation tube

228; fiber-optic scope 320 within sheath 322 to visualize surgery; as to the second channel, fluid

for uterine cavity distension comes into the device and passes down a channel a channel which

directs the perfusion fluid  to the uterus.  (*See, e.g.* Savage Figs. 1A, 1B, 10, 11, 17, 28, 29; 5:21-

25, 11:62-12:6, 13:29-31, 13:34-37, 13:39-42, 16:13-19, 16:27-39, 16:50-59, 20:11-15, 20:19-

21, 21:3-6.)

360.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent,

or the Dutch patent would understand those patents to describe this claim element, then that

person would also understand from reading Savage '673 that it also describes this claim element.

361.    In addition, the use of a permanently affixed light guide sealed from a fluid channel has been well known in the art, as shown in the Permanently Affixed References.  A person of ordinary skill in the art would be motivated to combine the light guides disclosed in any of the Permanently Affixed References with the device in the Savage '673 patent because the devices in these cited references and the device in the Savage '673 patent both include a light guide, and one could simply permanently affix the light guide to the Savage '673 patent for ease of storage, durability, and to seal it from the irrigation fluid infusion channel.  Accordingly, the Savage '673 patent combined with any one of the Permanently Affixed References would render this claim element obvious.

> **inserting the motor driven cutter for cutting and detaching tissue into the second channel through the port;**

362.    As discussed above, Savage '673 also discloses this element.  The specification of Savage '673 that probe P with obdurator O is inserted into uterus U, and then obdurator O is withdrawn and housing H with cutting head C threaded.  Cutting head C extends beyond the housing and is exposed to tissue as a DC motor rotates the cutting member.  (*See, e.g.* Savage Figs. 3A-C, 4, 5, 9, 10; 2:53-55, 3:44-45, 12:30-37, 16:27-39, 21:30-34, 37-41.)

363.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Savage '673 that it also describes this claim element.

364.    Moreover, the Savage '673 patent combined with any one of the Cutter Insertion References would render this claim element obvious.

> **introducing fluid into the uterus; and**

365.    As discussed above, Savage '673 discloses that fluid for uterine cavity distension comes into the device through inlet conduit 61 and enters probe P; the remaining interior volume of probe P forms a channel which directs the perfusion fluid to slot 18 at its distal end and into the uterus; seal formed between tissue resection device 200 and the sheath 226, allowing irrigation fluid to be applied through an irrigation tube 228 to distend the uterus before tissue removal, and to make up for fluid used in the extraction process; in another embodiment, an irrigation fluid port 328 and aspiration port 330 provide a continuous path for a irrigation fluid to enter the uterus; irrigation fluid supplied to irrigation port 328 enters the probe at a sheath coupler 350, and then flows distally through an infusion lumen of sheath 322. (*See, e.g.*, Savage 6:15-26, 11:65-12:6, 13:29-31, 13:39-42, 16:27-39, 21:3-9.)

366.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Savage '673 that it also describes this claim element.

> **aspirating fluid with detached tissue from the uterus through a lumen of the cutter.**

367.    Under S&N's view of this claim element as being satisfied by the MyoSure Tissue Removal System, as discussed above, Savage '673 discloses that morsels removed by the cutter or chopped by the chopping mechanism are extracted immediately through the aspiration lumen in the rotating shaft. (*See, e.g.*, Savage 3:3-5, 12:53-55, 13:52-62, 14:66-15:7, 15:35-47, 17:44-48, 21:9-18.)

368.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Savage '673 that it also describes this claim element.

369.    Moreover, the Savage '673 patent combined with any one of the Aspiration References would render this claim element obvious, as both sets of devices are intended to remove cut tissue and irrigation fluid from the surgery site.

370.    The Savage '673 patent discloses this claim element under at least S&N's proposed construction of this claim element.

371.    Accordingly, the Savage '673 patent describes and/or renders obvious all the elements of claim 5 of the '359 patent.

### f.    The Savage '673 Patent Discloses All The Elements Of Claim 6

372.    The Savage '673 patent discloses all the elements of claim 6 of the '359 Patent.

**The method of claim 5 wherein inserting the motor driven cutter comprises inserting an outer tube defining a cutting window at a distal region of the outer tube and an inner tube received within the outer tube that is configured to rotate relative to the outer tube to cut tissue, the inner tube including a cutting element at a distal region of the inner tube configured to cut tissue at the cutting window when the inner tube rotates relative to the outer tube.**

373.    As discussed previously with respect to claims 2 and 5, Savage '673 discloses ad/or renders obvious all of the elements of claim 6.

374.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Savage '673 that it also describes this claim element.

### g.    The Savage '673 Patent Discloses All The Elements Of Claim 7

375.    The Savage '673 patent discloses all the elements of claim 7 of the '359 patent.

376.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Savage '673 that it also describes this claim element.

**The method of claim 5, wherein inserting the distal region of the endoscope comprises inserting a distal region of an endoscope that includes a fiber optics bundle permanently affixed to the first channel of the elongated member.**

377.    As discussed previously with respect to claims 3 and 5, Savage '673 discloses ad/or renders obvious all of the elements of claim 7.

378.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Savage '673 that it also describes this claim element.

**h.      The Savage '673 Patent Discloses All The Elements Of Claim 8**

379.    The Savage '673 patent discloses all the elements of claim 8 of the '359 Patent.

380.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Savage '673 that it also describes this claim element.

**The method of claim 5, wherein inserting the distal region of an endoscope comprises inserting a distal region of an endoscope that includes a lens permanently affixed to the first channel of the elongated member.**

381.    As described previously with respect to claims 4 and 5, the Savage '673 patent discloses all of the elements of claim 8.

### 3. The Banko Patent Discloses And/Or Renders Obvious All The Elements of All Asserted Claims

382.    Even assuming for the sake of argument that S&N is correct to assert a priority date of September 1997 (it is not), the claims of the '359 patent are still invalid under Banko, as discussed herein.

### a. The Banko Patent Discloses All of the Elements of Claim 1

383.    The Banko patent discloses all the elements of claim 1 of the '359 Patent.

**A method for removal of tissue from a uterus, comprising:**

384.    Banko discloses that "the instrument can be used at any body location of a human or animal." (*See e.g.*, Banko 2:31-33.)  A person of ordinary skill in the art would understand from reading Banko that the body locations described include at least the uterus.

385.    To the extent that Banko does not anticipate this claim element, it would be obvious to one of ordinary skill in the art to use the device in Banko to remove tissue from the uterus in light of other prior art, such as Kresch '689, Savage '673, Alden, or any of the Uterus References, and the suggestion in Banko that the device disclosed therein could be used in other body cavities.  It would at least have been obvious to try the Banko device in the uterus, with predictable results, to yield the claimed method.

**inserting a distal region of an endoscope into said uterus**

386.    Banko discloses the insertion of a distal region of an endoscope into the uterus through its disclosure of the insertion of a probe 10 with attached optical rod or bundle of optic fibers 26 in "any body location of a human or animal." (*See e.g.*, Banko 2:24-26, 31-33.)  A person of ordinary skill in the art would understand from reading Banko that the body locations

described include at least the uterus and that a distal region of the endoscope would be inserted there.

387.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Banko that it also describes this claim element.

388.    To the extent that Banko does not anticipate this claim element, it would be obvious to one of ordinary skill in the art to use the device in Banko to remove tissue from the uterus in light of other prior art, such as Kresch '689, Savage '673, Alden, or any of the Uterus References, and the suggestion in Banko that the device disclosed therein could be used in other body cavities.  It would at least have been obvious to try the Banko device in the uterus, with predictable results, to yield the claimed method.

<h3 style="text-align:center">the endoscope including a valve</h3>

389.    The specification of the Banko  patent discloses this element by disclosing that one type of fluid control system that can be used with the Banko invention is the fluid control system in U.S. Patent No. 3,812,855 (to Banko), entitled "System for Controlling Fluid and Suction Pressure."  The system disclosed in that patent has a series of valves and other control elements to provide pressurized fluid.  (*See e.g.*, Banko 4:54-59; U.S. Patent No. 3,812,855.)

390.    One of ordinary skill in the art reading Banko would thus understand that the endoscope described therein includes a valve.  A valve is necessary to control the flow of irrigation fluid into the device.

391.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Banko that it also describes this claim element.

392.    In addition, the use of a valve to control irrigation fluid flow to a surgical site has been well known in the art, as shown in the Valve References.  A person of ordinary skill in the art would be motivated to combine the valves disclosed in any of the Valve References with the device in the Banko patent because the devices in these cited references and the device in the Banko patent both include delivery of irrigating fluid to a surgical site and because the use of a valve is one of the simplest, most well known ways of controlling irrigating fluid through an endoscope.  Accordingly, the Banko patent combined with any one of the Valve References would render this claim element obvious.

**and an elongated member defining discrete first and second channels extending from a proximal region of the elongated member to the distal region,**

393.    Banko also discloses an elongated member defining discrete first and second channels extending from a proximal region of the elongated member to the distal region, where its specification describes two separate channels within an endoscope.  (*See e.g.*, Banko Figs 2, 9-12.)  Banko describes a first channel through which fiber optic bundle 92 is held in place by epoxy 94 and "[t]he optical member 92 extends substantially along the entire length of probe 10, as shown in FIG. 1."  (5:10-25.)  Likewise, Banko describes a second channel defined by a portion of outer shell 56 (channel 59) through which the irrigation fluid flows into the region where cutting is taking place.  (2:45-53.)

394.   If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Banko that it also describes this claim element.

395.   The Banko patent discloses this claim element under either Hologic's or S&N's proposed construction of the claimed "elongated member."

**the second channel having a proximal end in communication with the valve such that fluid from the valve is able to flow into and through the second channel to the uterus,**

396.   Banko discloses a second channel having a proximal end  in communication with a valve such that fluid from the valve is able to flow into and through the second channel into the patient's body.  The valve element is disclosed as described previously.  (*See e.g.*, Banko 4:54-59.)  Through such a valve, irrigating fluid from the conduit 22 flows through a portion of shell 56 (channel 59) and  out the opening 60 into the region of the patient's body where cutting is taking place.  (*See e.g.*, Banko Figs 2, 9-12; 2:20-25, 45-55.)

397.   If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Banko that it also describes this claim element.

398.   To the extent that Banko does not anticipate this claim element, it would be obvious to one of ordinary skill in the art to use the device in Banko to remove tissue from the uterus in light of other prior art, such as Kresch '689, Savage '673, Alden, or any of the Uterus References, and the suggestion in Banko that the device disclosed therein could be used in other body cavities.  It would at least have been obvious to try the Banko device in the uterus, with predictable results, to yield the claimed method.

> **and the first channel having a light guide permanently affixed therein
> and being sealed from the second channel to prevent fluid from the
> valve from entering the uterus through the first channel, followed by:**

399.    As can be seen in Figure 9, Banko discloses the first channel having a light guide

permanently affixed therein and being sealed from the second channel to prevent fluid from the

valve from entering the uterus through the first channel where it states that "one arrangement for

mounting the optic material.... [is that] [t]he outer shell 56 is split longitudinally along a portion

of the length thereof and bent inwardly to leave a gap.  The bent ends 56a of shell 56 are suitably

bonded, such as by welding, soldering or other similar process to the outer surface of the inner

shell 54 to preserve the fluid-tight integrity of the outer passage 59.  A fiber optic rod, or bundle

of fibers 92 is located in the gap between the bent-in ends of the shell 56 and are held in place by

a suitable adhesive such as an epoxy 94." (*See e.g.*, Banko Figs. 2, 9-12; 5:10-20.)

400.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent,

or the Dutch patent would understand those patents to describe this claim element, then that

person would also understand from reading Banko that it also describes this claim element.

> **inserting a motor driven cutter into the second channel such that a
> distal cutting region of the cutter extends distally beyond the
> endoscope in the uterus;**

401.    Banko discloses the insertion of a motor driven cutter into the second channel

such that a distal region of the cutter extends distally beyond the endoscope into the uterus where

it discloses a motor driven cutter tool 35 with a shaft 36 included in the device contained within

internal lumen 58, which is contained in the space within outer shell 56 (the second channel), and

engages tissue to be cut at the distal end of the device.  (*See, e.g.* Banko Figs. 2, 9-12; 2:34-41.)

402.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Banko that it also describes this claim element.

403.     Moreover, to the extent Banko does not disclose this element, it would be obvious to combine Banko with another reference, such as Kresch '689, Kresch, Savage '673, Vukovic, or any of the Cutter Insertion References to make the motor driven cutter removable and separately insertable into the endoscope to extend distally beyond the endoscope in the uterus. One of ordinary skill in the art would be motivated to make the cutter removable, for example, so that a physician could dispose of the cutter after use on a patient and use a new cutter with each patient for hygenic reasons.

**delivering fluid into the uterus through the valve and the second channel to distend the uterus;**

404.     Banko discloses the delivery of fluid into the uterus through the valve and the second channel to distend the uterus where it states that "[i]rrigating fluid can be supplied from the conduit 22 through the outer passage 59 and out the opening 60" and that "[t]he irrigating fluid can serve several functions" in the enclosed operating field such as "to compensate for removed fluid and tissue" in order to keep the operative bodily location (i.e., the uterus) from collapsing.  (*See, e.g.*, Banko Figs. 2, 9-12; 2:20-25, 2:45-53, 4:37-48.)  Banko's provision about preventing the body cavity from collapsing refers to distention of the body cavity.

405.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Banko that it also describes this claim element.

406.    To the extent that Banko does not anticipate this claim element, it would be obvious to one of ordinary skill in the art to use the device in Banko to remove tissue from the uterus in light of other prior art, such as Kresch '689, Savage '673, Alden, or any of the Uterus References, and the suggestion in Banko that the device disclosed therein could be used in other body cavities.  It would at least have been obvious to try the Banko device in the uterus, with predictable results, to yield the claimed method.

### energizing an electric motor to drive the cutter to cut the tissue within the uterus; and

407.    Banko discloses the energizing of an electric motor to drive the cutter to cut tissue within the uterus where the specification states that "[t]he motor 14 can be operated to energize the cutter tool 35 to cause the blades, or flutes of cutter drill 37 to rotate with respect to the shearing edges 65 of the opening 64" and thereby cut tissue.  (*See, e.g.*, Banko Figs. 3, 5; 4:16-19.)

408.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Banko that it also describes this claim element.

409.    To the extent that Banko does not anticipate this claim element, it would be obvious to one of ordinary skill in the art to use the device in Banko to remove tissue from the uterus in light of other prior art, such as Kresch '689, Savage '673, Alden, or any of the Uterus References, and the suggestion in Banko that the device disclosed therein could be used in other body cavities.  It would at least have been obvious to try the Banko device in the uterus, with predictable results, to yield the claimed method.

### aspirating cut tissue and fluid from the uterus and the endoscope through the cutter.

410.     Under S&N's view of this claim element as being satisfied by the MyoSure Tissue Removal System, Banko discloses the aspiration of cut tissue and fluid from the uterus and the endoscope through the cutter where the specification describes that particles of cut tissue and any fluid removed from the operating field are moved down the central passage 58 housing the cutter and out through the conduit 20 into a collecting receptacle.  (*See, e.g.*, Banko Figs. 2, 9-12; 4:33-36.)

411.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Banko that it also describes this claim element.

412.     Moreover, the Banko patent combined with any one of the Aspiration References would render this claim element obvious, as both sets of devices are intended to remove cut tissue and irrigation fluid from the surgery site.  In addition, to the extent that Banko does describe use in the uterus, it would be obvious to one of ordinary skill in the art to use the device in Banko to aspirate tissue and fluid from the uterus in light of other prior art, such as Kresch '689, Savage '673, Alden, or any of the Uterus References, and the suggestion in Banko that the device disclosed therein could be used in other body cavities.  It would at least have been obvious to try the Banko device in the uterus, with predictable results, to yield the claimed method.

413.     The Banko patent discloses this claim element under at least S&N's proposed construction of this claim element.

414.     Accordingly, the Banko patent describes and/or renders obvious all the elements of claim 1 of the '359 patent.

> **b.**     **The Banko Patent Discloses All The Elements Of Claim 2**

415.     The Banko patent discloses all the elements of claim 2 of the '359 Patent.

> **The method of claim 1 wherein inserting the motor driven cutter comprises inserting an outer tube defining a cutting window at a distal region of the outer tube and an inner tube received within the outer tube that is configured to rotate relative to the outer tube to cut tissue,**

416.     As described previously, the Banko patent discloses all of the elements of claim 1.

417.     Banko discloses that cutter 37 rotates, sweeping its flutes across the opening in the outer tube (cone 62) defining cutting window 64, and cutting tissue with the shearing edges 65 of cutting window 64.  (*See e.g.*, Banko Figs. 2, 3, 5, 7, 8; 3:43-51, 4:20-32, 4:60-5:8.)

418.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Banko that it also describes this claim element.

419.     Moreover, to the extent Banko does not disclose this element, it would be obvious to combine Banko with another reference, such as Kresch '689, Savage, Vukovic, or any of the Cutter Insertion References and Rotating Tube Cutter References to make the motor driven cutter removable and separately insertable into the endoscope to extend distally beyond the endoscope in the uterus.  One of ordinary skill in the art would be motivated to make the cutter removable and in an outer-tube-inner tube form, for example, so that a physician could dispose of the cutter after use on a patient and use a new cutter with each patient for hygenic reasons, and the rotating tube form would be obvious to use with the motor in Banko, as such rotating tubes have been used for surgical cutting in body cavities for years before even S&N's 1997 priority date.

420.   The Banko patent discloses and/or renders obvious this claim element under at least S&N's proposed construction of this claim element.

**the inner tube including a cutting element at a distal region of the inner tube configured to cut tissue at the cutting window when the inner tube rotates relative to the outer tube.**

421.   Banko discloses that cutter 37 rotates, sweeping its flutes across the opening in the outer tube (cone 62) defining cutting window 64, and cutting tissue with the shearing edges 65 of cutting window 64.  (*See e.g.*, Banko Figs. 2, 3, 5, 7, and 8 3:43-51, 4:20-32, 4:60-5:8.)

422.   If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Banko that it also describes this claim element.

423.   Moreover, to the extent Banko does not disclose this element, it would be obvious to combine Banko with another reference, such as Kresch '689, Savage, Alden, Vukovic, or any of the Cutter Insertion References and Rotating Tube Cutter References to make the motor driven cutter removable and separately insertable into the endoscope to extend distally beyond the endoscope in the uterus.  One of ordinary skill in the art would be motivated to make the cutter removable and in an outer-tube-inner tube form, for example, so that a physician could dispose of the cutter after use on a patient and use a new cutter with each patient for hygenic reasons, and the rotating tube form would be obvious to use with the motor in Banko, as such rotating tubes have been used for surgical cutting in body cavities for years before even S&N's 1997 priority date.

424.   Accordingly, the Banko patent describes and/or renders obvious all the elements of claim 2 of the '359 patent.

### c.   The Banko Patent Discloses All The Elements Of Claim 3

425.   The Banko patent discloses all the elements of Claim 3 of the '359 Patent.

> **The method of claim 1, wherein inserting the distal region of the endoscope comprises inserting a distal region of an endoscope that includes a fiber optics bundle permanently affixed to the first channel of the elongated member.**

426.   As described previously, the Banko patent discloses all of the elements of claim 1.

427.   Banko  discloses a permanently affixed fiber optic bundle permanently affixed to the first channel of the elongated member where, as described in the specification, "[a] fiber optic rod, or bundle of fibers 92 is located in the gap between the bent-in ends of the shell 56 and are held in place by a suitable adhesive such as an epoxy 94[,]" and is sealed by epoxy from channels 56 and 59 through which the irrigation fluid flows into the region where cutting is taking place.  (*See e.g.*, Banko Figs. 2, 9-12; 5:10-20.)

428.   If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Banko that it also describes this claim element.

429.   Accordingly, the Banko patent describes and/or renders obvious all the elements of claim 3 of the '359 patent.

### d.   The Banko Patent Discloses All The Elements Of Claim 4

430.   The Banko patent discloses all the elements of claim 4 of the '359 Patent.

> **The method of claim 1, wherein inserting the distal region of an endoscope comprises inserting a distal region of an endoscope that includes a lens permanently affixed to the first channel of the elongated member.**

431.    As described previously, the Banko patent discloses all of the elements of claim 1.

432.    Banko discloses a lens permanently affixed to the first channel of the elongated member where its specification describes how there are separate channels in the scope, including one through which fiber optic bundle 92 moves and is held in place by epoxy 94, and is sealed by epoxy  from channels 56 and 59 through which the irrigation fluid flows into the region where cutting is taking place, and can be used for viewing the operating field or illuminating the operating field.  (*See, e.g.* Banko Figs. 2, 9-12; 5:10-25.)

433.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe a permanently affixed lens, then that person would also understand from reading Banko that it also describes a permanently affixed lens.

434.    Accordingly, the Banko patent describes and/or renders obvious all the elements of claim 4 of the '359 patent.

**e.    The Banko Patent Discloses All The Elements Of Claim 5**

435.    The Banko patent discloses all the elements of claim 5 of the '359 Patent.

**A method for removal of tissue from a uterus, comprising:**

436.    As discussed above with respect to claim 1, Bank discloses this element.

**inserting a distal region of an endoscope into the uterus,**

437.    As described above with respect to claim 1, Banko  discloses this claim element.

**the endoscope including a port for receiving a motor driven cutter and including an elongated member defining discrete first and second channels extending from a proximal region of the elongated member to the distal region,**

438.     Banko discloses an endoscope including a port for receiving a motor driven cutter and including an elongated member defining discrete first and second channels extending from a proximal region of the elongated member to the distal region where the specification sets forth that there are separate channels, one through which fiber optic bundle 92 moves and is held in place by epoxy 94, and a portion of shell 56 (channel 59) through which the irrigation fluid flows into the region where cutting is taking place, and an internal lumen 58 within which a motor-driven cutter tool 35 with a shaft 36 is included in the device. (*See, e.g.*, Banko Figs. 2, 9-12; 2:34-41, 2:45-53, 5:10-25.)

439.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Banko that it also describes this claim element.

440.     Moreover, to the extent Banko does not disclose this element, it would be obvious to combine Banko with another reference, such as Kresch '689, Savage, Vukovic, or any of the Cutter Insertion References to make the motor driven cutter removable and separately insertable into the endoscope to extend distally beyond the endoscope in the uterus.  One of ordinary skill in the art would be motivated to make the cutter removable, for example, so that a physician could dispose of the cutter after use on a patient and use a new cutter with each patient for hygenic reasons.

441.     The Banko patent discloses this claim element under either Hologic's or S&N's proposed construction of the claimed "elongated member."

> **the first channel having a light guide permanently affixed therein and the second channel having a straight, central longitudinal axis extending from the port to an opening at a distal tip of the endoscope, followed by:**

442.    Banko  discloses two separate channels within an endoscope.  (*See e.g.*, Banko

Figs 2, 9-12.)  Banko describes a first channel through which fiber optic bundle 92 is held in

place by epoxy 94 and "[t]he optical member 92 extends substantially along the entire length of

probe 10, as shown in FIG. 1.")  (Banko 5:10-25.)  Likewise, Banko describes a second channel

where irrigating fluid from the conduit 22 flows through a portion of shell 56 (channel 59) and

out the opening 60 into the region of the patient's body where cutting is taking place.  (*See e.g.*,

Banko Figs 2, 9-12; 2:20-25, 2:45-55.)

443.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent,

or the Dutch patent would understand those patents to describe this claim element, then that

person would also understand from reading Banko that it also describes this claim element.

444.    Moreover, to the extent Banko does not disclose a port, it would be obvious to

combine Banko with another reference, such as Kresch '689, Savage, Vukovic, or any of the

Cutter Insertion References to make the motor driven cutter removable and separately insertable

into the endoscope to extend distally beyond the endoscope in the uterus.  One of ordinary skill

in the art would be motivated to make the cutter removable, for example, so that a physician

could dispose of the cutter after use on a patient and use a new cutter with each patient for

hygenic reasons.

**inserting the motor driven cutter for cutting and detaching tissue into
the second channel through the port;**

445.    Banko  also discloses a motor driven cutter tool 35 with a shaft 36 included in the

device contained within internal lumen 58, which is contained in the space within outer shell 56

(the second channel), and engages tissue to be cut at the distal end of the device.  (*See, e.g.*

Banko Figs. 2, 9-12; 2:34-41.)  The specification further describes that particles of cut tissue and

any fluid removed from the operating field are moved down the central passage 58 housing the cutter and out through the conduit 20 into a collecting receptacle.  (*See, e.g.*, Banko Figs. 2, 9-12; 4:33-36.)

446.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Banko that it also describes this claim element.

447.    Moreover, to the extent Banko does not disclose this element, it would be obvious to combine Banko with another reference, such as Kresch '689, Savage, or Vukovic to make the motor driven cutter removable and separately insertable into the endoscope to extend distally beyond the endoscope in the uterus.  One of ordinary skill in the art would be motivated to make the cutter removable, for example, so that a physician could dispose of the cutter after use on a patient and use a new cutter with each patient for hygenic reasons.

**introducing fluid into the uterus; and**

448.    As described previously, Banko discloses that "[i]rrigating fluid can be supplied from the conduit 22 through the outer passage 59 and out the opening 60" and that "[t]he irrigating fluid can serve several functions" in the enclosed operating field such as "to compensate for removed fluid and tissue" in order to keep the operative bodily location (such as a uterus) from collapsing.  (*See, e.g.*, Banko 4:37-44; *see also* Banko Figs. 2, 9-12; 2:20-25, 2:45-53, 4:37-44.)

449.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Banko that it also describes this claim element.

> **aspirating fluid with detached tissue from the uterus through a lumen of the cutter.**

450.     Under S&N's view of this claim element as being satisfied by the MyoSure Tissue Removal System, Banko discloses the aspiration of fluid with detached tissue from the uterus through a lumen of the cutter where the specification describes that particles of cut tissue and any fluid removed from the operating field are moved down the central passage 58 housing the cutter and out through the conduit 20 into a collecting receptacle.  (*See, e.g.*, Banko Figs. 2, 9-12; 4:33-36.)

451.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Banko that it also describes this claim element.

452.     Moreover, the Banko patent combined with any one of the Aspiration References would render this claim element obvious, as both sets of devices are intended to remove cut tissue and irrigation fluid from the surgery site.

453.     The Banko patent discloses and/or renders obvious this claim element under at least S&N's proposed construction of this claim element.

454.     Accordingly, the Banko patent describes and/or renders obvious all the elements of claim 5 of the '359 patent.

### f.     The Banko Patent Discloses All The Elements Of Claim 6

455.     The Banko patent discloses all the elements of claim 6 of the '359 Patent.

> **The method of claim 5 wherein inserting the motor driven cutter comprises inserting an outer tube defining a cutting window at a distal region of the outer tube and an inner tube received within the outer tube that is configured to rotate**

**relative to the outer tube to cut tissue, the inner tube including a cutting element at a distal region of the inner tube configured to cut tissue at the cutting window when the inner tube rotates relative to the outer tube.**

456.    As described above with respect to claims 2 and 5, Banko discloses and/or renders obvious claim 6 of the '359 patent.

457.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Banko that it also describes this claim element.

### g.    The Banko Patent Discloses All The Elements Of Claim 7

458.    The Banko patent discloses all the elements of claim 7 of the '359 Patent.

**The method of claim 5, wherein inserting the distal region of the endoscope comprises inserting a distal region of an endoscope that includes a fiber optics bundle permanently affixed to the first channel of the elongated member.**

459.    As described above with respect to claims 3 and 5, Banko discloses and/or renders obvious claim 7 of the '359 patent.

460.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Banko that it also describes this claim element.

### h.    The Banko Patent Discloses All The Elements Of Claim 8

461.    The Banko patent discloses all the elements of claim 8 of the '359 Patent.

**The method of claim 5, wherein inserting the distal region of an endoscope comprises inserting a distal region of an endoscope that includes a lens permanently affixed to the first channel of the elongated member.**

462.    As described above with respect to claims 4 and 5, Banko discloses and/or renders obvious claim 8 of the '359 patent.

463.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Banko that it also describes this claim element.

### 4.    The Obenchain Patent Discloses And/Or Renders Obvious All The Elements of Asserted Claims 1, 3, 4, 5, 7, and 8

#### a.    The Obenchain Patent Discloses All of the Elements of Claim 1

464.    The Obenchain patent discloses all the elements of claim 1 of the '359 patent.

**A method for removal of tissue from a uterus, comprising:**

465.    Obenchain discloses "a method and device for accomplishing a laparoscopic lumbar disecectomy[,]" where such method and device is "quite suitable for lumbar disecectomy *and many other procedures*." (*See e.g*., Obenchain 1:32-33; 2:37-38 (emphasis added).) That such a method  is also appropriate for the removal of tissue from the uterus would be known to those skilled in the art since both procedures involve surgery performed in a small area or cavity in the human body.  Thus, a person of ordinary skill in the art would understand from reading Obenchain that the "other procedures" include at least tissue removal from the uterus.

466.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Obenchain that it also describes this claim element.

467.    To the extent that Obenchain does not anticipate this claim element, it would be obvious to one of ordinary skill in the art to use the device in Obenchain to remove tissue from the uterus in light of other prior art, such as Kresch '689, Savage '673, Alden, or any of the Uterus References, and the suggestion in Obenchain that the device disclosed therein could be used in many other procedures.  It would at least have been obvious to try the Obenchain cutter in the uterus, with predictable results, to yield the claimed method.

**inserting a distal region of an endoscope into said uterus**

468.    Obenchain discloses the insertion of a distal region of an endoscope into the uterus through its disclosure of the insertion of an endoscope through an endoscope receiving means into a patient to perform surgery in a small area or cavity in the human body.  (*See e.g.*, Obenchain 1:32-48.)  A person of ordinary skill in the art would understand from reading Obenchain that these body cavities include at least the uterus.

469.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Obenchain that it also describes this claim element.

470.    To the extent that Obenchain does not anticipate this claim element, it would be obvious to one of ordinary skill in the art to use the invention Obenchain discloses to insert the distal, cutting end of the Obenchain device into the uterus to remove tissue from the uterus in light of other prior art, such as Kresch '689, Savage '673, or Alden, or any of the Uterus References, and the suggestion in Obenchain that the device disclosed therein could be used in many other procedures.

**the endoscope including a valve**

471.    The specification of the Obenchain patent discloses that the aforementioned endoscope includes a valve via the embodiment illustrated by Figure 5 which depicts an endoscope with "fittings 51 and 53 for attaching irrigation and suction components." Such components constitute valves controlling the inflow and outflow of fluid.   (*See e.g.*, Obenchain Fig. 5; 4:20-23.)



**Fig. 5 (Obenchain at sheet 2 of 3**
**(altered to include arrows denoting valve disclosure at 51 and 53).)**

**and an elongated member defining discrete first and second**
**channels extending from a proximal region of the elongated**
**member to the distal region,**

472.    Obenchain also discloses an elongated member defining discrete first and second channels extending from a proximal region of the elongated member to the distal region, where its specification describes "a sleeve member 12 comprising an elongated cylinder having a first end 21 and a second end 23," whereby "[i]nteriorly of the sleeve 12 are secured an endoscope receiving means comprising a channel member 14 extending substantially entirely along the interior length of the sleeve between ends 21 and 23. Channel member 13 includes an interior portion 13, and an exterior portion 15 terminating in an adaptor or fitting 11 for receiving an eyepiece 20 of an endoscope." (*See e.g.*, Obenchain Figs 1, 2; 2:39-45.) The second channel being defined by "[a] plurality of conduits 18 and 20 to provide irrigation of the surgical site and

to suction tissue and fluid to be removed from the site" where the fluid handling conduits "are secured and extend substantially along the interior length of the sleeve 12." (Figs. 1, 2, 3:17-20, 33-34.)

473.    The Obenchain patent specifically discloses that different lengths of the device may be used for different uses, and "the criticality of the length will primarily be defined by the surgical procedure for which the device is to be used." (Obenchain 2:22-28.)  The patent discloses, for example, that the sleeve length should be  between 15 and 38 centimeters for thoracic surgery.  (*Id.*)

474.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Obenchain that it also describes this claim element.

**the second channel having a proximal end in communication
with the valve such that fluid from the valve is able to flow into
and through the second channel to the uterus,**

475.    Obenchain  discloses a second channel having a proximal end  in communication

with a valve such that fluid from the valve is able to flow into and through the second channel

into the patient's body.  As explained previously, Obenchain discloses a valve for the inflow of

irrigation fluid.  (*See e.g.*, Obenchain Fig. 5; 4:20-23.)  Accordingly, elements 51 and 53 are

valves controlling the inflow and outflow of fluid to and from conduits 18 and 20.   Conduits 18

and 20 contained within sleeve 12, provide irrigation to the site of the surgery and suction tissue

and fluid to be removed from the site.  (*See e.g.*, Obenchain Figs. 2, 5; 3:17-20, 4:20-23.)



**Obenchain Fig. 2**

476.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent,

or the Dutch patent would understand those patents to describe this claim element, then that

person would also understand from reading Obenchain that it also describes this claim element.

477.    Accordingly, the Obenchain patent discloses and/or renders obvious this claim

element.

> **and the first channel having a light guide permanently affixed therein and being sealed from the second channel to prevent fluid from the valve from entering the uterus through the first channel, followed by:**

478.    Obenchain discloses the first channel having a light guide permanently affixed therein and being sealed from the second channel to prevent fluid from the valve from entering the uterus through the first channel where it discloses that the fluid conduits 18 and 20 are separate and sealed off from the endoscope conduits used by the physician to illuminate and view the area of surgery.  The laser fiber can be secured to the device.  (*See e.g.*, Obenchain Figs. 1, 2, 4, 6; 2:39-49, 2:62-3:2, 3:17-34, 3:60-66, 4:20-23, 4:45-51.)

479.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe a permanently affixed light guide, then that person would also understand from reading Obenchain that it also describes a permanently affixed light guide.  Indeed, the figures of Obenchain actually depict the light guide, which one of ordinary skill would know can be permanently affixed to the endoscope.  In contrast, there is no depiction at all of a light guide in any of the figures of the '359 patent, the '602 patent, or the Dutch patent.

480.    In addition, the use of permanently affixed light guides, fiber optics bundles, and telescopes was well known in the art, as shown in the Permanently Affixed References.  A person of ordinary skill in the art would be motivated to combine the light guides disclosed in any of the Permanently Affixed References with the device in the Obenchain patent because the devices in these cited references and the device in the Obenchain patent both include light guides, light guides were well known to one of ordinary skill in the art as being useful to illuminate and view surgery sites, and one could simply permanently affix the light guide to the

Obenchain patent for ease of storage, durability, and to seal it from the irrigation fluid infusion channel.

481.    Accordingly, the Obenchain patent combined discloses and/or renders obvious this claim element.

> **inserting a motor driven cutter into the second channel such that a distal cutting region of the cutter extends distally beyond the endoscope in the uterus;**

482.    Obenchain discloses the insertion of a motor driven cutter into the second channel such that a distal region of the cutter extends distally beyond the endoscope into the uterus where it discloses that a surgeon can insert a number of conventional surgical devices into a channel of the device, including a shaver and surgical tools that can rotate. (*See, e.g.* Obenchain Figs. 3, 4; 3:42-60.)  A person of ordinary skill in the art reading Obenchain would understand that these surgical tools would include at least motor driven cutters.



483.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Obenchain that it also describes this claim element.

484.    Moreover, to the extent Obenchain does not disclose this element, it would be obvious to combine Obenchain with another reference, such as Kresch '689, Savage, Alden,

Vukovic, or any of the Cutter Insertion References and Motor Driven Cutter References to insert a motor driven cutter into the device.  One of ordinary skill in the art would be well aware of the motor-driver cutters used in surgery with endoscopes, hysteroscopes, and other devices performing surgery in small spaces, and would be motivated to make the use a motor-driven cutter rather than a manual cutter, with predictable results.  Moreover, one of ordinary skill in the art would be further motivated to make the cutter removable, so that a physician could dispose of the cutter after use on a patient and use a new cutter with each patient for hygenic reasons.

485.    Accordingly, the Obenchain patent combined discloses and/or renders obvious this claim element.

### delivering fluid into the uterus through the valve and the second channel to distend the uterus;

486.    Obenchain discloses the delivery of fluid into the uterus through the valve and the second channel to distend the uterus where it discloses that "[i]rrigating fluid can be supplied from the conduit 22 through the outer passage 59 and out the opening 60" and that "[t]he irrigating fluid can serve several functions" in the enclosed operating field such as "to compensate for removed fluid and tissue" in order to keep the operative bodily location (i.e., the uterus) from collapsing.  (*See, e.g.*, Obenchain Figs. 2, 5; 3:17-20, 4:20-23, 4:37-44.)

487.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Obenchain that it also describes this claim element.

488.    To the extent that Obenchain does not anticipate this claim element, it would be obvious to one of ordinary skill in the art to use the invention Obenchain discloses to insert the distal, cutting end of the Obenchain device into the uterus to remove tissue from the uterus in light of other prior art, such as Kresch '689, Savage '673, or Alden, or any of the Uterus

References, and the suggestion in Obenchain that the device disclosed therein could be used in many other procedures.

489.    Accordingly, the Obenchain patent combined discloses and/or renders obvious this claim element.

**energizing an electric motor to drive the cutter to cut the tissue within the uterus; and**

490.    Obenchain discloses a device in which a surgeon can insert a number of surgical devices "well known to those skilled in the art" into a channel of the device, which one of ordinary skill in the art would understand to include motorized surgical tools.  (Obenchain Figs. 3, 4; 3:42-63).

491.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Obenchain that it also describes this claim element.

492.    Moreover, to the extent Obenchain does not disclose this element, it would be obvious to combine Obenchain with another reference, such as Kresch '689, Savage, Alden, Vukovic, or any of the Cutter Insertion References and Motor Driven Cutter References to insert a motor driven cutter into the device.  One of ordinary skill in the art would be well aware of the motor-driver cutters used in surgery with endoscopes, hysteroscopes, and other devices performing surgery in small spaces, and would be motivated to make the use a motor-driven cutter rather than a manual cutter.  Moreover, one of ordinary skill in the art would be further motivated to make the cutter removable, for example so that a physician could dispose of the cutter after use on a patient and use a new cutter with each patient for hygenic reasons.

**aspirating cut tissue and fluid from the uterus and the endoscope through the cutter.**

493.     Under S&N's view of this claim element as being satisfied by the MyoSure Tissue Removal System, Obenchain discloses the aspiration of cut tissue and fluid from the uterus and the endoscope through the cutter where the specification describes that particles of cut tissue and any fluid removed from the operating field are moved down elongated member 12 housing the cutter and out through the conduit 20 into a collecting receptacle.  (*See, e.g.,* Obenchain Figs. 2, 5-6; 4:33-37.)

494.     Obenchain also discloses tissue and fluid being suctioned through port 67 of a shaver 66, through the shaver's hollow interior, and away from the surgical site.  (Figs. 5, 6; 4:27-33.)

495.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Obenchain that it also describes this claim element.

496.     Moreover, the Obenchain patent combined with any one of the Aspiration References would render this claim element obvious, as both sets of devices are intended to remove cut tissue and irrigation fluid from the surgery site, which one of ordinary skill would understand to include at least the uterus.  In addition, to the extent that Obenchain does not describe use in the uterus, it would be obvious to one of ordinary skill in the art to use the invention Obenchain discloses to insert the distal, cutting end of the Obenchain device into the uterus to remove tissue from the uterus in light of other prior art, such as Kresch '689, Savage '673, or Alden, or any of the Uterus References, and the suggestion in Obenchain that the device disclosed therein could be used in many other procedures.

497.    Accordingly, the Obenchain patent describes and/or renders obvious all the elements of claim 1 of the '359 patent.

### b.    The Obenchain Patent Discloses All The Elements Of Claim 3

498.    The Obenchain patent discloses all the elements of Claim 3 of the '359 patent.

> **The method of claim 1, wherein inserting the distal region of the endoscope comprises inserting a distal region of an endoscope that includes a fiber optics bundle permanently affixed to the first channel of the elongated member.**

499.    As described previously, the Obenchain patent discloses all of the elements of claim 1.

500.    The Obenchain device further discloses a device that includes a fiber laser device that is secured within the sleeve.  (Obenchain 2:8-11.)  The laser emitter can be secured in one of the channels of the device.  (Obenchain 2:39-49, 2:62-3:2, 3:17-34, 3:60-66, 4:20-23, 4:45-51.)

501.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe a permanently affixed light guide, then that person would also understand from reading Obenchain that it also describes a permanently affixed light guide.  Indeed, the figures of Obenchain actually depict the light guide, which one of ordinary skill would know can be permanently affixed to the endoscope.  In contrast, there is no depiction at all of a light guide in any of the figures of the '359 patent, the '602 patent, or the Dutch patent.

502.    In addition, the use of a permanently affixed fiber optics bundles was well known in the art, as shown in the Permanently Affixed References.  A person of ordinary skill in the art would be motivated to combine the light guides disclosed in any of the Permanently Affixed

References with the device in the Kresch patent because the devices in these cited references and the device in the Kresch patent both include fiber optics, fiber optics were well known to one of ordinary skill in the art as being useful to illuminate and view surgery sites, and one could simply permanently affix the fiber optics to the Kresch patent for ease of storage, durability, and to seal it from the irrigation fluid infusion channel.  Accordingly, the Kresch patent combined with any one of the Permanently Affixed References would render this claim element obvious.

503.     Accordingly, the Obenchain patent describes and/or renders obvious all the elements of claim 3 of the '359 patent.

### c.      The Obenchain Patent Discloses All The Elements Of Claim 4

504.     The Obenchain patent discloses all the elements of claim 4 of the '359 Patent.

> **The method of claim 1, wherein inserting the distal region of an endoscope comprises inserting a distal region of an endoscope that includes a lens permanently affixed to the first channel of the elongated member.**

505.     As described previously, the Obenchain patent discloses all of the elements of claim 1.

506.     The Obenchain patent also discloses a conduit with a lens at one end and an eyepiece on the other end for viewing a surgery.  (*See* Obenchain Figs. 1, 2, 4, 6; 2:39-49, 2:62-3:2, 3:17-34, 3:60-66, 4:20-23, 4:45-51.)

507.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe a permanently affixed lens, then that person would also understand from reading Obenchain that it also describes a permanently affixed lens.

508.     In addition, the use of permanently affixed lenses was well known in the art, as shown in the Permanently Affixed References.  A person of ordinary skill in the art would be motivated to combine the lenses disclosed in the Permanently Affixed References with the device in the Obenchain patent because the devices in these cited references and the device in the Obenchain patent both include lenses, distal lenses were well known to one of ordinary skill in the art as being useful to view surgery sites, and one could simply permanently affix the lenses to the Obenchain patent for ease of storage, durability, and to seal it from the irrigation fluid infusion channel.  Accordingly, the Obenchain patent combined with any one of the Permanently Affixed References would render this claim element obvious.

509.     Accordingly, the Obenchain patent describes and/or renders obvious all the elements of claim 4 of the '359 patent.

### d.     The Obenchain Patent Discloses All The Elements Of Claim 5

510.     The Obenchain patent discloses all the elements of claim 5 of the '359 Patent.

**A method for removal of tissue from a uterus, comprising:**

511.     As described previously with respect to claim 1, Obenchain discloses this claim element.

**inserting a distal region of an endoscope into the uterus,**

512.     As described previously with respect to claim 1, Obenchain discloses this element.

513.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Obenchain that it also describes this claim element.

**the endoscope including a port for receiving a motor driven cutter and including an elongated member defining discrete first and second channels extending from a proximal region of the elongated member to the distal region,**

514.    The Obenchain patent includes a sleeve with channels for a laser fiber illumination device, for viewing the surgery with a lens at the distal end of the channel and an eyepiece at the proximal end of the channel, for providing irrigation fluid to the surgical site, fluid and tissue removal from the surgical site, and for inserting surgical devices, which one of ordinary skill in the art would understand to include a motor-driven cutter to perform the surgery. (Obenchain Figs. 1-4; 2:39-45, 3:17-20, 3:42-60.)  The proximal end of the channel for the cutter is a port.

515.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Obenchain that it also describes this claim element.

516.    Moreover, to the extent Obenchain does not disclose this element, it would be obvious to combine Obenchain with another reference, such as Kresch '689, Savage, Alden, Vukovic, or any of the Cutter Insertion References and Motor Driven Cutter References to insert a motor driven cutter into the device.  One of ordinary skill in the art would be well aware of the motor-driver cutters used in surgery with endoscopes, hysteroscopes, and other devices performing surgery in small spaces, and would be motivated to make the use a motor-driven cutter rather than a manual cutter.  Moreover, one of ordinary skill in the art would be further motivated to make the cutter removable, so that a physician could dispose of the cutter after use on a patient and use a new cutter with each patient for hygenic reasons.

**the first channel having a light guide permanently affixed therein and the second channel having a straight, central longitudinal axis extending from the port to an opening at a distal tip of the endoscope, followed by:**

517.    As discussed above with respect to claim 1, Obenchain discloses this element. The Obenchain device includes conduits for irrigation fluid and aspirated fluid and cut tissue, for viewing the surgery site, for including illuminating fibers, and for inserting a cutting tool.  All of these conduits have parallel axes and are parallel to the central axis.  To the extent this element is not directly disclosed, the combination of Obenchain and Banko would render this claim obvious.  (*See* Obenchain Figs. 1, 2, 4, 6; 2:39-49, 2:62-3:2, 3:17-34, 3:60-66, 4:20-23, 4:45-51.)

518.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Obenchain that it also describes this claim element.

519.    Moreover, to the extent the Obenchain patent does not disclose this element, the Obenchain patent in combination with numerous other prior art references would render this element obvious.  The use of permanently affixed light guides, fiber optics bundles, and telescopes was well known in the art, as shown in the Permanently Affixed References and other patents such as Banko.  A person of ordinary skill in the art would be motivated to combine the light guides disclosed in any of the Permanently Affixed References with the device in the Obenchain patent because the devices in these cited references and the device in the Obenchain patent because fiber optics were well known to one of ordinary skill in the art as being useful to illuminate and view surgery sites and one could simply leave the laser fiber affixed to the Obenchain patent for ease of storage.  Accordingly, the Obenchain patent combined with any one of the Permanently Affixed References and other patents, such as Banko, would render this claim element obvious.

**inserting the motor driven cutter for cutting and detaching tissue into the second channel through the port;**

520.     The Obenchain patent discloses a sleeve with a channel for inserting a surgical device, such as a shaver or rotating surgical tools, which could include a motor-driven cutter. (*See* Obenchain Figs. 3-4; 3:42-60.)

521.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Obenchain that it also describes this claim element.

522.     To the extent the Obenchain patent does not include this limitation, it would be obvious to one of ordinary skill in the art that the devices that can be inserted into the sleeve of the Obenchain device could include motor-driven cutters, as such cutters were prevalent in the art.  (*See, for example*, Banko, Alden, Kresch '689, Savage '673.)   Moreover, to the extent Obenchain does not disclose this element, it would be obvious to combine Obenchain with any of the Cutter Insertion References and Motor Driven Cutter References to insert a motor driven cutter into the device.   One of ordinary skill in the art would be well aware of the motor-driver cutters used in surgery with endoscopes, hysteroscopes, and other devices performing surgery in small spaces, and would be motivated to make the use a motor-driven cutter rather than a manual cutter.   Moreover, one of ordinary skill in the art would be further motivated to make the cutter removable, for example so that a physician could dispose of the cutter after use on a patient and use a new cutter with each patient for hygenic reasons.

**introducing fluid into the uterus; and**

523.     Obenchain discloses the introduction of fluid to the surgical site through a conduit and valves.  (*See* Obenchain Figs. 2, 5; 3:17-20, 4:20-23.)

524.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Obenchain that it also describes this claim element.

> **aspirating fluid with detached tissue from the uterus through a lumen of the cutter.**

525.    Under S&N's view of this claim element as being satisfied by the MyoSure Tissue Removal System, Obenchain discloses a surgical device through which cut tissue and fluid are aspirated from the surgical site through the lumen of a hollow shaver or other surgical device.  (*See* Obenchain 4:34:42.)  Obenchain discloses a shaver 66 with a port 67 and hollow interior through which cut tissue and fluid can be suctioned from the surgical site.  (*See* Obenchain Figs. 5-6; 4:27-33.)

526.    If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe this claim element, then that person would also understand from reading Obenchain that it also describes this claim element.

527.    Moreover, the Obenchain patent combined with any one of the Aspiration References would render this claim element obvious, as both sets of devices are intended to remove cut tissue and irrigation fluid from the surgery site.

528.    Accordingly, the Obenchain patent describes and/or renders obvious all the elements of claim 5 of the '359 patent.

> **e.      The Obenchain Patent Discloses All The Elements Of Claim 7**

529.    The Obenchain patent discloses all the elements of claim 7 of the '359 patent.

> **The method of claim 5, wherein inserting the distal region of the endoscope comprises inserting a distal region of an**

> **endoscope that includes a fiber optics bundle permanently affixed to the first channel of the elongated member.**

530.     As described previously with respect to claims 3 and 5, the Obenchain patent discloses all of the elements of claim 7.

531.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe a permanently affixed lens, then that person would also understand from reading Obenchain that it also describes a permanently affixed lens.

### f.     The Obenchain Patent Discloses All The Elements Of Claim 8

532.     The Obenchain patent discloses all the elements of claim 8 of the '359 patent.

533.     If a person of ordinary skill in the art reviewing the '359 patent, the '602 patent, or the Dutch patent would understand those patents to describe a permanently affixed lens, then that person would also understand from reading Obenchain that it also describes a permanently affixed lens.

> **The method of claim 5, wherein inserting the distal region of an endoscope comprises inserting a distal region of an endoscope that includes a lens permanently affixed to the first channel of the elongated member.**

534.     As described previously with respect to claims 4 and 5, the Obenchain patent discloses all of the elements of claim 8.

### 5.     Banko in Light of Alden Renders Claims 1-8 of the '359 Patent Obvious

535.     As described previously, it is my opinion that Banko discloses each element of the Asserted Claims.  To the extent Banko does not anticipate the Asserted Claims, Banko in combination with Alden renders the Asserted Claims obvious.

536.     Alden explicitly teaches the use of a surgical device in the uterus of a patient. (Alden Fig. 3; 6:12-20.)

537.     Alden  explicitly teaches the use of a valve to control irrigation fluid into the surgical site.  (Alden Fig. 3; 6:12-20.)

538.     Alden explicitly teaches the insertion and removal of the motor driven cutter, for example to replace the cutting blades to extend the probe's life.  (Alden Figs. 1-3; 5:26-49.) Alden also teaches a cutting element that is motor-driven and includes an inner tube rotating with respect to an outer tube to cut tissue.  (Alden Figs. 4, 5; 3:7-12, 6:66-7:33.)

539.     The Banko patent discloses, among other things, (1) permanently affixed fiber optic illumination sources and mechanisms for illuminating and viewing the surgical site (Banko Figs. 11, 12; 5:38-56), (2) use of a motor-driven cutter (Banko 2:34-41), (3) a cutting window in an outer tube that admits tissue into the outer tube, which is then cut by the rotating cutter within the outer tube (Banko Figs. 2-7; 4:13-32), (4) conduit for directing irrigating fluid to the surgical site that is sealed from the channels with the cutter and the optical devices (Banko Fig. 2; 4:37-59), (5) use of a valve to introduce irrigating fluid into the system (Banko 4:53-59), and (6) aspiration of cut tissue and fluid away from the surgical site through the central passage of the device where the cutter is located (Banko Figs. 2, 9-12; 4:33-36).

540.     It would be obvious to one of ordinary skill in the art to combine the teachings of

Alden and Banko.  Both devices are used in the general field of performing surgery in small

spaces by inserting an endoscopic device into the small space.  One of ordinary skill would be

motivated to combine the teachings of Alden and Banko for several reasons.  These include

extending the lifetime of the probe by allowing replacement of the cutting member and

improving hygiene by making it easy to remove and clean or replace the cutting element after

each use.  Moreover, Alden and Banko both suggest use in several different locations of the

body, and Alden explicitly teaches use in the uterus.

541.     In addition, one of ordinary skill in the art would be motivated to seal the

irrigation fluid from the viewing scope and light guide to avoid corrosion of the viewing scope

and light guide and to generally extend the life of the viewing scope and light guide.

542.     Accordingly, it is my opinion that to the extent Banko does not anticipate the '359

patent, Banko in combination with Alden renders the Asserted Claims obvious.

### 6.      Alden in Light of the Olympus Scope Renders Claims 1-8 of the '359 Patent Obvious

543.     It is my opinion that Alden in light of the Olympus Scope renders the Asserted

Claims obvious.

544.     The disclosure in Alden includes (1) removal of tissue from a uterus (Alden Fig.

3; 6:12-20); (2) insertion of the distal end of the Alden device into the uterus (Alden Fig. 3; 6:12-

20); (3) a valve for controlling irrigation fluid into the surgical site (5:24-25); (4) channels for the

flow of irrigation fluid to the surgical site and viewing the surgery with a fiber optic scope

(Alden Figs. 1-3; 4:41-61, 55:5-12, 6:12-20); and (5) the insertion of a motor-driven cutter with

inner and outer tubes and a cutting window admits tissue to be cut into the outer and inner tubes,

and that is cut when the inner tube rotates with respect to the outer tube, with a lumen in the center of the inner tube through which cut tissue and fluid is aspirated from the surgical site (Alden Figs. 4, 5; 3:1-17, 5:26-33, 5:41-49, 6:66-7:33).

545.    The Olympus Scope discloses that the light guide and mechanism for viewing the surgical site (such as a telescope) can be permanently affixed to the scope and sealed from the channel delivering the irrigation fluid to the uterus.  The Olympus Scope further discloses that a cutting element can be inserted and removed from the device in a channel separate from the one in which the light guide and the viewing mechanism are located.

546.    It would be obvious to one of ordinary skill in the art to combine the teachings of Alden and the Olympus Scope.  The Alden invention and the Olympus Scope suggest the permanent securing of the viewing scope to the Alden device, and one of ordinary skill in the art might be motivated to permanently secure the scope or a light guide to the Alden device to minimize the number of separate parts that would need to be carried with the scope, and to avoid possible damage to the light guide and viewing scope from repeated insertions and removals. Similarly, one of ordinary skill in the art would be motivated to seal the irrigation fluid from the viewing scope and light guide to avoid corrosion of the viewing scope and light guide and to generally extend the life of the viewing scope and light guide.

547.    Accordingly, it is my opinion that Alden in combination with the Olympus Scope renders the Asserted Claims obvious.

### 7.      Alden in Light of Vukovic Renders Claims 1-8 of the '359 Patent Obvious

548.    As noted previously, Alden discloses includes (1) removal of tissue from a uterus (Alden Fig. 3; 6:12-20); (2) insertion of the distal end of the Alden device into the uterus (Alden

Fig. 3; 6:12-20); (3) a valve for controlling irrigation fluid into the surgical site (5:24-25); (4)

channels for the flow of irrigation fluid to the surgical site and viewing the surgery with a fiber

optic scope (Alden Figs. 1-3; 4:41-61, 55:5-12, 6:12-20); and (5) the insertion of a motor-driven

cutter with inner and outer tubes and a cutting window admits tissue to be cut into the outer and

inner tubes, and that is cut when the inner tube rotates with respect to the outer tube, with a

lumen in the center of the inner tube through which cut tissue and fluid is aspirated from the

surgical site (Alden Figs. 4, 5; 3:1-17, 5:26-33, 5:41-49, 6:66-7:33).

549.    Vukovic discloses a surgical arthroscope that includes an elongated operative end

encased in a sheath that includes (1) a fiber optic channel for illuminating the surgical site that is

sealed from a separate channel that delivers irrigation fluid to the surgical site (Vukovic Figs. 3,

4; 1:30-36, 3:31-57); (2) a permanently affixed lens system for viewing the surgical site that is

also sealed from the irrigation fluid channel (Vukovic Figs. 2-4; 1:30-36, 3:20-30); a sealed

irrigation channel 38 that receives fluid through a valve 34 (Vukovic Figs. 1-4; 3:6-19), and a

sealed channel in which to insert devices for performing the cutting during the surgery (Vukovic

Figs. 1, 3; 3:34-57.)

550.    It would be obvious for one of ordinary skill to combine the Alden and Vukovic

disclosures.  Both devices are used in the general field of performing surgery in small spaces by

inserting an endoscopic device into the small space.  Vukovic teaches and Alden suggests the

permanent securing of the viewing scope to an endoscopic device, and one of ordinary skill in

the art might be motivated to permanently secure the scope or a light guide to the Alden device

to minimize the number of separate parts that would need to be carried with the scope, and to

avoid possible damage to the light guide and viewing scope from repeated insertions and

removals.  Similarly, one of ordinary skill in the art would be motivated to seal the irrigation

fluid from the viewing scope and light guide to avoid corrosion of the viewing scope and light guide and to generally extend the life of the viewing scope and light guide.  One of ordinary skill would be motivated to insert the cutting element of Alden into the Vukovic device, as Vukovic suggests the use of different types of surgical implements and Alden discloses a removable cutter using concentric, rotating, motor-driven tubes that can be fit inside a sheath.  The reasons one of ordinary skill in the art might include the cutter of Alden in the Vukovic device include extending the lifetime of the probe by allowing replacement of the cutting member and improving hygiene by making it easy to remove and clean or replace the cutting element after each use.

551.    Accordingly, it is my opinion that Alden in combination with Vukovic renders the Asserted Claims obvious.

**8.    Alden in Light of Grossi Renders Claims 1-8 of the '359 Patent Obvious**

552.    As noted previously, Alden discloses includes (1) removal of tissue from a uterus (Alden Fig. 3; 6:12-20); (2) insertion of the distal end of the Alden device into the uterus (Alden Fig. 3; 6:12-20); (3) a valve for controlling irrigation fluid into the surgical site (5:24-25); (4) channels for the flow of irrigation fluid to the surgical site and viewing the surgery with a fiber optic scope (Alden Figs. 1-3; 4:41-61, 55:5-12, 6:12-20); and (5) the insertion of a motor-driven cutter with inner and outer tubes and a cutting window that admits tissue to be cut into the outer and inner tubes, and that is cut when the inner tube rotates with respect to the outer tube, with a lumen in the center of the inner tube through which cut tissue and fluid is aspirated from the surgical site (Alden Figs. 4, 5; 3:1-17, 5:26-33, 5:41-49, 6:66-7:33).

553.    Grossi discloses (1) an outer sheath with separate channels for delivery of irrigation fluid to a surgery site and a telescope for viewing the surgery site (Grossi 2:33-41, 3:25-37); (2) continuous flow of irrigation fluid to and from the surgery site (Grossi 2:10-12, 4:8-16); (3) a valve for supplying irrigation fluid to the surgery site (Grossi Fig. 2; 6:25-34); (4) a working channel for inserting a surgical device that is separate from the irrigation fluid delivery channel (Grossi Figs. 9, 16; 7:55-66, 8:50-61); and (5) insertion of the surgical device into a working channel of the sheath (Grossi Figs. 9, 16; 7:55-66, 8:50-61).

554.    One of ordinary skill in the art would be motivated to combine the teachings of Alden and Grossi in a manner that included all of the elements of the '359 patent, making that patent obvious.  Both devices are used in the general field of performing surgery in small spaces by inserting an endoscopic device into the small space.  One of ordinary skill in the art would be motivated to modify the Alden device to separate and seal the irrigation fluid inflow and outflow channels from the channel containing the telescope, as suggested by Grossi, to prevent corrosion of the telescope and to maximize the cross-section of the fluid delivery channels.

555.    Accordingly, it is my opinion that Alden in combination with Grossi renders the Asserted Claims obvious.

### 9.    The Combination of Banko and Kresch Renders Claims 1-8 of the '359 Patent Obvious

556.    As described previously, it is my opinion that both the Kresch and Banko patents anticipate the '359 patent.  To the extent that Kresch and Banko do not anticipate the '359 patent, the combination of Kresch and Banko render the Asserted Claims of the '359 patent obvious.

557.    The Banko patent discloses, among other things, (1) permanently affixed fiber optic illumination sources and mechanisms for illuminating and viewing the surgical site (Banko

Figs. 11, 12; 5:38-56), (2) use of a motor-driven cutter (Banko 2:34-41), (3) a cutting window in an outer tube that admits tissue into the outer tube, which is then cut by the rotating cutter within the outer tube (Banko Figs. 2-7; 4:13-32), (4) conduit for directing irrigating fluid to the surgical site that is sealed from the channels with the cutter and the optical devices (Banko Fig. 2; 4:37-59), (5) use of a valve to introduce irrigating fluid into the system (Banko 4:53-59), and (6) aspiration of cut tissue and fluid away from the surgical site through the central passage of the device where the cutter is located (Banko Figs. 2, 9-12; 4:33-36).

558.    The Kresch patent discloses, among other elements, (1) removal of tissue from a uterus (Kresch Figs. 3A-C, 4; 6:3-10); (2) a sheath with channels for a cutter and an optical fiber for illuminating or viewing the surgical site (Kresch Fig. 8; 7:7-17); (3) delivery of irrigation fluid to the site of surgery through an irrigation lumen 62 (Kresch Fig. 1A, 5:39-47); (4) a motor-driven cutter within the outer sheath, with a cutting window in the outer sheath, where cutting occurs when tissue is exposed to the cutter through the cutting window and the cutter rotates (Kresch Figs. 1A, 1B, 2A, 2B, 5; 5:26-30, 6:11-25), (5) insertion and removal of the cutter (*see, e.g.,* Kresch 1B, 2A, 3B, 5, 6, 8; 2:32-35, 6:3-10, 6:32-37, 7:7-17) and (6) aspiration of cut tissue and fluid through the lumen of the cutter (Kresch Figs. 2A, 5; 5:48-57, 6:26-31).

559.    It would be obvious to one of ordinary skill in the art to combine the teachings of Kresch and Banko to perform the method of the '359 patent for a number of reasons.  Both devices are used in the general field of performing surgery in small spaces by inserting an endoscopic device into the small space.  One of ordinary skill in the art performing the method would want to permanently affix the optical elements to the device and seal them from the irrigation fluid as Banko teaches, to minimize the number of separate parts to the device, to prevent corrosion of the optical elements, and to ensure a clear view of the optical elements.  In

addition, one of ordinary skill in the art would want to be able to remove the cutter from the device as Kresch teaches, to clean it or replace it after each use for hygenic purposes.  In addition, Kresch teaches the applicability of devices like Banko in the uterus.

560.    Accordingly, it is my opinion that to the extent Banko and Kresch do not individually anticipate the '359 patent, Banko in combination with Kresch renders the Asserted Claims obvious.

### 10.    The Combination of Banko and Savage Renders Claims 1-8 of the '359 Patent Obvious

561.    As described previously, it is my opinion that both the Banko and Savage patents anticipate the '359 patent.  To the extent that Banko and Savage do not anticipate the '359 patent, the combination of Banko and Savage render the Asserted Claims of the '359 patent obvious.

562.    The Banko patent discloses, among other things, (1) permanently affixed fiber optic illumination sources and mechanisms for illuminating and viewing the surgical site (Banko Figs. 11, 12; 5:38-56), (2) use of a motor-driven cutter (Banko 2:34-41), (3) a cutting window in an outer tube that admits tissue into the outer tube, which is then cut by the rotating cutter within the outer tube (Banko Figs. 2-7; 4:13-32), (4) conduit for directing irrigating fluid to the surgical site that is sealed from the channels with the cutter and the optical devices (Banko Fig. 2; 4:37-59), (5) use of a valve to introduce irrigating fluid into the system (Banko 4:53-59), and (6) aspiration of cut tissue and fluid away from the surgical site through the central passage of the device where the cutter is located (Banko Figs. 2, 9-12; 4:33-36).

563.    The Savage patent discloses, among other things, (1) the use of a surgical cutting device in the uterus (*See e.g.*, Savage 1:23-25; 29:30 (claiming "[a] method for resecting tissue

from the uterus"); 32:4, 32:25 (claiming "[a] method for extracting tissue from a uterus")); (2) use of a valve to introduce irrigation fluid into the surgery site (Savage 20:45-46); (3) a sheath with channels for a rotating cutter and a fiber for illuminating and viewing the surgery site (Savage Figs. 1A, 1B, 8; 11:62-64, ); a channel for infusing irrigation fluid into the surgery site (Savage Fig. 1A; 11:65-12:6, 13:33-43); (4) a motor-driven cutter within the outer sheath, with a cutting window in the outer sheath, where cutting occurs when tissue is exposed to the cutter through the cutting window and the cutter rotates (Savage Figs. 1A, 1B, 2A, 2B, 5; 11:37-40, 13:33-51), (5) insertion and removal of the cutter (*see, e.g.,* Savage 1B, 2A, 3B, 5, 6, 8; 4:1-4, 12:30-45, 13:16-27) and (6) aspiration of cut tissue and fluid through the lumen of the cutter (Savage Figs. 2A, 5; 2:47-52, 5:10-16, 12:53-58).

564.    It would be obvious to one of ordinary skill in the art to combine the teachings of Banko and Savage to perform the method of the '359 patent for a number of reasons.  Both devices are used in the general field of performing surgery in small spaces by inserting an endoscopic device into the small space.  One of ordinary skill in the art performing the method would want to permanently affix the optical elements to the device and seal them from the irrigation fluid as Banko teaches, to minimize the number of separate parts to the device, to prevent corrosion of the optical elements, and to ensure a clear view of the optical elements.  In addition, one of ordinary skill in the art would want to be able to remove the cutter from the device as Savage teaches, to clean it or replace it after each use for hygenic purposes.  In addition, Savage teaches the applicability of devices like Banko in the uterus.

565.    Accordingly, it is my opinion that to the extent Banko does not anticipate the '359 patent, Banko in combination with Savage renders the Asserted Claims obvious.

## 11.     The Combination of Banko and Grossi Renders Claims
### 1-8 of the '359 Patent Obvious

566.     As described previously, it is my opinion that both the Banko and Savage patents anticipate the '359 patent.  To the extent that Banko and Grossi do not anticipate the '359 patent, the combination of Banko and Grossi render the Asserted Claims of the '359 patent obvious.

567.     The Banko patent discloses, among other things, (1) permanently affixed fiber optic illumination sources and mechanisms for illuminating and viewing the surgical site (Banko Figs. 11, 12; 5:38-56), (2) use of a motor-driven cutter (Banko 2:34-41), (3) a cutting window in an outer tube that admits tissue into the outer tube, which is then cut by the rotating cutter within the outer tube (Banko Figs. 2-7; 4:13-32), (4) conduit for directing irrigating fluid to the surgical site that is sealed from the channels with the cutter and the optical devices (Banko Fig. 2; 4:37-59), (5) use of a valve to introduce irrigating fluid into the system (Banko 4:53-59), and (6) aspiration of cut tissue and fluid away from the surgical site through the central passage of the device where the cutter is located (Banko Figs. 2, 9-12; 4:33-36).

568.     The Grossi patent discloses, among other things, (1) an outer sheath with separate channels for delivery of irrigation fluid to a surgery site and a telescope for viewing the surgery site (Grossi 2:33-41, 3:25-37); (2) continuous flow of irrigation fluid to and from the surgery site (Grossi 2:10-12, 4:8-16); (3) a valve for supplying irrigation fluid to the surgery site (Grossi Fig. 2; 6:25-34); (4) a working channel for inserting a surgical device that is separate from the irrigation fluid delivery channel (Grossi Figs. 9, 16; 7:55-66, 8:50-61); (5) insertion of the surgical device into a working channel of the sheath (Grossi Figs. 9, 16; 7:55-66, 8:50-61), and (6) use of the device in the uterus (Grossi 2:10-12).

569.     It would be obvious to one of ordinary skill in the art to combine the teachings of Banko and Grossi to perform the method of the '359 patent for a number of reasons.  Both devices are used in the general field of performing surgery in small spaces by inserting an endoscopic device into the small space.  One of ordinary skill in the art performing the method would want to permanently affix the optical elements to the device and seal them from the irrigation fluid as Banko teaches, to minimize the number of separate parts to the device, to prevent corrosion of the optical elements, and to ensure that the optical elements have a clear view of the surgical site.  In addition, one of ordinary skill in the art would want to be able to remove the cutter from the device as Grossi teaches, to clean it or replace it after each use for hygenic purposes.  In addition, Grossi teaches the applicability of devices like Banko in the uterus.

570.     I note that in response to a rejection by the Patent Office based on Grossi, the patentee distinguished Grossi on the sole grounds that it did not include a permanently affixed light guide.  (*See* Amendment in Reply to Office Action of July 26, 2010 at 9.)  Banko explicitly teaches a permanently affixed light guide (permanently affixed using an adhesive such as epoxy).  (*See* Banko Figs. 11, 12; 5:10-25, 5:38-56).

571.     Accordingly, it is my opinion that to the extent Banko and Savage do not independently anticipate the '359 patent, Banko in combination with Savage renders the Asserted Claims obvious.

**12.   The Combination of Kresch and Vukovic Renders**
**Claims 1-8 of the '359 Patent Obvious**

572.   As described previously, it is my opinion that the Kresch patent anticipates the

'359 patent.  To the extent that Kresch does not anticipate the '359 patent, the combination of

Kresch and Vukovic render the Asserted Claims of the '359 patent obvious.

573.   The Kresch patent discloses, among other elements, (1) removal of tissue from a

uterus (Kresch Figs. 3A-C, 4; 6:3-10); (2) a sheath with channels for a cutter and an optical fiber

for illuminating or viewing the surgical site (Kresch Fig. 8; 7:7-17); (3) delivery of irrigation

fluid to the site of surgery through an irrigation lumen 62 (Kresch Fig. 1A, 5:39-47); (4) a motor-

driven cutter within the outer sheath, with a cutting window in the outer sheath, where cutting

occurs when tissue is exposed to the cutter through the cutting window and the cutter rotates

(Kresch Figs. 1A, 1B, 2A, 2B, 5; 5:26-30, 6:11-25), (5) insertion and removal of the cutter (*see,*

*e.g.,* Kresch 1B, 2A, 3B, 5, 6, 8; 2:32-35, 6:3-10, 6:32-37, 7:7-17) and (6) aspiration of cut tissue

and fluid through the lumen of the cutter (Kresch Figs. 2A, 5; 5:48-57, 6:26-31).

574.   The Vukovic patent discloses, among other things, a surgical arthroscope that

includes an elongated operative end encased in a sheath that includes (1) a fiber optic channel for

illuminating the surgical site that is sealed from a separate channel that delivers irrigation fluid to

the surgical site (Vukovic Figs. 3, 4; 1:30-36, 3:31-57); (2) a permanently affixed lens system for

viewing the surgical site that is also sealed from the irrigation fluid channel (Vukovic Figs. 2-4;

1:30-36, 3:20-30); (3) a sealed irrigation channel 38 that receives fluid through a valve 34

(Vukovic Figs. 1-4; 3:6-19), (4) a sealed channel in which to insert devices for performing the

cutting during the surgery (Vukovic Figs. 1, 3; 3:34-57); (5) and the insertion of a cutter or

surgical implement, such as a drill or saw, in a sealed channel to perform the surgery (Vukovic

Fig. 1; 2:9-11, 3:66-4:5).

575.    It would be obvious to one of ordinary skill in the art to combine the teachings of Kresch and Vukovic to perform the method of the '359 patent for a number of reasons.  Both devices are used in the general field of performing surgery in small spaces by inserting an endoscopic device into the small space.  One of ordinary skill in the art performing the method would want to permanently affix the optical elements to the device and seal them from the irrigation fluid as Vukovic teaches, to minimize the number of separate parts to the device, to prevent corrosion of the optical elements, and to ensure that the optical elements have a clear view of the surgical site.  In addition, one of ordinary skill in the art would want to be able to remove the cutter from the device as Kresch and Vukovic teach, to clean it or replace it after each use for hygenic purposes.  One of ordinary skill in the art would include the valve of Vukovic  in the Kresch device to control the ingress of irrigation fluid to the surgical site.  In addition, Kresch teaches the applicability of devices like Vukovic in the uterus and the applicability of motor-driven cutters with the Vukovic device that have an outer and inner tube, a cutting window to admit tissue to be cut by the rotating inner tube, and that aspirate the cut tissue through a lumen of the cutter.

576.    Accordingly, it is my opinion that to the extent Kresch does not anticipate the '359 patent, Kresch in combination with Vukovic renders the Asserted Claims obvious.

### 13.    The Combination of Savage and Vukovic Renders Claims 1-8 of the '359 Patent Obvious

577.    As described previously, it is my opinion that the Savage patent anticipates the '359 patent.  To the extent that Savage does not anticipate the '359 patent, the combination of Savage and Vukovic render the Asserted Claims of the '359 patent obvious.

578.    The Savage patent discloses, among other things, (1) the use of a surgical cutting device in the uterus (*See e.g.*, Savage 1:23-25; 29:30 (claiming "[a] method for resecting tissue from the uterus"); 32:4, 32:25 (claiming "[a] method for extracting tissue from a uterus")); (2) use of a valve to introduce irrigation fluid into the surgery site (Savage 20:45-46); (3) a sheath with channels for a rotating cutter and a fiber for illuminating and viewing the surgery site (Savage Figs. 1A, 1B, 8; 11:62-64, ); a channel for infusing irrigation fluid into the surgery site (Savage Fig. 1A; 11:65-12:6, 13:33-43); (4) a motor-driven cutter within the outer sheath, with a cutting window in the outer sheath, where cutting occurs when tissue is exposed to the cutter through the cutting window and the cutter rotates (Savage Figs. 1A, 1B, 2A, 2B, 5; 11:37-40, 13:33-51), (5) insertion and removal of the cutter (*see, e.g.,* Savage 1B, 2A, 3B, 5, 6, 8; 4:1-4, 12:30-45, 13:16-27) and (6) aspiration of cut tissue and fluid through the lumen of the cutter (Savage Figs. 2A, 5; 2:47-52, 5:10-16, 12:53-58).

579.    The Vukovic patent discloses, among other things, a surgical arthroscope that includes an elongated operative end encased in a sheath that includes (1) a fiber optic channel for illuminating the surgical site that is sealed from a separate channel that delivers irrigation fluid to the surgical site (Vukovic Figs. 3, 4; 1:30-36, 3:31-57); (2) a permanently affixed lens system for viewing the surgical site that is also sealed from the irrigation fluid channel (Vukovic Figs. 2-4; 1:30-36, 3:20-30); (3) a sealed irrigation channel 38 that receives fluid through a valve 34 (Vukovic Figs. 1-4; 3:6-19), (4) a sealed channel in which to insert devices for performing the cutting during the surgery (Vukovic Figs. 1, 3; 3:34-57); (5) and the insertion of a cutter or surgical implement, such as a drill or saw, in a sealed channel to perform the surgery (Vukovic Fig. 1; 2:9-11, 3:66-4:5).

580.     It would be obvious to one of ordinary skill in the art to combine the teachings of Savage and Vukovic to perform the method of the '359 patent for a number of reasons.  Both devices are used in the general field of performing surgery in small spaces by inserting an endoscopic device into the small space.  One of ordinary skill in the art performing the method would want to permanently affix the optical elements to the device and seal them from the irrigation fluid as Vukovic teaches, to minimize the number of separate parts to the device, to prevent corrosion of the optical elements, and to ensure that the optical elements have a clear view of the surgical site.  In addition, one of ordinary skill in the art would want to be able to remove the cutter from the device as Savage and Vukovic teach, to clean it or replace it after each use for hygenic purposes.  In addition, Savage teaches the applicability of devices like Vukovic in the uterus, and the applicability of motor-driven cutters with the Vukovic device that have an outer and inner tube, a cutting window to admit tissue to be cut by the rotating inner tube, and that aspirate the cut tissue through a lumen of the cutter.

581.     Accordingly, it is my opinion that to the extent Savage does not anticipate the '359 patent, Savage in combination with Vukovic renders the Asserted Claims obvious.

### 14.     The Combination of Kresch and the Olympus Scope Renders Claims 1-8 of the '359 Patent Obvious

582.     As described previously, it is my opinion that the Kresch patent anticipates the '359 patent.  To the extent that Kresch does not anticipate the '359 patent, the combination of Kresch and the Olympus Scope render the Asserted Claims of the '359 patent obvious.

583.     The Kresch patent discloses, among other elements, (1) removal of tissue from a uterus (Kresch Figs. 3A-C, 4; 6:3-10); (2) a sheath with channels for a cutter and an optical fiber for illuminating or viewing the surgical site (Kresch Fig. 8; 7:7-17); (3) delivery of irrigation

fluid to the site of surgery through an irrigation lumen 62 (Kresch Fig. 1A, 5:39-47); (4) a motor-driven cutter within the outer sheath, with a cutting window in the outer sheath, where cutting occurs when tissue is exposed to the cutter through the cutting window and the cutter rotates (Kresch Figs. 1A, 1B, 2A, 2B, 5; 5:26-30, 6:11-25), (5) insertion and removal of the cutter (*see, e.g.,* Kresch 1B, 2A, 3B, 5, 6, 8; 2:32-35, 6:3-10, 6:32-37, 7:7-17) and (6) aspiration of cut tissue and fluid through the lumen of the cutter (Kresch Figs. 2A, 5; 5:48-57, 6:26-31).

584.  The Olympus Scope discloses that the light guide and mechanism for viewing the surgical site (such as a telescope) can be permanently affixed to the scope and sealed from the channel delivering the irrigation fluid to the uterus.  The Olympus Scope further discloses that a cutting element can be inserted and removed from the device in a channel separate from the one in which the light guide and the viewing mechanism are located.

585.  It would be obvious to one of ordinary skill in the art to combine the teachings of Kresch and the Olympus Scope to perform the method of the '359 patent for a number of reasons.  Both devices are used in the general field of performing surgery in small spaces by inserting an endoscopic device into the small space.  One of ordinary skill in the art performing the method would want to permanently affix the optical elements to the device and seal them from the irrigation fluid as the Olympus Scope teaches, to minimize the number of separate parts to the device, to prevent corrosion of the optical elements, and to ensure that the optical elements have a clear view of the surgical site.  In addition, one of ordinary skill in the art would want to be able to remove the cutter from the device as Kresch and the Olympus Scope teach, to clean it or replace it after each use for hygenic purposes.  In addition, Kresch teaches the applicability of devices like the Olympus Scope in the uterus, and the applicability of motor-driven cutters with

the Olympus Scope device that have an outer and inner tube, a cutting window to admit tissue to be cut by the rotating inner tube, and that aspirate the cut tissue through a lumen of the cutter.

586.     Accordingly, it is my opinion that to the extent Kresch does not anticipate the '359 patent, Kresch in combination with the Olympus Scope renders the Asserted Claims obvious.

### 15.     The Combination of Savage and the Olympus Scope Renders Claims 1-8 of the '359 Patent Obvious

587.     As described previously, it is my opinion that the Savage patent anticipates the '359 patent.  To the extent that Savage does not anticipate the '359 patent, the combination of Savage and the Olympus Scope render the Asserted Claims of the '359 patent obvious.

588.     The Savage patent discloses, among other things, (1) the use of a surgical cutting device in the uterus (*See e.g.*, Savage 1:23-25; 29:30 (claiming "[a] method for resecting tissue from the uterus")); 32:4, 32:25 (claiming "[a] method for extracting tissue from a uterus")); (2) use of a valve to introduce irrigation fluid into the surgery site (Savage 20:45-46); (3) a sheath with channels for a rotating cutter and a fiber for illuminating and viewing the surgery site (Savage Figs. 1A, 1B, 8; 11:62-64, ); a channel for infusing irrigation fluid into the surgery site (Savage Fig. 1A; 11:65-12:6, 13:33-43); (4) a motor-driven cutter within the outer sheath, with a cutting window in the outer sheath, where cutting occurs when tissue is exposed to the cutter through the cutting window and the cutter rotates (Savage Figs. 1A, 1B, 2A, 2B, 5; 11:37-40, 13:33-51), (5) insertion and removal of the cutter (*see, e.g.,* Savage 1B, 2A, 3B, 5, 6, 8; 4:1-4, 12:30-45, 13:16-27) and (6) aspiration of cut tissue and fluid through the lumen of the cutter (Savage Figs. 2A, 5; 2:47-52, 5:10-16, 12:53-58).

589.    The Olympus Scope discloses that the light guide and mechanism for viewing the surgical site (such as a telescope) can be permanently affixed to the scope and sealed from the channel delivering the irrigation fluid to the uterus.  The Olympus Scope further discloses that a cutting element can be inserted and removed from the device in a channel separate from the one in which the light guide and the viewing mechanism are located.

590.    It would be obvious to one of ordinary skill in the art to combine the teachings of Savage and the Olympus Scope to perform the method of the '359 patent for a number of reasons.  Both devices are used in the general field of performing surgery in small spaces by inserting an endoscopic device into the small space.  One of ordinary skill in the art performing the method would want to permanently affix the optical elements to the device and seal them from the irrigation fluid as the Olympus Scope teaches, to minimize the number of separate parts to the device, to prevent corrosion of the optical elements, and to ensure that the optical elements have a clear view of the surgical site.  In addition, one of ordinary skill in the art would want to be able to remove the cutter from the device as Savage and the Olympus Scope teach, to clean it or replace it after each use for hygenic purposes.  In addition, Savage teaches the applicability of devices like the Olympus Scope in the uterus, and the applicability of motor-driven cutters with the Olympus Scope device that have an outer and inner tube, a cutting window to admit tissue to be cut by the rotating inner tube, and that aspirate the cut tissue through a lumen of the cutter.

591.    Accordingly, it is my opinion that to the extent Savage does not anticipate the '359 patent, Savage in combination with the Olympus Scope renders the Asserted Claims obvious.

### 16.   The Combination of Grossi and Grinberg Renders Claims 1-8 of the '359 Patent Obvious

592.     It is my opinion that the combination of Grossi and Grinberg render the Asserted Claims of the '359 patent obvious.

593.     The Grossi patent discloses, among other things, (1) an outer sheath with separate channels for delivery of irrigation fluid to a surgery site and a telescope for viewing the surgery site (Grossi 2:33-41, 3:25-37); (2) continuous flow of irrigation fluid to and from the surgery site (Grossi 2:10-12, 4:8-16); (3) a valve for supplying irrigation fluid to the surgery site (Grossi Fig. 2; 6:25-34); (4) a working channel for inserting a surgical device that is separate from the irrigation fluid delivery channel (Grossi Figs. 9, 16; 7:55-66, 8:50-61); (5) insertion of the surgical device into a working channel of the sheath (Grossi Figs. 9, 16; 7:55-66, 8:50-61), and (6) use of the device in the uterus (Grossi 2:10-12).

594.     The Grinberg patent discloses, among other things, (1) a cutter comprised of an inner tube within an outer tube, where the inner tube has a surgical tool with cutting edges at its distal end and is rotated within the outer tube by a motor (Grinberg Figs. 1-3; 2:66-3:8, 3:30-32), (2) a window at the distal region of the outer tube that exposes the cutting edges of the inner tube to the bone to be cut (Grinberg 5:5-12); (3) suctioning of cut bone through the hollow interior of the inner tube of the cutter (Grinberg 3:9-19, 3:61-4:5), (4) the insertion of the cutter into a handpiece prior to cutting (Grinberg Fig. 6; 3:26-45, 5:13-20); and (5) the infusion of irrigation fluid from a channel separate from the working instrument or the viewing or illuminating instrument (Grinberg Fig. 6; 5:20-35).

595.     It would be obvious to one of ordinary skill in the art to combine the teachings of Grossi and Grinberg to perform the method of the '359 patent for a number of reasons.  Both

devices are used in the general field of performing surgery in small spaces by inserting an surgical device with an elongated portion into the small space to perform the surgery.  It would be obvious to one of ordinary skill in the art to combine the separate fluid delivery and optical systems of Grinberg based on the disclosure of the Grossi device and the desire in the art to make the system more compact and with fewer separate parts, and the need to make fewer wounds in the patient to introduce the irrigation fluid, the optical viewing instrument, and the cutter to the surgical site.  Moreover, it would be obvious to one of ordinary skill in the art to permanently affix the telescope element to the device in Grossi, again to minimize the number of separate parts of the system.

596.    Accordingly, it is my opinion that Grossi in combination with Grinberg renders the Asserted Claims obvious.

### 17.    The Combination of Grinberg and the Olympus Scope Renders Claims 1-8 of the '359 Patent Obvious

597.    It is my opinion that the combination of Grinberg and the Olympus Scope render the Asserted Claims of the '359 patent obvious.

598.    The Grinberg patent discloses, among other things, (1) a cutter comprised of an inner tube within an outer tube, where the inner tube has a surgical tool with cutting edges at its distal end and is rotated within the outer tube by a motor (Grinberg Figs. 1-3; 2:66-3:8, 3:30-32), (2) a window at the distal region of the outer tube that exposes the cutting edges of the inner tube to the bone to be cut (Grinberg 5:5-12); (3) suctioning of cut bone through the hollow interior of the inner tube of the cutter (Grinberg 3:9-19, 3:61-4:5), (4) the insertion of the cutter into a handpiece prior to cutting (Grinberg Fig. 6; 3:26-45, 5:13-20); and (5) the infusion of irrigation

fluid from a channel separate from the working instrument or the viewing or illuminating instrument (Grinberg Fig. 6; 5:20-35).

599.    The Olympus Scope discloses that the light guide and mechanism for viewing the surgical site (such as a telescope) can be permanently affixed to the scope and sealed from the channel delivering the irrigation fluid to the uterus.  The Olympus Scope further discloses that a cutting element can be inserted and removed from the device in a channel separate from the one in which the light guide and the viewing mechanism are located.

600.    It would be obvious to one of ordinary skill in the art to combine the teachings of Grinberg and the Olympus Scope to perform the method of the '359 patent for a number of reasons.  Both devices are used in the general field of performing surgery in small spaces by inserting an surgical device with an elongated portion into the small space to perform the surgery.  It would be obvious to one of ordinary skill in the art to combine the separate fluid delivery and optical systems of Grinberg into a single device based on the disclosure of the Olympus Scope and the desire in the art to make the system more compact and with fewer separate parts, and the need to make fewer wounds in the patient to introduce the irrigation fluid, the optical viewing instrument, and the cutter to the surgical site.

601.    Accordingly, it is my opinion that Grossi in combination with Grinberg renders the Asserted Claims obvious.

### 18.    The Combination of Kresch and Grinberg Scope Renders Claims 1-8 of the '359 Patent Obvious

602.    It is my opinion that the combination of Kresch and Grinberg render the Asserted Claims of the '359 patent obvious.

603.    The Kresch patent discloses, among other elements, (1) removal of tissue from a

uterus (Kresch Figs. 3A-C, 4; 6:3-10); (2) a sheath with channels for a cutter and an optical fiber

for illuminating or viewing the surgical site (Kresch Fig. 8; 7:7-17); (3) delivery of irrigation

fluid to the site of surgery through an irrigation lumen 62 (Kresch Fig. 1A, 5:39-47); (4) a motor-

driven cutter within the outer sheath, with a cutting window in the outer sheath, where cutting

occurs when tissue is exposed to the cutter through the cutting window and the cutter rotates

(Kresch Figs. 1A, 1B, 2A, 2B, 5; 5:26-30, 6:11-25), (5) insertion and removal of the cutter (*see,*

*e.g.,* Kresch 1B, 2A, 3B, 5, 6, 8; 2:32-35, 6:3-10, 6:32-37, 7:7-17) and (6) aspiration of cut tissue

and fluid through the lumen of the cutter (Kresch Figs. 2A, 5; 5:48-57, 6:26-31).

604.    The Grinberg patent discloses, among other things, (1) a cutter comprised of an

inner tube within an outer tube, where the inner tube has a surgical tool with cutting edges at its

distal end and is rotated within the outer tube by a motor (Grinberg Figs. 1-3; 2:66-3:8, 3:30-32),

(2) a window at the distal region of the outer tube that exposes the cutting edges of the inner tube

to the bone to be cut (Grinberg 5:5-12); (3) suctioning of cut bone through the hollow interior of

the inner tube of the cutter (Grinberg 3:9-19, 3:61-4:5), (4) the insertion of the cutter into a

handpiece prior to cutting (Grinberg Fig. 6; 3:26-45, 5:13-20); and (5) the infusion of irrigation

fluid from a channel separate from the working instrument or the viewing or illuminating

instrument (Grinberg Fig. 6; 5:20-35).

605.    It would be obvious to one of ordinary skill in the art to combine the teachings of

Kresch and Grinberg to perform the method of the '359 patent for a number of reasons.  Both

devices are used in the general field of performing surgery in small spaces by inserting an

surgical device with an elongated portion into the small space to perform the surgery.  Both also

share a number of similar features, including aspirating cut tissue or bone through the interior

lumen of the cutter, insertion and removal of the cutter, a motor-driven cutter, and exposure of

the bone or tissue to be cut through a cutting window.  Kresch suggests the combination of the

optical viewing element and the fluid delivery system in a single device.   One of ordinary skill

in the art would be motivated to combine the separate fluid delivery and optical systems of

Grinberg into a single device based on the disclosure of Kresch and the desire in the art to make

the system more compact and with fewer separate parts, and the need to make fewer wounds in

the patient to introduce the irrigation fluid, the optical viewing instrument, and the cutter to the

surgical site.  Moreover, one would be motivated to use this combined device in the uterus based

on the disclosure of Kresch.

606.    Accordingly, it is my opinion that Kresch in combination with Grinberg renders

the Asserted Claims obvious.

### 19.    The Combination of Savage and Grinberg Scope Renders Claims 1-8 of the '359 Patent Obvious

607.    It is my opinion that the combination of Savage and Grinberg render the Asserted

Claims of the '359 patent obvious.

608.    The Savage patent discloses, among other things, (1) the use of a surgical cutting

device in the uterus (*See e.g.*, Savage 1:23-25; 29:30 (claiming "[a] method for resecting tissue

from the uterus"); 32:4, 32:25 (claiming "[a] method for extracting tissue from a uterus")); (2)

use of a valve to introduce irrigation fluid into the surgery site (Savage 20:45-46); (3) a sheath

with channels for a rotating cutter and a fiber for illuminating and viewing the surgery site

(Savage Figs. 1A, 1B, 8; 11:62-64, ); a channel for infusing irrigation fluid into the surgery site

(Savage Fig. 1A; 11:65-12:6, 13:33-43); (4) a motor-driven cutter within the outer sheath, with a

cutting window in the outer sheath, where cutting occurs when tissue is exposed to the cutter

through the cutting window and the cutter rotates (Savage Figs. 1A, 1B, 2A, 2B, 5; 11:37-40, 13:33-51), (5) insertion and removal of the cutter (*see, e.g.,* Savage 1B, 2A, 3B, 5, 6, 8; 4:1-4, 12:30-45, 13:16-27) and (6) aspiration of cut tissue and fluid through the lumen of the cutter (Savage Figs. 2A, 5; 2:47-52, 5:10-16, 12:53-58).

609.    The Grinberg patent discloses, among other things, (1) a cutter comprised of an inner tube within an outer tube, where the inner tube has a surgical tool with cutting edges at its distal end and is rotated within the outer tube by a motor (Grinberg Figs. 1-3; 2:66-3:8, 3:30-32), (2) a window at the distal region of the outer tube that exposes the cutting edges of the inner tube to the bone to be cut (Grinberg 5:5-12); (3) suctioning of cut bone through the hollow interior of the inner tube of the cutter (Grinberg 3:9-19, 3:61-4:5), (4) the insertion of the cutter into a handpiece prior to cutting (Grinberg Fig. 6; 3:26-45, 5:13-20); and (5) the infusion of irrigation fluid from a channel separate from the working instrument or the viewing or illuminating instrument (Grinberg Fig. 6; 5:20-35).

610.    It would be obvious to one of ordinary skill in the art to combine the teachings of Savage and Grinberg to perform the method of the '359 patent for a number of reasons.  Both devices are used in the general field of performing surgery in small spaces by inserting an surgical device with an elongated portion into the small space to perform the surgery.  Both also share a number of similar features, including aspirating cut tissue or bone through the interior lumen of the cutter, insertion and removal of the cutter, a motor-driven cutter, and exposure of the bone or tissue to be cut through a cutting window.  Savage suggests the combination of the optical viewing element and the fluid delivery system in a single device.   One of ordinary skill in the art would be motivated to combine the separate fluid delivery and optical systems of Grinberg into a single device based on the disclosure of Savage and the desire in the art to make

the system more compact and with fewer separate parts, and the need to make fewer wounds in the patient to introduce the irrigation fluid, the optical viewing instrument, and the cutter to the surgical site. Moreover, one would be motivated to use this combined device in the uterus based on the disclosure of Savage.

611.     Accordingly, it is my opinion that Savage in combination with Grinberg renders the Asserted Claims obvious.

### 20.     The Combination of Alden and Iglesias Renders Claims 1-8 of the '359 Patent Obvious

612.     It is my opinion that the combination of Alden and Iglesias render the Asserted Claims of the '359 patent obvious.

613.     The disclosure in Alden includes (1) removal of tissue from a uterus (Alden Fig. 3; 6:12-20); (2) insertion of the distal end of the Alden device into the uterus (Alden Fig. 3; 6:12-20); (3) a valve for controlling irrigation fluid into the surgical site (5:24-25); (4) channels for the flow of irrigation fluid to the surgical site and viewing the surgery with a fiber optic scope (Alden Figs. 1-3; 4:41-61, 55:5-12, 6:12-20); and (5) the insertion of a motor-driven cutter with inner and outer tubes and a cutting window admits tissue to be cut into the outer and inner tubes, and that is cut when the inner tube rotates with respect to the outer tube, with a lumen in the center of the inner tube through which cut tissue and fluid is aspirated from the surgical site (Alden Figs. 4, 5; 3:1-17, 5:26-33, 5:41-49, 6:66-7:33).

614.     The Iglesias patent discloses, among other things, (1) a resectoscope with an elongated shaft inserted into the surgical site, that is, the distal end of the resectoscope is inserted into the patient to perform surgery (Iglesias Fig. 1; 1:43-51), (2) a permanently affixed light guide in the elongated shaft for viewing the surgical site, as it includes a permanently affixed

telescope tube with a lens at its distal end and an eyepiece at the proximal end (Iglesias Figs. 1-3; 1:45-52, and (3) a channel for delivering irrigation fluid to the surgical site that is sealed from the channel containing the telescope (Iglesias Figs. 2, 3; 2:45-57).

615.     It would be obvious to one of ordinary skill in the art to combine the teachings of Alden and Iglesias.  Both devices are used in the general field of performing surgery in small spaces by inserting an surgical device with an elongated portion into the small space to perform the surgery.  Iglesias suggests the permanent securing of the viewing scope to the Alden device, and one of ordinary skill in the art might be motivated to permanently secure the scope or a light guide to the Alden device to minimize the number of separate parts that would need to be carried with the scope, and to avoid possible damage to the light guide and viewing scope from repeated insertions and removals.  Similarly, Iglesias suggests sealing the irrigation fluid delivery channel from the channel containing the optical viewing members in the Alden device, and one of ordinary skill in the art would be motivated to seal the irrigation fluid from the viewing scope and light guide to avoid corrosion of the viewing scope and light guide and to generally extend the life of the viewing scope and light guide.

616.     Accordingly, it is my opinion that Alden in combination with Iglesias renders the Asserted Claims obvious.

### 21.     The Combination of Kresch '689 and Bonnell Renders Claims 1-8 of the '359 Patent Obvious

617.     It is my opinion that the combination of Kresch '689 and Bonnell render the Asserted Claims of the '359 patent obvious.

618.     The Kresch '689 patent discloses, among other elements, (1) removal of tissue from a uterus (Kresch '689 Figs. 3A-C, 4; 6:3-10); (2) a sheath with channels for a cutter and an

optical fiber for illuminating or viewing the surgical site (Kresch '689 Fig. 8; 7:7-17); (3)

delivery of irrigation fluid to the site of surgery through an irrigation lumen 62 (Kresch '689 Fig.

1A, 5:39-47); (4) a motor-driven cutter within the outer sheath, with a cutting window in the

outer sheath, where cutting occurs when tissue is exposed to the cutter through the cutting

window and the cutter rotates (Kresch '689 Figs. 1A, 1B, 2A, 2B, 5; 5:26-30, 6:11-25), (5)

insertion and removal of the cutter (*see, e.g.,* Kresch '689 1B, 2A, 3B, 5, 6, 8; 2:32-35, 6:3-10,

6:32-37, 7:7-17) and (6) aspiration of cut tissue and fluid through the lumen of the cutter (Kresch

'689 Figs. 2A, 5; 5:48-57, 6:26-31).

619.    The Bonnell patent discloses (1) removal of tissue from a joint, such as a knee; (2)

use of a valve to control delivery of irrigation fluid to the surgery site; (3) an outer tube with an

inner tube inside, whose distal region is inserted into the surgery site; (4) an inner tube with a

cutting element at its end, which is exposed to tissue to be cut through a window in the outer

tube; (5) cutting of tissue by activating a motor, which turns the inner tube with the cutting

element at its distal end, which is exposed to tissue; and (6) removal of cut tissue and fluid

through a channel in the interior of the inner tube.  (*See* Bonnell Figs. 3-9; 3:31-5:14.)

620.    It would be obvious to one of ordinary skill in the art to combine the teachings of

Kresch '689 and Bonnell.  Both devices are used in the general field of performing surgery in

small spaces by inserting an surgical device with an elongated portion into the small space to

perform the surgery.  Kresch '689 discloses the use of an endoscopic surgery device in a uterus.

Kresch '689 also teaches the inclusion of the viewing and illumination elements and the

irrigation channels within a single elongated member.  Bonnell discloses the use of a valve to

control the flow of irrigation fluid into the surgical site.  Bonnell also teaches the use of a cutting

window and an inner tube that cuts tissue exposed through the window to the inner tube's cutting

portion and the aspiration of the cut tissue through the inner cutting tube.  Moreover, it would be obvious to one of ordinary skill in the art to permanently affix the optical elements in the Kresch '689 device, to minimize the number of additional parts and the number of incisions that have to be made to the patient from the number made for the Bonnell device.

621.    Accordingly, it is my opinion that Kresch '689 in combination with Bonnell renders the Asserted Claims obvious.

### 22.    The Combination of Bonnell and the Olympus Scope Renders Claims 1-8 of the '359 Patent Obvious

622.    It is my opinion that the combination of Bonnell and the Olympus Scope render the Asserted Claims of the '359 patent obvious.

623.    The Bonnell patent discloses (1) removal of tissue from a joint, such as a knee; (2) use of a valve to control delivery of irrigation fluid to the surgery site; (3) an outer tube with an inner tube inside, whose distal region is inserted into the surgery site; (4) an inner tube with a cutting element at its end, which is exposed to tissue to be cut through a window in the outer tube; (5) cutting of tissue by activating a motor, which turns the inner tube with the cutting element at its distal end, which is exposed to tissue; and (6) removal of cut tissue and fluid through a channel in the interior of the inner tube.  (*See* Bonnell Figs. 3-9; 3:31-5:14.)

624.    The Olympus Scope discloses that the light guide and mechanism for viewing the surgical site (such as a telescope) can be permanently affixed to the scope and sealed from the channel delivering the irrigation fluid to the uterus.  The Olympus Scope further discloses that a cutting element can be inserted and removed from the device in a channel separate from the one in which the light guide and the viewing mechanism are located.

625.     It would be obvious to one of ordinary skill in the art to combine the teachings of Bonnell and the Olympus Scope.  Both devices are used in the general field of performing surgery in small spaces by inserting an surgical device with an elongated portion into the small space to perform the surgery.  The Olympus Scope teaches the inclusion of the viewing and illumination elements and the irrigation channels fixed to a single elongated member, with the irrigation channels sealed from the optical elements.  Moreover, it would be obvious to one of ordinary skill in the art to permanently affix the optical elements in the Bonnell device, to minimize the number of additional parts and the number of incisions that have to be made to the patient from the number made for the Bonnell device.  Bonnell and the Olympus Scope both teach the use of a valve to control the flow of irrigation fluid into the surgical site.  Bonnell also teaches the use of a cutting window and an inner tube that cuts tissue exposed through the window to the inner tube's cutting portion and the aspiration of the cut tissue through the inner cutting tube.  It would be obvious to insert a device like Bonnell's cutter into the Olympus Scope.

626.     Accordingly, it is my opinion that Bonnell in combination with the Olympus Scope renders the Asserted Claims obvious.

### D.     Additional Obviousness Combinations

627.     In addition to the combinations of two references that make the '359 patent obvious described previously, it would be obvious to one of ordinary skill in the art to combine a number of the patents described in the two-patent combinations above that would also make the '359 patent obvious.  It would be obvious to combine the patents described above as anticipating references, as they are all in the same art (surgery in small body cavities or spaces).  It would also be obvious to combine any of the anticipating references (or combinations of anticipating

references) with the Olympus Scope, as the Olympus Scope allows the insertion of surgical

cutting devices similar to those of the anticipating references and also includes viewing and

illumination elements.  It would also be obvious to combine the anticipating references and the

Olympus Scope with Grossi, Grinberg, and Alden, as Grossi, Grinberg, and Alden all relate to

the same art (surgery in small body cavities or spaces) and are simply variations of the same

concept -- insertion of a motor-driven cutter into a surgery site, irrigating the site, activating the

cutter, and aspirating the cut tissue and irrigation fluid.

### IX.    OPINIONS REGARDING LACK OF WRITTEN DESCRIPTION AND/OR ENABLEMENT OF A METHOD OF REMOVING UTERINE TISSUE USING A DEVICE WITHOUT THE "FURTHER OUTLET CHANNEL"

628.    I understand that a patent may be invalid if the disclosure of the patent itself is

insufficient in certain respects.  In that regard, I understand that the specification must contain a

written description of the invention, and of the manner and process of making and using it, in

such full, clear, concise, and exact terms as to enable any person skilled in the art to which it

pertains, or with which it is most nearly connected, to make and use the same, and shall set forth

the best mode contemplated by the inventor of carrying out his invention.

629.    If S&N's interpretations of the claims is accepted, then it is my opinion that the

claims would be invalid for lack of written description and/or enablement of the claims' full

scope.

### A.    Lack Of Written Description Of The Method Using A Device Without A "Further Outlet Channel"

630.    I understand that the patent's specification must reasonably convey to those

skilled in the art that the inventor had possession of the claimed subject matter as of the filing

date.  I understand that this requires an objective inquiry into the four corners of the specification

from the perspective of a person of ordinary skill in the art.  Based on that inquiry, the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed.  For generic claims, I understand that several factors should be considered, including (1) the existing knowledge in the particular field, (2) the extent and content of the prior art, (3) the maturity of the science or technology, and (4) the predictability of the aspect at issue.  I have considered these factors in my analysis below.

631.   I understand that the '359 patent specification states that it is necessary to "blow up" certain body cavities, such as the uterus, before inserting a cutter into the body cavity and removing tissue.  ('359 patent 2:7-10.)  I understand that the patent states that the amount of enlargement of such body cavities, including the uterus, must be accurately controlled.  ('359 patent 2:10-12.)  I further understand that the '359 patent specification states that a device which discharges irrigation fluid and detached tissue through the same channel of a cutting device, such as the hollow stem of a cutter, is "not very suitable for use in the treatment of such cavit[ies]" such as the uterus because the irregular discharge of fluid from such a cavity, caused in part by the irregular release of detached tissue, would prevent the device from guaranteeing that the pressure inside the cavity is accurately controlled.  ('359 patent 2:13-19.)

632.   I understand from the '359 patent specification that the object of the '359 patent's invention was to provide a device that could perform treatments in such small body cavities, and that "according to the invention," a "further outlet channel" is provided in the invention through which there is a "regular discharge of fluid," and only a "minor part" of the irrigation fluid delivered to the surgical site is removed through the same outlet as the detached tissue.  ('359 patent 2:22-34.)  According to the '359 patent specification, by removing all but a minor part of the fluid through the "further outlet channel," and removing cut tissue fragments through a

different channel, the pressure inside the body cavity (such as the uterus) "can be regulated and controlled accurately." ('359 patent 2:28-31.)

633.    It is my opinion that the '359 patent lacks the written description of the claimed invention as required under patent law.  Asserted claims 1-4 cover a method that includes "aspirating cut tissue and fluid from the uterus and the endoscope through the cutter" ('359 patent 5:41-42) and asserted claims 5-8 cover a method that includes "aspirating fluid with detached tissue from the uterus through a lumen of the cutter" ('359 patent 5:41-42).

634.    I understand that S&N asserts that the asserted claims are broad enough to cover a method involving a device that does not have a "further outlet channel" through which substantially only fluid is discharged from the site of the surgery in the uterus.  If this is true, then it is my opinion that there would be no written descriptions of the methods claimed in the '359 patent.

635.    The specification of the '359 patent provides that a device with no "further outlet channel" does not allow the pressure inside the uterus to be "regulated and controlled accurately."  In fact, the '359 patent provides that such a device — one in which fluid is discharged together with cut tissue only through the hollow stent of the cutter — is "not very suitable" for use in side the uterus.  ('359 patent at col. 2:4-18.)  The Summary of the Invention provides that the "further outlet channel" is what "makes it possible" for the device described to be used in a method for removing tissue in the uterus.  (*Id.*)

636.    Accordingly, a person of ordinary skill in the art would not believe that the inventor possessed the concept of his method using a device that lacked the "further outlet channel."  By noting that the further outlet channel "makes it possible" to perform the method

-168-

described in the '359 patent, one of ordinary skill in the art would believe that the inventor felt it impossible to do the described method without the further outlet channel.

637.     Therefore, it is my opinion that one of ordinary skill in the art would conclude that the method of the claims of the '359 patent is not described in the specification of the '359 patent if those claims are construed as covering a method using a device without the "further outlet channel" described in the specification.

### B.     Lack Of Enablement The Method Using A Device Without A "Further Outlet Channel"

638.     I understand that a patent may be invalid if the disclosure of the patent itself is insufficient in certain respects.  In that regard, I understand that the specification must contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

639.     I understand that this requirement means that a patent's specification must enable one of skill in the art to make and/or use the full scope of the claims without undue experimentation.  I understand that it is not sufficient if the patent enables one aspect or embodiment of the claims but not others.  I further understand in considering enablement, the following factors may be relevant:  (a) the breadth of the claims; (b) the nature of the invention; (c) the state of the prior art; (d) the level of one of ordinary skill; (e) the level of predictability in the art; (f) the amount of direction provided by the inventor; (g) the existence of working examples; and (h) the quantity of experimentation needed to make or use the invention based on the content of the disclosure.  I have considered these factors in my analysis below.

640.     *The breadth of the claims.*  I understand that S&N contends the claims are very broad.  In particular, S&N contends that the claims to not require the "further outlet channel" in the specification.  This drastically broadens the claims, as the "further outlet channel" is expressly described in the '359 patent as being the piece that "makes it possible" to use the method described in the uterus.

641.     *The nature of the invention.*  Although I understand that S&N has not yet provided an expert report regarding non-obviousness, I understand that S&N asserts in this case that the nature of the invention is that is pioneering.  I understand S&N asserts that the invention is not obvious, despite the many pieces of prior art that S&N acknowledges disclose many of the elements of the claims.  If S&N's views about the nature of the invention are accepted, this would require more teaching in the '359 patent in order to enable the invention, because, according to S&N, persons of ordinary skill in the art would not have know how to make and/or use the elements of the claims, even as of S&N's asserted 1997 priority date.

642.     *The state of the prior art*.  I understand that S&N contends that none of the prior art cited by Hologic in this case describes all the elements of the claims, nor would combinations of that art that would disclose all the elements be obvious to persons of ordinary skill in the art.  Thus, the start of the prior art according to S&N is not very instructive with respect to methods like those claimed in the '359 patent.  This would require more teaching in the '359 patent in order to enable the full scope of the claims.

643.     *The level of one of ordinary skill.*  S&N asserts that one of ordinary skill in the art is "a medical doctor who has completed a residency program in gynecology and who has one or more years of experience performing gynecological surgery, including but not limited to removing tissue, such as fibroids or polyps, from the uterus."  A medical doctor with merely one

year of experience removing tissue such a fibroids is on the lower end of the experience level to which I believe the '359 patent is directed.  However, if S&N's view regarding the person of ordinary skill in the art is accepted, then the '359 patent would need a greater level of teaching in order to enable those people, as of S&N's 1997 priority date, to make and use the claimed invention in the '359 patent.

644.  *The level of predictability in the art.*  I understand that S&N asserts that none of the combinations of prior art identified by Hologic would give predictable results and, at least in part on that basis, asserts that the claims of the '359 patent are not obvious.  If this view is accepted, then the '359 patent would need more teaching in order to enable a person of ordinary skill in the art to make and use the invention in the claims.

645.  *The amount of direction provided by the inventor.*  The inventor provides no direction on how to make and use a device without a further outlet channel to use in the claimed method.  In fact, the inventor says that such a device was "not very suitable" for removing uterine tissue and that the further outlet channel "makes it possible" to remove such tissue with an electric-motor driven cutter.  In addition, I understand that S&N asserts that the disclosures in the prior art are not sufficient to teach someone how to make and use the invention in the claims.  As the disclosure in the '359 patent is even less instructive than the disclosures in the prior art about use of an electric-motor driven cutter in the claimed method, if the prior art lack sufficient disclosure as S&N asserts, then so too would the '359 patent.

646.  *The existence of working examples.*  S&N contends there were no working examples of the claimed method before the asserted 1997 priority date set forth by S&N.  If this view is accepted, then the '359 patent would need more teaching in order to enable a person of ordinary skill in the art to make and use the invention in the claims.

647.    *The quantity of experimentation needed to make or use the invention based on the content of the disclosure.* I understand that S&N asserts that it would not have been obvious to combine the cited prior art because of unpredictable results and the need for undue experimentation to practice method claimed in the '359 patent. If this view is accepted, then the '359 patent would need more teaching in order to enable a person of ordinary skill in the art to make and use the invention in the claims.

I declare under penalty of perjury under the Laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Henry Dominicis

Executed this 23d day of March, 2012.

# APPENDIX A



**WOMANCARE**

# <u>CURRICULUM VITAE</u>

| | |
|---|---|
| Name: | Henry A. Dominicis, M.D. |
| Primary Office: | 1051 West Rand Road<br>Arlington Heights, IL 60004<br>(847) 221-4900 |
| Second Office: | 455 South Roselle Road<br>Schaumburg, IL  60193<br>(847) 221-4300 |
| Work History: | 1991 to Present |

| | | | |
|---|---|---|---|
| Educational Background: | (College) | St. John's University<br>Collegeville, MN | 1979-1983 |
| | (Medical School) | University of Illinois<br>Chicago, IL | 1983-1987 |
| | (Intern) | Lutheran General Hospital | 1987-1988 |
| | (Residency) | Lutheran General Hospital<br>Park Ridge, IL | 1988-1991 |

| | | |
|---|---|---|
| Hospital Appointments: | Lutheran General Hospital – Park Ridge, IL –<br>Attending Physician | 1991-2006 |
| | Northwest Community Hospital –<br>Arlington Heights, IL | 1996 to Present |
| | Northwest Community Hospital –<br>Arlington Heights, IL<br>Chairman – Department of<br>Obstetrics and Gynecology | 2006 to 2010 |

| | |
|---|---|
| Work Background: | High Risk Pregnancy, Laparoscopic Surgery, including<br>Advanced Gyne Surgery, Laser Surgery, Gynecology and<br>Obstetrics and Ultrasound and Genetic Amniocentesis |
| Board Status: | Board Certified – November of 1995 to Present<br>American Board of Obstetricians and Gynecologists |

| | |
|---|---|
| **Henry A. Dominicis, M.D.** | **Date** |

*HAD:  January of 2011*

# APPENDIX B

### **Dr. Henry A. Domincis Documents Considered In Forming Opinions**

- U.S. Patent No. 4,700,694 ("Shishido")

- U.S. Patent No. 5,133,713 ("Huang")

- U.S. Patent No. 5,275,609 ("Pingleton")

- U.S. Patent No. 5,709,698 ("Adams")

- U.S. Patent No. 4,756,309 ("Sachse")

- U.S. Patent No. 4,924,851 ("Ognier")

- U.S. Patent No. 5,195,541 ("Obenchain")

- U.S. Patent No. 5,569,284 ("Young")

- U.S. Patent No. 5,492,537 ("Vancaillie")

- U.S. Patent No. 5,498,258 ("Hakky")

- U.S. Patent No. 5,549,541 ("Muller")

- U.S. Patent No. 5,569,254 ("Carlson")

- U.S. Patent No. 5,730,752 ("Alden")

- U.S. Patent No. 5,456,689 "("Kresch")

- U.S. Patent No. 5,527,331 ("Kresch '331")

- U.S. Patent No. 5,759,185 ("Grinberg")

- U.S. Patent No. 5,320,091 ("Grossi")

- U.S. Patent No. 3,945,375 ("Banko")

- U.S. Patent No. 3,850,162 ("Iglesias")

- U.S. Patent No. 6,032,673 ("Savage")

- U.S. Patent No. 6,156,049 ("Lovato")

- U.S. Patent No. 6,113,594 ("Savage '594")

- U.S. Patent No. 6,086,542 ("Glowa")

- U.S. Patent No. 5,913,867 ("Dion")

- U.S. Patent No. 5,814,009 ("Wheatman")

- U.S. Patent No. 6,626,827 ("Felix")

- U.S. Patent No. 6,159,209 ("Hakky '209")

- U.S. Patent No. 4,369,768 ("Vukovic")

- U.S. Patent No. 4,950,278 ("Sachse '278")

-  U.S. Patent No. 4,955,882 ("Hakky '882")

- U.S. Patent No. 5,392,765 ("Muller")

- U.S. Patent No. 5,449,356 ("Walbrink")

- WO 95/10982 ("Correa")

- WO 03/022164 ("Todd")

- DE 3615694 ("Korth")

- WO 00/28890 ("Hsei")

- Baggish *et al.*, "Instrumentation of Hysteroscopy," in "Diagnostic and Operative Hysterectomy," Mosby (1999).

- Baggish *et al.*, "Accessory Instruments for Operative Hysteroscopy," in "Diagnostic and Operative Hysterectomy," Mosby (1999).

- Baggish *et al.*, "Hysteroscopic Sterilization," in "Diagnostic and Operative Hysterectomy," Mosby (1999).

- Neis *et al.*, "Hysteroscopy: Textbook and Atlas" 91-103, Thieme Medical Publishers (1994).

- Sugimoto *et al.*, "A Color Atlas of Hysteroscopy" 6-7, Springer (1999).

- Gregory Bacsko, *Uterine Surgery by Operative Hysteroscopy*, 71 European Journal of Obstetrics & Gynecology and Reproductive Biology, 219-222 (1997).

- S. Gerber *et al.*, *The Endoscapel: A New Endoscopic Instrument for Supracervical Hysterectomy and Morcellation of Masses; Clinical Evaluation*, 86: Suppl. 1, European Journal of Obstetrics & Gynecology and Reproductive Biology, S9-S31 (1999).

- Ludovic Cravello *et al.*, *Hysteroscopic Resection of Fibroids: Results with a 6-Year Follow-up Period*, 15: 1, Journal of Gynecologic Surgery, 1-5 (1999).

- Michael R. Drews *et al.*, *Surgical Approach to Myomas: Laparoscopy and Hysteroscopy*, 10: 4, Seminars In Reproductive Endocrinology, 367-77 (1992).

- Daniel A. Dumesic *et al.*, *A New Approach to Hysteroscopic Cannulation of the Fallopian Tube*, 7 Journal of Gynecologic Surgery, 7-9 (1991).

- Mario Franchini *et al.*, *Endometrial Resection: A Diagnostic Tool in Postmenopausal Women*, 8 Gynecological Endoscopy, 111-14 (1999).

- Bao-Liang Lin *et al.*, *Clinical Applications of a New Fujinon Operating Fiberoptic Hysteroscope*, 6 Journal of Gynecologic Surgery, 81-87 (1990).

- L. Mettler *et al.*, *Pelviscopic Uterine Surgery* 6 Surgical Endoscopy, 23-31 (1992).

- M. Nisolle *et al.*, *Endometrial Ablation with the Nd-VAG Laser in Dysfunctional Bleeding* 1 Minimally Invasive therapy, 35-39 (1991).

- Ki Hyun Park *et al.*, *Endoscopic Management of Uterine Myoma* 40: 6 Yonsei Medical Journal, 583-88 (1999).

- Shirish S. Sheath *et al.*, *Fiberoptic Light for Oophorectomy at Vaginal Hysterectomy* 14 Journal of Gynecologic Surgery, 119-22 (1998).

- Rafael F. Valle, *Hysteroscopic Removal of Submucous Leiomyomas* 6:2 Journal of Gynecologic Surgery, 89-96 (1990).

- K. M. Williamson *et al.*, *Editorial 1: Complications of Hysteroscopic treatments of Menorrhagia*, 77:3 British Journal of Anesthesia, 305-08 (1996).

- Mark H. Emanuel *et al.*, *Long-term Results of Hysteroscopic Myomectomy for Abnormal Uterine Bleeding*, 93:5 Obstet Gynecology, 743-48 (1999).

- *Weck, a Squibb Company: Direct Path to Diagnostic and Operative Control*, Advertisement, Journal of Gynecologic Surgery, vol. 7 (1991).

- *Gynescope: Laser Fiber Director*, Advertisement, Journal of Gynecologic Surgery, vol. 6 (1990).

- *Karl Storz*, Advertisement, Journal of Gynecologic Surgery, vol. 5 (1989).

- *Karl Storz Uterine Resectoscopes for Endometrial Ablation and Resection*, Advertisement, Journal of Gynecologic Surgery, vol. 6 (1990).

- Commercially available Olympus scope used by Mark H. Emanuel ("Olympus Scope").

- Smith & Nephew S&N morcellator system ("S&N morcellator system").

- Cutter used by Mark H. Emanuel with the Olympus Scope (See Emanuel Tr. 41:24-42:9) ("Emanuel Cutter").

- Cutters by Dionics, DuPuy, and Storz identified by Mark H. Emanuel (See Emanuel Tr. 14:10-20) ("Dionics, DuPuy, and Storz Cutters").

- Textbook of Biliopancreatic Diseases (W. Hess and G. Berci, eds., PICCIN 1997), *e.g.*, Fig. 6.5.1, 1584-86.

- Any other prior art references of record shown on the face of the '359 patent.